F466lasc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           12 CR 868(NRB)

5    LENA LASHER,

6                 Defendant.

7    ------------------------------x

8                                      New York, N.Y.
                                       April 6, 2015
9                                      4:00 p.m.

10

     Before:
11
                     HON. NAOMI REICE BUCHWALD,
12
                                       District Judge
13

14                      APPEARANCES
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   DANIEL C. RICHENTHAL
     KRISTY GREENBERG
17        Assistant United States Attorney

18   LOUIS M. FREEMAN
     NADJIA LIMANI
19        Attorneys for Defendant

20

21

22

23

24

25

F466lasc

1              (In open court; case called)

2              THE LAW CLERK:  United States v. Lena Lasher.

3              Is the government present and ready to proceed?

4              MR. RICHENTHAL:  Good afternoon, your Honor.  Daniel

5    Richenthal and Kristy Greenberg for the government.

6              THE DEPUTY CLERK:  Is defense counsel present and

7    ready to proceed?

8              MR. FREEMAN:  Yes.  Good afternoon, your Honor. Louis

9    Freeman for my client Lena Lasher.  I am waiving her appearance

10   for this hearing this afternoon, which is primarily about

11   scheduling.  There is a possibility she will call and if so

12   we'll deal with it at that time.

13             THE COURT:  Okay.  Before we get to the specific

14   reasons for this conference, I want to remind the parties of

15   something.  That is not that the trial in this action was set

16   on September 15th, 2013.  As I reminded you when you asked to

17   adjourn motions two days before they were due, that was not

18   only the 11th hour but the Court had set the schedule for the

19   benefit of the parties.  The U.S. Attorney's Office should know

20   that your performance in this case will make this Court

21   reluctant to ever grant an adjournment related to any trial

22   after I have set the date with as much consideration as I did.

23   This is not right.  It may not require an adjournment of the

24   trial date, but there is no excuse when you are on notice.  You

25   will not receive personal consideration because you have shown

F466lasc

1    none.  The consequences will be beyond whatever happens today.

2    It is nothing to do with the merits of the case.  It has to do

3    with the fact that this Court is one of the most considerate of

4    all in this courthouse and all that happens is that I get

5    abused.  You wouldn't dare pull this on some of my colleagues

6    and you know it.  I regret having granted you any of these

7    extensions.  Had I not granted you the extension on the motion,

8    all of this would have been resolved a long time ago.  So I

9    don't know the consequences yet, but there may be no

10   adjournment.  There is a matter of personal privilege here and

11   you should be aware of how you have treated the Court.

12           So I need to get a handle on the differences between

13   the original and the superseding indictments in this case.  So

14   I notice that Counts One and Two, the narcotics distribution

15   and conspiracy charges, are dropped despite the Court's opinion

16   denying the motion to dismiss them.  So what role do those

17   narcotics charges or the facts underlying them play in the new

18   indictment?

19           MR. RICHENTHAL:  The facts underlying them are -- let

20   me answer the question.  I think our view is that the

21   underlying facts here, that is the dispensing of drugs pursuant

22   to what in our judgment were invalid prescriptions, have not

23   changed since the day Ms. Lasher was arrested.  The legal

24   theories apply to those facts originally included both

25   narcotics distribution, because a subset of those prescription

F466lasc

drugs were controlled, and misbranding as fraud with respect to
all drugs, many of which were not controlled.  The piece of
that that is narcotics distributions, meaning the Controlled
Substances Act, is not in the superseding indictment.  The
factual gravamen of what happened, that drugs were dispensed
and mailed all over country pursuant to what we submit were not
valid prescriptions has not change.  It is just the fact that
one of those drugs is controlled is now no longer of legal
importance.  It may be of importance for other reasons that I
cannot speak to, but it is no longer of legal importance.  It
is now one of several prescription drugs that were dispensed.

            THE COURT:  We needed to go through a motion to
dismiss for you then to drop the count?

            MR. RICHENTHAL:  The position we find ourselves in is
we're not happy with the position we're in and how everything
has been handled.  We take responsibility for that.  I take the
words of the Court very seriously and I am sure my office more
generally does about how this case, which has gone through
several hands but is no excuse, has been handled.  The count
which was litigated has been dropped.  It has been.  I can
certainly understand the Court's to put it mildly concern that
there was litigation on a count that has now been dropped.
It's more than valid to ask that question.

            THE COURT:  Well --

            MR. RICHENTHAL:  It is difficult for me to go beyond

F466lasc

1    that.  All I can say, your Honor, is that when this case --

2              THE COURT:  Did you decide that I was wrong?

3              MR. RICHENTHAL:  No, your Honor.  We did not decide

4    you were wrong, and this Court is not the only Court to take

5    that view.  As a general matter --

6              THE COURT:  I think I am right.  I am not hesitant

7    to--

8              MR. RICHENTHAL:  We also think you are right.  To the

9    extent we don't think it is necessarily relevant to the trial

10   anymore to the extent it came up, we would take the position

11   this was a controlled substance.

12             As cases at a trial, the assistants in charge of this

13   look at the facts even more closely, they look at the law even

14   more closely and they confer internally and then they come to a

15   determination about what the indictment should be presented for

16   a jury's consideration.  That happened here and that resulted

17   in the present indictment.  It not a reflection to believe that

18   your Honor was incorrect on the law.  We believe your Honor was

19   correct on the law.

20             THE COURT:  How does the dropping of the narcotics

21   charges change the guidelines applicable to this case if at

22   all?

23             MR. RICHENTHAL:  It is a different guideline.  It is

24   no longer 2D1.1, it is 2B1.1 with respect to the fraud counts.

25   If the question is did they go up or down, it is actually

F466lasc

 1    difficult to answer.  Because with respect to fraud counts, as

 2    your Honor knows it turns on loss or intended loss.  That is

 3    not particularly easy to discern when it comes to an offense

 4    that involves the dispensation of prescription drugs.  You have

 5    to some understanding of the value of the drugs that the people

 6    received, which they believed were of a certain amount and may

 7    be worth less or an alternative of Ms. Lasher's gain.  There is

 8    evidence that she got a bonus for her conduct.  I cannot stand

 9    here now and tell your Honor that it has gone up or down.

10         I suspect roughly the same, and the reason I say that

11    is Fioricet is Schedule III.  As your knows at the

12    Dr. Amberdino's sentencing, the guidelines for Schedule III

13    drugs are not particularly high.  They cap out so to speak.

14    Whereas the guidelines for fraud can go into the millions and

15    millions.  We know that there were millions of dollars' of

16    worth prescription drugs that were dispensed.  So my sense --

17    my point on it is that the guidelines haven't changed because

18    in fact the 2B1.1 calculation has always been higher than the

19    narcotics calculation.  We don't know for sure.

20         THE COURT:  So what is the distinction between the

21    misbranding counts in the original and the superseding

22    indictment?

23         MR. RICHENTHAL:  The -- I will start with conspiracy.

24    Which was originally Count Three and is now Count One.  So the

25    difference between the original conspiracy and the misbrand

F466lasc

count and the current conspiracy and misbrand count is twofold.
First and the most apparent difference is that a second object
has been added.  Misbranding essentially is in a sense that --
is a temporal one that in short the misbranding statutes
prohibit misbranding or adulteration, but this is misbranding,
had essentially three steps in the process.  So one is before
you put it into interstate commerce, one is after it is moved
in interstate commerce while being held for sale, and the third
is when you put it back in interstate commerce.  It is all
essentially the same crime just if different points in time.
That is the jurisdictional hook, the interstate commerce
aspect.  It may be occurring contemporaneously, it may have
already occurred or may occur in the future.

        In the original conspiracy charge, Ms. Lasher was
charged with misbranding at the moment it was going into
interstate commerce or in the language of the statute
introducing and delivering for induction into interstate
commerce misbranded drugs.  The new indictment adds as an
object, that is the second object, that misbranding occurred
before that moment, that is, while they were being held at the
pharmacy held for sale.  That is prior to dispensation.  So
that is the first difference.  It is adding an object that is
essentially different in time.

        The second difference is that both objects now cite
additional subsections of misbranding.  It is still the same

F466lasc

1    crime.  It is still misbranding.  Like many crimes there is

2    more than one way to misbrand and it now cites additional

3    subsections with respect to misbranding.  That is the

4    conspiracy count.  I should add some of the overt acts have

5    changed but that is not indicative of a legal change.  There is

6    only one defendant left.  All the overt acts are this defendant

7    alone.  Other over acts have been added to help put Ms. Lasher

8    on notice of other actions that we may intend to prove, unless

9    your Honor knows we don't have to actually prove any or all of

10   the specifically alleged overt acts.

11          With respect the misbranding itself, the substantive

12   offense, that was previously Count Four.  It is now Count Two.

13   The only difference is the addition of citing again other types

14   of misbranding.  The time frame is the same.  The moment in

15   time, the temporal thing I spoke of earlier is the same.  It

16   cites other subsections.

17          Moving on to the mail and wire fraud conspiracy, that

18   was previously Count Five.  That is now Count Three.  The time

19   frame is the same.  It obviously only names one defendant.  The

20   overt acts have been removed because they are not required by

21   law.  It otherwise is identical.  I believe we correct the

22   typographical error, but it should otherwise be quite literally

23   identical.

24          The next count in the superseding indictment is mail

25   fraud.  That is, substantive mail fraud.  That was not in the

F466lasc

original indictment.  The original indictment contained

conspiracy but not substantive mail fraud.  It now adds

substantive mail fraud.  The time frame is the same as the

conspiracy count and consistent with our general practice a to

wit clause has been added because it is a substantive count.

That is on page 8 of the superseding indictment.  The to wit

clause identifies two types of conduct specifically.

        THE COURT:  The first one is new, yes?

        MR. RICHENTHAL:  The evidence was already in the case.

There was no to wit clause at all in the prior indictment with

respect to mail fraud and wire fraud because it was only a

conspiracy.  The discovery is identical.  He evidence was in

the case.  It wasn't specifically identified, that is correct,

because there was no to wit clause.  So nothing was identified.

I think it is fair to say and I think it is reasonable for

Mr. Freeman to take the position, if he does, that the addition

of that piece of the to wit clause even though there wasn't one

before indicates an intention that may not have been as

apparent from the face of discovery to proceed on an additional

theory.  I think that is a fair interpretation.  As a legal

matter there was no to wit clause previously.

        THE COURT:  When Mr. Riccio said at his sentencing or

perhaps his plea, I don't recall, that Ms. Lasher was selling

drugs out of the back door, is this what he was referring to?

        MR. RICHENTHAL:  I don't believe so.  Although, I

F466lasc

can't speak for Mr. Riccio.  What I believe Mr. Riccio was
referring to is something that we've provided notice several
weeks to Mr. Freeman about.  We provided notice under 404(b) or
in the alternative direct evidence about and that is that
Ms. Lasher was actually in addition to this stuff, meaning
Internet based, she was filling prescriptions for cash for
Oxycodone and other controlled substances.  I don't know what
Mr. Riccio meant by back door, but I believe what he may have
meant is in-person as opposed to Internet and mail order.
There are substantial evidence she was filling prescriptions
for Oxycodone for out-of-state customers for cash.  They would
come in groups.  They would be in some cases from several
states away, like Kentucky.  They would often present
prescriptions from a pain clinic in northern Florida and they
would alert her in advance they were coming and she would fill
the prescriptions for cash and some other pharmacists or
non-pharmacist employees would raise questions about this and
she would order them to fill the prescriptions.  It is our
belief that Mr. Riccio was referring to that conduct and that
he explained knowledge of that conduct.  Our judgment is that
conduct is probably direct evidence with respect to
Ms. Lasher's state of mind that is her interest and lack
thereof in verifying restrictions or in the alternative 404(b)
we provided notice to Mr. Freeman several weeks ago.  That is
not charged conduct and it was not originally charged conduct

F466lasc

1    and not presently charged conduct.

2         THE COURT:  Insofar as you have as the first object

3    that Ms. Lasher shipped and directed others to ship

4    prescription drugs that had been previously sent to other

5    customers and had been returned and restocked without informing

6    the customers, just so I am clear your position is that you've

7    turned over all of the discovery related to that and you've got

8    nothing else to turn over but that Mr. Freeman could

9    legitimately say that he was not aware that that activity was

10   part of the charged conduct?

11        MR. RICHENTHAL:  I will take those in order.  With

12   respect to discovery, we have to our knowledge either turned

13   over or identified specifically made available for review all

14   discovery relevant to that piece of the puzzle.

15        THE COURT:  What is the difference between turning

16   over and making available?

17        MR. RICHENTHAL:  There were so many searches in this

18   case and some things we were seeking in advance of this

19   proceeding and so many devices, electronic, that were seized

20   that it is truly voluminous.  So our predecessors on this case

21   gave Mr. Freeman what is known as a DEA 7a, which is the DEA

22   form indicating a specific object was seized from a particular

23   place in connection with a particular case.  Mr. Freeman was

24   told if he wants any of those objects -- I am saying objects

25   but they were not all electronic -- he can get them to be

F466lasc

copied, reviewed or inspected.  A subset of those was

physically produced.  So there is daylight between what was

literally handed over and what was said some time ago here is

all the material that was seized, what do you want.

          One of the things that the parties been exploring in

recent day, separate and apart from the superseder is whether

Mr. Freeman wants to close that daylight to continue my silly

metaphor.  It is our understanding he does and we are going to

work with him on that.  That is why I don't want to represent

that we physically handed everything over because it is not the

case.  Everything was made known to Mr. Freeman.  That is the

answer on discovery.

          The only caveat on that, and this is not atypical, is

we have sent trial subpoenas and we are in touch with various

entities and we're getting additional records in.  For example,

we've told him that we anticipate getting records from certain

pharmacies in various states.  We made production of discovery

last week.  I anticipate that we'll make production of

discovery tomorrow.  In terms of the existing set, we have

turned over or identified and made available everything

relevant to this particular piece of conduct.

          I think on the second thing your Honor said, I don't

know how to phrase it as -- I can't speak for Mr. Freeman.  I

wouldn't phrase it as unaware it was in the case.  I would

phrase it as I think it is a fair reading of the evidence that

F466lasc

1    while Mr. Freeman was likely aware this evidence was part of

2    the case and would be presented to the jury in our judgment

3    because it is part of the story of how this pharmacy was

4    operated, it is equally fair to say as originally charged to my

5    knowledge that there is no particular reason why he would know

6    that we intend to ask the jury to instruct the jury they may

7    convict her on that basis, that is distributing prescription

8    drugs that have been returned.  I don't think that has been

9    expressly known to Mr. Freeman and I don't know that it is

10   implicitly good enough for this purpose.

11        THE COURT:  So in the course of your plea discussions,

12   you never made it clear that if there was no plea that these

13   were some of the changes that would be forthcoming?  So I am

14   interested to know, not that I want to be privy to those

15   discussions, but I know you had them, you sought adjournments

16   because of them, whether in fact I am the last to know about

17   these changes and whether they have actually been the subject

18   of conversation between counsel for weeks.

19        MR. RICHENTHAL:  Well, we informed Mr. Freeman that in

20   short we believe or understood there were lots of improprieties

21   for lack of a better word happening in this pharmacy that we

22   expected documentary evidence about those improprieties and

23   that we anticipated a superseding indictment would include

24   different kinds of misbranding, same crime but different

25   citations that would account for those improprieties and that

F466lasc

1    as we explored further we felt even stronger that we could

2    prove all of those, including not just this that is returned

3    medication but things like removing labels on drugs, things

4    like miscounting drugs.  So those were part of our discussions.

5         I don't think I ever said to Mr. Freeman point blank

6    because it hadn't been written that we anticipated that the to

7    wit clause will pull out one of those, but certainly the idea

8    that we intended to present for the jurors' consideration all

9    of the improprieties and a number of them we thought were

10   criminal was absolutely part of those discussions, yes.

11        The next count if your Honor wants me to continue --

12        THE COURT:  Sure.

13        MR. RICHENTHAL:  -- is wire fraud.  It is identical to

14   mail fraud.  Same time frame, same conduct.  Essentially as is

15   not unusual in this district in advance of trial what had been

16   just a conspiracy count has become a conspiracy count and

17   substantive counts with a potential wrinkle that we've been

18   talking about, which is the to wit clause.  Otherwise the same

19   time frame and should be the same verbiage, identical, one

20   defendant.

21        The final count as your Honor knows is witness

22   tampering, this is a brand new count.  As your Honor knows I

23   think I was in person in court at the time there was some

24   discussion with this Court and Ms. Lasher about conduct that

25   she had engaged in after she was arrested.  To my knowledge the

F466lasc

discovery on this is very limited.  It is witness testimony.

Ms. Lasher has known that we have known about it for a long

time.

          THE COURT:  Well, since at least January 7th, 2013.

          MR. RICHENTHAL:  Correct.  The decision was made that

that conduct was not just consciousness of guilt, which was our

original view.  Our original view was this is admissible but

not charged.  Our new view is that it is charged conduct.  It

was actually a crime and not consciousness of guilt.  It hasn't

changed our presentation.  There is going to be we anticipate

lots of discussion at trial about things Ms. Lasher said to

various employees at various times during the charged conduct

principally and most importantly having to do with inspections

by the state of Pennsylvania on potentially also by the state

of Ohio.  This conduct of course postdates that.  This is

postarrest statements to employees, but our judgment is it is

essentially always been in the case.  It is now just a charged

piece of the case.

          From our side I think in all fairness to Mr. Friedman

the biggest change is twofold.  One is what isn't there and

that arguably is the biggest charge of all that narcotics is

not charged.  It is factually in the case but no longer of

legal importance.  The second, and I think it is fair, this

issue about the mail fraud.  That is, the idea of whether

Ms. Lasher was given notice this was a theory of mail fraud

F466lasc

1    even if the gravamen on the facts were the same.  In our

2    judgment those are the two for lack of a better word material

3    changes.  The citation of additional misbranding I suppose that

4    is a change in the sense that the jury might be presented with

5    A, B and C but told C is something you can vote on but the

6    facts are the same.  That is our perspective.  Some of the

7    overt acts have changed to focus on this defendant, but I don't

8    think that is material because we could legally cite one overt

9    act.  We have chosen to cite many to put Ms. Lasher on maximum

10   notice.

11            THE COURT:  Now, if at all, does the superseder moot

12   some or all of the pending motions?

13            MR. RICHENTHAL:  In our judgment it moots the motion

14   to dismiss, the language which Ms. Lasher takes issue is not in

15   the superseder.  It also moots the motion to strike surplusage.

16   Again, the language which she takes issue is not in the

17   superseder.  The next motion is the motion for reliance on

18   counsel defense.  We're not sure if it moots it in whole or in

19   part.  It turns on whether Ms. Lasher continues to want to

20   introduce evidence in support of such defense and the contours

21   of it.  We cannot speak to that.  Our view, and I am happy to

22   get into the details if your Honor likes, is that Ms. Lasher's

23   present motion is a little hard for us to understand.  It is

24   written in a high level generality and frankly we're not sure

25   exactly what she seeks to tell the jurors she was told and by

F466lasc

whom.  There is references repeatedly of the mail order

business.  It is not clear to us whether that encompasses the

stuff that we allege is criminal, whether that merely means

they were shipping drugs to other states, which is actually not

a crime based under federal law.  So part of what we're going

to say tomorrow, I will say right now, is we actually think

absent some increased regularity about this that this may be

appropriate for a Rule 104 preliminary hearing so that

Ms. Lasher can develop facts and the Court can develop facts

outside the earshot of the jury about this issue and we think

that is particularly true in light of the at least three

things.  One is -- does your Honor want me to continue?

THE COURT:  Yes, go ahead.

MR. RICHENTHAL:  So first it is written in a high

level of generality.  Mr. Freeman can dispute that but there is

a lot of reference to the Internet pharmacy business or mail

order business.  I don't think it is going to be disputed this

pharmacy shipped drugs by mail.  I don't think it is going be

disputed that these pharmacy filled prescriptions ordered on

the Internet.  Those are not crimes, at least not federal

crimes.  What is a crime in our judgment is filling

prescriptions whether ordered on the Internet or not that are

invalid.  Invalidity here does not turn on the mere fact that

they were ordered on the Internet.  That is not a crime.

Invalidity turns on the fact that the doctors never met the

F466lasc

purported patients, never spoke with the purported patients,
never reviewed records of the purported patients, neither had
the ability to nor did verify the patients or even using the
they're real names, ages, genders or medical histories.  It is
true they were transmitted over the Internet but that fact
alone is just the background.  So if what Ms. Lasher means is
she told is not unlawful to fill a prescription ordered off the
Internet, she would have gotten correct legal advice in our
judgment.  That is not unlawful at least as charged here.  But
it doesn't defeat the mens rea because she is not charged with
doing that.  She is charged with doing that with respect to
invalid prescriptions.  So the question from our perspective is
was she told.  The law is clear she needs to provide all facts
to counsel, get advice back and follow the advice.  Without all
three of those, there is no such defense.

        The question from our perspective is did she tell
these counsel we're filling prescriptions based on doctors'
brief review, if any review at all, of an Internet
questionnaire without anything else full stop, no records, no
vetting, no speaking.  Did she tell counsel that?  If she told
counsel that, did they say back, that is lawful?  If so and she
followed that advice, she might well be entitled to an attorney
instruction, but that is not a clear that is exactly what she
was saying she was told.

        THE COURT:  I think you skipped over the first

F466lasc

1    question.

2              MR. RICHENTHAL:  Are they her lawyers?

3              THE COURT:  Yes.

4              MR. RICHENTHAL:  There is real complexity here and it

5    is unfortunately in our judgment even more complex than that.

6    It is not clear they are lawyers at all.  She said she didn't

7    retain them.  She says she understood they were her lawyers but

8    it is not clear that was a reasonable understanding or that she

9    had the same understanding with respect to each lawyer.  So

10   there is this question to begin.  Unfortunately in our view it

11   becomes even more complicated because she is purporting, at

12   least according to her attachments, to seek so prove this by

13   introducing communications she wasn't a party to.  Like, for

14   example, a letter from Carl Riccio to North Dakota without any

15   evidence whatsoever she had anything to do with the production

16   of that letter.  Those are not statements to Carl Riccio and

17   they are not statements to her.  They are statements of Carl

18   Riccio to a state.

19              She also seeks to want to introduce evidence of

20   statements from her coconspirator defendant, Peter Riccio to

21   her about what he was advised by lawyers.  That in our judgment

22   is one step removed from the advice of counsel defense.  It may

23   go to good faith generally, the generic good faith in most

24   fraud cases.  We don't think it is advice of counsel.  It is

25   particularly problematic because as your Honor realizes we

F466lasc

1    cannot call Mr. Riccio, Peter Riccio.  He will undoubtedly

2    invoke the Fifth Amendment and do so reasonably because he was

3    charged with several offenses that were dismissed when he pled

4    guilty, which means at bottom Ms. Lasher seems to introduce

5    statements, the validity of which we cannot probe because we

6    cannot call the person who called them.  It is problematic

7    because she attaches an e-mail in which Mr. Riccio, that is

8    Peter, says to many people, which Ms. Lasher is one, I spoke

9    with four lawyers.  But Ms. Lasher only identifies two lawyers,

10   which means she seems to want the jury to think Peter Riccio

11   spoke with four.  She has only identified two.

12          THE COURT:  The reality is those exhibits don't

13   establish that there was a blessing of the charged conduct.

14          MR. RICHENTHAL:  We agree.  I am just getting farther

15   down the rabbit hole.

16          Finally as if this weren't complicated enough, Carl

17   Riccio, I think this is undisputed, had a business role in the

18   pharmacies.  He was not an outside lawyer.  He was the son of

19   Peter Riccio.  He worked in one of the pharmacies.  He may be a

20   fact witness.  In fact, I got a phone call make maybe an hour

21   ago at most from a lawyer who represents Carl Riccio.  It was

22   suggested to me Mr. Riccio, Carl Riccio, may invoke the Fifth

23   Amendment if called.  That creates even more complexity because

24   we believe it would be entitled to probe the communications

25   between Ms. Lasher and Mr. Riccio and the veracity of the

F466lasc

1    information going back and force.  Mr. Riccio has his own

2    incentive to talk about those communications in a certain way

3    but those very incentives may be hindered by his invocation of

4    the Fifth Amendment not unreasonably.  In short it is a morass.

5    So what we're going to say to your Honor tomorrow and I am

6    saying now is we have to go through this morass because

7    Ms. Lasher has a right to present this defense.  We don't think

8    has presently described she can make it out.  We have a lot of

9    concerns about the nuts and bolts how she seeks to make it out

10   and our ability to counter it by calling these lawyers in

11   rebuttal all of which we think is appropriate for pretrial

12   resolution not during trial resolution.

13          THE COURT:  Mr. Riccio, because we're on it, the

14   advice of counsel defense given the dropping of the narcotics

15   charges, is this still a defense that you intend to pursue?

16   And maybe at the same time if you do what about the

17   government's suggestion that we explore this ASAP?

18          MR. FREEMAN:  I am in favor of exploring it ASAP.

19   However, I wasn't prepared to argue the specifics this

20   afternoon.

21          THE COURT:  There are a whole level of very clear

22   legal issues.

23          MR. FREEMAN:  I couldn't agree more and the government

24   and defense have been talking about it.  Before I go any

25   further, with respect to the way the schedule played out, I

F466lasc

think it is fair that the defense takes some of the

responsibility.  We did ask the government during plea

negotiations to hold open a particular plea, which I think

delayed the government.  The timing was not done in a way that

I think was considerate of the Court -- sufficiently

considerate of the Court.

          THE COURT:  Sure.

          MR. FREEMAN:  No, sorry.

          THE COURT:  The Court's view is very simple.  I am

considerate of counsel.  I set a schedule that avoided all the

holidays.  You would have been done before.  I didn't want you

working over Easter Sunday and Passover.  I gave you plenty of

time and the end result is exactly what I strived to avoid,

which is unnecessary pressure.  There is always real pressure.

Then there is pressure that gets sort of self-created.  I am

not into creating additional pressure.

          MR. FREEMAN:  Look, Judge, we wound up being in the

office yesterday.

          THE COURT:  That is your problem.

          MR. FREEMAN:  It is.

          THE COURT:  I tried to avoid that for you.

          MR. FREEMAN:  I understand that and I appreciate that.

          THE COURT:  One thing is if you do it to yourselves

that is your business.  But when it bounces back after I've

tried everything possible, given you more advance notice, set a

F466lasc

trial date which counsel wanted, it is unacceptable to me
because counsel are not I don't think totally aware of how the
entire Court's schedule is built around weeks that are reserved
around trial, Part I week, sequences of sentencing.  And
everything time you throw a monkey wrench into that, you mess
up more things than you realize.  Because I am not one of those
judges that just has indictment filed, here is your trial date
and I don't want to hear from you ever again.  That is your
date.  No consideration, no thought, no nothing, that is your
date.  Or somebody else who does multiple scheduling and this
is it, you lose.

        Since I consider myself as considerate as anybody, my
level of reaction when those considerations which here are
staggering both as of the set of consequences here.  Because to
this day I now, having listened to you, I don't know why you
needed to add.  If you did not add the additional object about
restocking, you could have proceeded.  There would be zero
argument here.  The case goes.  He has gotten a great thing.
His client isn't going to be called a narcotics trafficker.  He
would be jumping up and down with glee.  I might not be so
happy because a lot of effort went into an opinion, but okay.
So be it.

        MR. FREEMAN:  Your Honor, it is not just the overt act
of restocking.  Counts One and Count Two are conspiracy to
introduce misbrand into interstate commerce and misbrand and

F466lasc

1    Count Two is misbranding of prescriptions into interstate

2    commerce.  When the government gets up to speak to the jury,

3    they are going to talk about the essence of the case.  This

4    case is going to be about getting prescriptions or actually I

5    should say drugs that were returned and that they were then

6    resold to the public.  The lot numbers were missing.  As I

7    understand it, the labels were taken off the wholesale jars as

8    I understand it.  That is going to be the case.  The rest of it

9    is dressing.

10           THE COURT:  Really?

11           MR. FREEMAN:  In my opinion based on what I see

12    happening, based on what I predict, and I am pretty good about

13    this, what the government is going to say to the jury, its

14    going to be a misbranding case about a pharmacist who puts the

15    public at risk by not keeping the drugs where they are supposed

16    to.  We don't know what the government will say to the jury,

17    whether they have been adulterated.  If somebody gets sick,

18    what will the lot number be?  How can we trace it?  That is

19    going to be the gravamen of the case.

20           THE COURT:  Do you think that Internet sales without a

21    doctor really being between the patient and the drug is more

22    risky to public health?

23           MR. FREEMAN:  That is going to be in the case of

24    course, but I think it is going to take a second seat.  The

25    other indictment, the government was going to stand up and say

F466lasc

to the jury that we -- that the second seat was going to be
first and foremost.  They were going to talk about Fioricet as
a controlled drug and the fact that you need to have a
face-to-face with a physician.  You need to have -- a
questionnaire is not sufficient by itself.  It is just a
precursor to the visit with the doctor.  As far as we're
concerned, this is a completely different case and it requires
a completely different defense.  Of course there are some
common denominators and there are some overlap, but it is a
completely different case.  We haven't prepared for this.  And
as Mr. Richenthal mentioned, what we did prepare for is now
gone from the case.

            Getting back to my other point, and I don't want to
ask for more anger or disappointment from the Court, but we
have been speaking every day.  The defense and the government
have been speaking literally every day for the last two weeks.
That doesn't mean that I wasn't surprised by the first two
counts in the indictment.  I was.  I thought that they were
going to be the charged conduct relating to the so-called back
door sale of Oxy.  We have been talking and working together
and trying to iron out issues so they didn't have to come
before the Court so we didn't have to ask for an adjournment.
However, when we saw the superseding indictment on Friday, we
knew that we had to ask for an indictment and it really isn't
sufficient as far as we're concerned to say that the witness

F466lasc

1   tampering has very little discovery and it is not sufficient to

2   say that we've all known about it --

3          THE COURT:  Two and I half years.

4          MR. FREEMAN:  -- two and a half years.  It now becomes

5   something that is important to negate or rebut because witness

6   tampering even if it is charged as charged conduct, it is as

7   the government said also indicative of consciousness of guilt.

8          THE COURT:  You knew it was going to be part of the

9   case --

10         MR. FREEMAN:  Honestly --

11         THE COURT:  -- in some way.  Something that the

12  government thought was important enough to bring to my

13  attention two and a half years ago and have me say to

14  Ms. Lasher, You, Ms. Lasher, if you do this, it is called

15  witness tampering.

16         MR. FREEMAN:  Judge, it wasn't in their 404(b).  It

17  just wasn't in the letter.  I had ever reason to believe if

18  you're going to ask me -- if I was on a couch and you asked me

19  did I have some thought that it might be introduced in the

20  case, I would have to answer yes.  Did I have notice that it

21  was going to be in the case either as 404(b) or as charged

22  conduct, no, I didn't.  I don't think we should focus on Count

23  Six.  I have made the point, your Honor, that for us we have to

24  reframe the defense.  We have to retool the defense.  It is a

25  different case.  There are overlaps.  There are some common

F466lasc

1    denominators, but it is a completely different case.

2           Also, looking at the indictment, and this is not a big

3    point and this could be handled in a short drift, but the

4    indictment does mention Butalbital not Fioricet on page 4 and

5    G.  And we think that since the tablets of a prescription drug

6    known as Butalbital is an inaccuracy because there is no such

7    tablet as Butalbital.  As you learned or may have known,

8    Butalbital is and ingredient in a compound drug known as

9    Fioricet.  The only place you can get Butalbital is a

10   distributor, a wholesale distributor that sends it to a company

11   like Pfizer and they create the drug given certain percentages.

12          MR. RICHENTHAL:  A few things.  The reason why

13   Ms. Lasher's conduct with respect to employees after her arrest

14   was not part of our 404(b) notice, is that it is not 404(b).

15   It is not a prior bad acts.  It is consciousness of guilt of

16   the acts for which she is charged.  I am not aware of any case

17   that says we have to provide notice to a defendant of evidence

18   of consciousness of guilt, for example false exculpatory.  It

19   has been in the case for a very long time.

20          With respect to the part of this case, I haven't

21   written my opening statement so it is hard to wind of clock

22   backwards, but in addition to 404(b) notice, we gave expert

23   notice to Mr. Freeman two months ago.  Some substantial period

24   of time ago.  The expert in the notice was clear as day was a

25   pharmacist expert sharing with the National Board of Pharmacies

F466lasc

1    who has testified all over the country about signs that a

2    prescription is invalid.  That notice had nothing to do with

3    Fioricet.  It attached a very lengthy CD.  The heart of this

4    case is a pharmacist who filled prescriptions that were bogus

5    for pain medication and shipped them all over the country for

6    money.  It is true a subset of those were controlled.  It is

7    true that if the government demonstrated the requisite

8    elements, that is a crime.  The heart of the case has always

9    been the same from the very first moment Ms. Lasher was

10   charged.  Mr. Freeman is a very good lawyer and I don't for a

11   second believe that he would let his client be convicted of

12   multiple felony counts but not narcotics conspiracy.  The other

13   felony narcotics counts are serious and they have always been.

14   I don't think the case has changed.

15         Finally with respect to Butalbital, if Mr. Freeman

16   wants to dismiss the indictment on the ground that there is no

17   drug known as Butalbital, our answer would be first of all it

18   says known as Butalbital, as in common parlance.  In any event

19   you cannot dismiss an indictment on the ground you disagree

20   with the allegations.  That is why we have trials.  If

21   government fails to prove an overt act, Ms. Lasher should get

22   acquitted.  If we prove an overt act on the other elements, she

23   should be convicted.  There is no basis to dismiss an

24   indictment by liking a particular overt act uses a word that

25   the defendant thinks is not the right the word.

F466lasc

          MR. FREEMAN:  Your Honor, so the record is clear we
received expert notice on March 20th, 2015.  Not two months
ago.
          MR. RICHENTHAL:  Really?
          MR. FREEMAN:  Really.
          MR. RICHENTHAL:  I don't have it in front of me.  That
certainly is not my memory.  I accept his representation
although that does not fit my memory.
          MR. FREEMAN:  That is my best recollection and best
recollection of my associate.  There is a small chance I could
be in error.
          MR. RICHENTHAL:  Even if it were more recent than I
thought, my point was the notice is very clear what the heart
of this case is.  The heart of this case is about the validity
of prescriptions filled by Ms. Lasher.  If I misspoke, I
apologize to Mr. Freeman and the Court.
          I want to add one thing that as your Honor thinks
about how the trial would have spun out versus how it spins out
now.  I think it is important because we always speak about
evidence when we're talking about documents and prescriptions,
but the heart of the trial is witnesses with potentially only
one exception, and I am not ensure about that.  It is my
judgment the same exact witnesses would have testified in the
prior indictment and will testify in this trial.  That is --
the reasons are obvious.  It is her own employees, some

F466lasc

1      pharmacists and pharmacy technicians, the people she directed

2      to take actions.  It is same witnesses.  They will talk about

3      the same thing.  One of the drugs is Fioricet.  They will talk

4      about the exact same thing.  It is true we might affirmatively

5      elicit from those witnesses a little bit more about Fioricet.

6      For example, some vials had the word "controlled substance" on

7      them.  Some prescriptions described it as barbiturate.  We

8      probably would have elicited a little more about those things.

9      The same people will testify about the same stuff.  I worked in

10     this pharmacy and this woman was my supervisor.  We got

11     hundreds of prescriptions a day.  She told me to fill them even

12     when I asked question.  She took labels off.  I am summarizing,

13     but that is all the same stuff.  If anything the testimony will

14     be a little more streamlined because we will not elicit much

15     about those drugs.  We'll elicit it is pain medication.  We

16     will elicit the bulk of them is pain medication.  The nature of

17     one of them is no longer of legal importance.  It is the same

18     people talking about the same stuff.

19             THE COURT:  Just so I am clear, the prescription

20     requirement doesn't change whether it is a Schedule III

21     narcotic or it's not?

22             MR. RICHENTHAL:  It does in one way.  The Ryan Haight

23     Act, which I think came into law in 2008, but in any event

24     predates the conduct here, provides affirmatively and

25     executively a prescription for controlled substance is not

F466lasc

valid as a matter of law unless there has been at least one

physical interaction between a doctor and patient.  That

statute does not apply outside the controlled substances area.

Outside the controlled substances area a prescription will

still be valid but there is no express statute as a matter of

federal law says that requires an in-person visit.  The

standard is instead as the Eighth Circuit said, multiple

circuits have said, a bona fide physician-patient relationship,

which we expect our expert and we will talk about means in some

you know the patient or you have some understanding of the

records, some understanding of their history.  There is a

relationship.

          THE COURT:  Right.  I discussed that.

          MR. RICHENTHAL:  Right.  There is a legal distinction.

The jury would have instructed in an arguably confusing way

with respect to Counts One and Two here is your definition of

prescription.  With respect to the other counts, here is a

definition of prescription.  Here it is just one definition.

It is a stack question for the jury.

          MR. FREEMAN:  I just want to be absolutely clear that

I had no idea that the evidence would include testimony.

Although the witnesses -- many or all the witnesses may be the

same, I had no idea they would be asked about taking back pills

which had been sold to customers, taking them back and

reselling them and shipping those pills and using pills that

F466lasc

1    didn't have lot numbers.  That is news to me and that is the

2    major change that requires us as a defense to change our

3    theories.

4            MR. RICHENTHAL:  I can't speak to Mr. Freeman's

5    knowledge.  What I can say is that his clients' pharmacies were

6    inspected by the state of Pennsylvania and she was investigated

7    by the state of Ohio and other places.  Those investigations

8    and inspections included allegations of restocking, included

9    allegations of mislabeling.  She was interviewed by the state

10   of Ohio and Pennsylvania.  It is difficult for us to accept

11   Ms. Lasher was not aware that multiple regulatory authorities

12   believed she had engaged in this conduct.  I agree she was not

13   necessarily aware that we would present to the jury this

14   conduct as a crime rather than part of what she was doing, but

15   it is very unlikely that Ms. Lasher didn't know multiple

16   regulatory authorities, not lay people, had alleged that she

17   engaged in this conduct during the charged period.  At least

18   one of them, Ohio, and maybe more than one, served her with a

19   violation notice, essentially a warning, that she was engaged

20   in improper conduct.  The notice I think wasn't as specific as

21   the inspection reports, but she was interviewed by two states,

22   Pennsylvania and Ohio, if not others, and asked questions about

23   all of this.

24           THE COURT:  I am curious how does it happen that there

25   are enough prescription drugs that are returned so that you can

F466lasc

1   have a second-hand business in prescription drugs?

2           MR. RICHENTHAL:  Well, I think our view is that it is

3   part of the business.  I am not sure it is a separate business.

4   The answer to your Honor's question as we understand it --

5           THE COURT:  How is it possible that just numerically

6   speaking enough drugs are returned so you will have the

7   opportunity to resell them?  That's my question.

8           MR. RICHENTHAL:   The answer is because this was a

9   pill mill.  They sent hundreds of prescriptions a day, every

10  week day, all over the country and unsurprising some of those

11  got returned by the Postal Service from people who were not

12  using real address or people who picked them up and said, I

13  didn't order this.  When you send hundreds of prescriptions all

14  over the countries without vetting, you are going to get some

15  back by the Postal Service or loved ones.  What they did when

16  they got it back was they took the label out and either put it

17  back on the shelf and stuck a new level on it and shipped it

18  out or poured it back into the manufacturer's bottle from which

19  they shipped more drugs out.  Since you've already gotten money

20  for them once, why not get money for them twice.

21          It is the same answer by the way as to why they

22  miscounted.  I mentioned miscounting early.  The reason they

23  miscounted, and we expect there to be overwhelming testimony,

24  is that business was booming to such a degree that they

25  literally couldn't keep up by counting.  Instead they poured

F466lasc

1    pills to a line, looks about right, shipped it out.

2              THE COURT:  Don't they have pill counting machines?

3              MR. RICHENTHAL:  Not a machine.  They had bottles or

4    vials with a line.  Ms. Lasher instructed employees to fill the

5    bottle to the line and it is good enough.  That is your

6    measuring cup.  It is like cooking.  You put it in the vial for

7    the customer, put the labels and keep going.

8              Why does that matter?  Well, you are going to send out

9    too many pills sometimes.  The doctor authorized 90 and you are

10   going to send more than 90 because you are not counting.  That

11   is misbranding.  However, it is not all that happened.  You are

12   going to send too few sometimes.  Patient paid for 90 and you

13   are going to get 86.  It is fraud.  Sometimes instead of

14   filling to the line, they just weighed it.  They would decide a

15   hundred grams is roughly 90 pills so we'll weigh it.  When it

16   is roughly a hundred grams, ship it out.  This was a factory,

17   not a pharmacy.  It is all part of the same conduct.

18             So that is why it is part of what we'll present.  The

19   jury needs to understand what happened.  To think of the trial

20   that would have happened versus the trial that is going to

21   happen now as if somehow all we were going to present was a

22   clinical laser light focus on just the validity of a piece of

23   paper, that would give the jury a misleading view.  It is not

24   how the employees felt it worked there who were told their pay

25   would be docked if they didn't fill a number of prescriptions

F466lasc

1      each day.  What laws apply to that case, originally narcotics

2      and fraud, now just fraud.  No dispute about that.  That has

3      always been the case.  It has always been how we intend to

4      present the case.  The heart of this case is witnesses who

5      worked with the defendant and potentially a doctor who filled

6      prescriptions will candidly acknowledge they did not know the

7      people for which they were filling.

8            MR. FREEMAN:  Judge, they also dropped one money

9      laundering conspiracy count, one substantive money laundering

10     count, which we have been preparing for.

11           THE COURT:  That's good news.

12           MR. FREEMAN:  Judge, we're not here to say whether it

13     benefits the defense or doesn't benefit the defense to drop a

14     count.  That is not the point.  The point is notice and

15     preparedness.

16           THE COURT:  There is still now a whole bunch of very

17     serious things you don't have to work on.  So that has to be

18     weighed against what you say you now need to focus on different

19     than what you were focusing on.

20           MR. FREEMAN:  Yes.  I don't understand how the

21     government can suggest that the two trials are essentially the

22     same.  They are not.  The trial as played out with the original

23     indictment and the trial of the superseder would be quite

24     different.  The evidence would be quite different.  The rules

25     of law are quite different.  The defense is quite different.

F466lasc

You can say and you can look and determine what is similar
about both trials, but they are distinctly different.

THE COURT:  Why is the defense different?  It seems to
me you have some serious charges that have been dropped and you
don't have to focus on those issues.  To the extent that the
defense could be factually and it could be advice of counsel
but once you get to advice of counsel, it is inherent in that
there is a certain acknowledgment of conduct.  You can't get to
the next step.  So you are saying I did certain things but I
thought it was okay.

MR. FREEMAN:  Your Honor, I have to go out and
investigate these new allegations.  We have to review some new
discovery.  We have to reexamine the discovery we already
looked at.  This is much more about credibility.

THE COURT:  Isn't this really going to be as I
understand it that there are witnesses some of whom you cannot
talk to anyway who are going to testify about what went on and
the it's --

MR. RICHENTHAL:  Your Honor, I just realized I am late
for another proceeding but would it be all right if I placed a
phone call?

THE COURT:  Absolutely.

(Pause)

MR. RICHENTHAL:  Your Honor, I am supposed to be in
front of Judge Scheindlin.  I called her chambers.  I didn't

F466lasc

1    know what time it was.  We have been going at this for a while.

2    I would like to continue this.

3              THE COURT:  What do you have do?

4              MR. RICHENTHAL:  I have a sentencing.  I don't think

5    it will take long.  I can't speak for the Court.

6              THE COURT:  That's another perfect example of how I

7    get screwed.  Go ahead.

8              MR. RICHENTHAL:  I didn't realize we had been at this

9    for an hour and a half.  Ms. Greenberg can proceed without me.

10             THE COURT:  We have some very important things to talk

11   about so go do your sentencing.  The reason I don't want to

12   continue without you is we have decisions to make about

13   scheduling, the attorney-client issues, which I really want to

14   do quickly, and the real question of how much time, if any, is

15   being given to adjourning this trial because you have a

16   reserved spot.  These are important issues.  As lead counsel

17   you need to be here.

18             (Recess)

19             THE COURT:  I think I was trying to explore what was

20   actually involved in this additional object of being included

21   in the superseding indictment.  As I understand what Mr.

22   Richenthal was saying is that this evidence -- this aspect of

23   repackaging, misbranding would be introduced through the

24   testimony of witnesses primarily the same witnesses that are

25   going to testify under the original indictment.

F466lasc

1          MR. RICHENTHAL:  That's correct.  The employees that

2    worked with and under Ms. Lasher.  The government would call an

3    inspector with either the state of Pennsylvania with whom

4    Ms. Lasher spoke on a variety of subjects, including this

5    subject.  It is not a new witness that only knows about this

6    and wouldn't otherwise be competent to testify about the other

7    conduct in this case.

8          THE COURT:  Would you anticipate that there are going

9    to be exhibits, either document type exhibits or physical

10   exhibits, related to this that would otherwise not have been

11   introduced?

12         MR. RICHENTHAL:  I think not that wouldn't have

13   otherwise been induced because -- so maybe the most real way of

14   talking about is there are a number of photographs of what --

15   there are three pharmacies here, the Town Pharmacy, Palmar

16   Pharmacy, typically called Palmar and Heller Town Pharmacy.

17   Ms. Lasher was the supervisor of two of the three and

18   specifically the pharmacist in charge Heller Town Pharmacy.

19   Speaking about those two, Heller Town and Palmar, we would

20   anticipate regardless of this restocking we would introduce

21   photographs of what the pharmacy looked like in the back where

22   a jury could see with its own eyes the quantity of pills, how

23   those pills were stored, the vials in which they were stored,

24   the labels or lack thereof and direction on the wall to

25   employees of how to count or not to count.  A piece of that

F466lasc

1  story how it looked is this piece, but it is only a piece.

2  There is no sign that said, Restock pills, that we wouldn't

3  have otherwise introduced.  People are going to explain what

4  they were doing.

5      THE COURT:  Those photographs have been turned over

6  already?

7      MR. RICHENTHAL:  The seven A's that identify them were

8  turned over a couple years ago.  The photographs themselves I

9  am not sure literally the photographs have been physically

10  produced.  We have taken upon ourselves to produce them because

11  we view them as meaningful.  In fact, as we speak there is a

12  paralegal preparing them of Heller Town Pharmacy and we asked

13  the DEA to give to us photographs of Palmar Pharmacy, which we

14  intend to produce.  They were identified as having been taken

15  in forms that were produced quite a substantial time ago.

16      Similarly exhibits, for example, vials without labels,

17  those would been introduced anyway and people will talk about

18  them.  Because restocking pills is not someone can see unless

19  you are literally seeing the pill bottle come back, in some

20  sense they are just witnesses.  At bottom one could argue those

21  bottles were just bottles and you cannot prove they came back.

22  That is generally true.  We need people to say they came back.

23      THE COURT:  When you did your searches did you find

24  packages that had been returned?

25      MR. RICHENTHAL:  I don't know whether they found

F466lasc

1    labels indicating they had been returned.  Our understanding is

2    they would literally physically take the off and throw it out.

3              THE COURT:  The day you did the search, did you just

4    happen to find a cardboard box which had been used to ship

5    pills out that happened to have been returned that day?

6              MR. RICHENTHAL:  I am not competent to speak about

7    that level of detail.  I think they weren't shipped in boxes.

8    I think they were vials put into a Fed Ex envelope.  I think

9    evidence would be that the vial had been sent back, like a

10   return envelope.  They may have gotten that.  The volume of

11   material seized, even putting aside drugs, is almost

12   incomprehensible.  As a result it was sent to an outside

13   company and scanned and sent to Mr. Freeman, meaning the

14   papers.  It is huge.  As we have taken charge of this case, we

15   tried to wrap our heads around that volume and streamline the

16   exhibits.

17             THE COURT:  Well, isn't the practical solution here so

18   that we don't need to do more than tweak this trial schedule

19   for the government to give to Mr. Freeman very shortly

20   essentially the 3500 that you have for the witnesses who are

21   going to testify about the new defined object, to give him your

22   exhibit list and whether it is photographs, exhibits or

23   whatever, and in a meaningful way so that he knows very soon

24   what he is dealing with because that way we can basically

25   essentially proceed on schedule?

F466lasc

1          MR. RICHENTHAL:  We're not in a position to produce

2     3500 material.  It is not marked and available.  The witnesses

3     who would talk to us about restocking are the same witnesses

4     that talk about other things.  I think we could provide some of

5     those statements perhaps in retacked form or write Mr. Freeman

6     a letter.  I can represent on the record multiple employees at

7     the pharmacies will testify that as a matter common every day

8     conduct when pill bottles were returned principally by the

9     Postal Service or Fed Ex, that is not by the customer

10    themselves, the directive was to remove the label and either

11    put it back on shelf next to with or other pill bottles, which

12    were then sitting and waiting for a new label or pour it back

13    into the manufacturer's stock bottle, the large bottle.  A

14    multiple of witnesses will say that Ms. Lasher directed them to

15    do that and they understood that is what they were doing and

16    that was the regular course.  To be even more precise witnesses

17    will testify that they were instructed when the bottles were

18    returned they should be opened and there should be a visual

19    inspection to make sure that they are not visually dirty or

20    waterlogged and there is no apparent problem.  If there is no

21    visual problem, they would be returned to stock.  If there was

22    an apparent visual problem, to these employees' knowledge they

23    would be thrown out.  Although multiple people believed it was

24    up to Ms. Lasher whether they be thrown out.  The same

25    employees will testify there was no chemical analysis done, no

F466lasc

1    analysis done that bacteria or other organisms had not gotten

2    into the bottles.  And that if the bottles were returned with

3    an inexact number of pills, for example if there were supposed

4    to have 90 and they returned 89, they would still be restocked.

5    They would have to add one more pill.  That is the sum of what

6    multiple witnesses would say.

7          With respect to Heller Town pharmacy, which is the

8    principal pharmacy at issue here, we can -- this is a DEA case

9    so the forms are called 6s.  The 6s I think with respect to

10   this conduct is frankly only a piece of what these witnesses

11   are going to testify about and if there is an adjournment

12   providing all of these witnesses' testimony in advance would

13   give Mr. Freeman respectfully something he wouldn't otherwise

14   get.  So we're a little resistent but--

15         THE COURT:  Guys, you created this.  In life there are

16   consequences.  If the consequence here is that Mr. Freeman gets

17   some discovery a little bit sooner than you would otherwise

18   give it to him, that seems appropriate.  I don't even

19   understand how you could begin to resist.

20         MR. RICHENTHAL:  Our concern is that Ms. Lasher still

21   knows these people.  They live in similar areas.  Our concern

22   is that, not that Ms. Lasher knows the substance of what she is

23   alleged to have done.  It is absolute appropriate.  I was

24   suggesting we have some concern absent redaction--

25         THE COURT:  On your theory you just told the defense

F466lasc

1    what it is and therefore we don't need any adjournment because

2    now he is on notice.  Isn't there supposed to be something

3    beyond a naked allegation in an indictment and your verbal

4    description so that when you do have cases like this with tons

5    of seized material, then it is your job to direct the defendant

6    to that which is going to be utilized?

7         MR. RICHENTHAL:  Your Honor, when I mentioned

8    redaction, I only meant identifying information.  For example,

9    when they were hired, where they live now.  That is all I meant

10   by redaction.  I didn't mean substance.

11        THE COURT:  How did does Mr. Freeman assuming -- let

12   me ask --

13        MR. RICHENTHAL:  I didn't mean the substance.  I meant

14   material that would identify who they are.  Substance, yes, we

15   will provide that.  When I said redaction, I meant information

16   sufficient to identify who they are.

17        THE COURT:  How does he get an opportunity to

18   interview any of these people?  Let me go back.  Do all of them

19   have lawyers and have all of their lawyers said, We're not

20   talking to the defense?

21        MR. RICHENTHAL:  No.  Some have lawyers and some do

22   not.  At present the majority don't have lawyers.

23        MR. FREEMAN:  I would like to point out that since

24   your Honor warned Ms. Lasher about this allegation, which we

25   referred to earlier today, there have been no instances of

F466lasc

1    violating the Court's directive.  I don't think there will be

2    in the future.

3         THE COURT:  Look, at some point, Mr. Richenthal, the

4    defendant was going to get 3500 material.

5         MR. RICHENTHAL:  Yes.  With identifying information

6    without a doubt, yes.

7         THE COURT:  So what I am talking about is advancing

8    that a few weeks.  Because I think that if we do that we can

9    either proceed as scheduled or a week later and that to me

10   makes the most sense and then Mr. Freeman can have an

11   opportunity to interview witnesses.

12        MR. RICHENTHAL:  We can do that.  I just want to

13   note --

14        THE COURT:  Mr. Freeman is going into his calendar.

15        MR. FREEMAN:  I want to note that in our view changing

16   a case from a controlled substance to a fraud case and adding

17   the subdivisions of misbranding that we're not in the last

18   indictment that that is a material change sufficient to provide

19   the defendant with at least 30 days additional for preparing.

20        THE COURT:  Do you want it play that way?  Fine.  No

21   early discovery.  Nothing different.  You want to do it that

22   way, you want to proceed under government rules on holding back

23   rather than getting a real advantage of getting early discovery

24   of 3500 nature where we're still three weeks in advance of

25   trial and I was going to give this to you, put it off one week,

F466lasc

1    and you would be close to four weeks, at least three weeks of

2    getting stuff in advance, you can have that or not have that

3    and you can have the 3500 material the Friday before and deal

4    with that.  I am trying to balance this out in a way that holds

5    the government responsible for what it has done and gives the

6    defense a real chance to have an opportunity to address these

7    additional charges.

8            And let's also just remember that the government

9    dropping the counts it did is helpful.  The reality is that

10   this information -- yes, there is a change in the indictment

11   but it seems pretty clear that the lawyers in this case all

12   knew -- knew all about these facts.  You didn't necessarily

13   know they were going to be charged the way they have been, but

14   it is not like something totally out of left field, something

15   totally unheard of.

16           MR. FREEMAN:  Your Honor, I was reacting without

17   considering the extra week which would give us the total of 28

18   days and I am not sure that those two days are going to make a

19   significant difference.  If you can give me just a moment.

20           (Pause)

21           THE COURT:  Before you say anything now that the

22   government is focused on the case that it would now like to

23   bring, what is the government's best estimate about the length

24   of trial before I go mess with the trial date?

25           MR. RICHENTHAL:  I think our case in chief is

F466lasc

1   approximately a week, but I think that trial in general is

2   likely going to small on no small part on advice of counsel.

3          THE COURT:  I would love to get that issue resolved

4   this week.

5          MR. RICHENTHAL:  We would like to get it resolved and

6   the motion to suppress resolved.

7          THE COURT:  I was going to ask you in fact -- well, I

8   was waiting for your submission on that, which I guess I should

9   get tomorrow at 2:00.

10          MR. RICHENTHAL:  I think we're prepared to discuss it

11   earlier, but we can file our submission tomorrow.  Much of what

12   I said with respect to advice of counsel is what the submission

13   says.

14          THE COURT:  I think as you can tell we spent some time

15   thinking that issue through and realize there are a series of

16   decision points.

17          MR. RICHENTHAL:  It's a waterfall, yes.

18          THE COURT:  Or hurdles or whatever you want to call

19   them is a viable defense.

20          MR. RICHENTHAL:  We agree.  We think our case in chief

21   is approximately a week.  The bulk of our witnesses are

22   pharmacy employees.  There were undercover officers for

23   purchases here.  There was searches here.  There is probably a

24   regulatory witness.  We have identified one expert witness.

25          THE COURT:  I can deal with a weak's adjournment

F466lasc

1    consistent with my other obligations.

2              MR. FREEMAN:  I think it would be fair to predict that

3    the case could last two weeks.  In this particular case the

4    defendant will testify and may have some witnesses.  I think

5    that's a safe bet.

6              THE COURT:  That's fine.  We can work this out.

7              MR. FREEMAN:  Your Honor, my concern about agreeing to

8    the schedule is it's predicated on the government complying

9    with certain turnover obligations and I don't want to be back

10   here.  I don't think any of us want to be back here on that

11   issue.  That's all I have to say.

12             THE COURT:  Well, I think before we conclude we ought

13   to figure out dates for disclosure some of which can be

14   rolling.  It doesn't all have to wait until a single day.  The

15   government knows whose its witnesses are.  I assume they

16   already gathered the DEA 6s at least on those witnesses.  So

17   that would be a good beginning and that shouldn't take them

18   very long even if they have to make some redactions from them.

19   There is a reality that at some point before this trial there

20   was going to be a disclosure of who the witnesses are and there

21   is -- let put it this way:  Lots of activity constitutes

22   witness tampering as a matter of law but there is shall we say

23   witness tampering and witness tampering.  I don't know that we

24   have necessarily the full concerns that we might have in some

25   other context.

F466lasc

1              MR. FREEMAN:  It has been my understanding that the

2      allegation is in its distilled form that my client ask certain

3      employees at various pharmacies owned by Mr. Riccio to write

4      her letters of recommendation.  That's my understanding of what

5      the allegation is.

6              MR. RICHENTHAL:  I am not sure to characterize them as

7      letters of recommendation.  More importantly we believe she

8      directed them on pain of being fired or having their hours cut

9      to signs letters to not be truthful in order to exculpate

10     herself.  I think I would use different verbiage.

11              I wanted to say earlier that multiple witnesses have

12     expressed concerns about Ms. Lasher and her directives to them

13     included what to say and not to say.  As your Honor can see in

14     the overt acts, she herself made false statements to

15     investigators.  We expect that there will be testimony that she

16     directed others to do the same or conceal acts from

17     investigators.  There is a course of conduct here involving

18     essentially using her position to influence what people said

19     and did.  It goes beyond the witness tampering count.  What

20     witnesses have said to us, we subjectively believe them, we

21     can't look into their hearts, that it made them very

22     uncomfortable.  We're trying to proceed cautiously.  It is our

23     expectation in the coming weeks to get them all counsel, not to

24     interfere with Mr. Freeman's right to speak with them but

25     because some of them may have exposure.  So when they come here

F466lasc

1    because they are not located in New York city, we anticipate

2    saying to them that if they wish to do so, and it is up to them

3    if they wish to do so, we'll facilitate in getting them CJA

4    counsel.  We can certainly give Mr. Freeman all of the names of

5    those counsel as they come into the case and certainly there is

6    at least one witness, if not two, who I think already have

7    counsel.

8            THE COURT:  Why don't you start by giving him the

9    material of those who already have counsel and he would

10   obviously follow the rules and call counsel.

11           MR. RICHENTHAL:  Of course.

12           THE COURT:  In a situation like this where you sort of

13   have these lay witnesses and you're about to turn over their

14   3500 material, let's say, do you typically call them and say,

15   For your information we've had to under the law turn over prior

16   statements to defense counsel and you may receive a call and

17   you are free to talk to them and you are free not to?

18           MR. RICHENTHAL:  Essentially, yes.  We tell them both

19   that we're going to turn over our notes of our conversations

20   with them and the DEA's conversations with them.  We ask a

21   series of *Giglio* questions.  We don't know their criminal

22   history, if any.  To the extent that they give us answers that

23   might be embarrassing or something, we tell them they have an

24   obligation to turn that over.  We ask them point blank:  Is

25   there anything about your past that you don't want out in court

F466lasc

1    we need to tell defense counsel and we tell them that.

2            With respect to being approached by a private

3    investigator, we tell them it may happen.  It is perfectly

4    appropriate for the defendant to do it.  She has a

5    constitutional right to defend herself and whether they wish to

6    speak to that person is up to them.  If they have counsel we

7    say in consultation with your lawyer and it is your business

8    what you want to do.  That is a pretty standard line.

9            We have not to my knowledge had that conversation with

10   any of these lay witnesses yet.  It is imminent.  We're a few

11   weeks away.  I think some of them are frankly a little more

12   sophisticated and probably know that is coming.  I think some

13   of them are less sophisticated and may not realize that is

14   coming.

15           THE COURT:  We have the two represented people.  How

16   many of these lay witnesses are we talking about in total?

17           MR. RICHENTHAL:  We're still figuring that out in the

18   margins.

19           THE COURT:  Between what and what?

20           MR. RICHENTHAL:  I am smiling because it is a big

21   range.  Ms. Greenberg said between five and 10.  Somewhere

22   between those two numbers.  There is a principal person who is

23   represented and we can immediately tell Mr. Freeman that

24   person's name and that person's lawyer.  We'll do that right

25   after this proceeding.

F466lasc

1          In addition, I can represent in court and I will tell

2     Mr. Freeman that Carl Riccio has also retained counsel.  I will

3     give Mr. Freeman Mr. Carl Riccio's lawyer's number and we'll

4     continue to do that.

5          THE COURT:  Can we say within four days' time from

6     today, so I guess by the end of the week, you will have turned

7     over essentially the 3500 as it exists?  Certainly at least the

8     DEA 6s for all the potential witnesses and that should give you

9     enough time to call them?

10          MR. RICHENTHAL:  Yes.  I think we can turn over the

11     DEA 6s by the end of the week with respect to all pharmacy

12     witnesses.  I am distinguishing that from people who have no

13     knowledge of restocking.  If you would like to us turn over

14     other people's 6s, we can.  For example, there are some

15     cooperating witnesses here.  They have counsel.  I am happy to

16     express who they are.  For cooperating witnesses who have no

17     knowledge of restocking, that was something that happened in

18     the pharmacy.  So if the issues were restocking, we can turn

19     over all DEA 6s of potential pharmacy employees.

20          THE COURT:  That seems fair.  It wasn't my intent to

21     totally change the whole landscape.  I wanted to address

22     anything that changed that has an impact.

23          MR. RICHENTHAL:  I think nearly every possible

24     employee spoke about restocking.  It is easier for us and safer

25     to turn over all pharmacy employees.  One of them as I said has

F466lasc

1   counsel and others of whom I expect will get counsel.

2           THE COURT:  I wanted to give you enough time to call

3   them.

4           MR. RICHENTHAL:  That's literally next on our to-do

5   list.  None of them live in New York city.  I think we have

6   time to call them.

7           THE COURT:  You raised the suppression issue.  What

8   was found in the car?

9           MR. RICHENTHAL:  Ms. Greenberg can speak more

10  intelligently about that than I can.  In substance a bunch of

11  papers having to do with Internet prescriptions, some notes

12  having to do with controlled substances.  If it is okay with

13  the Court, Ms. Greenberg can take the lead on that.

14          THE COURT:  That may be all I need.

15          MR. RICHENTHAL:  It's our understanding Ms. Lasher was

16  surveilled doing work in her car and this is consistent with

17  that.  She would drive to the pharmacy and hang out in the car

18  and do a bunch of work.  Papers consistent with her knowing

19  involvement was found in the car and from our perspective the

20  volume of business.  Part of this case as the Court was asking

21  is the volume and the implications of that volume.  I think the

22  evidence in the car is further evidence of her knowing and

23  understanding of that volume.

24          THE COURT:  Mr. Freeman, if the car had been inside

25  the garage given the search warrant, would you have any

F466lasc

1  argument at all?

2          MR. FREEMAN:  First of all, I didn't come prepared to

3  discuss the extent, the reach of the search warrant.

4          THE COURT:  I don't want to make you.

5          MR. FREEMAN:  It depends on a lot of factors.  I

6  understand the Court's concern and how curtilage is within the

7  house and outside the curtilage is not in the house.

8          THE COURT:  I think there was a specific provision to

9  search the garage?

10          MR. RICHENTHAL:  For the garage, correct.

11          THE COURT:  I assume that it wasn't so much --

12          MR. FREEMAN:  It wasn't in the garage.

13          THE COURT:  I understand that.

14          MR. RICHENTHAL:  We agree it was not in the garage.

15          MR. FREEMAN:  I misremembered that part of the search

16  warrant specifically targeted the garage.

17          THE COURT:  I suspect without knowing that it and

18  wasn't her collection of nails and screws that she might have

19  kept in the garage that was the reason that the garage was

20  included in the search or her lawn mower.

21          I do want your papers.  I really do think that this

22  advice of counsel defense needs to be the subject of a hearing,

23  which I think Ms. Lasher has the burden to establish in the

24  first instance that she had an attorney-client relationship

25  such that she is in the position to waive the privilege if she

F466lasc

1    is not a client.  It is not her privilege to waive.  That's

2    obviously a threshold question which precedes any of the other

3    questions related to when someone can actually rely on an

4    advice of counsel defense.

5            MR. FREEMAN:  Your Honor, we reserved time on 14th at

6    2:00 p.m.

7            THE COURT:  That's not going to work for that hearing

8    because I have an obligation that gets me out of the office by

9    10 to 5:00 and think that is enough time.

10           John, do we have time this Thursday?  I was thinking

11   maybe this Thursday.

12           MR. FREEMAN:  Judge, may I speak from a seated

13   position?

14           THE COURT:  Of course.

15           MR. FREEMAN:  Are you thinking of doing a hearing that

16   day?

17           THE COURT:  Yeah.

18           MR. FREEMAN:  I think the first witness has to be Ms.

19   Lasher because I don't think Mr. Riccio is about to say a word.

20           MR. RICHENTHAL:  You mean Carl Riccio?

21           THE COURT:  Carl Riccio.

22           MR. RICHENTHAL:  All his lawyer said to me in sum was

23   my now client called me and he said you are interested in

24   speaking to him.  I said Ms. Lasher filed this motion and it is

25   publically available.  He said, I already have it from my

F466lasc

1    client.  I said there seems to be a lot of issues here and we

2    would like to get a sense of where he is at.

3          THE COURT:  I may have over-spoken to say he is not

4    going to speak.

5          MR. RICHENTHAL:  His lawyer raised the potential of

6    the Fifth Amendment.  His lawyer said in short I have to speak

7    to my client.

8          THE COURT:  As counsel he is not free to speak without

9    a waiver of the client.  That is more of what I was focusing on

10   not so much --

11         MR. RICHENTHAL:  Oh, okay.  We agree with everything

12   the Court has said.  I think there is potentially two

13   privileges potentially in operation here.  Other than one

14   Ms. Lasher may or may not have had.  One is the pharmacy's

15   privilege.  Mr. Riccio was the owner of the pharmacies, all

16   three pharmacies, and those are legal entities.  They are

17   entitled to have counsel.  Mr. Lasher alleges that at least

18   Mr. Riccio, Carl Riccio, was the pharmacist counsel.  That is

19   in her declaration or brief or both.  The second potential

20   privilege is Mr. Peter Riccio's privilege.  There may be

21   overlap there, especially in any closely held corporation.

22         THE COURT:  The law certainly doesn't typically extend

23   to an employee the privilege of the corporation.  Again, to the

24   extent that the employee is asserting that they have a

25   attorney-client relationship with the counsel to the

F466lasc

corporation, the employee has to make it clear that they are

creating this separate attorney-client relationship.  If you

get past all of these things, then you have as I said before

the issues which Mr. Freeman acknowledged in his brief all the

preconditions to be able to rely on advice of counsel in terms

of how forthcoming one must be and I would think that there are

certain charges here that I can't begin to imagine there having

ever been an attorney-client privilege discussion about whether

other aspects of the case could have been the subject.  It

seems somewhat more plausible.

        But I would just tell you now because there isn't

reason to hold it back that neither of the exhibits, Mr.

Freeman, to your motion persuade me on their face that there is

an attorney-client relationship between Ms. Lasher and either

of the two lawyers mentioned in the exhibits.

        MR. FREEMAN:  The reason I hesitated about Thursday --

there are several reasons.  First of all, Thursday is not a

good day for me; but second of all, I wanted some

clarification.  I need to have Ms. Lasher here, I understand

that.  The question I would have is whether you want to go in

phases.  In other words, should I try to get Mr. Carl Riccio

here?  There is an attorney named Pamela Mandel.  Should I try

to have her here?  So the reason I hesitated was not because of

Thursday being bad, but I didn't know how much you would want

to go into this in the first instance or would you just want to

F466lasc

1    have Ms. Lasher here for the first round and then see where we

2    go.  In addition, I will probably make some attorney proffers

3    between now and the hearing which might help frame the issue.

4            THE COURT:  What do you mean by that?

5            MR. FREEMAN:  What I mean by that is first of all you

6    indicated that the attachments to the motion are insufficient

7    so that guides me.  There may be further information that we

8    can call from the information that we have and then also with

9    respect to the attorney-client there are -- you indicated that

10   certain counts might -- the reliance on counsel defense could

11   conceivably apply to some and not others and I think it might

12   be helpful if we identify them.

13           THE COURT:  There are two.  I was thinking one thing

14   but there are actually two things.  One, to have advice of

15   counsel defense, you have to have a crime that has an intent

16   element.  So if you have a crime like you did before, the

17   narcotics, I tend to agree with the proposition that as a

18   matter of law you cannot have an advice of counsel defense to

19   that.  What I was also just thinking about was let's assume

20   that it is considered misbranding to get a return of drugs and

21   take the label off of the bottle and throw the contents of the

22   bottle back into the a big bottle or put a new label on it, I

23   just didn't imagine someone actually saying to a lawyer, Would

24   it be okay if I did those acts?  What is your advice on that?

25   I can't project that being the case.  Could I have projected

F466lasc

someone in the pharmacy business asking for advice of counsel

given potential conflict between state law and federal law.

Surely I can envision that.  So that is what I mean.  There are

some things where I could see it being sensible and rational

that someone might talk to a lawyer about it, but there are

other things that I cannot imagine someone actually having

sought advice of counsel and candidly told counsel what they

were about to do and asking if it was okay.

            MR. FREEMAN:  Unless the client says that what these

witnesses are saying never happened and it happened this way, a

very different way, and I didn't ask if it is okay to rip

labels off and pour the return pills into a vial with a mark on

it, but I did ask a different question and I received an answer

and it guided me and I relied on it and I did have a

relationship.  It's true that the government witness may say

that, but Ms. Lasher might deny it.

            THE COURT:  Don't misunderstand me.  Those are the

allegations.  I am not accepting them as true or not.  But I am

just saying if those things happened, it doesn't make logical

sense to me that there would have been consultation with

counsel to sanative or approve of that.  If it didn't happen,

then there would probably have been no advice.  I don't think

we have to go quite deep into this.  That is what I meant by

two things.  There is a possible conduct that didn't seem to me

to be logically requesting counsel.  There is other conduct

F466lasc

1    that has been in this case that makes total sense to me that

2    someone, a pharmacist would have asked a lawyer to help them

3    through a regulatory morass if that is how they viewed it.  For

4    example, the issue of which state accepts Internet

5    prescriptions, that makes some sense to me that you would ask a

6    lawyer about.  That is sort of what I meant.

7              MR. FREEMAN:  I understand.

8              MR. RICHENTHAL:  This may be moot how the facts

9    developed, but I think I hear Mr. Freeman raising what I think

10   is actually a very legal question which is the following:  If

11   Ms. Lasher says in sum, I asked counsel things like which

12   states may I ship to, of the states I may ship to are there

13   certain drugs that I may ship or not ship, do I have to keep

14   regulatory records and got an answer and complied with it but

15   did not tell counsel she was doing the things she is alleged to

16   have done is that an advice of counsel defense?

17             THE COURT:  No.

18             MR. RICHENTHAL:  Our answer is no because advice of

19   counsel is to defeat the mens rea.  The defense I just

20   described is I didn't do the actus reus.  I didn't do the

21   things.  Not I did the things, but I was told it was okay.  So

22   when I did them, I lacked wrongful intent.  So I think the

23   legal question that Mr. Freeman poses while interesting, the

24   answer has to be no.  If the proffer is all Ms. Lasher would

25   say in sum what I just said that is not advice of counsel.  It

F466lasc

```
 1    may go to good faith.  It may be pieces of it may be admissible
 2    in other ways, but it is not advice of counsel.  It removes
 3    from advice of counsel the element of telling the lawyer all
 4    the facts.
 5            THE COURT:  You have to totally come clean.
 6            MR. FREEMAN:  What I said was not what Mr. Richenthal
 7    characterized, although I appreciate he observed it was
 8    interesting.  I will say this:  As he described it and as the
 9    Court seems to accept reliance on counsel defense, I wouldn't
10    dispute that you have to put forth the facts.  You can't
11    withhold facts or lie about them and then rely on the advice of
12    counsel defense.
13            THE COURT:  As you said in your brief?
14            MR. FREEMAN:  Right.  Mr. Richenthal and I can talk
15    about that interesting proposition outside the Court.
16            MR. RICHENTHAL:  On a related note I don't know that
17    the Court answered Mr. Freeman's question, which I think we
18    probably share.  Does the Court want them to come, I guess they
19    are subject to subpoena, Mr. Carl Riccio and Ms. Mandel to be
20    here at the hearing.  I think they should probably be.
21            THE COURT:  I don't think it ends at, Well, I thought
22    they were my lawyer.  It is a formal establishment of an
23    attorney-client relationship.  It is not simply someone talking
24    to someone else who happens to be a lawyer and to point out
25    that it is perfectly clear that Mr. Carl Riccio was not the
```

F466lasc

1   lawyer and the case law is clear that it isn't even sufficient

2   to pass the bar exam.  You actually have to be admitted to

3   qualify as the lawyer on the attorney-client relationship.

4           MR. RICHENTHAL:  For what it is worth I would add to

5   our knowledge he never joined the barred of the state in which

6   Ms. Lasher operated in.  I don't think we need to get there for

7   all the other reasons.

8           THE COURT:  What I am prepared to say is this issue

9   cannot be resolved simply on Ms. Lasher testifying, I thought

10  he was my lawyer and here is what I said.  If that would work,

11  everybody would have an advice of counsel defense.

12          MR. FREEMAN:  That's not all we're proffering.  Some

13  of this is my my papers, but Mr. Carl Riccio had weekly

14  meetings.  Mr. Carl Riccio was house counsel.

15          THE COURT:  That doesn't make him her counsel

16  necessarily.

17          MR. FREEMAN:  By itself it doesn't make him her

18  counsel, but there was an understanding between Carl Riccio and

19  Lena Lasher that he was representing her along with other

20  employees of the pharmacy.  And she was not just an employee,

21  she was chief pharmacist and she had although she never used

22  the power the ability to sign checks and she was understood to

23  be a partner by Peter Riccio and therefore Carl Riccio.  There

24  are a lot of indicia that we'll put forth at the appropriate

25  time.  If we have to try to get Carl Riccio and Pam Mandel, I

F466lasc

1    think the Court would have to give us some flexibility as to

2    what day we can get them in by.

3         MR. RICHENTHAL:  I don't dispute we need flexibility

4    for that.  I can't speak to the schedules.  I don't want to use

5    the word interesting again, but I wonder whether Mr. Freeman is

6    actually saying, and maybe this is what we have to explore,

7    that even if the privilege belonged to the corporation, his

8    client can waive it because she was sufficiently high.  I think

9    our concern on that is first of all she wasn't an officer or a

10   director.  She may go by that title, but she wasn't.  Second of

11   all she is talking about waiving it to defend herself in a

12   personal criminal action, not in connection with the

13   corporation.  The pharmacy to our knowledge don't exist anymore

14   and a formal employee cannot waive the corporation privilege.

15   I am not sure that gets us there.  I think we're back to the

16   same square one.

17        THE COURT:  I think we ought to get started on getting

18   some testimony because it is going to have to go into the

19   context of some establishing but sophisticated case law.

20        MR. FREEMAN:  May I propose that all of us led by me

21   contact the Court tomorrow after I reach out to these people

22   and starting with Ms. Lasher and see what days she can come in

23   and then see how much further I can get with Ms. Mandel and

24   Mr. Carl Riccio once I know his attorney?

25        THE COURT:  I can wait.

F466lasc

1          MR. RICHENTHAL:  That sounds sensible.  On the

2    specific issue, while we're happy to file our papers, I think

3    we've gone well beyond what we anticipated filing.  These were

4    all the issues we were going to raise, but we were going to ask

5    for a hearing.

6          THE COURT:  That is fine on the attorney-client

7    privilege.

8          MR. RICHENTHAL:  We're prepared to file tomorrow and

9    the Court can decide what to do or I think Ms. Greenberg is

10   prepared to talk about it.

11         THE COURT:  I think in fairness to the court reporter,

12   who had no idea that she was going to be here at 6:45, that we

13   ought to conclude this now.  I think we made a lot of good

14   progress.

15         MR. RICHENTHAL:  So we know what to file tomorrow, am

16   I correct that we should file in opposition -- I will take them

17   in order.  It's cleaner.  We should not file with respect to

18   the motion to dismiss the indictment?

19         THE COURT:  Right.

20         MR. RICHENTHAL:  We should not file with respect to

21   the strike surplusage?

22         THE COURT:  No.

23         MR. RICHENTHAL:  We should not file with respect to

24   the advice of counsel defense?

25         THE COURT:  Right.

F466lasc

1          MR. RICHENTHAL:  We should file with respect to the

2     motion to preclude as Mr. Freeman calls it evidence of underage

3     and/or addicted individuals?

4          THE COURT:  Right.

5          MR. RICHENTHAL:  We should file with respect to the

6     motion to suppress evidence retrieved from the defendant's

7     vehicle?

8          THE COURT:  I think that's right.  You would agree

9     that some things are either out as a practical matter in light

10    of the superseder and others we need to -- on the advice of

11    counsel we're moving on to the hearing phase, which can cause

12    some more briefing?

13         MR. FREEMAN:  I don't quarrel with the list that was

14    read into the record by Mr. Richenthal.

15         THE COURT:  Okay.

16         MR. FREEMAN:  Your Honor, I am sorry to the court

17    reporter.  I will be quick.

18         As I indicated in my letter, we had new motions

19    addressed to the indictment.  We also have motions that would

20    supplement the responses that we would have made tomorrow

21    because of the superseding indictment.  I think it would be

22    best for us to submit one set of motions, not several sets of

23    motions.  I would ask some leeway in submitting them especially

24    since we have an additional week.

25         THE COURT:  I have Part I in between now and then.  So

F466lasc

1    there are reasons.  As I tried to hint to you, schedules are in

2    larger pictures of obligations.

3               MR. FREEMAN:  I just wanted to make it clear we would

4    be submitting incomplete motions.

5               THE COURT:  Since I kept you here as long as I have

6    today, why don't you give me your responses to the current

7    government motions, let's say, tomorrow by 6:00.

8               MR. RICHENTHAL:  It was 2:00.  Yes, your Honor, for

9    both sides?

10              THE COURT:  Say by 6:00.  Can you give me a hint as to

11   what your new motions are if you know?

12              MR. FREEMAN:  Your Honor, I don't.  What I would say,

13   which I am not going to say, has been informed by today's

14   conversation.  A lot of things have changed.  Plans that we had

15   have now changed.

16              THE COURT:  Hopefully for the better?

17              MR. FREEMAN:  For the better.

18              MR. RICHENTHAL:  At the risk of asking a question, are

19   we also filing by 6:00 or 2:00?

20              THE COURT:  Were you done?

21              MR. RICHENTHAL:  We're not done, no, your Honor.  We

22   made substantial progress.

23              THE COURT:  You can wait until 6:00, too.

24              MR. RICHENTHAL:  I don't think this is necessarily for

25   the Court but I do want to raise it so the Court is aware and I

F466lasc

1    think the parties need to confer further and they have already

2    begun.  What I referred to earlier as to daylight as the

3    difference between what was identified and made available and

4    what was basically handed over and I think I said electronic

5    devices.  Before this proceeding, Mr. Freeman said that he

6    would like some of those physically provided.  The parties need

7    to confer further about that because among the devices he has

8    requested are those seized from Mr. Peter Riccio's home, which

9    Mr. Peter Riccio's counsel has informed us is privilege

10   material so we cannot see and it we also cannot give it to

11   Mr. Freeman.  So unless there could be keyword searches or some

12   efficient way to do this, we have to find out a way to get that

13   done.  That could take meaningful time.  We're not asking for

14   an adjournment period.  I just want to highlight this is

15   something we have to talk more about.  It is on the list of

16   things.  I am hopeful we'll work it out, but it does need to be

17   worked out.

18          THE COURT:  Just understand that this attorney-client

19   privilege issue needs to be addressed and resolved in the next

20   week and a half.  As you're talking to people and I think it is

21   important that you know the answer.

22          MR. FREEMAN:  I agree.  Judge, I think there are

23   certain items that I should mention that we cannot resolve

24   today but I don't think we should leave each other without

25   mentioning them.  We don't have a schedule for 3500 other than

F466lasc

1    the very beginning of it.  You may adjust the voir dire and

2    request to charge but that doesn't have to be resolved today.

3    I think that's it.

4           MR. RICHENTHAL:  I think on the former, 3500, the

5    parties have not talked about it.  Notwithstanding our concerns

6    about witnesses given the nature of the case, we did anticipate

7    providing it earlier than the business day before.  We haven't

8    talked to Mr. Freeman what it was.  We anticipate providing

9    witnesses who are less fearful, cooperating witnesses and

10    alike.  I think the parties can work that out.  I don't know

11    that the Court needs to get involved.

12           THE COURT:  Why don't you take a shot at it.  It is

13    not my understanding that it is normally the day before.  My

14    understanding is it is typically the Friday before if not

15    earlier.  Most of my cases it is earlier.

16           MR. RICHENTHAL:  We're going to do it earlier.

17           MR. FREEMAN:  I have a note that said the 20th and I

18    thought as a result of today's conversations it is going to

19    be --

20           THE COURT:  You are getting a lot of stuff this week.

21    You are going to get it all by the end of the week.

22           MR. RICHENTHAL:  Tonight I will give him counsel for a

23    pharmacy employee, name of counsel for Mr. Carl Riccio.  By the

24    end of week we'll give 6s for pharmaceutical aides.  I am

25    talking about the remainder of the 3500 material.  We were

F466lasc

1    always intending to give it earlier than the Friday before.  In

2    terms of the request to charge, we might prefer to have another

3    few days.  I think we can still get it done if the Court wants

4    it on Monday.

5              MR. FREEMAN:  I was hoping two weeks before trial

6    would be sufficient.

7              THE COURT:  You are into my Part I week and that is

8    not going to work for me.  I need it before I have scheduled

9    just a million things that week.  You can take another week on

10   the request to charge and the voir dire.  One more week.

11   Though, I am not sure why I am giving you any adjournments

12   given what I said earlier.

13             MR. FREEMAN:  Your Honor, I am really having a hard

14   time figuring out how we can submit an intelligent response by

15   tomorrow at 6:00.

16             THE COURT:  On what you were supposed to give me

17   tomorrow by 2:00?

18             MR. FREEMAN:  Right.  I am just reiterating that there

19   are changes because of the superseding indictment so I am

20   asking you to consider the following day, the 8th, by 2:00?

21             THE COURT:  Look, the government's motion addresses

22   two things.  One, lay witnesses testifying about lawfulness of

23   conduct and two the the postarrest statement whether it can be

24   slashed between that which is helpful to one side versus that

25   which is helpful to the other side.  Nothing we've done here

F466lasc

1   today really affected either of those issues as far as I can

2   tell.

3           MR. FREEMAN:  All right.  There still has to be a new

4   motion schedule for other motions and we can deal with that on

5   a different date as well.

6           THE COURT:  We're just going to finish up what was on

7   our plate by 6:00 tomorrow instead of by 2:00.  Now we have a

8   new plate which we need to fill up because it is empty.

9           MR. FREEMAN:  It sounds like Passover.

10          THE COURT:  So what I understood Mr. Freeman to say

11  earlier is a lot of this happened this afternoon.  I agree with

12  that and that what has happened today will influence what

13  motions, if any, he now wants to make addressing the

14  superseding indictment.

15          MR. FREEMAN:  Correct.

16          THE COURT:  So why don't you take until Wednesday

17  morning to think about it and send me a letter bright and early

18  Wednesday morning telling me what the motion, if any, you want

19  to make and then we'll set a schedule.

20          MR. FREEMAN:  Thank you.

21          THE COURT:  How's that?

22          MR. FREEMAN:  Fine.

23          MS. GREENBERG:  Your Honor, just one last thing.  I am

24  not sure this changes anything in light of what you've said.

25  So I understand that now the new trial date is starting

F466lasc

| 1 | May 4th; is that correct? |

THE COURT:  That's correct.

MS. GREENBERG:  And this trial is anticipated to go roughly two weeks?

THE COURT:  Right.

MS. GREENBERG:  That does set me up with a potential conflict that I have before Judge Sweet.  That said, I understand in light of what your Honor has said about your Honor's schedule and is not inclined to adjourn anymore, but I just wanted to put that on the record in case that moves the needle at all.

THE COURT:  It doesn't move the needle.

MS. GREENBERG:  Okay.  Lastly again during the break I had the chance to speak to the narcotics chief who has been supervising this case.  We regret that you have concerns about where we are and how we've gotten here and she's happy to speak with you about those if you are so inclined.

THE COURT:  Let's wait until after the trial.  I am not interested in engaging in ex parte conversations.

MS. GREENBERG:  Okay.

THE COURT:  With counsel or anybody.

MS. GREENBERG:  All right.  Thank you.

oOo