F57sLAS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                      12 Cr. 868 (NRB)

LENA LASHER,

           Defendant.

------------------------------x

                              New York, N.Y.
                              May 7, 2015
                              9:00 a.m.

Before:

                HON. NAOMI REICE BUCHWALD,

                              District Judge

                      APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
DANIEL RICHENTHAL
KRISTY GREENBERG
    Assistant United States Attorney

FREEMAN, NOOTER & GINSBERG
    Attorneys for Defendant Lena Lasher
BY:  LOUIS M. FREEMAN
     NADJIA LIMANI

ALSO PRESENT:  Annie Chen, Paralegal

F57sLAS1

1          (In open court; jury not present)

2          THE COURT:  There is a note from the jury.  I'm not

3     sure it is necessary to mark it as an exhibit.  It says:  Just

4     so you are aware, if the court stops at 2:15, many of the

5     jurors can make an express train.  The next express train is

6     one hour later.  Thank you for your support.

7          MR. RICHENTHAL:  2:15 it is.

8          THE COURT:  We will do our best.

9          MR. RICHENTHAL:  Would it be okay if I sent one

10    e-mail?  It is case related.  I want to get something out to an

11    agency.

12         THE COURT:  Let me just say, we got Ms. Greenberg's

13    e-mail of yesterday.  I just want to let Mr. Freeman know that,

14    since the government obviously is not perfect on estimating its

15    time, which is okay -- disappointing but okay, of course -- you

16    should have a witness ready to go on Monday.  Don't assume --

17         MR. FREEMAN:  I'm not assuming.

18         THE COURT:  Don't assume they are absolutely going to

19    take up the whole day.  Just have someone ready.

20         MR. FREEMAN:  Message received.

21         THE COURT:  Great.

22         (Jury present)

23         THE COURT:  Good morning, everyone.

24         Get your witness.

25     DANIEL GEIGER, resumed.

F57sLAS1

1          MS. GREENBERG:  May I proceed?

2          THE COURT:  Ms. Greenberg, please proceed.

3  DIRECT EXAMINATION (CONTINUED)

4  BY MS. GREENBERG:

5  Q.  Good morning, Mr. Geiger.

6  A.  Good morning.

7  Q.  Mr. Geiger, I would like to return back to Government

8  Exhibit 3003, which is in evidence.

9          MS. GREENBERG:  Ms. Chen, could you please put that on

10  the screen.  If you could just zoom in on the top.

11  Q.  Mr. Geiger, looking at the middle center on the top, what

12  does this part of the report show?

13  A.  That this is a doctor's patient list.

14  Q.  Look just to the left of that, what is the report date?

15  A.  December 10, 2012.

16  Q.  Were you working at Hellertown or Palmer Pharmacy on

17  December 10, 2012?

18  A.  No, I was not.

19          MR. FREEMAN:  Your Honor, I renew my objection from

20  yesterday as to the introduction of this document into

21  evidence.  Now I have further reason.

22          MS. GREENBERG:  Your Honor, the foundation has been

23  laid that Mr. Geiger would run these reports in the usual

24  course of his business.  He would see these reports in the

25  regular course of business.  This particular report was not run

1    by him, but he's aware of how they look and the contents of

2    these general documents.

3              THE COURT:  In the business record context, the

4    employee who authenticates it does not have to be employed at

5    the time that the business record was created.

6              The objection's overruled.

7              MS. GREENBERG:  Thank you.

8              Ms. Chen, if you could go a few pages into the reports

9    in this exhibit.  If you could go to the schedule two

10   controlled substances report to Pennsylvania, just a few pages

11   into the report.  If you could just zoom in on the top.

12   BY MS. GREENBERG:

13   Q.  Mr. Geiger, looking at the top, what is this report?

14   A.  This was a monthly report of all the controlled two

15   substances and prescriptions that were filled.

16   Q.  Looking through this report in hard copy, I will hand it up

17   to you in a moment.  Just looking through this report, are

18   there several monthly reports?

19   A.  Yes.  This report appears -- yes, there are.

20   Q.  Generally, do these monthly reports span from 2010 through

21   the end of 2012?

22   A.  Yes.  I see the earliest date is 2010.

23   Q.  The latest date is the end of 2012?

24   A.  Yes.

25   Q.  Mr. Geiger, did you run these particular reports?

1   A.  Yes.

2   Q.  To be clear, the monthly reports that are in this document

3   that are with the report date next to it, do you see where it

4   says December 10, 2012?

5   A.  Yes.

6   Q.  Did you run the reports for these monthly reports on

7   December 10, 2012?

8   A.  No, I did not.

9           MS. GREENBERG:  Ms. Chen, can you take this exhibit

10  down.

11  BY MS. GREENBERG:

12  Q.  Mr. Geiger, you testified yesterday that you saw a

13  prescription for oxycodone that was prescribed by a Dr. Yang

14  that had a notation by Ms. Lasher that it had been verified by

15  the doctor.  Where did you see that prescription in her

16  notation?

17  A.  It was in the filing cabinet where we keep all of the

18  narcotic prescriptions that are filled and it was in like a

19  manila file folder envelope that all the prescriptions,

20  narcotic prescriptions, were kept after they were filled.

21  Q.  Can you provide a rough estimate of when you saw that

22  prescription and notation by Ms. Lasher?

23  A.  Well, I believe it was --

24          MR. FREEMAN:  Objection.

25          MS. GREENBERG:  I'm asking for an approximate time

F57sLAS1                    Geiger - direct

1    frame when he saw it.  I don't think the witness is going to

2    remember a precise date, but just an approximate time frame.

3            THE COURT:  What is your best recollection?

4            THE WITNESS:  My best recollection is December of

5    2011.

6    BY MS. GREENBERG:

7    Q.  Now, Mr. Geiger, did there come a time when you stopped

8    working at Hellertown and Palmer Pharmacies?

9    A.  Yes.

10   Q.  When was that?

11   A.  I stopped working the end of January, January 30, 2012.

12   Q.  Now, prior to January 30, 2012, what were your plans

13   regarding this job?

14   A.  I was going to try to keep the job that I had, but at the

15   same time, I was looking for another job.

16   Q.  When did you start looking for another job?

17   A.  Approximately towards the end of December, right after

18   holidays, of December 2011, early January 2012.

19   Q.  Roughly a month before you actually left the job, you had

20   begun looking for a new job?

21   A.  Yes.

22   Q.  Now, for how long then were you at Hellertown and Palmer

23   Pharmacies before you began looking for a new job?

24   A.  Approximately two months.

25   Q.  Prior to your leaving, what, if any, plans did you have to

1    file any complaints against Ms. Lasher?

2              MR. FREEMAN:  Objection, speculative.

3              MS. GREENBERG:  It's not speculation.  It's what plans

4    did he have.

5              THE COURT:  What plans did he actually have, if any,

6    to file complaints that he formulated before he left.

7    A.  I had planned to file a complaint with the Pennsylvania

8    state board of pharmacy.

9    Q.  On what basis did you plan to report her?

10   A.  She was breaking pharmacy --

11             MR. FREEMAN:  Objection.  Beyond the scope of this

12   witness's knowledge.

13             THE COURT:  He can answer.

14   A.  She was performing work that was against pharmacy law.

15   Q.  Again, prior to your leaving Hellertown and Palmer

16   Pharmacies, what, if any, steps did you take regarding filing

17   this complaint?  I'm sorry.  Go ahead, you can answer.

18   A.  Prior to leaving?

19   Q.  Prior to leaving, did you do anything; for example, did you

20   look at any documents?

21   A.  I made some copies of documents.

22   Q.  What kinds of documents did you make copies of prior to

23   leaving the pharmacy?

24   A.  I made copies of my work schedule, I made copies of the

25   written policies, I made copies of a patient profile.

1    Q.  Prior to your leaving the pharmacy, what, if any, threats

2    did Ms. Lasher make towards you?

3    A.  She had threatened to terminate my position, to terminate

4    me.

5    Q.  How regularly did those threats occur?

6    A.  Verbally, there was several threats.

7    Q.  And in writing?

8    A.  In the policies, yes.

9    Q.  The general policies for the pharmacy?

10   A.  Yes.

11   Q.  Did Ms. Lasher cut your hours?

12   A.  Yes.

13   Q.  When you left Hellertown and Palmer Pharmacies, were you

14   terminated, did you resign?  What were the circumstances?

15   A.  Well, I terminated, I resigned, but at the same time, I was

16   going to be terminated.

17          THE COURT:  The time you resigned, you anticipated.

18          THE WITNESS:  I anticipated I was going to be

19   terminated.

20   BY MS. GREENBERG:

21   Q.  Can you please describe the events that led to your

22   resignation?

23   A.  Yes.  On, I believe, January 27, Ms. Lasher had informed me

24   that I committed several prescription errors.

25   Q.  Do you recall what kinds of errors she had said you --

1  A.  I believe she said that there were seven prescriptions that

2  were mailed and the patient received the wrong medication.

3  Q.  How did Ms. Lasher inform you that there were these certain

4  scripts that had been misfiled where the customer got the wrong

5  medication?

6  A.  Well, she called me up and told me, but she also wrote it

7  down in a notebook, communication notebook.

8  Q.  That communication notebook, was that a notebook that was

9  in regular use in the course of the business?

10  A.  Yes.

11  Q.  What was the notebook used for?

12  A.  The notebook was used to communicate to the pharmacist

13  things that were going on or things that happened.

14  Q.  Who maintains that notebook?

15  A.  Ms. Lasher.

16  Q.  Did other employees make entries into this notebook as well

17  to communicate with Ms. Lasher?

18  A.  Yes.

19  Q.  Did you at any time make a copy of a page from that

20  notebook?

21  A.  Yes.

22  Q.  I would like to show you what has been marked as Government

23  Exhibit 3010.  Mr. Geiger, do you recognize this document?

24  A.  Yes.

25  Q.  What is it?

F57sLAS1                    Geiger - direct

1   A.  It was the document from the notebook that she used to

2   communicate to the pharmacist and staff.

3   Q.  At what time did you make this copy?

4   A.  On January 30, 2012.

5   Q.  Is this an accurate representation of how this page

6   appeared in the log on January 30, 2012?

7   A.  Yes.

8           MS. GREENBERG:  Government offers Government Exhibit

9   3010.

10          MR. FREEMAN:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 3010 received in evidence)

13          MS. GREENBERG:  Ms. Chen, could you please publish.

14  Could you zoom on just the first top part, the entry.

15  BY MS. GREENBERG:

16  Q.  Mr. Geiger, looking at this top entry, whose handwriting is

17  this?

18  A.  Ms. Lasher's.

19  Q.  Can you please read the top part up through Fioricet?

20  A.  Dan, be careful, you misfiled eight RXs on 1/23/12.

21  Customers got tramadol, order was for Fioricet.

22  Q.  What, if any, instruction had Ms. Lasher previously given

23  you about who would be the last person to see the pills before

24  they were shipped out?

25  A.  That was the technicians.

1   Q.  So after you read this entry from Ms. Lasher, what, if any,

2   conversation did you have with her?

3   A.  She called me up and told me what had happened, and as I

4   wrote in the notebook as well, I told her that I didn't make

5   prescription errors because I do not have the final check

6   before that prescription bottle is placed in the envelope and

7   shipped to the customer.

8   Q.  Did you say anything about how you wanted to proceed moving

9   forward?

10  A.  Yes.  Then I also told her that from here on out, I was

11  going to change the process, and when I check prescriptions the

12  next time, I was going to wait until the technicians placed the

13  label on the bottle and then I was going to do the final check

14  to make sure the tablets in the bottle is what was on the

15  label, and I was going to place it in the envelope and seal the

16  envelope.

17  Q.  How did Ms. Lasher respond?

18  A.  She didn't say anything.

19  Q.  What happened now on January 30, 2012?

20  A.  When I reported for work?

21  Q.  Yes.

22  A.  I was scheduled to work that day at the Hellertown

23  Pharmacy.  On my way to work, I received a phone call informing

24  me not to go in the store, that there was something wrong with

25  the alarm system, and that Ms. Lasher would be there to open up

1    the pharmacy.

2    Q.  Just to be clear, it was phone call from Ms. Lasher or

3    someone else?

4    A.  It was from someone else.

5    Q.  So did you go to the store?

6    A.  I was at the store waiting in my car until Ms. Lasher

7    showed up.

8    Q.  So could you get into the store at that time?

9    A.  I didn't try because I was told not to because something

10   was wrong with the alarm system.  I didn't want to set off the

11   alarm system.

12   Q.  Did there come a time when you entered the store?

13   A.  Yes.  Ms. Lasher came, got out of her car, unlocked the

14   door.  I saw her doing something with the alarm system, and

15   while she was doing that, I got out of my car and walked up

16   towards the door.

17   Q.  Did you work that day?

18   A.  Yes, I did.

19   Q.  What did you do that day?

20   A.  Well, I did my scheduled time that I was supposed to do,

21   and at the end of the day, I wrote up my letter of resignation,

22   drove over to the Palmer Pharmacy, and presented it to her.

23   Q.  That same day, you testified earlier that you thought you

24   were going to be terminated.  Why did you think that?

25   A.  Because I received another phone call shortly after the

1    first one informing me that the locks to the stores had been

2    changed and that's why I couldn't get into the store.  And

3    while I was at the store, I actually tried the key that I had,

4    and the key didn't unlock the door.

5    Q.  Was it on that basis that you believed you were going to be

6    terminated?

7    A.  Yes.

8    Q.  You said at the end of the day you submitted a resignation

9    letter to Ms. Lasher?

10   A.  Yes.

11   Q.  Prior to submitting that resignation letter, did you make

12   any entries into the log book?

13   A.  Yes, I did.

14        MS. GREENBERG:  Ms. Chen, could you put up the next

15   entry.

16   BY MS. GREENBERG:

17   Q.  Mr. Geiger, just looking at the date, this is the date that

18   you resigned, January 30, 2012?

19   A.  Yes.

20   Q.  Can you please read your entry to the log book?

21   A.  Lena, I did not misfile any order, as you have the

22   technicians place the label on the bottle and placed in an

23   envelope to be shipped.  The pharmacists do not do final

24   verification based on your process for mail orders.

25   Q.  You underlined "your."  Why did you do that?

1   A.  Because it was her process.

2            MS. GREENBERG:  Ms. Chen, could you take this down,

3   please?  Thank you.

4   Q.  After you resigned on January 30, 2012, what did you do?

5   A.  I started to put together my letter to the state board of

6   pharmacy, my letter of complaint.

7   Q.  How soon after you resigned did you file your complaint?

8   A.  I mailed it in February, sometime in February.

9   Q.  Do you recall how soon after?

10  A.  Yes.  It was days to weeks after I resigned.

11  Q.  Did you tell anyone you were going to make a complaint

12  against Ms. Lasher?

13  A.  Yes, I did.

14  Q.  Who did you tell?

15  A.  I told several of the other employees who had worked there.

16  Q.  Did you show them your complaint?

17  A.  Yes, I did.

18  Q.  In your complaint, did you report about the topic of

19  Ms. Lasher's supervision?

20  A.  Yes.

21  Q.  Did you report about the topic of the Internet prescription

22  orders in both pharmacies?

23  A.  Yes.

24  Q.  Did you report about the topic of labeling of the totes?

25  A.  Yes.

F57sLAS1                    Geiger – direct

1  Q.  Did you report about the topic of counting of prescription

2  drugs?

3  A.  Yes.

4  Q.  Did you report about the topic of handling customer

5  complaints?

6  A.  Yes.

7  Q.  Did you report about the topic of returned medications?

8  A.  Yes.

9  Q.  Did you report about the topic of misuse of controlled

10  substances?

11  A.  Yes.

12  Q.  Did you report about the topic of a doctor who had an

13  addiction problem?

14  A.  Yes.

15  Q.  That doctor, did you report regarding the substance of

16  opium tincture?

17  A.  Yes.

18  Q.  Did you report about the verification of prescription

19  orders?

20  A.  Yes.

21          MS. GREENBERG:  No further questions at this time.

22  CROSS-EXAMINATION

23  BY MR. FREEMAN:

24  Q.  Is Exhibit 1023 a computer printout of substances that were

25  reported to Pennsylvania?  Do you remember seeing that?

F57sLAS1                    Geiger - cross

1      3003, I'm sorry.  Do you remember looking at that?

2   A.  Yes.

3   Q.  Next to patient Dr. Craig Haytmanek, there is a name Eric

4   Cochran, correct?

5   A.  Yes.

6   Q.  Eric Cochran is Craig Haytmanek's primary care physician

7   and you know that, right?

8   A.  No, I do not.

9   Q.  You didn't call to find out, did you?

10  A.  No.

11  Q.  You suspected Dr. Craig Haytmanek of being addicted to

12  opium and you didn't call his primary care physician?

13  A.  I didn't know who his primary care physician was.

14  Q.  You didn't ask him?

15  A.  There was no need to.

16  Q.  But you were concerned for his health, as I understand it?

17  A.  Yes.

18  Q.  You didn't call his primary care physician to --

19  A.  No, I did not, because I did not know who it was.

20  Q.  So we are clear, you didn't know who it was, but you didn't

21  ask him?

22  A.  I did not ask Cochran, no.

23  Q.  Nor did you ask Haytmanek?

24  A.  No.

25  Q.  You worked at Hellertown for approximately three months, is

F57sLAS1                    Geiger - cross

1  that right?

2  A.  Both pharmacies for three months, yes.

3  Q.  You were hired by Lena Lasher?

4  A.  Yes.

5  Q.  Is it fair to say that you didn't like Lena Lasher?

6  A.  No.

7  Q.  That's not fair to say?

8  A.  No, it's not.

9  Q.  Is it fair to say that there came a point in your employ at

10 Hellertown and Palmer that you didn't like her?

11 A.  No.

12 Q.  Is it fair to say that you didn't respect her?

13 A.  Yes.

14 Q.  You were in the Navy for approximately 25 years, correct?

15 A.  Yes.

16 Q.  You finished your stint in the Navy as a lieutenant

17 commander?

18 A.  Yes.

19 Q.  Percentagewise, using the Navy as the entire universe, only

20 a small percentage of people make grade as lieutenant

21 commander, correct?

22 A.  No.

23 Q.  Is it fair to say that they're in the minority?

24 A.  No.

25 Q.  Let me phrase it a different way.  It's a high rank, is it

F57sLAS1                    Geiger - cross

1    not?

2    A.  It's a middle rank.

3    Q.  You were used to giving out orders when you were a

4    lieutenant commander, correct?

5    A.  I was used to leading, yes.

6    Q.  You didn't like Lena Lasher's leadership style, correct?

7    A.  Yes.

8    Q.  Over time, your dislike of her leadership style got greater

9    and greater and greater, correct?

10   A.  Yes.

11   Q.  Didn't it feel petty to you that she was making you sign

12   memos to acknowledge that they were read?

13   A.  No.

14   Q.  Had you ever done that before as a lieutenant commander?

15   A.  Yes.

16   Q.  Didn't it seem petty and unfair that the sick policy

17   changed in the way it did?

18   A.  Yes.

19   Q.  Did you ever meet Peter Riccio?

20   A.  Once.

21   Q.  Was it at a meeting, was it at a party; do you recall the

22   circumstances?

23   A.  He visited the Palmer Pharmacy.

24   Q.  Did you know that he was the owner of Palmer and Hellertown

25   and Towne Pharmacy in New Jersey?

F57sLAS1              Geiger - cross

1    A.  Yes.

2    Q.  You knew that he was above Lena Lasher, correct, in the

3    chain of command?

4    A.  Yes.

5    Q.  Did you see e-mails at any time during your employ

6    indicating that Riccio was directing Lena Lasher to do certain

7    tasks?

8              MS. GREENBERG:  Objection.

9    A.  No.

10   Q.  You indicated on direct examination that you were planning

11   to file a complaint against Lena Lasher, if I heard you

12   correctly, is that right?

13   A.  Yes.

14   Q.  It was not against the pharmacy, it was against Lena Lasher

15   the person, correct?

16   A.  It was against Lena Lasher the pharmacy manager.

17   Q.  Lena Lasher, comma, the pharmacy manager, is that what you

18   meant?

19   A.  Yes.

20   Q.  Not against the pharmacy?

21   A.  No.

22   Q.  You indicated that there was a plan in your mind to file a

23   complaint before you left, correct?

24   A.  No.

25   Q.  Think about your answer, please.

F57sLAS1                    Geiger - cross

1    A.  I thought about filing the complaint, but it wasn't filed

2    until after I left.

3    Q.  I apologize if I was unclear.  You were planning to file a

4    complaint, you didn't file it until after you left?

5    A.  Yes.

6    Q.  Can you estimate, during the three-month period you worked

7    there, when you started thinking about filing a complaint?

8    A.  The end of December, beginning of January.

9    Q.  So that would be approximately a month before you left?

10   A.  Yes.

11   Q.  You didn't quit before January 30, 2012, correct?

12   A.  Correct.

13   Q.  Part of your plan was to stay on until you found another

14   job, correct?

15   A.  Yes.

16   Q.  The items that you were asked about on direct examination,

17   I'm sure you will recall the questions, it was a list of topics

18   that were in your complaint.  Do you remember that question?

19   A.  Yes.

20   Q.  Those topics were going to be the subjects of your

21   complaint, correct?

22   A.  Yes.

23   Q.  But none of those topics in December of 2011 were topics

24   that forced you to quit the employ at the pharmacies, correct?

25   Let me rephrase the question.  It might have been unclear.

F57sLAS1                    Geiger - cross

1          There were certain topics that were in your complaint,

2    correct?

3    A.   Yes.

4    Q.   Those topics, were they part of your planned complaint that

5    you were thinking about in December?

6    A.   Yes.

7    Q.   None of those topics caused you to quit working at the

8    pharmacy in December, correct?

9    A.   No.

10   Q.   It's not correct?

11   A.   It's not correct.

12   Q.   But you didn't quit?

13   A.   I didn't quit.

14   Q.   In fact, you didn't quit and you didn't write a termination

15   letter until David Allen called you and said, You're going to

16   be fired, correct?

17   A.   He called me and told me the locks were going to be changed

18   and I asked him if he thought I was going to be terminated.

19   Q.   And he said yes?

20   A.   He said he believed I was, yes.

21   Q.   Isn't it accurate to say that that is the chronology, that

22   you were told that you were going to be fired or that it was a

23   good chance you were going to be fired, and then later that

24   day, you penned a resignation letter by hand and delivered it

25   to Lena Lasher at the end of the day?

1    A.  Yes.

2    Q.  Do you know when Hellertown Pharmacy began business?

3    A.  Approximately, I do.

4    Q.  Would it be about 2007?

5    A.  I thought it was later than that, but I guess it's

6    possible.

7    Q.  What did you think?

8    A.  I thought it was around 2010.

9    Q.  Well, regardless of the date that it started, the pharmacy

10   was up and running before you started working there?

11   A.  Yes.

12   Q.  Do you know when the cameras were installed?

13   A.  No.

14   Q.  Do you know who ordered the cameras to be installed?

15   A.  No.

16   Q.  Do you know who paid for the cameras to be installed?

17   A.  No.

18   Q.  Do you know who requested or directed their location?

19   A.  No.

20   Q.  Getting back to my earlier question, what was the occasion

21   that you met Mr. Riccio?  I'm not sure.

22   A.  I came to the Palmer Pharmacy once on an inspection, I

23   believe.

24   Q.  He did not hold a meeting while you were there that day?

25   A.  I wasn't part of the meeting.

1  Q.  To your recollection, you were not part of any meeting that

2  he held?

3  A.  That is correct.

4  Q.  You don't know what directions, if any, he gave Lena Lasher

5  on a daily basis, correct?

6  A.  Correct.

7  Q.  Did you ever meet Carl Riccio?

8  A.  His son?  Yes.

9  Q.  Under what circumstances did you meet Carl Riccio?

10  A.  He would come to the Palmer Pharmacy once a month maybe.

11  Q.  Were you ever present for any meetings with Carl Riccio?

12  A.  No.

13  Q.  Did you see any meetings with Carl Riccio and techs or Carl

14  Riccio and other pharmacists?

15  A.  No.

16  Q.  You indicated yesterday on direct examination that policy

17  changes were made -- I'm paraphrasing -- policy changes were

18  made that resulted in memos based on things that happened.  Do

19  you remember that statement?

20  A.  Yes, I do.

21  Q.  Did policy change regularly?

22  A.  Weekly.

23  Q.  The policy as you understand it, based on these memos and

24  things that were said to you, were told to you by Lena Lasher,

25  correct?

F57sLAS1                    Geiger - cross

1    A.  Some were told and some were written.

2    Q.  But told or written by Lena Lasher?

3    A.  Yes.

4    Q.  Did you also work for Stephen Goloff?

5    A.  Not for him.

6    Q.  Well, maybe that was a bad choice of words.  When Lena

7    Lasher worked at Hellertown, she was the pharmacy in charge,

8    correct, or as you put it yesterday managing pharmacy?

9    A.  Yes.

10   Q.  There were times when you worked at Hellertown that she

11   wasn't present, am I correct?

12   A.  Yes.

13   Q.  Who was the pharmacist in charge or your direct supervisor

14   or any concept like that when she wasn't there?

15            MS. GREENBERG:  Objection.

16            MR. FREEMAN:  I'll rephrase.

17   BY MS. GREENBERG:

18   Q.  When you were hired, you were hired adds an as needed or a

19   part-time pharmacist?

20   A.  Yes.

21   Q.  You weren't guaranteed a number of hours, were you?

22   A.  No.

23   Q.  You testified earlier that at least on one occasion your

24   hours were cut, correct?

25   A.  Yes.

F57sLAS1                   Geiger - cross

1    Q.  Wasn't there an occasion when your hours were raised

2    because Eric Correa was on vacation?

3    A.  I don't know a reason why they were raised, but my hours

4    were raised.

5    Q.  Was there a time when you worked at Hellertown when

6    Ms. Lasher was not present when you were working with another

7    pharmacist who was higher than you in the chain of command?

8    A.  No.

9            MS. GREENBERG:  Objection.

10           THE COURT:  I think he can answer that.

11           MR. FREEMAN:  Pardon?

12           THE COURT:  I think he can answer that.

13           MR. FREEMAN:  Would you answer it, please?

14   A.  No.

15   Q.  Was Stephen Goloff equal to you?

16   A.  Yes.

17   Q.  Was Stephen Goloff the pharmacist in charge for Palmer

18   Pharmacy?

19   A.  His name was on the license, yes.

20   Q.  His name was on the license as pharmacist in charge?

21   A.  Yes.

22   Q.  Of Palmer?

23   A.  Of Palmer.

24   Q.  So when he was at Hellertown, he was not the pharmacy in

25   charge, so therefore he was equal to you?

1    A.   Yes.

2    Q.   Were there any other pharmacists that you worked with at

3    Hellertown?

4    A.   Other than Ms. Lasher and Steve Goloff, those are the only

5    two pharmacists that I worked with at Hellertown.

6    Q.   When you worked at Palmer, you worked with Stephen Goloff

7    there, correct?

8    A.   Never, no.

9    Q.   Who did you work with at Palmer?

10   A.   I usually worked by myself, but sometimes Ms. Lasher would

11   be there.

12   Q.   Did you ever work with Eric Correa?

13   A.   Eric Correa, yes, Eric would relief me or I would relieve

14   him.

15   Q.   Was David Allen a tech?  He was a tech, was he not?

16   A.   He was a certified pharmacy technician, yes.

17   Q.   But he had managerial responsibilities for the two stores,

18   correct?

19   A.   He had the front retail management responsibilities of

20   Palmer.  That's where he worked most of the time.  I didn't see

21   help very -- I don't remember seeing him at Hellertown.

22   Q.   Did you meet Sandra Arnao, do you recall meeting someone by

23   that name?

24   A.   On occasion, yes.

25   Q.   She was involved in the financial end of the pharmacies?

F57sLAS1                    Geiger - cross

1    A.  Yes.

2    Q.  Do you know who signed your check?

3    A.  I can't say I ever looked at that, no.

4    Q.  To your recollection, it was not Lena Lasher, correct?

5    A.  I don't know who signed by check.

6    Q.  Do you recall testifying yesterday regarding some persons

7    from the New York area getting prescriptions filled for

8    oxycodone?

9    A.  Yes.

10   Q.  Do you remember when that was?

11   A.  I believe I filled the prescription sometime in January.

12   Q.  January 2012?

13   A.  2012.

14   Q.  Now, there was testimony regarding a prescription for opium

15   tincture, correct?

16   A.  Yes.

17   Q.  Would you spell tincture?

18   A.  T-i-n-c-t-u-r-e.

19   Q.  What is a tincture?

20   A.  Tincture is a liquid base that contains some alcohol in it,

21   but it is considered a base, a preparation that you would use

22   to dissolve medications in.

23   Q.  Do you know how many prescriptions in total were filled for

24   this opium tincture?

25   A.  I never counted them, no.

F57sLAS1                    Geiger - cross

Q.  Do you know how many --

             THE COURT:  Do you mean for one person?

             MR. FREEMAN:  For one person.

Q.  Do you know how many were filled by Goloff?

A.  I don't know the number.  I know he did.  I don't know what

the number was.

Q.  Would it be refresh your recollection if I said 14?

             MS. GREENBERG:  Objection.

             MR. FREEMAN:  I'll withdraw the question.

Q.  To your knowledge, did Goloff's prescription fills for

opium tincture for Dr. Craig Haytmanek exceed Lena Lasher's

prescriptions that she wrote that were filled?

             MS. GREENBERG:  Objection.  He just said he doesn't

know.

             THE COURT:  If you want to show him something to

refresh his recollection.

             MR. FREEMAN:  I'll do it through a witness.

             THE COURT:  If he has a recollection.

BY MR. FREEMAN:

Q.  When you fill a prescription like opium tincture, do you

have to input it in a computer so that the state of

Pennsylvania gets notice either immediately or shortly

thereafter of the fact that you filled a prescription of that

type?

A.  I didn't know the ins and outs of the computer system.

F57sLAS1                    Geiger - cross

Q.  I am talking about a general regulation for any pharmacy in

Pennsylvania.

A.  Again, I didn't know what the process was after input the

prescription into the system.  I didn't know what happened

behind the scenes.

Q.  Does a pharmacist, to your knowledge, does a pharmacist to

your knowledge have an obligation to input, at that time, to

input at that time meaning January of 2012, does the pharmacist

have to input the fact that this particular medication, which

is a controlled substance, was filled?

A.  Yes.

Q.  How does the pharmacist do that?

A.  Sitting at a computer terminal with a keyboard and

inputting the information into the pharmacy system.

Q.  If I understand you correctly, you're saying that that is

the obligation of the pharmacist and that is what you did when

you filled the prescription for opium tincture, you just don't

know what happens mathematically or in computer terms how the

information flows from there to the state?

        THE COURT:  He doesn't know whether he does or it

doesn't.

A.  I don't know.

Q.  But you know that there is an obligation to put it in?

A.  It was our process, yes.

Q.  When you say "our process," what do you mean?  Whose

F57sLAS1                    Geiger - cross

1   process?

2   A.  Anybody who worked any of the pharmacists who worked there

3   and filled prescriptions.

4   Q.  Before you worked at Hellertown, you worked as a

5   pharmacist, correct?

6   A.  Yes.

7   Q.  I know there was a time when you worked as a pharmaceutical

8   rep, but when was the last time you worked as a pharmacist

9   prior to November 2011?

10  A.  1995.

11  Q.  Were you out of the game from 1995 until 2011?

12          MS. GREENBERG:  Objection.

13          MR. FREEMAN:  I'll withdraw the question.

14  Q.  Were you working as a pharmacist in any capacity from 1995

15  to 2011?

16          THE COURT:  What do you mean working as a pharmacist?

17  BY MR. FREEMAN:

18  Q.  Were you doing retail pharmacy, online pharmacy, made order

19  pharmacy, were you working as a pharmacist in a brick and

20  mortar pharmacy?

21  A.  No.

22  Q.  Had you been taking pharmacy continuing education courses?

23  A.  Yes.

24  Q.  It's your understanding, as of 2011, that the pharmacist's

25  obligation is to input a prescription involving a controlled

1    substance, correct?

2    A.   Yes.

3    Q.   That's what you did when you were at Hellertown and Palmer,

4    you inputted any controlled substances into the computer that

5    was at the pharmacies, one of the two pharmacies, correct?

6    A.   Yes.

7    Q.   You received training before you started working at

8    Hellertown/Palmer, am I correct?

9    A.   Yes.

10   Q.   On-the-job training, correct?

11   A.   Yes.

12   Q.   For two weeks?

13   A.   For two weeks, yes.

14   Q.   Who was your teacher?  Who was your supervisor there?

15   A.   Ms. Lasher.

16   Q.   That was one of the things that she instructed you on was

17   to use how to use the computer and to input either all

18   prescriptions or certain prescriptions?

19   A.   Yes.

20   Q.   Was there ever a time while you were working at Hellertown

21   or Palmer where you received a prescription and you felt it

22   necessary to call a physician, the physician that wrote the

23   prescription?

24   A.   Yes.

25                (Continued on next page)

F57elas2                    Geiger - cross

1    BY MR. FREEMAN:

2    Q.  And did you do it?

3    A.  Yes.

4    Q.  There was testimony yesterday about a patient profile.  Do

5    you remember that testimony?

6    A.  Yes.

7    Q.  Now, was the patient profile, did that need to be inputted

8    separately from inputting a prescription, or is it

9    automatically created by the software?

10   A.  No.  You have to create the patient profile first before

11   you can fill the prescription.

12   Q.  What if the patient profile is already filled in and it

13   exists at the pharmacy; you don't have to fill it in again, do

14   you?

15   A.  No.  You don't have to re -- if the patient information is

16   there, the profile is already created, then you don't need to

17   do it again.

18   Q.  Do you recall testifying yesterday regarding a -- and we

19   talked about this briefly a moment ago -- a prescription for

20   oxycodone where the person lived in the Bronx?

21   A.  Yes.

22   Q.  Now, you said you had suspicions regarding that particular

23   prescription, correct?

24   A.  Yes.

25   Q.  Do you remember saying that it was typed in tiny letters,

1    or words to that effect?

2    A.   Yes.

3    Q.   Did you call the doctor?

4    A.   No.

5    Q.   Did you call the police?

6    A.   No.

7    Q.   Do you recall using the term or the word -- and I may

8    butcher it, but I think it's -- I'll spell it first,

9    P-R-O-V-I-N-G-I-L -- Provigil?

10   A.   Provigil, yes.

11   Q.   That's a medication, right?

12   A.   Yes.

13   Q.   And that's a medication that could be used for serious

14   diarrhea or gastrointestinal problems, correct?

15   A.   No.

16   Q.   What is it used for?

17   A.   Provigil is a stimulant.

18   Q.   And that stimulant, was that another prescription that you

19   saw?

20   A.   Yes.

21   Q.   At the same time you saw the oxycodone?

22   A.   No.

23   Q.   When did you see the Provigil?

24   A.   With the opium tincture.

25   Q.   And that was one of the so-called red flags?  There were

1    two medications that had opposite effects, am I correct?

2    A.  That produced no red flag to me.

3    Q.  Okay.  Is Provigil a medication that has potential for

4    abuse?

5    A.  Yes.

6    Q.  When you were about to leave the employ -- withdrawn.  I'll

7    rephrase that.

8            When you were out looking for a job and you were

9    thinking of leaving, when you found out that you were leaving,

10   you spoke to other people who worked at Palmer and Hellertown

11   to see if they would be witnesses for you in your complaint, is

12   that right?

13   A.  Yes.

14   Q.  And that was Goloff?

15   A.  He was one, yes.

16   Q.  And David Allan was another?

17   A.  Yes.

18   Q.  And did you speak to James Barnes?

19   A.  Yes.

20   Q.  And you told them about your plan to file a complaint,

21   right?

22   A.  Yes.

23   Q.  And you were enlisting them as witnesses on your behalf

24   against Lena Lasher, correct?

25            MS. GREENBERG:  Objection.

F57elas2                    Geiger - cross

1          THE COURT:  Sustained.

2     Q.  Were you asking them to support you?

3     A.  Yes, I was.

4          THE COURT:  Just to clarify, did you speak to these

5     people before you actually left?

6          MR. FREEMAN:  Yes, I think so.  We can ask the

7     witness.

8          THE COURT:  I thought the answer originally was the

9     opposite, so I just want to be clear.

10         Did you speak to these other three people before you

11    resigned or were terminated or afterwards?

12         THE WITNESS:  Afterwards.

13         THE COURT:  That's what I --

14    BY MR. FREEMAN:

15    Q.  How long afterwards?

16    A.  A couple of weeks.

17    Q.  While you were working at Hellertown, did you discuss your

18    disrespect for Lena Lasher with those same potential witnesses?

19    A.  No.

20    Q.  You never shared your disrespect for Lena Lasher with David

21    Allan, the person that called you to warn you that you were

22    going to be fired?

23         MS. GREENBERG:  Objection.  It's asked and answered.

24    He said he didn't speak to anybody about disrespecting

25    Ms. Lasher.

F57elas2                    Geiger - cross

                THE COURT:  Right.  You can answer.  Before you

left --

                MR. FREEMAN:  Yes.

                THE COURT:  -- did you speak to David Allan concerning

your disrespect for Ms. Lasher?

                THE WITNESS:  I didn't put it in those -- using that

word, no.

BY MR. FREEMAN:

Q.  Did you complain?

A.  Yes.

Q.  Frequently?

A.  Define frequently.

Q.  Once a week?

A.  I'd say it was once a week, may -- yes.

Q.  Now, so we're clear, after you left the employ of

Hellertown/Palmer, you spoke to David Allan, Steven Goloff.

Who else did you speak to?

A.  Eric Carrera, James Barnes, Katie Scott, Albert Buck and

Jordan Boyer.

                MR. FREEMAN:  I have nothing further.

REDIRECT EXAMINATION

BY MS. GREENBERG:

Q.  I'll be brief, Mr. Geiger.

                So starting with opium, when you got the script from

Dr. Haytmanek on January 7, 2012, who was listed on the

1    prescription as the prescribing doctor?

2    A.  Haytmanek, the same as the patient.

3    Q.  And when you went into the profile in the Hellertown

4    Pharmacy system, on each and every script when you looked at

5    it, who was listed as the prescribing doctor?

6    A.  Dr. Haytmanek, the same as the patient.

7    Q.  Now, in anywhere in his profile or in any conversation did

8    he mention that there was any other physician who was

9    prescribing opium tincture for him?

10   A.  No.

11   Q.  In fact, he said to you that he was prescribing it for

12   himself?

13   A.  Yes.

14   Q.  And he had told you that it was Ms. Lasher that was filling

15   his scripts, correct?

16   A.  He told me Ms. Lasher had filled prescriptions for him in

17   the past.

18   Q.  And when you spoke to Ms. Lasher, she knew who

19   Dr. Haytmanek was, right?

20   A.  Yes.

21   Q.  She was aware that he was taking opium tincture, correct?

22   A.  Yes.

23   Q.  And when you told her of your concerns of Dr. Haytmanek

24   having an addiction problem, she told you to continue filling

25   the scripts, correct?

F57elas2                    Geiger - redirect

1    A.  Yes.

2            MR. FREEMAN:  Objection to the form.  Leading.

3            MS. GREENBERG:  I can --

4            THE COURT:  Go ahead.

5    Q.  Ms. Lasher didn't say anything to you about any other

6    pharmacist being responsible for filling the prescriptions for

7    Dr. Haytmanek, is that right?

8    A.  Yes.

9    Q.  Now, I want to talk about your time at Hellertown and

10   Palmer pharmacies.  When did you start working at Hellertown

11   and Palmer pharmacies?

12   A.  It was about the beginning of November.

13   Q.  And I believe you testified during your direct examination

14   that it was sometime in December when you decided that you were

15   going to start looking for another job, is that right?

16   A.  Late December, yes.

17   Q.  So you'd been there, what, roughly a month or so?

18   A.  Roughly almost two months.

19   Q.  And it was at that time, after a month or two months, that

20   you decided to start putting together a potential complaint?

21   A.  Yes.

22   Q.  And you left in January of 2012, correct?

23   A.  Yes.

24   Q.  So you were there less than three months?

25   A.  Yes.

F57elas2                    Geiger - redirect

1    Q.  Now, during your time at Hellertown Pharmacy, you testified

2    about the cameras.  Who monitored those cameras every day?

3    A.  Ms. Lasher monitored cameras a lot.

4    Q.  Who was the one who was calling on a daily basis about what

5    she was seeing on those cameras?

6    A.  Ms. Lasher.

7    Q.  Did you receive -- and the calls that she was referring to,

8    these were calls about whether the people in the pharmacy were

9    talking?

10   A.  That was one of them.

11   Q.  About whether they were standing around?

12   A.  Yes.

13   Q.  About anything she was observing in the pharmacy?

14   A.  Yes.

15   Q.  And those happened on a daily basis?

16   A.  It was a daily basis, yes.

17   Q.  Now, we've heard about other individuals.  You mentioned

18   Steven Goloff.  Was Steven Goloff -- putting aside what was on

19   the license, was Steven Goloff actually in charge of either of

20   these pharmacies?

21   A.  No.

22   Q.  Did you ever take any direct orders from him?

23   A.  No.

24   Q.  Was he ever involved in any supervisory decisions; hiring,

25   firing, disciplining anyone?

F57elas2                    Geiger - redirect

1   A.  Hiring, firing, no.  During the course of his work he may

2   have disciplined some of the other employees.  I'm speculating

3   on that.

4   Q.  I don't want you to speculate.  Is the answer you don't

5   know about that?

6   A.  I don't know about that.

7   Q.  You were never present for him having a supervisory role in

8   the pharmacy?

9           MR. FREEMAN:  Objection.

10          MS. GREENBERG:  You know what, strike it.

11  Q.  With respect to -- we've heard about David Allan.  Is David

12  Allan presently deceased?

13  A.  Yes.

14  Q.  Now, David Allan, was he a direct supervisor in either of

15  the pharmacies?

16  A.  He may have provided some supervision for the other

17  technicians at the Palmer pharmacy.

18  Q.  Did he give Ms. Lasher direction?

19  A.  No.

20  Q.  Did he report to Ms. Lasher?

21  A.  Yes.

22  Q.  Did the staff at both of these pharmacies report to

23  Ms. Lasher?

24  A.  Yes.

25          MS. GREENBERG:  No further questions.

F57elas2                          Geiger - redirect

1              MR. FREEMAN:  No.  Thank you.

2              THE COURT:  Good.  Thank you very much.  You're

3    excused.

4              (Witness excused)

5              THE COURT:  The government can call its next witness.

6              MS. GREENBERG:  The government calls Albert Buck.

7     ALBERT BUCK,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MS. GREENBERG:

12   Q.  Good morning, Mr. Buck.

13   A.  Good morning.

14   Q.  Mr. Buck, how old are you?

15   A.  Twenty-six.

16   Q.  What is your educational background?

17   A.  I'm GED, and Cortiva Institute for massage therapy.

18             THE COURT:  Say the second thing?

19             THE WITNESS:  Cortiva Institute for massage therapy.

20   Q.  And are you currently employed?

21   A.  Yes.

22   Q.  In what position?

23   A.  Massage therapy.

24   Q.  Now, could you briefly describe your employment history.

25   A.  Yes.  My first job was McDonald's.  Then Shop Rite as a

1    cart pusher.  BJ's Wholesale Club as a cart pusher and restock.

2    Wawa for restocking.  Hellertown Pharmacy as pharmacy

3    technician.  Hand and Stone as massage therapist.

4    Q.  You just mentioned your work as a pharmacy technician at

5    Hellertown Pharmacy.  When did you begin working there?

6    A.  July 2011.

7    Q.  Now, did you receive a license to work as a pharmacy

8    technician?

9    A.  No.

10    Q.  Any certification?

11    A.  No.

12    Q.  Did you have any course work in pharmacy -- as being a

13    pharmacy technician prior to your working there?

14    A.  No.

15    Q.  What were your duties and responsibilities as a pharmacy

16    technician at Hellertown Pharmacy?

17    A.  Cashier, counting, counting prescriptions, shipping,

18    printing out papers, putting papers together and filing.

19    Q.  When you say "counting," did you ever count pills?

20    A.  Yes.

21    Q.  When did you stop working at Hellertown Pharmacy?

22    A.  October 2012.

23    Q.  For whom did you work?

24    A.  Ms. Lasher.

25    Q.  And do you recognize Ms. Lasher in the courtroom today?

F57elas2                          Buck - direct

1   A.  Yes.

2   Q.  Could you please describe an article of clothing that she's

3   wearing?

4   A.  A red shirt.

5           MS. GREENBERG:  May the record reflect Mr. Buck has

6   identified the defendant.

7           THE COURT:  It may.

8   Q.  Who hired you to work at Hellertown Pharmacy?

9   A.  Ms. Lasher.

10  Q.  And who was your direct supervisor at Hellertown Pharmacy?

11  A.  Ms. Lasher.

12  Q.  Who trained you?

13  A.  Ms. Lasher.

14  Q.  On what topics did Ms. Lasher train you?

15  A.  Counting, printing, cashiering.

16  Q.  When you say "counting," are you referring to pill

17  counting?

18  A.  Yes.

19  Q.  And when you say "printing," what kinds of paperwork did

20  she train you on how to print?

21  A.  An order sheet, invoice and prescription label.

22  Q.  Now, who gave you instructions on your work?

23  A.  Ms. Lasher.

24  Q.  How did Ms. Lasher communicate with the pharmacy, with the

25  people in Hellertown Pharmacy, when she was not physically

1   present in the pharmacy?

2   A.  By phone.

3   Q.  And how many phone calls would Ms. Lasher make to the

4   pharmacy in any given day?

5   A.  Anywhere between one to three, I believe.

6   Q.  Now, did you ever speak to her directly on any of these

7   phone calls?

8   A.  Yes.

9   Q.  What kinds of things would Ms. Lasher say to you during

10  these calls?

11  A.  No talking; to work faster; and no laughing.

12  Q.  I'm sorry.  What was that?

13  A.  No laughing.

14  Q.  No laughing?

15  A.  Yes.

16  Q.  What, if anything, did Ms. Lasher say about whose pharmacy

17  Hellertown Pharmacy was?

18  A.  Her pharmacy.

19  Q.  Would she refer to it as her pharmacy?

20  A.  Yes.

21  Q.  Now, you just testified about a number of different things

22  Ms. Lasher would call the pharmacy about; talking, moving fast,

23  smiling.  How was Ms. Lasher able to know these things if she

24  wasn't in the pharmacy?

25  A.  By camera.

F57elas2                      Buck - direct

1    Q.  Were there cameras in the work areas of Hellertown

2    Pharmacy?

3    A.  Yes.

4    Q.  Were there cameras positioned in all of the work areas at

5    Hellertown Pharmacy?

6    A.  Yes.

7    Q.  Did Ms. Lasher have an area in the pharmacy where she

8    worked?

9    A.  Yes.

10   Q.  Did you understand that to be her office space?

11   A.  Yes.

12   Q.  Did Ms. Lasher give any instructions as to whether anybody

13   was able to touch anything in her space?

14   A.  To do -- do not touch anything at her desk.

15   Q.  Now, in what ways could a customer obtain drugs from

16   Hellertown Pharmacy?

17   A.  Walk-in prescription or Internet order.

18   Q.  So what percentage of the business was Internet orders

19   versus walk-in customers?

20   A.  I would say about over 99 percent was Internet based.

21   Q.  While you were working at Hellertown Pharmacy, were there

22   any written protocols for pharmacy technicians?

23   A.  Yes.

24   Q.  Now let's focus on the Internet pharmacy for the moment.

25   How many website companies did Hellertown Pharmacy work with?

F57elas2                    Buck - direct

1    A.  About eight.

2    Q.  So I'd like to show you what's been admitted into evidence

3    as Government Exhibit 1013.  Now, I've given you a stack of

4    materials.  Just looking at one of those materials that you

5    have in front of you, what are these?

6    A.  I'm sorry.  What was that?

7    Q.  Sure.  I've given you a stack of materials, and you're

8    handling one piece of that stack.  Can you just explain to us

9    what it is you're holding?

10   A.  Yes.  An Internet order.  This one is the order sheet with

11   the drug name.  This is the prescription label.  And then this

12   is the invoice.  And then there's the shipping label.

13   Q.  And the shipping label is placed on a shipping envelope?

14   A.  Yes.

15   Q.  Those materials that are in the shipping envelope, who

16   prints out those materials?

17   A.  Pharmacy technician.

18   Q.  And where do you print those from?

19   A.  The back room and the computer room.

20   Q.  So let's just look at the questionnaire for the moment,

21   what you've referred to as the order sheet.  So what steps

22   would you take when you would see these order sheets on a

23   computer before you would print it out?

24   A.  I would check the state to make sure that it's one of the

25   states that we can ship to according -- by drug, or if it's a

1    no-ship state.  I would check the name to see if it's one of

2    the names on the blacklist.

3    Q.  So let's talk about each of those in turn.  What is the

4    no-ship list?

5    A.  The no-ship list is a list of states that we cannot send

6    orders to and certain states we couldn't send anything, certain

7    states we couldn't send certain drugs.

8    Q.  And what, if anything -- and let's talk about the

9    blacklist.

10            What is the blacklist?

11   A.  The blacklist is a list of names that we cannot send to.

12   Q.  When did that blacklist first begin to be used?

13   A.  If I remember, about six months into working there.

14   Q.  And when did you start working at Hellertown Pharmacy?

15   A.  July 2011.

16   Q.  And so you said for the first six months that you were

17   working there, there was not a blacklist?

18   A.  No.

19   Q.  And how did the blacklist come about?

20   A.  I believe one of the technicians made it.

21   Q.  Now, is there a period of time during which a person who

22   has ordered a prescription drug can't order that drug again?

23   A.  Yes.

24   Q.  Do you know what that time frame was?  Was there a general

25   time frame involved for you or did it differ?

F57elas2                    Buck - direct

1   A.  It differed from drug and quantity.  For example, tramadol

2   180 was I believe 21 to 23 days, was the -- how long it had to

3   be in between.  And Fioricet, I'm -- was between 10 to 14.  I

4   can't remember the exact time period of Fioricet.  And Soma was

5   the same as -- Soma 90 tablets was the same as the tramadol

6   180, when it comes to the amount of time that it has to be

7   between.

8   Q.  And how did you know those different time frames from which

9   you could order a drug for each of the different drugs?

10  A.  There was a piece of paper on the walls that said when

11  something could be ordered, or how far in between it had to be.

12  Q.  So have you heard of customers who would order the drugs

13  too soon, so within that time frame when they weren't allowed

14  to order again?

15  A.  I'm sorry.  What was that?

16  Q.  That wasn't a good question.  Let me try again.

17          Were there ever occasions when customers would order

18  the drug too soon?

19  A.  Yes.

20  Q.  Now, when you'd printed out those order sheets that had the

21  list of questions on them, on those forms, was there ever --

22  just the form itself, was there ever an indication of when the

23  customer had last ordered the drug?

24  A.  Yes.

25  Q.  On the questionnaire itself?

F57elas2                    Buck - direct

1          MS. GREENBERG:  Ms. Chen, can you put that up.

2     A.   Not on the questionnaire.

3     Q.   So putting aside the questionnaire, then?

4          MS. GREENBERG:  Ms. Chen, you can take it down.

5     Thanks.

6     Q.   For the companies themselves on the computer in a separate

7     place, would there ever be an indication of when the customer

8     had last ordered that drug?

9     A.   In -- in four of the systems there was a program called

10    PCMS that said when the last time they ordered from that

11    company was.

12    Q.   So let's just take this step by step.  I think you had

13    testified earlier there were eight website companies?

14    A.   Yes.

15    Q.   And you just testified that four of those eight had a

16    system where it would indicate the last time, the date of the

17    last order of that drug?

18    A.   Yes.

19    Q.   So let's talk about those four companies first.

20          When you would see the date of the last time that the

21    customer had ordered the drug, what would you then do?

22    A.   I would check to see how far apart the -- from the last

23    time they ordered was.

24    Q.   So was there any kind of like an alert or something that

25    would come up that would say they've ordered too soon within

F57elas2                    Buck - direct

1    that time frame?

2    A.   No.  We had to recognize visually.

3    Q.   And when you say "we," to whom are you referring?

4    A.   To the technicians.

5    Q.   So if a customer ordered a pain medication, then, from two

6    different website companies on the same day, would that come up

7    on the screen?

8    A.   No.

9    Q.   So was there any way within one website company's order

10   history to indicate whether the customers were ordering from

11   any of the other websites at the same time?

12   A.   No.

13   Q.   So for these four companies, where it did indicate the date

14   of the last order, what, if anything, instruction did

15   Ms. Lasher give you regarding these patients who you and the

16   other technicians would identify as ordering too soon?

17   A.   What is the procedure?

18   Q.   Yes.

19   A.   The procedure was while checking the PCMS system to see

20   when the last order was, if it was to be determined too soon,

21   to write down the order ID number, the drug quantity and the

22   name of the person that ordered.

23   Q.   And what would you do with that information once you wrote

24   it down?

25   A.   Usually towards the end of the day, or if there was enough

F57elas2                    Buck - direct

1    time, sometime during the day we would send to the company that

2    ordered, that the clients ordered from.

3    Q.  Now, in terms of going through and sort of making the

4    calculations for different drugs about when it was too soon,

5    did it make it more or less difficult that you had to work

6    fast?

7    A.  It made it very hard for -- to be accurate and to -- to be

8    able to work fast was very difficult.

9    Q.  I'm sorry.  I want to make sure that I ask the proper

10   question before, then.

11           Whose policy was it to work fast in the pharmacy?

12   A.  Ms. Lasher.

13   Q.  Again, just sticking with the companies, the four companies

14   out of eight where they do have the order listed, how many

15   scripts were coming in from those companies in a given day?

16   A.  It usually ranged between 200 to 500.  Some days it was

17   close to 1,000.

18   Q.  And so for each of those, while working fast, you're also

19   trying to compute for each different drug's time period, if

20   they ordered too soon?

21   A.  Yes.

22   Q.  So let's talk about the other four companies, the ones

23   where it does not indicate a date of when the customers last

24   ordered on the computer.  So in that case, if that information

25   is not on the computer, how do you know when the customer last

F57elas2                    Buck - direct

1   placed an order for the drug?

2   A.  To remember the name and check it to the cold copies.

3   Q.  What do you mean, "to remember the name"?

4   A.  To recognize the name of the person that ordered.

5   Q.  So let me just give an example.  So if you see a name John

6   Smith, and that name you happen to think may be somebody who

7   had ordered within the last 25 days of orders, it's at

8   that point that you're then going to do some kind of a check to

9   see if they ordered too soon?

10  A.  To see if they ordered too soon, I would check through --

11  Q.  I'm sorry, Mr. Buck.  I think I was asking a different

12  question.  Let me be more clear.

13          So it would be the responsibility of the pharmacy

14  technician to remember or be able to identify the name of the

15  person that they thought may have ordered too soon for these

16  companies because the information was not on the computer?

17  A.  Yes.

18  Q.  And this is for basically a 25-day period roughly, give or

19  take, for different drugs; that you would have to identify to

20  yourself whether that name may have come up in an order too

21  soon?

22  A.  Yes, unless it was on some of the systems that had the --

23  four of the systems that had the PCMS.

24  Q.  I'm sorry.

25  A.  That we could search -- if we went to the computer, we

1    could manually search by typing in, and it would tell us the

2    person ordered.  But that was only for four of the companies

3    that had that system.

4    Q.  So I think we understand the process for the four

5    companies, right, where you do have the information; it says to

6    you on the computer what date they last ordered, right?

7    A.  Yes.

8    Q.  So I want to talk about the other four companies on the

9    computer, where on the computer there is no date ordered.  So

10   you don't know the last date?

11   A.  No.

12   Q.  So the way that you would do it is you would have to

13   remember a name of an individual and whether or not they had

14   ordered within the last three weeks?

15   A.  Yes.

16   Q.  And that's out of how many scripts per day are you looking

17   at, for those companies?

18   A.  Usually between 50 to 200 per day.

19        THE COURT:  That's you personally?  In other words,

20   you were doing the work on 50 to 200 prescriptions every day,

21   or the whole pharmacy was filling 50 to 200 prescriptions a

22   day?

23        THE WITNESS:  On one particular system for that many

24   that didn't have the PCMS system -- I believe it was called

25   Motto -- if the person was working on that one that day, it

1    would be usually between 50 to 200.

2              THE COURT:  So for each of the Internet companies that

3    you were dealing with, you received between 50 and 200 orders

4    each day?

5              THE WITNESS:  On the Motto system.

6              THE COURT:  Okay.

7    BY MS. GREENBERG:

8    Q.  Let me see if I can clarify.  Each computer, would each

9    computer correspond to one or two systems?

10   A.  Yes.

11   Q.  And would one technician be working at each of the

12   individual computer stations?

13   A.  It varied from day to day.  Usually there was anywhere

14   between one to three people working in the back room on

15   computers.

16   Q.  But in a typical day would you focus on printing out the

17   orders from one computer system?

18   A.  One, one to two computer systems, usually two.

19   Q.  And for that one or two computer -- well, just sticking

20   with one computer system, roughly how many in a day scripts

21   would you be looking at?

22   A.  Usually about 50 to 200, unless it was the -- one of the

23   computers, there was a computer that printed out -- we

24   described as CA in the pharmacy, in which that one on some days

25   was -- could be up to a few hundred.

F57elas2                    Buck - direct

1    Q.   Now, that's per day.  So once you figure out, or you

2    remember a name that you think, just sticking with the four

3    companies now where the information is not listed on the

4    website as to whether they last ordered, the other four

5    companies where that information is not there, you think you

6    may remember a name, what do you then do?  How do you check to

7    know when they last ordered?

8    A.   Look through the cold copies.

9    Q.   Do you mean physical printouts of the hard copies of the

10   questionnaires?

11   A.   Yes.

12   Q.   And you would do this for, again, we're talking for how --

13   what period of time would you have to then look to see if they

14   had ordered?

15   A.   For tramadol, I believe it was 23 days; Fioricet was

16   between 10 to 14 I think.

17   Q.   So let's just stick with the first one.  Tramadol you said

18   was what?

19   A.   Twenty-three.

20   Q.   Twenty-three days.  So you would have to go through

21   twenty-three days of hard copy order sheets to see if that same

22   name that you remembered came up again and ordered too soon?

23   A.   Yes.

24   Q.   What kind of volume are we talking about for that 23 -- how

25   many scripts roughly would you have to go through?

1  A.  I think roughly about 1,000 to 4,000.

2  Q.  So you'd have to go through thousands?

3  A.  Yes.

4  Q.  Let me just show you an example of an exhibit, and I want

5  you to show me generally, when I show you this exhibit, how it

6  is you would go back and check to see if that first name still

7  came up.

8         So, Mr. Buck, if you could just look at some of these

9  scripts.  This is just one box.  How many boxes would you say

10 of scripts would you be looking at to do this check for a "too

11 soon" customer.

12 A.  Usually one to two boxes.

13 Q.  So this is an example of one box.  So take out the scripts.

14 What is your process?  What do you do to check the names?

15        Can you stand up so that the jury can see you.

16 A.  I would straighten the papers out and I would grab papers

17 like this, then check for the name.

18 Q.  Mr. Buck, that stack that you just pulled out, that's not

19 even -- how much of that little box there would you say you

20 just did that for?

21 A.  That I skimmed through, probably about 50.

22 Q.  And how many more would you say are in that little box that

23 you just looked at?

24 A.  This one, about --

25 Q.  What percentage would you say that you just pulled out of

1    that little box?

2    A.   5 percent.

3    Q.   Now, looking at -- and you just pulled out a stack from

4    that little box.  That's in a larger box, correct?

5    A.   Yes.  They're usually larger boxes about this big.

6    Q.   About as big -- you can go out and inspect the larger box.

7    A.   Usually about, about this size, maybe sometimes a little

8    wider.

9    Q.   For the record, Mr. Buck, your hands were about a few feet

10   apart in each direction?

11   A.   Yes.  Maybe about 20 inches apart, 20 by 20, about.

12   Q.   And it would be more than one of those boxes that you'd be

13   looking at to check if a customer had ordered too soon?

14   A.   One to two, depending on if it was a -- if it was a new box

15   or an old box.

16   Q.   And is that just for one company?

17   A.   Yes.

18   Q.   So what about, is there any way to then check to see if

19   that customer that you remembered that may have ordered before

20   had ordered -- was ordering from any of the other companies

21   that also didn't have the last order date there?

22   A.   We would have to check the cold copies for those as well.

23   Q.   So is that something that you would do?

24   A.   Yes.

25   Q.   So how many more boxes would you have to go through?

F57elas2                    Buck - direct

1    A.  Three, I believe.

2    Q.  How long would this take you in any given day -- let me ask

3    this a different way.

4            In any given day, how many names did you remember that

5    may have ordered too soon because they had ordered in the past

6    few weeks?

7    A.  I usually check a few a day.

8    Q.  And how long did it then take you to do this check, where

9    you'd go through these boxes and check to see if the name had

10   come up in orders before?

11   A.  Usually took me between 15 to 30 minutes.  I usually

12   skimmed through the papers.

13   Q.  And this process that you're doing to do this check, did

14   Ms. Lasher tell you to do this process?

15   A.  Yes.  To check through the cold copies if we thought that

16   they may have ordered too soon.

17   Q.  Again, I'm going to go back to another question I asked you

18   with respect to the system, the four companies where the name

19   did come up.  Now, for these companies, where the name doesn't

20   come up and you go through this process, are you still being

21   instructed by Ms. Lasher to work fast?

22   A.  Yes.

23   Q.  How did that affect your ability to check using this

24   process?

25   A.  It was very difficult.

F57elas2                    Buck - direct

1    Q.  Would you say that -- did you have any concern that working

2    fast would affect your ability to accurately find customers who

3    had ordered too soon?

4    A.  Yes.

5    Q.  Now, what, if any, responsibility did you have to examine

6    each questionnaire?

7    A.  Each questionnaire would check the state that it's being

8    shipped to, the person's -- and the person's name.

9    Q.  Did Ms. Lasher ever ask you to review each of those order

10   sheets with the questionnaires on them to determine if they

11   were suspicious in any way?

12   A.  No.

13   Q.  Did there come a time where you raised an issue with a

14   prescription from a Buffalo address with Ms. Lasher?

15   A.  Yes.

16   Q.  What did you tell Ms. Lasher about that prescription?

17   A.  That many people were ordering from one address and one

18   apartment.

19   Q.  What did Ms. Lasher say?

20   A.  At first that it was okay.

21   Q.  At first that it was okay.  How many times was it raised

22   with Ms. Lasher?

23   A.  I'm not sure exactly how many.

24   Q.  More than once?

25   A.  Yes.

1    Q.  So the first time you said, hey, I see and hear that this

2    address is being ordered from multiple times.  What was her

3    response?

4    A.  That it's okay.  Because they -- they were different names.

5    Q.  So let me make sure I understand.  Your concern is you see

6    an address in Buffalo and different names of patients ordering

7    prescriptions from that same address?

8    A.  Yes.  Same address, same apartment.

9    Q.  And you raised that with Ms. Lasher, and she said it was

10   fine the first time you raised it?

11   A.  Yes.

12   Q.  Generally speaking, let's talk about the blacklist for a

13   moment.  So how does a customer's name get on the blacklist?

14   A.  By ordering too soon, too often.

15   Q.  I'm just going to stop you for a moment.  I'm sorry to

16   interrupt you.

17         But when you say "too soon, too often," what is "too

18   often"?  What do you mean?

19   A.  Probably about four times, I think.

20   Q.  So in order to get on to a blacklist, you or one of the

21   other technicians would need to raise a concern about a

22   customer roughly four times before they could make it to the

23   blacklist?

24   A.  Yes.

25   Q.  Who ultimately decided whether a customer was placed on the

1    blacklist?

2    A.   Ms. Lasher.

3    Q.   Did Ms. Lasher ever ask you to do anything with respect to

4    the doctors, the prescribers for those customers who had made

5    it on to the blacklist?

6    A.   No.

7    Q.   Was there a separate blacklist for the doctors who were

8    prescribing to these customers?

9    A.   Not to those customers.

10   Q.   Well, doctors for any customers.  Was there a blacklist, a

11   list of doctors who were identified as prescribing

12   suspiciously?

13   A.   I remember that there was a -- there was a few, I think

14   they said, that they were waiting for his license to be

15   renewed.

16   Q.   So there were a few doctors, then, that were not being

17   allowed to prescribe for the moment because of a license

18   renewal issue?

19   A.   Yes.

20   Q.   But other than that, was there a blacklist for doctors who

21   were prescribing to patients that were frequently ordering too

22   soon?

23   A.   No.

24   Q.   When you stopped working at Hellertown Pharmacy -- I think

25   you said you left in October of 2012 -- how many names were on

1  the blacklist at that time of customers?

2  A.  About 20.

3  Q.  So once you did this review of questionnaires and

4  determined if they were -- there was a no-ship list or a state

5  they couldn't go to, or if they had ordered too soon, or if

6  their name was on a blacklist, once you have done that sort of

7  review, what did you then do with the order sheets?

8  A.  After writing down the order ID, whether it was too soon or

9  no ship or blacklist, the person's name, the drug and the

10  amount, it was then written down, and then we threw away the

11  paper.

12  Q.  And if the customer didn't show up on any of those lists,

13  and it was a customer that you determined could be shipped to,

14  what did you then do with the piece of paper?

15  A.  We would -- this is after or before packaging the paper?

16  Q.  Well, so look in front of you at Government Exhibit 1013.

17  A.  Yes.

18  Q.  Those papers in there, you had testified earlier you

19  printed out those papers; not those particular ones, but ones

20  like them?

21  A.  Yes.

22  Q.  And would you put those papers in an envelope like you see

23  there in front of you?

24  A.  Yes.

25  Q.  And once you had packaged those documents into the shipping

1   envelope, what were you going to do with the envelope?

2   A.  The envelope, after checking the papers and putting them

3   in, we hand to the pharmacist on duty.

4   Q.  Now, what, if any, direction did Ms. Lasher give you about

5   contacting the web companies?

6   A.  Whenever there was a no-ship or too sooner blacklist, to

7   message the company or -- yes.  Or if there were enough orders,

8   if it was beginning to slow down or was slow, to send more

9   orders.

10  Q.  How often would Ms. Lasher ask you to contact the web

11  companies to request more orders?

12  A.  If it was -- if it was slow, in which we were receiving

13  very little or no orders at the time, to message them every

14  five minutes until orders come in.

15  Q.  And when you say "message them," how were you contacting

16  them?  Message in what way?

17  A.  An all-in-one instant messenger on the computer.

18  Q.  And would you have to -- would Ms. Lasher direct you to

19  send these instant messages every five minutes until you hit a

20  certain volume?

21  A.  Yes.

22  Q.  What was that volume?

23  A.  I think it was at least until we received I think 25 at

24  least on a particular system.

25  Q.  And that's for one individual company?

1   A.  Yes, at a time.

2   Q.  Now I want to stick with the envelope in front of you,

3   Government Exhibit 1013.

4           So you had testified we talked about what you do with

5   the question forms, the order sheet that has the questions on

6   them.  So I want to ask you now about the labels that are in

7   there.  Can you pull out the label sheet.

8           Now, did you ever observe any differences between the

9   doctors' instructions on these labels and the -- I'm sorry.

10  Let me start again.

11          Did you ever observe any differences between the

12  instructions on how to take the drug on these labels and the

13  instructions on how to take the drug that were on the order

14  sheets?

15  A.  Yes.

16  Q.  Now, on the labels that you're looking at, do you see where

17  the instructions are?  You can look at the one in your hand or

18  you can look on the screen where it's highlighted.

19  A.  Yes.

20  Q.  So now these instructions that are on the labels, these

21  labels go on the pill bottles?

22  A.  Yes -- well, pill bottle on the back of the order form.

23  Q.  These instructions on how to take the drug, where did these

24  instructions come from?

25  A.  Ms. Lasher.

F57elas2                     Buck - direct

1        MS. GREENBERG:  Now, Ms. Chen, could you put up the

2   questionnaire.  And if you can zoom in and highlight the

3   instructions there.

4   Q.  Now, these instructions on the order sheet above the

5   doctor's signature, where did these instructions come from?

6   A.  The doctor.

7   Q.  Now, when you saw differences between the instructions on

8   the order sheet that the doctor gave and the instructions on

9   the labels, did you ever talk to Ms. Lasher about that?

10  A.  Yes.

11  Q.  What did she tell you to do?

12  A.  To go with her instructions on the prescription label.

13  Q.  Just to make sure I'm clear, Ms. Lasher directed you --

14        MR. FREEMAN:  Objection, Judge.

15        MS. GREENBERG:  Just trying to clarify.

16        MR. FREEMAN:  Asked and answered.

17        THE COURT:  We don't know if she hasn't finished the

18  question.

19  BY MS. GREENBERG:

20  Q.  Did Ms. Lasher instruct you to put a different set of

21  instructions -- not what the doctor had put on the order -- on

22  to the pill labels?

23  A.  Yes, for -- for three of the drugs, there was a set of

24  directions that we would copy and paste for certain drugs on a

25  PCMS system for prescription labels.

1    Q.  What were those three drugs?

2    A.  Soma, Fioricet and tramadol.

3            MS. GREENBERG:  Ms. Chen, could you put up

4    Exhibit 2002, please.

5    Q.  Mr. Buck, have you seen this document before that's on your

6    screen?

7    A.  Yes.

8    Q.  Where have you seen this document?

9    A.  All along the walls throughout the pharmacy.

10   Q.  What is it?

11   A.  Ms. Lasher's directions for the prescription labels for

12   Fioricet.

13   Q.  And so what would Ms. Lasher tell you to do regarding these

14   instructions for Fioricet?

15   A.  On the system called PCMS, which were used to print out the

16   prescription labels, to copy and paste those directions into

17   the directions on the PCMS system.

18           MS. GREENBERG:  So, Ms. Chen, could you put up side by

19   side with Government Exhibit 2002 the labels from Government

20   Exhibit 1013.  And if you could highlight on the label the

21   instructions.

22   Q.  So, Mr. Buck, looking at Government Exhibit 2002, the

23   instructions that were on the wall and the label on the pill

24   bottles for Fioricet, are these instructions on how to take the

25   drug the same?

1    A.  Yes.

2    Q.  And is it that you created these pill bottle labels by

3    cutting and pasting the instructions from Government

4    Exhibit 2002 on to these labels?

5    A.  Yes, copy and paste.  When the -- when it was downloaded

6    into the system, PCMS system, the directions were blank.  And

7    those were the instructions -- the copy and paste were all

8    Fioricet.

9    Q.  And for the companies, the other four companies that didn't

10   have that PCMS system, how were those labels created?

11   A.  They would be printed with the -- with the order sheet and

12   the invoice on a 14-inch paper.

13   Q.  So for those labels, were those already made or did you

14   also cut and paste the instructions on to those labels?

15   A.  Those ones were already made.

16   Q.  And did those instructions always follow what the doctor

17   had, doctor's instructions?

18   A.  I'm not sure.

19   Q.  Now, did Ms. Lasher ever say anything about whether she had

20   consulted with a doctor about changing their instructions to

21   what the instructions were on the pill bottle label?

22   A.  Not that I know of.

23   Q.  And these instructions were across the board for these

24   drugs; regardless of the doctor who was prescribing, that you

25   would cut and paste these different instructions on to the pill

1   bottle label?

2   A.  For those drugs and quantity numbers.

3   Q.  In terms of the speed with which you were working, would it

4   be faster to put the doctor's individual instructions on the

5   pill bottle label or cut and paste the same set of instructions

6   on each pill bottle label?

7   A.  For the particular drug and the amount, to copy and paste

8   the same instructions on to each one.

9   Q.  So now going back to Government Exhibit 1013, your envelope

10  that has the materials in it, so we've talked about the order

11  sheet.  We've talked about the labels.  What's the last

12  piece -- what's the last document that's in that envelope?

13  A.  This one here?

14  Q.  Yes.  What is that?

15  A.  The customer invoice.

16          MS. GREENBERG:  Ms. Chen, could you put that up on the

17  screen, please.

18  Q.  And just looking at this one customer receipt for this

19  customer, what does it indicate as to how much the customer was

20  charged for 90 tablets of Fioricet?

21  A.  107.95.

22          MS. GREENBERG:  Ms. Chen, you can take this down.

23  Thank you.

24  Q.  So you have this envelope.  You've printed out the three

25  materials -- the order form, the labels and the customer

F57elas2                    Buck - direct

1    receipt -- put them in a shipping envelope.  I think you

2    testified then that you give that shipping envelope to the

3    pharmacist?

4    A.  After putting all the papers together, we then handed it to

5    the pharmacist on duty.

6    Q.  Do you then see these envelopes again?

7    A.  Yes.

8    Q.  When is that?

9    A.  When it's time to package it for shipping.

10   Q.  And what do you do when you're packaging for shipping?

11   A.  We would be handed a pile of the same drug and quantity,

12   and then we just check to make sure that it's the same drug and

13   quantity and the envelopes handed.  And then we grab a

14   container with -- that matches the same -- the same drug and

15   quantity from the back.  The pharmacist checks to make sure

16   it's the right drug.  And then we begin packaging it, in which

17   we remove these three papers and we put this one upside down,

18   the order sheet.  And the customer invoice gets put into the

19   envelope.  And then we remove the prescription label on to the

20   right, on to the -- on to the order form, and then the other

21   one to the left goes on to the prescription bottle and then

22   gets packaged and sealed.

23            (Continued on next page)

24

25

F57sLAS3                    Buck - direct

BY MS. GREENBERG:

Q.  And so you seal up the envelopes with the pill bottles

inside of them?

A.  Yes.

Q.  Are you and the other technicians the last people to see

the pill bottles before they go into the envelopes?

A.  Yes.

Q.  Now, you mentioned containers.  Mr. Buck, I'm showing you

Exhibit 1013-4.  Is this an example of a container?

A.  Yes.  That is one of the types of containers.  There is

that one, and then there is that another one that is a little

bit bigger for storing the drugs.

Q.  These containers, how were they labeled?

A.  In accordance to the drug manufacturer, I mean, if it is

brand or generic, the quantity within the vials and the

expiration date.

Q.  Would all of the containers have an expiration date?

A.  Up to like a certain date within working there.

          THE COURT:  What do you mean up to a certain date?

          THE WITNESS:  There was one time that there was no

label on the front onto the vials or onto the totes with the

vials in them.

          THE COURT:  Will you follow through?  I don't

understand.

BY MS. GREENBERG:

1    Q.  Initially, when you first started working at Hellertown

2    Pharmacy, were these containers labeled?

3    A.  Not at first.

4    Q.  Not at all, no labels on them at all?

5    A.  No.

6    Q.  Did there come a time where that changed?

7    A.  Yes.

8    Q.  How long into working at Hellertown Pharmacy did that

9    change?

10   A.  About midway.

11   Q.  So about what would you say, when would that be, roughly?

12   A.  Six to seven months into working there.

13   Q.  Would that take you to like early 2012?

14   A.  Yes.

15   Q.  About that time, early 2012, what labeling was happening of

16   these containers?

17   A.  Before or after 2012?

18   Q.  Let's do it after 2012 now, beginning of 2012.

19   A.  The drug, whether brand or generic, the quality and the

20   expiration date.

21   Q.  Looking at Government Exhibit 1035-2.  I am just going to

22   bring this up and show it to you.

23        Mr. Buck, does this container have an expiration date?

24   A.  No, it does not.

25   Q.  Were there ever containers after early 2012 when you were

1   working at Hellertown that saw that didn't have an expiration

2   date?

3            THE COURT:  Did or didn't?

4            MS. GREENBERG:  Did not.

5   A.  I think if whoever is making it forgot to put the

6   expiration date on there, from as far as I can remember.

7            MR. FREEMAN:  Your Honor, I am going to move to

8   strike.

9            THE COURT:  Let me grant the motion and try this

10  again.

11           MS. GREENBERG:  Yes.

12  BY MR. FREEMAN:

13  Q.  Did you ever see, during your time at Hellertown Pharmacy

14  after early 2012, any containers that did not have a label with

15  an expiration date?

16           THE COURT:  Why don't you ask positively.

17           MS. GREENBERG:  I will try again.

18  Q.  Did you ever see any containers after early 2012 that had

19  expiration dates on them?

20  A.  They usually had expiration dates on them, as far as I can

21  remember.

22  Q.  Would you say "not always" --

23           MR. FREEMAN:  Objection.

24           THE COURT:  Overruled.

25  A.  If the technician that was counting it forgot to put the

1    expiration on the front.

2    Q.  Were there occasions --

3           MR. FREEMAN:  Judge, that is the same issue.  I don't

4    think it is a recollection, I think it is a speculation.

5           MS. GREENBERG:  Just let me try it one more time.

6    BY MR. FREEMAN:

7    Q.  Were there ever totes that you saw that did not have the

8    expiration date on them?

9    A.  Yes.

10   Q.  Did these containers ever contain vials of pills that had

11   different lot numbers and expiration dates associated with

12   them?

13   A.  If there was two of them that were half empty or less than

14   half empty, sometimes they were condensed and/or if there was a

15   return.

16   Q.  I'm going to get to returns in a moment.  There would be

17   occasions where you would condense two different containers?

18   A.  Yes.

19   Q.  When you would condense two different containers and

20   combine the materials, those pill bottles would come from

21   different lot numbers and different expiration dates?

22   A.  Yes.

23   Q.  So in that situation, would there be any way to check and

24   reference for each individual pill bottle what their lot number

25   was or what the expiration date was?

1    A.  No.

2    Q.  I want to move on to a different topic now.  I want to talk

3    about pill counting.  Did Ms. Lasher provide any instructions

4    on how to count pills that would be shipped to customers?

5    A.  Yes.

6    Q.  I would like to show you what has been admitted in evidence

7    as Government Exhibit 1019.  It should come up on your screen.

8    Do you recognize this document?

9    A.  Yes.  It's the counting procedure for the Internet drugs.

10   Q.  Where did you see this?

11   A.  Along the walls in the counting room and the hallway.

12   Q.  The counting room, where was that in the pharmacy?

13   A.  That was -- when walking down the hallway to the left of

14   the hallway, in like the center of the pharmacy work area.

15   Q.  So you would count the pills in the middle area and then

16   were the computers in the back area?

17   A.  Yes.

18   Q.  Now, whose instruction were these?

19   A.  Ms. Lasher's.

20   Q.  I'm bringing up to you what has been marked as Government

21   Exhibit 1001.

22       Mr. Buck, do you recognize the contents of Government

23   Exhibit 1001?

24   A.  Yes.

25   Q.  What are they?

1    A.  Some of the vials for counting.

2    Q.  I want you to take us through step by step what your

3    process was for counting the pills?

4    A.  Okay.

5    Q.  Start with the first bottle that you would take out.  What

6    would you do with the first bottle?

7    A.  We would -- the very first thing we would do is to get the

8    amount of pill bottles that was listed on here of the -- of the

9    manufacturer drug type, then we would take out the amount

10   specified on the instructions of how many pills to take out,

11   then we would line up the amount of vials that it says here.

12   The first one is then hand counted and then we use this vial to

13   power the manufacturer -- for the manufacturer bottle into the

14   empty vials.

15   Q.  Let me just make sure I understand.  The first pill bottle

16   that you have, you do an exact count of the pills that go into

17   that first vial?

18   A.  Yes.

19   Q.  Once you have that, you put that aside?

20   A.  Yes.

21   Q.  Then what is the next pill bottle you take?

22   A.  The next pill bottle that we take?

23   Q.  Looking at the pill bottle that you have in your hand, when

24   you would take the next pill bottle, would it have a marking on

25   it?

1    A.  Just these ones for counting.

2    Q.  I can't see the one in front of you.  Does that one that

3    you're holding have a line on it?

4    A.  Yes.

5    Q.  Would you use for the next pill bottle a bottle with a line

6    around it?

7    A.  Yes.

8    Q.  What would you do with that bottle that vial that has a

9    line around it?

10   A.  The vial that has a line around it is to -- is the one that

11   we used to pour the drugs into to make sure that it gets to

12   that line not under or over.

13   Q.  Let's just stop there.  So you fill up pills into that pill

14   vial and it goes up to the line.  What do you then do with that

15   pill vial?

16   A.  We then pour it into the empty vials, and then we continue

17   to do that until we filled up all of the amount of vials

18   specified on here.

19   Q.  So you were essentially using that pill vial with the

20   marking on it, you would fill that up but pour it into each

21   individual pill vial that you had lined up?

22   A.  Yes.  Then after we get the bottle that was hand counted to

23   line up to make sure that the other vials that they're tapping

24   them down to make sure that they're even.

25   Q.  Let me make sure --

1           THE COURT:  That size pill bottle holds approximately

2     how many pills?

3           THE WITNESS:  If this was tramadol, I think is it was

4     180 tramadol.

5           MR. FREEMAN:  Judge, could I make up for yesterday?  I

6     think it is time for a break.

7           THE COURT:  He's looking for points.  One minute

8     before, but we will give him his points.

9           Let's take our break.  Remember the rules, keep an

10    open mind and don't talk about the case.  We got your message

11    about 2:15.

12          (Jury excused)

13          (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

1                      AFTERNOON SESSION

2                         11:45 a.m.

3              (In open court; jury present)

4              THE COURT:  Let me just say something else to the jury

5    about the 2:15 usual stopping time.  I have reason to believe

6    we can respect that today.  I just want to explain that there

7    are times when we may have a witness who is from out of town,

8    and we can finish that witness in five or ten minutes, and it's

9    simply too much of an imposition to not do so.

10             The other thing is, I am not sure whether I made this

11   clear or not when I was selecting the jury, but we don't

12   necessarily or generally don't use the 2:15 stopping time when

13   the jury is deliberating.  We don't have sort of an artificial

14   cutoff.  It may be, for the time we do the charge and

15   summations, that we may need more time.  We certainly have it

16   available on the deliberation days.

17             At the very end of the trial, I wouldn't count on the

18   2:15, but we will do our very best to respect it as often as we

19   can.

20             Please proceed, Ms. Greenberg.

21   BY MS. GREENBERG:

22   Q.  Mr. Buck, I believe we were in the middle of you telling us

23   about pill counting.

24   A.  Yes.

25   Q.  Let me just say if I have got your testimony right about

F57sLAS3                    Buck - direct

1    what you would do.

2              MR. FREEMAN:  Objection to the form of the question.

3    Let me make sure I have got your testimony right.

4              MS. GREENBERG:  That's fair.

5              THE COURT:  It should be "have," not "got."

6              MR. FREEMAN:  I have a different objection.

7    BY MS. GREENBERG:

8    Q.  In the method you would describe about how you would count

9    the pill vials, each time you would take out the pill vials,

10   how many of those vials would you count the exact quantity of

11   the pills?

12   A.  Just one.

13   Q.  The rest of the pill vials, they would be counted or filled

14   using that vial, measuring vial?

15   A.  Yes.  And then the one that was counted we use to make sure

16   that it lines up, that none are -- none are uneven or off.

17   Q.  You did that with a visual inspection?

18   A.  Yes.

19   Q.  How many pill vials would you fill at one time?

20   A.  Each set, for example, if it was tramadol, I would have two

21   of the manufacturer bottles and 11 vials in front of me.  The

22   one that was hand counted, because that one continued to be

23   used throughout the process to make sure that it's lined up

24   with the rest of them.  So then I would open it up, fill to the

25   line, and just bang it out, make sure that it is not over or

1  under the line, and pour it into the other vials.

2  Q.  Would you ever receive complaints from customers who did

3  not get the amount of pills that they had ordered?

4  A.  Yes.

5  Q.  What would you do in response to those complaints?

6  A.  We would send out the amount that was missing to make up

7  for the amount that they were missing.

8  Q.  How many times a day would you say a customer would call

9  and say that they didn't get the amount that they had ordered?

10  A.  I don't remember.

11  Q.  Could you recall an approximate amount?  I am not asking

12  you to be precise.

13  A.  I think about one, one every other day, or one every day

14  about, approximately.

15           MS. GREENBERG:  Ms. Chen, could you please put up on

16  the clean Government Exhibit 1026.

17  Q.  Mr. Buck, do you recognize this document?

18  A.  Yes.

19  Q.  Where have you seen this before?

20  A.  On the walls at the pharmacy and also inside of the

21  employee book with the papers that we signed.

22  Q.  What, if anything, did Ms. Lasher say to you about how fast

23  you were working?

24  A.  We must work fast or our hours would be cut.

25  Q.  This sign, this policy, whose policy was that?

1  A.  Ms. Lasher's.

2  Q.  Specific to you, what did Ms. Lasher ever tell you about

3  the speed at which you were working?

4  A.  Many -- many times, to work faster.

5  Q.  What, if anything, did Ms. Lasher say about how many pills

6  had to be filled each day?

7  A.  Of the totes, I think on weekdays was five and weekends we

8  had to count like eight totes.

9  Q.  In like one of these containers that you have been looking

10  at, I am holding up 1035-4?

11  A.  Yes, and some of them were a little bit bigger.

12  Q.  If you know, how many pill vials would be filled in each

13  tote?

14  A.  I would say between 48 to 72, I think.  If it was about

15  this size vial, about 48 to 72, about.

16          MS. GREENBERG:  Ms. Chen, could you put up Government

17  Exhibit 1018.

18  Q.  Mr. Buck, do you recognize this document?

19  A.  Yes.

20  Q.  What is it?

21  A.  How many totes we had to count.

22  Q.  Could you just read the contents?

23  A.  Yes.  This store is required to count five totes of either

24  tramadol or generic Fioricet per day.  There is no exceptions.

25  On Saturday and Sunday, eight totes are required per

1    technician.  Penalty for the pharmacist and technician will be

2    hours will be cut.

3    Q.  And on the bottom, what are the names on the bottom?

4    A.  David and Lena.

5    Q.  Who is David?

6    A.  The manager of Palmer Pharmacy.

7    Q.  Was he a pharmacist?

8    A.  No.  I don't believe -- no.  He was a pharmacy technician.

9    Q.  Now, this policy, this quota of how many totes you had to

10   fill, did there come a time where you did not meet the quota?

11   A.  Yes.

12   Q.  What happened?

13   A.  My hours were cut.

14   Q.  Who cut your hours when you didn't meet the quota for

15   counting totes?

16   A.  Ms. Lasher.

17   Q.  What did Ms. Lasher say to you when she cut your hours

18   because you didn't meet the quota?

19   A.  That I -- I didn't count enough totes and I have to be

20   faster.

21   Q.  Did she say anything about what she was going to do with

22   your hours?

23   A.  That the hours would be cut if I -- if I don't -- if I

24   don't reach the amount of totes counted.

25   Q.  Well, just to be clear, were your hours cut?

1  A.  Yes.

2  Q.  How did Ms. Lasher determine how many totes each of the

3  individual pharmacy technicians filled each day?

4  A.  Sometimes the totes would be put to the side after

5  counting, but each tote had -- at one point, had a piece of

6  paper in it, in which it was the technician's initials who

7  counted, the pharmacist who checked it, the date -- the date of

8  expiration, and I think the date counted.

9          MS. GREENBERG:  Ms. Chen, could you please put up

10  Government Exhibit 1012.

11  Q.  Mr. Buck, do you recognize the form generally of this

12  document?

13  A.  Yes.  That's the paper that is put into the totes after the

14  tote is counted.

15  Q.  First of all, when you first started working at Hellertown,

16  were there these papers put in the totes?

17  A.  No.

18  Q.  When did that start?

19  A.  About the same -- the same time that the totes were

20  labeled.

21  Q.  Is it correct that that is like early 2012?

22  A.  Yes.

23  Q.  Looking at the first line where it says "counted by," what

24  would be filled in that line?

25  A.  The technician's name, the initials of their name.

1    Q.   And "checked by," what would be filled in there?

2    A.   The initials of the pharmacist who checked the tote.

3    Q.   The expiration date?

4    A.   The expiration of the drugs in the tote.

5    Q.   Again, would that expiration date always correspond to all

6    of the vials in the tote?

7    A.   No.

8    Q.   The date counted?

9    A.   Yes, the date that the tote was counted.

10   Q.   Were these documents provided to Ms. Lasher so that she

11   could determine how many totes each technician counted that

12   day?

13   A.   Yes.  And also if it was -- if the totes were off -- were

14   off the -- the vials and the totes, the levels were off.

15   Q.   So is it fair to say then, I think you said for each tote

16   it would be somewhere between 48 and 72?

17   A.   Yes, depending on the size of the tote.

18   Q.   You said the quota for a weekday would be five per day?

19   A.   Yes.

20   Q.   Just going between those two dates, let's say average of

21   50 vials per day that you had to fill, and then you had to fill

22   five totes of those?

23   A.   Yes.

24   Q.   So roughly, on the lower end, like 250 pill vials you would

25   have to fill each day?

F57sLAS3                    Buck - direct

1    A.  Yes.

2    Q.  You said that Ms. Lasher would check if the vials were off.

3    What do you mean?

4    A.  If the levels were off visually, like if some of them were

5    less and some of them were more.

6    Q.  Once you were done with the tote, you filled up the tote

7    with the pills you had counted and the vials, would she take

8    out the vials and look at them herself?

9    A.  Before we put the vials into the tote, the pharmacist on

10   duty checks to make sure that the levels are correct before.

11   Q.  Just to be clear, is the pharmacist actually counting all

12   of the pills in the vials to do that check?

13   A.  No.

14   Q.  It's, again, just a visual inspection?

15   A.  Yes.

16        MS. GREENBERG:  Ms. Chen, you can take that down.

17   Q.  Before I move on to another topic regarding returns, I want

18   to go back to the labels just briefly.  You had testified

19   earlier that you would cut and paste instructions on how to

20   take the drug onto the labels?

21   A.  Yes.

22   Q.  I want to show you what has been marked as Government

23   Exhibit 1016.

24        MS. GREENBERG:  Ms. Chen, can you put this up, please.

25   Q.  Mr. Buck, do you recognize this exhibit?

1    A.  I don't recognize the paper, but I recognize the

2    directions.

3    Q.  Were these the same kinds of directions you would cut and

4    paste onto the label?

5    A.  Yes.

6          MS. GREENBERG:  You can put that aside.  Thank you,

7    Ms. Chen.  Can you take that down.

8    BY MS. GREENBERG:

9    Q.  Moving on, were the prescriptions that had been sent out

10   over the Internet ever returned to the pharmacies?

11   A.  Yes.

12   Q.  For what reasons?

13   A.  Either refused by the patient or that it was unclaimed or

14   sometimes damaged.

15   Q.  How often were returned medications sent back to Hellertown

16   Pharmacy?

17   A.  Frequently.

18   Q.  What do you mean by frequently?

19   A.   Every -- every couple weeks, enough to fill up a small

20   tote.  And the tote that was used for the returns was a post

21   office tote.

22   Q.  Would there be returns coming in on a daily basis?

23   A.  Yes.

24   Q.  Did Ms. Lasher provide any instructions about what to do

25   when medication had been returned by a customer?

1    A.   Yes.

2    Q.   What were her instructions?

3    A.   To write down the order -- the order ID number, the name of

4    the patient, the drug and quantity of the drug, and reason for

5    return.

6    Q.   Taking a step back, when you would get a pill bottle that

7    had been returned by a customer, what would you do with that

8    physical pill bottle?

9    A.   After writing the information into the return book, then

10   remove the sticker and then place it on the counter in the

11   hallway for the pharmacist to check the pills after the

12   technician counted the pills to make sure that it's the correct

13   amount.

14   Q.   What would happen after that?

15   A.   The pharmacist would check -- would check the pill -- the

16   pill vial, and then the technician would then put the -- put

17   the bottle into the right tote.

18   Q.   When you say "the right tote," what do you mean?

19   A.   By drug and quantity of the drug.

20   Q.   So the returned medications go right back into the totes

21   that are being made for all of the other medications to go out

22   to the customers?

23   A.   Yes.

24   Q.   Again, who told you to do that process?

25   A.   Ms. Lasher.

1    Q.  Now, I want to talk about the log that you mentioned,

2    writing down the order information.  Where would you document

3    that?  Where would you record it?

4    A.  A notebook for returns.

5    Q.  Mr. Buck, I'm showing you two exhibits.  One has been

6    marked Government Exhibit 1014.  The other has been marked

7    1015.  You can take the books out of the bags.

8        Let's look at Government Exhibit 1014 first.  I believe

9    that is the other one that you have there.  Mr. Buck, take your

10   time and look at it and look up when you're done.

11       Do you recognize this book?

12   A.  Yes.

13   Q.  What is it?

14   A.  This is the first return book.

15   Q.  When you say "the first return book," were there more than

16   one?

17   A.  Yes, there was two.

18   Q.  Just looking at the front of this book, what are these, on

19   the top where it says return prescriptions, what does that

20   indicate to you about what is inside the book?

21   A.  A log of the prescriptions that were returned back to the

22   pharmacy.

23   Q.  Sticking with that first cover, these letters here, CA,

24   BRX, NOS, NRX, Tim PHP, Motto Paul, Fast Meds, what is that?

25   A.  Those are some of the systems at which we receive the

1    orders and prescriptions from.

2    Q.  When you say "systems," what are you referring to?

3    A.  The companies and the company system.

4    Q.  These are the website companies?

5    A.  Yes.

6         MS. GREENBERG:  Just going into the book, Ms. Chen,

7    can you just put up the next page and the page after that and

8    the page after that.

9    Q.  What information, just looking at the top there, would you

10   fill into the book?

11   A.  The date that the vial was filled, the patient name, the

12   drug name along with the quantity, the RX number, and the

13   reason for return.

14   Q.  Who would be filling these returned medication entries into

15   the return book?

16   A.  The pharmacy technicians.

17   Q.  Who told you to use this book to do that?

18   A.  Ms. Lasher.

19   Q.  Now, Mr. Buck, if you could look at Government Exhibit

20   1015.

21        MS. GREENBERG:  Ms. Chen, if you could put that up.

22   Q.  Mr. Buck, looking at the book in front of you, what is this

23   book?

24   A.  The second return book.

25   Q.  How do you know that?

1    A.   I recognize it.

2    Q.   Looking at the front, is this return book for the same

3    website companies that the first book was for?

4    A.   Yes.

5    Q.   Did you work in both of these books making log entries of

6    returned medications?

7    A.   Yes.

8    Q.   How often would you do so?  How often would you log entries

9    of returned medications in these books?

10   A.   At one point, I believe once every couple weeks or so.

11   Q.   Did you review the book you have in front of you, 1015, in

12   preparation for your testimony today?

13   A.   Yes.

14   Q.   Can you identify in that book the last entry that you made

15   during your work at Hellertown Pharmacy?

16   A.   Yes.

17          MS. GREENBERG:  Ms. Chen, could you identify the page

18   that Mr. Buck is going to go to.  Could you go to the page for

19   Mr. Buck's most recent entry in the book.

20   BY MS. GREENBERG:

21   Q.   Mr. Buck, if you look at this page, is this a page that

22   you, upon reviewing this book, identified as having an entry

23   that you made from your last time in Hellertown Pharmacy?

24   A.   Yes.

25   Q.   Where is that entry from your last entry into this book?

1    Can you identify the name of the patient?

2    A.  R. McFarland.

3            MS. GREENBERG:  Ms. Chen, can you highlight that,

4    please.

5    Q.  Looking on the right of R. McFarland, is there a date

6    there?

7    A.  Yes.

8    Q.  What is that date?

9    A.  The date the vial was filled.

10   Q.  What does the date say?

11   A.  10/09/2012.

12   Q.  Is October 9, 2012 the last entry that you made into this

13   book?

14   A.  Yes.

15   Q.  Now, when you would open up the book, if you could hold it

16   up?

17   A.  Yes.

18   Q.  You can stand up if you would like.  When you would open up

19   this book to work at, explain to me how -- if you could just

20   close it, close the book -- if you could just explain or

21   demonstrate for the jury how it was you would open the back

22   each time you would open it?

23   A.  Yes.  First thing I would do is make sure I have the right

24   book.  Then I would open up to make sure that is the right one.

25   Then I would move to the last entry.

1    Q.  Just to stop you, when you would open the book, would it be

2    your natural practice to do what you just did now, which was to

3    open up the first flap cover so you could see the inside cover

4    of the book?

5    A.  Yes, to make sure I have the right one.

6    Q.  That was your general practice when using this book?

7    A.  Yes.

8    Q.  So when you did that, just stopping there, did you ever see

9    anything on any of the times you went into this book on the

10   inside cover of that book, any piece of paper?

11   A.  No.

12   Q.  Looking at the book that you have in front of you, is there

13   something in the inside of that book?

14   A.  Yes.

15           MS. GREENBERG:  Ms. Chen, can you go to the inside of

16   the book so it comes up on the jurors' screen.

17   Q.  Mr. Buck, is what you see on the screen in front of you

18   what you see in the front flap of the book?

19   A.  Yes.

20   Q.  When you used this book, this was never in the book?

21   A.  I have never seen it in the book.

22   Q.  Could you please read what this says?

23   A.  Yes.  Returns medication important.  Pharmacist or pharmacy

24   technician must report the return prescriptions in the book

25   after this is reported.  Pharmacist destroy the medication.

1    Only pharmacist.

2    Q.  Did you ever get an instruction from Ms. Lasher to destroy

3    returned medication?

4    A.  No.

5    Q.  Did you ever see anyone at Hellertown Pharmacy destroy

6    returned medication?

7    A.  No.

8    Q.  Did you ever see this piece of paper anywhere in the

9    pharmacy?

10   A.  No.

11   Q.  You have testified that the last time you made an entry

12   into that return book was October 9, 2012.  When did you leave

13   Hellertown Pharmacy?

14   A.  October 2012.

15   Q.  So around this same time?

16   A.  Yes.

17   Q.  What, if any, notification was provided to customers that

18   they were receiving medication that had been returned?

19   A.  As far as I know, the patients are not informed if they are

20   returned.

21   Q.  Let me ask my question in a more precise way.  The

22   customers who are now receiving medication that had already

23   been returned, are they informed in any way that the

24   medications they are getting had already been sent out to a

25   different customer and sent back?

1    A.   No.

2    Q.   One moment.

3         Did Ms. Lasher ever ask you to inform any customers that

4    they were receiving returned medications?

5    A.   No.

6    Q.   Did you ever hear her ask anyone to do that?

7    A.   No.

8    Q.   Now, I want to switch subjects.  What, if any, observations

9    did you make about customers who were coming to Hellertown

10   Pharmacy with oxycodone prescriptions?

11   A.   They were a bit unusual.  Their clothes are a little bit

12   dingy.  Some of their faces was -- had a sunken appearance, and

13   they would come in in groups.

14   Q.   Did you have any awareness of what states these people were

15   coming from?

16   A.   Kansas and Ohio.

17   Q.   How did you know that?

18   A.   I remember from when they were coming in.

19   Q.   Would the customers, in order to get oxycodone, have to

20   present a form of identification?

21   A.   Yes.  Their ID was to be copied.

22   Q.   Did you ever see any of those?

23   A.   Yes.

24   Q.   Did you see their identifications indicated they were from

25   Ohio or Kansas?

F57sLAS3                    Buck - direct

1    A.   Yes.

2    Q.   Where was the doctor located who had issued those

3    prescriptions for oxycodone?

4    A.   Florida.

5    Q.   These groups of customers, did they arrive together?

6    A.   Yes.

7    Q.   Would they leave together?

8    A.   Yes.

9    Q.   Did you see how they were traveling at all?

10   A.   Yes.

11   Q.   What was their mode of transportation?

12   A.   A vehicle.

13   Q.   Would you see them get in and out of the same vehicle?

14   A.   Yes.

15   Q.   How many times did you speak to Ms. Lasher about the

16   oxycodone prescription to these groups?

17   A.   Twice.

18   Q.   Tell me what happened the first time you spoke to

19   Ms. Lasher.

20   A.   I told her that they were a little bit unusual.

21   Q.   Did you say anything else for this first time?

22   A.   I think that it was strange that they were coming from so

23   far away.

24   Q.   How did Ms. Lasher respond?

25   A.   She said that they -- that they're okay, they like our

F57sLAS3                         Buck - direct

1   pharmacy.

2   Q.  Your pharmacy is in what state, again?

3   A.  Pennsylvania.  Hellertown, Pennsylvania.

4   Q.  What happened the second time that you spoke to Ms. Lasher?

5   A.  That was the second time.  That was the response that I

6   remember.  I can't remember what the response was for the first

7   time.

8   Q.  I see.  You don't recall how she responded the first time

9   that you told her that this was unusual?

10  A.  Yes.

11  Q.  The second time that you talked to Ms. Lasher about the

12  oxycodone prescriptions, what did you say to her?

13  A.  That they're very unusual, their appearance was dingy,

14  dirty, and their faces were sunken in, and they're coming in

15  from groups, and they are coming in from so far away, and

16  they're getting prescriptions from a doctor that is very far

17  away from where they live.

18  Q.  Did you say anything this second time to Ms. Lasher about

19  whether or not these individuals appeared to be intoxicated?

20  A.  Yes.

21  Q.  What did you say?

22  A.  They appeared to be on something.

23  Q.  How did Ms. Lasher respond to that?

24  A.  That they're okay.

25  Q.  Was that the point at which she said they are coming

1   because they like our pharmacy?

2   A.   Yes.

3   Q.   Who filled their prescriptions?

4   A.   Ms. Lasher.

5   Q.   Did there come a time when a number of those oxycodone

6   prescriptions were questioned?

7   A.   Yes.  The company McKesson said that we reached our limit

8   of --

9          MR. FREEMAN:  Objection, hearsay.

10  Q.   How do you know what you are saying now about McKesson?

11  Who said that?

12  A.   Ms. Lasher.  I heard her when she was ordering -- ordering

13  stuff from McKesson, and she was angry because they won't send

14  any more because they -- because we reached the --

15         MR. FREEMAN:  Objection.

16         THE COURT:  Just stop.  Only what you overheard her

17  say.

18  BY MS. GREENBERG:

19  Q.   Did you overhear Ms. Lasher say that McKesson had cut off

20  the pharmacy because the pharmacy had reached its limit on

21  oxycodone prescriptions?

22  A.   For --

23         MR. FREEMAN:  Objection to the form of the question.

24         THE COURT:  Sustained.

25         MR. FREEMAN:  I ask it be stricken.  It doesn't have

 1   to be, it's your ruling.

 2           MS. GREENBERG:  Can I try again?

 3           THE COURT:  One more shot.

 4   BY MS. GREENBERG:

 5   Q.  What did you hear Ms. Lasher say about --

 6           THE COURT:  If anything.

 7   Q.  -- if anything, about McKesson?

 8   A.  That they -- they won't send any more because they --

 9   because we have reached the limit that they can send us for

10   that.

11   Q.  I want to turn to another topic now and talk about

12   Ms. Lasher's policies.  Who was responsible for issuing the

13   policies at Hellertown Pharmacy?

14   A.  Ms. Lasher.

15   Q.  How often did Ms. Lasher implement policies?

16   A.  Frequently.

17   Q.  What do you mean by frequently?

18   A.  Very -- very frequently.  Whether she was there or not, she

19   told us to move -- to move faster and if anyone was talking or

20   she thought someone was talking, she told them to be quiet and

21   sometimes separate the person from the rest of the people

22   because she thought they were talking.

23   Q.  What was Ms. Lasher's practice when she instituted a new

24   policy?

25   A.  It was written on a piece of paper throughout the pharmacy.

1    Some of them were put into an employee book in which the

2    technician signed.

3    Q.  Who asked the technicians to sign each new policy?

4    A.  Ms. Lasher.

5    Q.  I would like to show you what has been admitted as

6    Government Exhibit 3007.

7         MS. GREENBERG:  Ms. Chen, can you please put that up

8    on the screen.

9    BY MS. GREENBERG:

10   Q.  Mr. Buck, what is this document?

11   A.  It's the sick policy for Hellertown Pharmacy.

12   Q.  When issued this policy?

13   A.  Ms. Lasher.

14   Q.  How were you informed of this policy?

15   A.  She told us orally and also written in, which we signed.

16   Q.  Did you sign this particular policy?

17   A.  Not -- not this exact paper, but on another piece of paper

18   for this policy.

19   Q.  So what does this policy say?

20   A.  All employees will be required to report to work even if

21   sick.  You will no longer be allowed to call off unless you are

22   in the hospital.  You will report to work and the pharmacy on

23   duty will -- I mean, sorry -- you will report to work and the

24   pharmacist on duty will determine if you are sick enough to see

25   a doctor.  If you feel you need -- if you need to see a doctor,

1    the pharmacist on duty will let you see a doctor.  The doctor

2    note is required to return to work.

3    Q.   Now, what was the effect of this policy?

4    A.   Some people were coming in whether they were sick or not.

5    Q.   Did you observe anybody come into the pharmacy sick?

6    A.   Yes.

7    Q.   What did you observe?

8    A.   My partner at the time came in with a stomach ulcer, and he

9    was afraid to call out because he didn't want his hours cut or

10   lose -- lose time.

11             MS. GREENBERG:  Ms. Chen, can you put up Government

12   Exhibit 3008.

13   BY MS. GREENBERG:

14   Q.   Mr. Buck, do you recognize this document?

15   A.   Yes.

16   Q.   What is it?

17   A.   The sick policy.

18             MS. GREENBERG:  Ms. Chen, if you could put back both

19   of them and just have these exhibits side by side.

20   Q.   What are the dates of these documents?

21   A.   The first one is January 3, 2012, the second is January 19,

22   2012.

23   Q.   In a two-week period, there were two sick policy memos?

24   A.   Yes.

25   Q.   Looking at the second sick policy, what was this sick

1    policy?  Can you read it for us?

2    A.   Yes.  Any employee who calls off sick or calls off in

3    general will be taken off the schedule for the following two

4    weeks' period.  Continuous call-offs will be reviewed and may

5    be grounded for termination.

6    Q.   Did you sign this policy?

7    A.   Yes.

8    Q.   Can you point to your signature?

9    A.   Yes.

10   Q.   Now, what was the effect of this policy?

11   A.   People were coming in whether they were ill -- I mean, when

12   they were ill.  People were afraid to call off.

13           MS. GREENBERG:  Ms. Chen, could you take these down,

14   please.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

BY MS. GREENBERG:

Q.  So, Mr. Buck, did there come a time where you left

Hellertown Pharmacy?

A.  Yes.

Q.  And how did you leave?  Did you resign or were you

terminated?

A.  I resigned.

Q.  Now, at the time that you worked at Hellertown Pharmacy did

you have any medical ailments or conditions?

          MR. FREEMAN:  Could we approach, please.

          (Continued on next page)

1           (At side bar)

2           MR. FREEMAN:  Your Honor, I anticipate the testimony

3      that's coming out now is about this witness' lactose

4      intolerance, and he passed gas, and he was written up for it.

5      And I don't think it's necessary.  I think it's inappropriate.

6      The government has more than enough testimony already about my

7      client and how she handled employees.  I just don't think that

8      it adds anything to the trial.  And I think it detracts.

9           MS. GREENBERG:  We disagree strongly.  This is

10     relevant to his story.  This is why he left the pharmacy.

11     There were multiple policies about his medical issue and the

12     symptoms he suffered from and that caused him to leave.  And

13     again, this is relevant to the issue of Ms. Lasher's control

14     over every single employee at this pharmacy, about the work

15     they were doing, about their medical conditions.  She is

16     clearly the one that's running the show.  This is directly

17     relevant to his story of when he was working there.

18          THE COURT:  When was the search of this pharmacy?

19          MS. GREENBERG:  November of 2012.  It's a month after

20     he leaves.

21          MR. RICHENTHAL:  Specifically, November 29, 2012.

22          MS. GREENBERG:  Leaving it now the way it is, they

23     would be given a misimpression about why he left.  He came to

24     resign, but no reason is given for why he resigned or the

25     circumstances thereof.  The jury could be left with the false

1    impression that he was somehow incompetent, not why it is that

2    he had to leave.  And again, it was directly related not to

3    Peter Riccio, not to Carl Riccio, but to Ms. Lasher and her

4    actions in the pharmacy.

5            THE COURT:  Well --

6            MS. GREENBERG:  We've talked to Mr. Buck about this.

7    It's something that he wants to share.  We intend to treat this

8    with respect and try to be as tactful as possible in addressing

9    what his medical condition was and what his symptoms were.

10           THE COURT:  Look, I think it's ultimately your call.

11           MR. FREEMAN:  Judge, with all --

12           THE COURT:  I would assume, though, that there is a

13   way to frame your questions to avoid the more sort of

14   potentially embarrassing aspects of his condition.  I think you

15   could ask him generally, did you have a medical condition while

16   you were working there?  Did it have certain symptoms?  Were

17   you repeatedly criticized for those symptoms?  And was the

18   criticism of your symptoms the reason that you had to leave?

19           MS. GREENBERG:  Those are my questions.

20           THE COURT:  Good.

21           MS. GREENBERG:  I mean, I think Mr. Buck is prepared

22   to say what his symptoms are.

23           THE COURT:  But you don't have to elicit them, if

24   you -- if he volunteers them, he volunteers them.

25           MS. GREENBERG:  Okay.  That's fine.

1      MR. FREEMAN:  Judge, I'm concerned that this testimony

2   goes over the top and that my client would be prejudiced,

3   substantially prejudiced for her actions vis-a-vis this

4   witness.  And as I indicated earlier, it's completely

5   unnecessary.  It becomes cumulative, to say the least.

6      MS. GREENBERG:  These were her own actions.  She can't

7   be prejudiced by her own actions.  This is what she did.

8   Mr. Freeman may not like it.  The jury may not like it.  But

9   it's what she did.

10      MR. FREEMAN:  It's not a question of liking it.  I'm

11   trying to keep the trial fair.

12      MS. GREENBERG:  It's fair because these are her own

13   actions.  And it's only cumulative because this is how she

14   treated everyone.

15      THE COURT:  I think if you ask the questions the way I

16   suggested, it balances the interests.  And I can interrupt at

17   some point and tell him, we do not need to describe the

18   symptoms.

19      MR. FREEMAN:  Judge, with all due respect, that's not

20   the issue.  He's okay with talking about it.

21      THE COURT:  But you're not okay with him talking about

22   it.

23      MR. FREEMAN:  Correct, because of the --

24      THE COURT:  So that's why I'm trying -- look, these

25   are her actions.  You opened on Peter Riccio is running the

1  show.  It's the same thing.  You opened on good faith.  And

2  it's their burden to prove good faith, and that is why a lot of

3  stuff becomes relevant.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               (In open court; jury present)

2    BY MS. GREENBERG:

3    Q.  Mr. Buck, at the time you worked at Hellertown Pharmacy did

4    you have a medical condition?

5    A.  Yes, lactose --

6               THE COURT:  Wait.  It's not necessary.  You don't have

7    to tell us exactly what the condition is, and you also don't

8    have to tell us what the symptoms were, okay?  Just listen to

9    her questions.  We'll move that along.

10   Q.  Did you have a medical condition?

11   A.  Yes.

12   Q.  Without asking you what the symptoms were, did you exhibit

13   symptoms as a result of that condition?

14   A.  Yes.

15   Q.  Did there ever come a time where Ms. Lasher criticized you

16   for the symptoms of your medical condition?

17   A.  Yes.

18   Q.  How many times did she criticize you for the symptoms of

19   your medical condition?

20   A.  Approximately nine times.

21   Q.  And did she do so verbally, in writing or both?

22   A.  Both.

23   Q.  And as a result of Ms. Lasher's criticisms, how, if at all,

24   did that factor into your decision to resign from Hellertown

25   Pharmacy?

1    A.  I was stressed and it was embarrassing.  And I just

2    couldn't take working there.  So I resigned.

3    Q.  And when Ms. Lasher would criticize you orally, were others

4    present?

5    A.  Yes.

6    Q.  I'd like to move on to a different subject now.

7            Mr. Buck, are you testifying here voluntarily or

8    pursuant to a subpoena?

9    A.  Subpoena.

10   Q.  After meeting with the -- and did you, prior to testifying

11   here today, have any meetings with prosecutors and law

12   enforcement?

13   A.  Yes.

14   Q.  And did there come a time where you consulted with a

15   lawyer?

16   A.  Yes.

17   Q.  And was that lawyer appointed by the Court?

18   A.  Yes.

19   Q.  After you consulted with the lawyer, did you have

20   additional meetings with the government?

21   A.  Yes.

22   Q.  And at those meetings were prosecutors and law enforcement

23   present?

24           MR. FREEMAN:  Your Honor, I object to this line of

25   questioning.

1          THE COURT:  Overruled.

2     A.  Yes.

3     Q.  And what, if any, agreement did you sign with the

4     government?

5     A.  Nonprosecution agreement.

6     Q.  Now, I'd like to show you what's been marked as Buck

7     3501-5.  Mr. Buck, do you recognize this document?

8     A.  Yes.

9     Q.  What is it?

10    A.  A nonprosecution agreement.

11    Q.  Did you sign this document?

12    A.  Yes.

13    Q.  What is your understanding of what a nonprosecution

14    agreement is?

15    A.  In exchange for testifying and my honesty, that I would not

16    be charged for participation in the labeling, storage and

17    distribution of the prescription drugs at Hellertown Pharmacy

18    between the dates of summer 2011 and fall -- November 2012.

19    Q.  So what is your understanding as to whether this

20    nonprosecution agreement protects you from prosecution for

21    other crimes you may have committed, other than your work as a

22    pharmacy technician at Hellertown Pharmacy?

23    A.  It does not.  It only protects -- it only protects me from

24    any crimes within Hellertown Pharmacy.

25    Q.  What is your understanding as to whether a nonprosecution

1    agreement protects you from prosecution for perjury,

2    obstruction of justice or making false statements, if you lie

3    on the stand here today?

4    A.  It does not.  It does not protect me from that.  It makes

5    this void, if I do that.

6    Q.  Aside from that nonprosecution agreement, were you made any

7    promises, any other promises by the government?

8    A.  No.

9    Q.  I have no more questions about that agreement.  I'd like to

10   move on to a different topic.

11            Prior to your resignation in October of 2012, was

12   there an inspection conducted at Hellertown Pharmacy?

13   A.  Yes.

14   Q.  When was that, roughly?

15   A.  Roughly September 2012.

16   Q.  What, if any, instructions did Ms. Lasher give you

17   regarding -- regarding the inspection?

18   A.  To not -- not to speak with anyone.

19   Q.  "Anyone" meaning whom?

20   A.  Anyone that comes in, including the inspectors.

21   Q.  And did she give that instruction before, after, or after

22   the inspection, or both?

23   A.  I believe both.

24   Q.  Now, you testified earlier about the computers for the web

25   companies being in the back room of the pharmacy, is that

F57elas4                    Buck - direct

1   right?

2   A.   Yes.

3   Q.   So what, if any, instructions did Ms. Lasher give about

4   that back room?

5   A.   That no one was to enter the back room, and the back room

6   had to be locked.

7   Q.   Was that back room normally locked?

8   A.   No.

9   Q.   But Ms. Lasher gave an instruction prior to the inspection

10  that it needed to be locked?

11  A.   Yes.

12          MS. GREENBERG:   Now, Ms. Chen could you put up

13  Government Exhibit 1032.

14  Q.   Mr. Buck, do you recognize this document?

15  A.   Yes.

16  Q.   And looking at the date on top, what is the date?

17  A.   September 21, 2012.

18  Q.   Was this policy issued after the inspection?

19  A.   Yes, I believe so.

20  Q.   Now, looking at the policy, what kind of a policy is this?

21  A.   It's a prescription policy -- count policy.

22  Q.   Did you sign this policy?

23  A.   Yes.

24  Q.   Could you point to where your signature is.

25  A.   Yes.

F57elas4                    Buck - direct

1    Q.  Now, looking at the first line of the policy, do you see

2    where it says, all prescriptions must be counted by hand or by

3    machine?

4    A.  Yes.

5    Q.  Did that happen?

6    A.  No.

7    Q.  Did anybody ask Ms. Lasher -- well, let me back up.

8              Who issued this policy?

9    A.  Ms. Lasher.

10   Q.  Did you or other technicians, did anybody ever ask her

11   about this policy?

12   A.  Yes.

13   Q.  What happened?

14   A.  The person started counting with a -- a machine that weighs

15   the pills and tells the amount.

16   Q.  Did everybody start doing that or just one person?

17   A.  Just one person.

18   Q.  Did anybody ever ask her whether or not you had to now

19   count by hand?

20   A.  Yes.

21   Q.  What did Ms. Lasher say?

22   A.  Continue counting as we previously did.

23   Q.  And as you previously did meaning not by hand?

24   A.  Meaning one count it and poured into a vial at the line and

25   then lined up until they're all level.

F57elas4                    Buck - direct

1    Q.  Now, I think we had spoken about calls that would be

2    received by the pharmacy.

3           MS. GREENBERG:  Ms. Chen, could you put up Government

4    Exhibit 1009.

5    Q.  Mr. Buck, do you recognize this document?

6    A.  Yes.

7    Q.  What is this document?

8    A.  It's the policy for answering the phones at Hellertown

9    Pharmacy.

10   Q.  Now, I just want to look at the top.  Do you see where it

11   says, when someone is asking a question related to pharmacy

12   situations.  So there what is the instruction?  What are you to

13   do?

14   A.  We are then to write down the person's name, the number,

15   what they were calling about, the reason for calling and what

16   company were they a patient.

17   Q.  And so you were to obtain that information.  What

18   information are you to provide?

19   A.  To -- on the note or --

20   Q.  Just read that second paragraph there on the document.

21   A.  Not to mention any names.

22   Q.  Did Ms. Lasher ever give -- I don't know if I asked this,

23   but this policy, who instituted this policy?

24   A.  Ms. Lasher.

25   Q.  With respect to the part about don't say any names, just

1  say exactly what you see -- do you see that?

2  A.  Yes.

3  Q.  Did Ms. Lasher ever tell you not to ever mention her name

4  on the phone?

5  A.  Yes.

6  Q.  Was that a general instruction she gave to the staff?

7  A.  Yes.  She said not to mention her name.

8  Q.  And looking at this last paragraph, do you see where it

9  says, you are never, in caps and underlined, give anybody's

10  phone number or any pharmacy's phone number to -- I believe

11  that would be cut off, is anyone.  Is that right?

12  A.  Yes.

13  Q.  Did Ms. Lasher ever say why you were not to give out a

14  phone number?

15  A.  I -- I don't remember.

16  Q.  But this was Ms. Lasher's instruction not to do so?

17  A.  Yes.

18  Q.  Now, did she give any other instructions about what not to

19  discuss over the phone?

20  A.  Not to discuss anything about patients, mail orders or

21  about any of the -- about any of the pharmacists on duty.

22  Q.  Let's take that one step at a time.  What do you mean, she

23  instructed never to say anything about the pharmacists on duty?

24  A.  We couldn't say -- say on the phone which pharmacist was

25  there at the moment.

1    Q.  Did she say why?

2    A.  No.

3    Q.  Now, if a customer called and asked for a pharmacist, did

4    she give you any instruction on what to do with that person on

5    the phone?

6    A.  Yes.  To take a note of their name, number and reason for

7    calling.

8    Q.  If Ms. Lasher was in the pharmacy when one of those phone

9    calls would come in, would she tell you to give the phone to

10   somebody else?

11   A.  Yes.

12   Q.  Who?

13   A.  When the next pharmacist comes in, to give the call to that

14   pharmacist and tell the person to call back at that time.

15   Q.  Do you recall, if anybody, who that was on any of the

16   occasions?

17   A.  Steven.

18   Q.  Do you know Steven's last name?

19   A.  I believe Goloff.

20   Q.  So to make sure I understand, there would be -- were

21   there --

22          MR. FREEMAN:  Objection.

23          MS. GREENBERG:  I'll move on.

24          THE COURT:  That's not even a question.

25          MS. GREENBERG:  I'll start a new question.

1    BY MS. GREENBERG:

2    Q.  Were there occasions when a customer would call the

3    pharmacy, Ms. Lasher was present but she would instruct you to

4    tell the customer to call back when Mr. Goloff gets in?

5    A.  Yes.

6    Q.  Were there occasions when Ms. Lasher was in the pharmacy,

7    someone would call the pharmacy and she would instruct you to

8    give the phone to Mr. Goloff?

9    A.  Yes.

10   Q.  To be clear, was Mr. Goloff -- was Mr. Goloff or was

11   Ms. Lasher the supervisor of the pharmacy?

12   A.  Lena.  Ms. Lasher, I mean.

13   Q.  Now, you mentioned that Ms. Lasher also instructed you not

14   to say anything about mail orders.  To what are you referring?

15   A.  Any of the prescriptions that we've gotten through the --

16   through the companies, through e-mail or through the Internet.

17   Q.  Other than people calling over the phone who you weren't to

18   mention Internet to, was there anyone else that she would say

19   not to mention anything about the Internet?

20   A.  Yes.  The postalmen that pick up the bags of the

21   prescriptions.

22   Q.  Was there anybody else?  What about, for example, did she

23   give any instructions about whether you could mention the

24   Internet prescriptions to customers that would walk in to the

25   pharmacy?

F57elas4                      Buck - direct

1    A.  Not to mention to any customers that walk in.

2    Q.  How many times roughly would Ms. Lasher give the

3    instruction that you all couldn't mention the Internet?

4    A.  I think a couple times a week.

5              MS. GREENBERG:  No further questions at this time.

6    CROSS EXAMINATION

7    BY MR. FREEMAN:

8    Q.  Mr. Buck, my name is Mr. Freeman, and I represent Lena

9    Lasher.  How are you doing today?

10   A.  I'm doing well.

11   Q.  Are you feeling all right?

12   A.  Yes, I'm feeling okay.

13   Q.  Did you resign from working at Hellertown or were you

14   fired?

15   A.  I resigned.

16   Q.  Who's David?  David Allan?

17   A.  David is the manager at the Palmer pharmacy.

18   Q.  At or about the time that you left the employ of

19   Hellertown, did you have a fight with David?

20   A.  Yes.  I had an argument with him about the -- about the

21   write-ups, about my medical condition.

22   Q.  And didn't he fire you at that point?

23             MS. GREENBERG:  Objection.

24             THE COURT:  Excuse me.  After that side bar, you want

25   to go into this?

1          MR. FREEMAN:  No.  No.  Judge, with all due respect,

2     that's not the answer.

3          MS. GREENBERG:  That was the question.

4          THE COURT:  Whatever he answers comes out.

5          MR. FREEMAN:  Fine.

6          THE COURT:  Okay?

7     BY MR. FREEMAN:

8     Q.  Were you fired by him?

9     A.  No.

10    Q.  Yes or no.  Okay.  Did you believe that you were fired?

11    A.  It seemed I think they were about to, and I was very

12    stressed and embarrassed, and I told him I quit.

13    Q.  Now, while you were working at Hellertown you worked for

14    Ms. Lasher primarily?

15    A.  Yes.

16    Q.  Did she hire you?

17    A.  Yes.

18    Q.  Did she interview you?

19    A.  Yes.

20    Q.  And did she train you?

21    A.  Yes.

22    Q.  And when you first started working there, did you enjoy

23    working there?

24    A.  No.

25    Q.  Is it fair to say that from the very beginning you were

1    uncomfortable at Hellertown Pharmacy?

2    A.  With -- with the speed at which things were being done, I

3    felt it was too fast.

4    Q.  And would it also be fair to say that you didn't get along

5    with Ms. Lasher?

6    A.  In the beginning it was okay, but the majority of the time

7    I didn't get along.

8    Q.  She wanted you to work fast, and you felt it was too fast,

9    am I right?

10   A.  Yes, too fast to be accurate.

11   Q.  And it stressed you out?

12   A.  Yes.

13   Q.  And in total you worked there for about -- why don't you

14   tell me rather than ...

15   A.  From about July 2011 to October 2012.

16   Q.  So that's seven months?  No, no, no.

17   A.  About a year and four months, I think.

18   Q.  Now, while you were working at Hellertown, did you meet

19   somebody named Peter Riccio?

20   A.  Yes.

21   Q.  On how many occasions?

22   A.  I've introduced myself to him once and seen him a second

23   time.

24   Q.  Did you understand Peter Riccio to be the owner of

25   Hellertown?

F57elas4                    Buck - cross

1    A.  Yes.  Later into working there one of the technicians told

2    me that that was the owner.

3    Q.  And he owned Hellertown, Palmer and another store in

4    New Jersey called Towne Pharmacy?

5    A.  Yes.

6    Q.  Did you meet a Carl Riccio?

7    A.  I'm sorry.  What was that?

8    Q.  Carl Riccio.  Did you meet somebody by the name of Carl

9    Riccio?

10   A.  Yes.

11   Q.  And did you understand him to be Peter Riccio's son?

12   A.  Yes.

13   Q.  How many times did you meet him?

14   A.  I believe twice.

15   Q.  When you met with Carl Riccio, did Carl Riccio hold a

16   meeting of any kind, or you just met him to say hello?

17   A.  I believe one of the times he held a meeting.

18   Q.  And do you remember the subject of that meeting?

19   A.  No, I don't recall.

20   Q.  What about with respect to Peter Riccio?  Did you ever sit

21   with him during a meeting or observe him having a meeting?

22   A.  I observed him talking to Lena in the front of the

23   pharmacy, from what I remember.

24   Q.  And do you recall whether he was giving her instructions?

25   A.  I -- I didn't hear the conversation between them.

1    Q.  Now, it's your testimony that Lena Lasher called in to the

2    pharmacy frequently, correct?

3    A.  Yes.

4    Q.  And you assume that she was looking through a camera

5    monitor, correct?

6          MS. GREENBERG:  Objection.

7          MR. FREEMAN:  Let me rephrase the question.

8    Q.  Did you see her looking through a monitor, TV monitor or a

9    computer screen, and watch her look at the inside of the

10   pharmacy?

11   A.  While she worked at the Hellertown Pharmacy, she watched

12   Palmer pharmacy, and she did the same when she was at Palmer

13   pharmacy watching Hellertown Pharmacy.

14   Q.  Did you work at Palmer and Hellertown?

15   A.  I've worked at Palmer during three months during a power

16   outage.

17   Q.  You mean the Sandy storm or a different one?

18   A.  I'm not sure which storm it was.

19   Q.  In any case, there were times when you watched Lena Lasher

20   at Hellertown using the screen, the computer monitor screen, to

21   look at Palmer, correct?

22   A.  From Hellertown, yes.

23   Q.  Were you also able to see her look at the computer screen

24   in Palmer looking at Hellertown?

25   A.  I was not able to see that because I've worked at

Hellertown.  During the three days that I've worked at Palmer,

there was a power outage, so the cameras were not working at

the Hellertown Pharmacy.

Q.  Were there times when Lena Lasher said things to you in

person, as opposed to viewing the computer screen?  In other

words, would she say, you're working too slow?  Would she come

in and say it to your face, or would she call in and say,

you're working too slow?

A.  She would call in and say I'm working too slow.

Q.  Would she ever come up to you while you were working and

say, can you work a little faster?

A.  During my time at the Hellertown Pharmacy when she was

there in person, she told us to work faster, yes.

Q.  Do you know Daniel or Dan Geiger?

A.  I remember a Daniel.  I think he came in a few times at the

Palmer pharmacy, or at the Hellertown Pharmacy.  I believe he

was a technician at the Palmer pharmacy.

Q.  Did you see anyone here today in the halls that you knew

named Daniel, who's a pharmacist, who used to be in the Navy?

Does that ring a bell?

        MS. GREENBERG:  Objection.

A.  I don't recall.

Q.  Was there a pharmacist or a pharmacy tech named Daniel

who --

        THE COURT:  It's one or the other.

F57elas4                    Buck - cross

1           MR. FREEMAN:  I'm trying not to put words in his

2     mouth.

3     Q.  Did you work with a pharmacist named Daniel?

4     A.  Not that I remember.

5     Q.  Did you work with a pharmacy tech named Daniel?

6     A.  I believe I remember him as Dan, a technician.

7     Q.  What did he look like?  Could you describe him, please.

8     A.  Young, 20s, short hair.

9     Q.  All right.  Thank you.

10          Do you remember you've testified that there was an

11    inspection at Hellertown?

12    A.  Yes.

13    Q.  Do you recall that after the inspection a complaint was

14    made by an individual against Lena Lasher?

15    A.  I don't recall.

16    Q.  And you don't recall somebody asking you if you would

17    support him in his complaint?

18    A.  No, I don't recall.

19    Q.  You said that when you started working at Hellertown, there

20    was a blacklist?

21    A.  The blacklist was about midway into working there.  I

22    remember the blacklist.

23    Q.  So when you started working there, to your knowledge there

24    was no blacklist?

25    A.  Yes.

1   Q.  In other words, there was nothing on the wall called a

2   blacklist?

3   A.  Nothing that I remember.

4   Q.  Did the blacklist, after it was started, did it grow?  Did

5   it get bigger?

6   A.  It started growing, yes, from what I remember.  I remember

7   when it was about three names, I think, on it.

8   Q.  Did you say 20 names earlier?

9   A.  When I -- around the time that I resigned, there was about

10  20 names on there.

11  Q.  Oh.  Started at 3 and ended at 20?

12  A.  Yes, from what I remember.

13  Q.  Did you add any names to the blacklist?

14  A.  From what I remember, I think I may have asked Lena if I

15  could add someone with the last name of Potts on to it.

16  Q.  And what happened?

17  A.  The person was added to the blacklist.

18  Q.  You were asked a question on direct examination about who

19  created the blacklist, who started it.  Do you remember that

20  question?

21  A.  Yes.

22  Q.  Do you know who started it?

23  A.  I believe one of the technicians.

24  Q.  What makes you say that?

25  A.  That's what I recall around that time.

1  Q.  Do you know who that technician was?

2  A.  I'm not -- not positive, but I think it may have been

3  James.

4  Q.  Now, you recall earlier today there was testimony about

5  what you could determine with respect to the last time that the

6  person -- when was the last time a person ordered medication.

7  Do you remember that?

8  A.  Could you --

9  Q.  I'll do it a different way.  If you wanted to find out the

10  last time somebody ordered medication, to find out if that

11  person was ordering too soon, you could go on a computer, is

12  that right?

13  A.  It depends on the system.  On some of the systems, I

14  believe CA, NOS, NRX and BRX, there is a system in which I

15  could check that if they ordered too soon.

16  Q.  Now, are those computers separate; in other words, are

17  those systems that you just described, CA, NOS, are there

18  dedicated computers to each of those systems?

19  A.  There was about five computers.  I believe all of the ones

20  that were CA had one computer in which it was printed on.  Then

21  there was one for NRX and BRX, and another for NOS.  And there

22  was one for Motto, and Fast Meds was printed at the same one CA

23  was printed from.  PHP was not on a particular computer.  That

24  one I think we checked in e-mail or something for that one.

25  Q.  Do you remember which systems did not have the ability to

1    check the last date that the patient ordered the medication, if

2    you can?

3    A.  On the ones that did not have the system and that we

4    couldn't look up from the computer?

5    Q.  Correct.

6    A.  Fast meds, PHP, Motto, those ones.

7    Q.  Could you be wrong about that?  Is it possible your memory

8    is incorrect about that?

9    A.  That's as much as I remember on that.

10   Q.  Did that change at any time, to your recollection?

11   A.  I remember on one of them called Motto, towards the end

12   that I started working there, there was a -- after they were

13   printed and after they were checked by a technician, that they

14   were brought to a pharmacist and the pharmacist would put it on

15   the front computer, the main computer for Hellertown Pharmacy.

16   Q.  To see if the medication was ordered too early?

17   A.  Yes.

18   Q.  Now, could you check different systems -- could you

19   cross-check different systems?  In other words, if somebody

20   ordered a medication for Motto, could you go to CA and see if

21   that person ordered the same medication from CA?

22   A.  Yes, by name on the CA system, there was a name hold -- I

23   mean, a system called PCMS on the CA system that we could type

24   in a name and find the person's name.

25   Q.  And weren't the techs directed to do that by Lena Lasher?

Buck - cross

1    A.  Only if they thought it was too soon, but it was not part

2    of the system that, upon printing those, that we check all of

3    the systems.

4    Q.  So if the tech thought it was too soon, then the tech could

5    check across the systems, correct?

6    A.  For Motto, by hard copies, until the time I think until

7    they started putting it on to the main computer.  And PHP was

8    hard copies.  Fast Meds was checked by hard copies, but the

9    NRX, BRX, NOX and CA had systems called PCMS, in which if

10   someone thought that it could have been one that was too soon,

11   they could check those.

12   Q.  And, in fact, you testified a little while ago that you

13   found someone who had ordered too soon and you discussed it

14   with Lena Lasher, and that name was put on the blacklist,

15   correct?

16   A.  If the person ordered too soon, too often, it gets put on

17   the blacklist.

18   Q.  And what I'm asking you is:  Did you discover such a

19   person, at least one, and did that person's name go on the

20   blacklist?

21   A.  Yes.

22   Q.  And, in fact, it was more than one that you discovered and

23   more than one that went on the blacklist?

24   A.  Yes.

25   Q.  And you were also instructed to call the web-based company

1  and tell them about it as well, correct?

2  A.  I believe for the Motto system, yes.

3  Q.  And that you did by texting, correct, a certain kind of

4  texting through the computer?

5  A.  For all other systems were text based.

6  Q.  How was Motto then?

7  A.  Motto was done by phone.

8  Q.  Okay.  Do you recall how the postage was handled for the

9  packages that were sent out to the people who ordered the

10  medication?

11  A.  Sorry.  Could you rephrase that?

12  Q.  Yes.  You indicated earlier that a package or an envelope

13  was sent to the person that ordered the medication; that there

14  were a number of steps involved; that you pulled off the

15  prescription from the computer and printed it out, and then you

16  put it in an envelope and you checked the level of the

17  medication.  Do you remember that testimony?

18  A.  Yes.

19  Q.  Well, what about the postage?  How was that handled?

20  A.  The postage was --

21  Q.  If you recall.

22  A.  Do you mean for --

23  Q.  For the individual packages.

24  A.  The postage on the front of each package?

25  Q.  Yes.  That would allow it to be mailed.

F57elas4                    Buck - cross

1    A.  That would depend on the company.  For Motto, it was typed

2    into the computer, the person's name and address, city, state

3    and zip, and then we click what type it is, whether express or

4    priority mail.  For the other systems it was printed along with

5    the order.

6    Q.  So it was printed either with the order or in a separate

7    interchange with the computer, correct?

8    A.  It was printed by the -- for Motto, typing it on to the

9    computer.  But for the other systems, like NRX, BRX, CA and

10   NOS, when you pull up the orders, you can pull up the labels.

11   The labels are printed separate for those.  For PHP, Fast Meds

12   and Align Health, they're printed with the order.

13   Q.  Now, if a customer called and said, I'm short three pills,

14   could you send them, did those pills ever get sent

15   individually?

16   A.  In a -- do you mean if they were short a few pills, they're

17   put into a pill bottle and sent to the person?

18   Q.  Yes.

19   A.  Yes.  If we asked -- if we could send out this order that

20   they were shorted X amount of pills, we could send them the

21   amount of pills to correct the amount.

22   Q.  So in other words, you had to ask the company via computer,

23   is that right?

24   A.  For the postage for that?

25   Q.  First, did you have to ask the company if you could send

1    three pills, or did you call the company and ask?  What was the

2    procedure?

3    A.  We -- I don't remember if we -- if we had to contact the

4    company or not before we sent it out.

5    Q.  So let's assume that we get past that step and you're

6    sending the three pills in my example.  How did you package

7    them?

8    A.  After everything was printed out, I don't remember.

9    Q.  Mr. Buck, how many times did you meet with the government

10   in the last month or so in anticipation of your testimony at

11   this trial?

12   A.  Three times.

13   Q.  And how many hours each time?

14   A.  I think the first time was for approximately four hours,

15   the second time about approximately four hours, and the last

16   time was about -- about four hours.

17   Q.  So that's about twelve hours total?

18   A.  Yes.

19   Q.  You were asked near the end of the examination by the

20   government about a nonprosecution agreement?

21   A.  Yes.

22   Q.  And you said in your answer that the government agreed not

23   to prosecute you, and you agreed to tell the truth?

24   A.  Yes.

25   Q.  Who determines -- according to the agreement, who

F57elas4                    Buck - cross

1    determines whether you're telling the truth or not?

2    A.  I'm sorry.  What was that?

3    Q.  Isn't it the government that determines whether you're

4    telling the truth?

5    A.  Yes.

6              MR. FREEMAN:  Thank you, Judge.

7    REDIRECT EXAMINATION

8    BY MS. GREENBERG:

9    Q.  Mr. Buck, a very brief few questions for you.

10             With respect to the policies regarding your medical

11   condition that led to your resignation, were those policies

12   Lena Lasher's policies?

13   A.  Yes.

14   Q.  Now, we talked -- you were asked on cross-examination about

15   the too soon process and the different systems.  With the

16   systems, the four companies where they had a computer but they

17   didn't have the order date, the last order date from the

18   customer, did there come a time where that information did

19   enter on to a computer system?

20   A.  Yes.

21   Q.  Was that after the inspection happened?

22   A.  It was around then.  I don't remember if it was

23   particularly after, but I remember it was around then.

24   Q.  You mentioned -- you also testified that there was a name,

25   at least one name that you provided to Ms. Lasher that

 1  Ms. Lasher accepted on the blacklist.  Did she accept it the

 2  first time you mentioned it to her?

 3  A.  No.  It usually takes a couple times, unless -- well, if

 4  it's too soon a couple times, or unless we find out that

 5  someone was ordering but they changed some of their

 6  information -- like, for example, if Greg Potts orders from one

 7  company and we find out he's ordered from another company as

 8  Gregory Potts, then that would usually -- that would get them

 9  on the blacklist immediately.  But too soons usually took

10  about, I'd say, probably about four times.

11          MS. GREENBERG:  Nothing further.  Thank you.

12          MR. FREEMAN:  No, thank you.

13          THE COURT:  Thank you very much for coming in.

14          THE WITNESS:  You're welcome.

15          (Witness excused)

16          MS. GREENBERG:  The government calls Task Force

17  Officer Matt Murphy.

18   MATTHEW MURPHY,

19       called as a witness by the Government,

20       having been duly sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MS. GREENBERG:

23  Q.  Good afternoon, Officer Murphy.

24  A.  Good afternoon.

25  Q.  Officer Murphy, where do you work?

649

F57elas4                    Murphy - direct

A.  The Clinton Township Police Department at Hunterdon County,

New Jersey.

Q.  What is your position?

A.  I'm a patrolman.

Q.  How long have you been a patrolman with the Clinton

Township Police Department?

A.  Since July of 2008.

Q.  What, if any, other positions do you have?

A.  Currently I'm a task force officer with the DEA in Newark,

New Jersey.

Q.  How long have you been a task force officer with the DEA?

A.  Since July of 2012.  I'm sorry.

Q.  Go ahead.

A.  I apologize.  Yes, July 2012.  January.

Q.  And as task force officer -- is task force officer also

known as a TFO?

A.  That's correct.

Q.  So what are your duties and respondents as a TFO with the

Drug Enforcement Administration?

A.  To investigate narcotics offenses.

Q.  Before becoming a patrolman, did you participate in any

training?

A.  Prior to becoming a patrolman, no.

Q.  Since becoming a patrolman, have you participated in any

training?

1   A.  Yes, I have.

2   Q.  What kind of training?

3   A.  Narcotics related training, as well as financial crimes,

4   studying motor vehicle law in New Jersey, as well as criminal

5   code in New Jersey.

6   Q.  Did there come a time where you became involved in an

7   investigation of Lena Lasher?

8   A.  Yes.

9   Q.  And what investigatory steps did you take in connection

10  with that investigation?

11  A.  Surveillance, as well as trash pulls.

12  Q.  Let's just start there.  What is a trash pull?

13  A.  Trash pull is going through someone else's garbage to

14  obtain anything of value.

15  Q.  So when you go through the garbage, what do you physically

16  do?

17  A.  You can either lean into the garbage can or dumpster and

18  pull out whatever was discarded, their trash; or in some cases,

19  in this investigation, when I jumped into the dumpster and

20  pulled out trash bags, trash.

21  Q.  What does surveillance involve?

22  A.  I conducted mobile surveillance, as well as stationary

23  surveillance, observing both targets as well as establishments.

24  Q.  Now, I want to direct your attention to October 2nd, 2012.

25  Were you working that day?

1   A.  Yes, I was.

2   Q.  What were you doing?

3   A.  I was conducting surveillance.

4   Q.  Where were you conducting surveillance?

5   A.  In Hellertown, Pennsylvania.

6   Q.  Where in Hellertown, Pennsylvania, were you conducting

7   surveillance?

8   A.  The Hellertown Pharmacy.

9   Q.  Were you by yourself?

10  A.  No, I was not.

11  Q.  Who were you with?

12  A.  Other law enforcement officers.

13  Q.  Now I'd like to direct your attention to approximately

14  11:10 a.m. that day, October 2, 2012.  What, if anything, did

15  you observe at that time?

16  A.  I observed a motor vehicle pull into the lot of the

17  Hellertown Pharmacy with Ohio registration.

18  Q.  And how did you know that this motor vehicle had Ohio

19  registration?

20  A.  By the license plate, as well as running a motor vehicle

21  check on the license plate.

22  Q.  And when you ran the motor vehicle check, did you learn

23  anything else about the car?

24  A.  Yes, that it was a rental.

25  Q.  And did you observe anyone in the car?

F57elas4                    Murphy - direct

1    A.  Yes.  There were two males.

2    Q.  How far away were you from the two men?

3    A.  Approximately 30 feet.

4    Q.  Can you please describe their appearance.

5    A.  They appeared to be unkempt, disheveled, ill fitting

6    clothing.

7    Q.  What did you observe these men do?

8    A.  They exited the vehicle and stood outside of the pharmacy.

9    Q.  And what did they do after they -- how long were they

10   standing around the pharmacy for?

11   A.  Not that long in the beginning.  Then one of the males

12   entered into the pharmacy.

13   Q.  And did that male come out of the pharmacy?

14   A.  Yes, shortly thereafter.

15   Q.  And what did they do when they were outside of the

16   pharmacy?

17   A.  He met up with the other individual.  They loitered about

18   the parking lot in the pharmacy area.  And shortly after that,

19   the same male who went in the first time entered back into the

20   pharmacy.

21   Q.  And did he exit at some point?

22   A.  He did.

23   Q.  What did you observe when he exited the pharmacy?

24   A.  He exited the pharmacy holding a white pharmacy bag.

25   Q.  So what happened when the one male left the pharmacy with

1   the white pharmacy bag?

2   A.  He met up with the other male.  They both entered into the

3   vehicle, where I observed them open up the bag, open up the

4   pill bottle, look inside.

5   Q.  You observed them do that in the car?

6   A.  Yes, ma'am.

7   Q.  After the two men looked inside the pill bottle, what did

8   they do next?

9   A.  They exited the lot.

10  Q.  Roughly how long were these men in the vicinity of

11  Hellertown Pharmacy?

12  A.  It was approximately 30 minutes.

13  Q.  So I'd like to direct your attention to 1:29 p.m. that day.

14  What, if anything, did you observe at that time?

15  A.  I observed the van with Kentucky registration pull into the

16  lot.

17  Q.  And approximately how far away were you from the van?

18  A.  About 50 feet.

19  Q.  And how did you know that it was a Kentucky license plate?

20  A.  By looking at the registration of the vehicle, as well as

21  running a motor vehicle check.

22  Q.  And when you ran that motor vehicle check, what, if

23  anything, else did you learn?

24  A.  I learned that it was also a rental.

25  Q.  Can you please describe the appearance of the people that

F57elas4                    Murphy - direct

1   got out of the van?

2   A.   They were also disheveled, ill-fitting clothing, unkempt.

3   Q.   Approximately how many people were there?

4   A.   There were six.

5   Q.   And how old were they?

6   A.   I would say in their mid20s.

7   Q.   What did you observe them do after they got out of the van?

8   A.   They congregated around the van, and once they were all out

9   of the van, they entered into the Hellertown Diner.

10  Q.   Where is the Hellertown Diner in relation to Hellertown

11  Pharmacy?

12  A.   It's located in the same parking lot.

13  Q.   How long was this group of six people in the diner?

14  A.   Approximately an hour.

15  Q.   What did they do when they left the diner?

16  A.   They congregated back around the van.

17  Q.   What happened after that?

18  A.   Shortly thereafter they entered into the Hellertown

19  Pharmacy.

20  Q.   How long were they in the Hellertown Pharmacy roughly?

21  A.   Approximately ten minutes.

22  Q.   Now, can you please describe what you observed as these

23  individuals left the pharmacy.

24  A.   They either left one by one or in pairs.

25  Q.   What, if anything, were these individuals holding?

1    A.   Five of the individuals were holding a white pharmacy bag.

2    Q.   What did they do after they left the pharmacy?

3    A.   Congregated around the van and then got into the van.

4    Q.   And once they got into the van, what did they do?

5    A.   They exited the lot.

6    Q.   I'd like to direct your attention, still sticking with this

7    same day at 3:22 p.m.  What, if anything, did you observe at

8    that time?

9    A.   I observed a postal truck pull into the lot and park in

10   front of the Hellertown Pharmacy.

11   Q.   Did you observe anyone exit the truck?

12   A.   Yes, postal employee.

13   Q.   Where did he go?

14   A.   He entered into the Hellertown Pharmacy.

15   Q.   What, if anything, did you observe next?

16   A.   He came out with two large clear plastic bags, like trash

17   bags, filled with what appeared to be parcels.

18   Q.   What did he do next?

19   A.   Placed them into the postal truck, got into the truck and

20   then left the lot.

21   Q.   So now I'd like to direct your attention to November 20,

22   2012.  Were you working that day?

23   A.   Yes, I was.

24   Q.   What did you do?

25   A.   I was conducting surveillance at Towne Pharmacy.

F57elas4                    Murphy - direct

1   Q.  Where is Towne Pharmacy located?

2   A.  That's in Dunellen, New Jersey.

3   Q.  Were you by yourself?

4   A.  No, I was not.

5   Q.  Who were you with?

6   A.  I was with other law enforcement officers.

7   Q.  So I'd like to direct your attention to 8:36 p.m.  What, if

8   anything, did you observe at that time?

9   A.  I observed three people leave the pharmacy.

10  Q.  Do you recognize anyone from that surveillance that night

11  in the courtroom today?

12  A.  Yes, I do.

13  Q.  Who do you recognize?

14  A.  Ms. Lasher.

15  Q.  Could you describe an article of clothing that she's

16  wearing.

17  A.  Black jacket and red shirt.

18          MS. GREENBERG:  May the record reflect that the

19  witness has identified the defendant?

20          THE COURT:  Yes.

21  Q.  Did you identify anyone else who was with Ms. Lasher?

22  A.  Yes, I did.

23  Q.  Who else did you identify?

24  A.  Peter Riccio.

25  Q.  Could you identify anyone else?

1   A.  No.  There was one other unknown male.

2   Q.  And how were you able to identify Ms. Lasher and Peter

3   Riccio?

4   A.  Through DMV photos, as well as previous surveillances.

5   Q.  What, if anything, did you observe Ms. Lasher to be

6   holding?

7   A.  Under her right arm she was holding large white envelopes

8   or a binder of some sort, as well as her purse.

9   Q.  After Ms. Lasher left Towne Pharmacy, where did she go?

10  A.  She entered into her vehicle and traveled 78 West.

11  Q.  And how do you know that the car that Ms. Lasher entered

12  was her car?

13  A.  The registration was registered to Ms. Lasher.

14  Q.  Can you describe her car?

15  A.  Yes.  It was a silver Toyota Highlander.

16  Q.  Once Ms. Lasher entered her car what did you observe?

17  A.  We followed her 78 West in the direction towards

18  Highbridge, New Jersey, towards her residence.

19  Q.  Did you see Ms. Lasher again that evening?

20  A.  I did.

21  Q.  Where did you see her?

22  A.  On Patton Street in Highbridge, New Jersey.

23  Q.  What did she do at that time?

24  A.  At that time she pulled into her driveway, backed out of

25  the driveway, did a K turn in the middle of the street, backed

1  down into her driveway, where she stopped parked the car and

2  turned the dome light on.

3  Q.  After Ms. Lasher arrived at the driveway of her residence

4  in her car, how long did Ms. Lasher remain in her car?

5  A.  Approximately two minutes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. GREENBERG:

2   Q.  What happened next?

3   A.  She got out of the vehicle with the same documents that I

4   saw her at the pharmacy.  She walked into her residence.

5   Q.  Now, I would like to direct your attention to April 17,

6   2012, at 11:45 p.m.  Were you working that day?

7   A.  Yes, I was.

8   Q.  Where were you working?

9   A.  In Hellertown, Pennsylvania.

10  Q.  Were you working with anyone else?

11  A.  Yes.

12          MR. FREEMAN:  I'm sorry, could I have the day, please?

13          MS. GREENBERG:  April 17, 2012.

14  Q.  Were you working with anyone else?

15  A.  Yes, I was.  I was with other law enforcement officers.

16  Q.  What investigatory steps did you take that day?

17  A.  Trash pull.

18  Q.  Where did you conduct the trash pull?

19  A.  In the rear of the pharmacy from the dumpster.

20  Q.  What did you do with the trash that you obtained from the

21  dumpster at Hellertown Pharmacy?

22  A.  The trash was taken to Clinton Township Police Department,

23  where it was analyzed.

24  Q.  Mr. Murphy, I am showing you what has been marked as

25  Government Exhibit 701.  Officer Murphy, do you recognize these

1  documents?

2  A.  Yes, I do.

3  Q.  What are these documents?

4  A.  This is a report run by Lena Lasher from Hellertown

5  Pharmacy.

6  Q.  What is the report called?

7  A.  It's called the Hellertown Nursing Home, Lena Lasher.

8  Q.  Where did this come from?

9  A.  This came from the dumpster behind the Hellertown Pharmacy

10  in Pennsylvania.

11  Q.  How do you know that?

12  A.  By the DEA exhibit number, which is N-39, and comparing

13  that to the DEA 6, it would tell you that it came from that

14  location.

15  Q.  When you say DEA 6, what are you referring?

16  A.  It's a report of investigation.

17  Q.  Based on that comparison of the evidence tag before you and

18  your own reports, what does that tell you about where you got

19  that document from?

20  A.  From Hellertown Pharmacy.

21          MS. GREENBERG:  The government offers Government

22  Exhibit 701.

23          MR. FREEMAN:  Can I have a moment, Judge?

24          THE COURT:  Yes.

25          MR. FREEMAN:  Thank you.  No objection.

1          THE COURT:  Received.

2          (Government's Exhibit 701 received in evidence)

3   BY MS. GREENBERG:

4   Q.  What is the date of this report?

5   A.  April 15, 2012.

6   Q.  Who is indicated as running this report?

7   A.  Lena Lasher.

8   Q.  Generally, what information is provided on the report?

9   A.  Prescription number, date, patient name, doctor name, drug

10  name, quantity, and direct.

11  Q.  Looking at this document, what are the last names of the

12  doctors in this report?

13  A.  Burling, Imbernino, Porter, Paredes, Kaplan, Osterer.

14  Q.  Roughly six doctors are named in that report?

15  A.  Yes, ma'am.

16  Q.  Can you identify any drug names from this list?

17  A.  Tramadol and butalbital.

18          MS. GREENBERG:  These exhibits are not scanned.  Your

19  Honor, may I publish that exhibit to the jury?

20          THE COURT:  Yes.

21  BY MS. GREENBERG:

22  Q.  I would like to direct your attention to April 23, 2012, at

23  11:30 p.m.  Where were you working that day?

24  A.  Palmer Pharmacy in Easton, Pennsylvania.

25  Q.  Were you working with anyone else?

1   A.  Yes, along with law enforcement officers.

2   Q.  What investigatory steps did you take that day?

3   A.  Trash pull.

4   Q.  Where did you obtain the trash?

5   A.  From the rear of the pharmacy in the dumpster.

6   Q.  What did you do with the trash that you obtained from the

7   dumpster at Palmer Pharmacy?

8   A.  That was taken down to Clinton Township to the police

9   department where it was analyzed.

10  Q.  I am putting before you two exhibits, Government Exhibit

11  702 and 703.  I would like to show you first what has been

12  marked as Government Exhibit 702.  What are these documents?

13  A.  These documents are the Ohio automated prescription

14  reporting system.

15  Q.  Are they printouts from that system?

16  A.  Yes, they are.

17  Q.  Where did these documents come from?

18  A.  They came from the dumpster of Palmer Pharmacy.

19  Q.  How do you know that?

20  A.  By comparing the DEA exhibit number, which is N-54, with

21  the associated DEA 6, the report of investigation.

22          MS. GREENBERG:  The government offers Government

23  Exhibit 702.

24          MR. FREEMAN:  No objection.

25          THE COURT:  Received.

F57sLAS5                           Murphy - direct

1              (Government's Exhibit 702 received in evidence)

2      BY MS. GREENBERG:

3      Q.  What are the month of the dates of these printouts?

4      A.  April of 2012.

5      Q.  According to the patient addresses listed on these patient

6      printouts, where are the patients located?

7      A.  Ohio.  Ohio.

8      Q.  Who is listed at the prescriber for all of these patients?

9      A.  Paredes-Mitchel, Julio.

10     Q.  What drugs is Dr. Parades-Mitchel listed as prescribing to

11     these Ohio patients?

12     A.  Tramadol, butalbital.  Tramadol and butalbital.

13     Q.  What pharmacy is listed at filling these prescriptions?

14     A.  Palmer Pharmacy.

15     Q.  What, if any, information was listed regarding how the

16     patients were receiving the drugs?

17     A.  C.O.D., UPS.

18     Q.  What does C.O.D. mean?

19     A.  Cash on delivery.

20     Q.  Is there any other way that is listed?

21     A.  Private pay.

22     Q.  What does that refer to?

23     A.  Cash.

24     Q.  Now I would like you to look at Government Exhibit 703.

25     What are these documents?

1    A.   Orders for shipping and invoices.

2    Q.   Where did they documents come from?

3    A.   Palmer Pharmacy in Easton, Pennsylvania.

4    Q.   How do you know that?

5    A.   By the name at the top of the report, as well as the DEA

6    exhibit number, which is N-55 and the associated DEA 6, the

7    report of investigation that it is linked to.

8            MS. GREENBERG:  The government offers Government

9    Exhibit 703.

10           MR. FREEMAN:  No objection.

11           THE COURT:  Received.

12           (Government's Exhibit 703 received in evidence)

13   BY MS. GREENBERG:

14   Q.   Officer Murphy, would you please look at the top of the

15   document where it says PHP Billing, LLC on top.  Who is listed

16   as logged in?

17   A.   Lena T. Contang.

18   Q.   What is she logged in as?

19   A.   Level five RX manager.

20   Q.   On the top left corner, what is listed under pharmacy?

21   A.   Print credit cards orders, prints C.O.D.s orders, ship

22   credit card orders, shipped C.O.D. orders, return/undelivered

23   orders.

24   Q.   Under the title browse orders for shipping C.O.D., what

25   information is provided?

1  A.  The order date, print date, order number, tracking number,

2  medication, patient name, status, shipping method, and view

3  label days since last order, checked orders.

4  Q.  Just looking through the other documents behind that,

5  generally, what are those documents?

6  A.  These are Palmer invoices for tramadol and butalbital.

7          MS. GREENBERG:  Your Honor, may I publish these

8  exhibits to the jury?

9          THE COURT:  Yes.

10 Q.  I would like to direct your attention to May 15, 2012, at

11 10:45 p.m.  Were you working that day?

12 A.  Yes, I was.

13 Q.  Where were you working?

14 A.  In Hellertown, Pennsylvania.

15 Q.  Were you working with anyone else?

16 A.  Yes, I was.

17 Q.  Who were you working with?

18 A.  Other law enforcement officers.

19 Q.  What investigatory steps did you take?

20 A.  Trash pull.

21 Q.  Where did you obtain the trash?

22 A.  From the dumpster in the rear of the pharmacy.

23 Q.  What did you do with the trash after you obtained it from

24 the dumpster at Hellertown Pharmacy?

25 A.  I secured it and it was taken down to Clinton Township

1    Police Department where it was analyzed.

2    Q.  Showing you what has been marked as Government Exhibit 704

3    and 705.  Let's start with Government Exhibit 704.  What are

4    these documents?

5    A.  These are printable labels.

6    Q.  Where did they come from?

7    A.  They came from the dumpster at Hellertown Pharmacy.

8    Q.  How do you know that?

9    A.  Through the DEA exhibit number, which is N-65, which is

10   compared to the DEA 6, the report of investigation.

11          MS. GREENBERG:  Government offers Government Exhibit

12   704.

13          MR. FREEMAN:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibit 704 received in evidence)

16   BY MS. GREENBERG:

17   Q.  Who is listed on these documents as the prescriber on the

18   label?

19   A.  Paredes, Julio, M.D.

20   Q.  What drugs are listed as prescribed by Dr. Parades-Mitchel?

21   A.  Flexeril, Fioricet, tramadol.

22   Q.  Where are the patients located who are receiving these

23   drugs, according to that document?

24   A.  Texas, New York, Michigan.

25   Q.  If you could look at Government Exhibit 705.  What are

1    these documents?

2    A.   There are more printable labels, order forms and patient

3    questionnaire, as well as an express mail United States Postal

4    Service envelope.

5    Q.   Where did these materials come from?

6    A.   This came from Hellertown Pharmacy and in Hellertown,

7    Pennsylvania.

8    Q.   How do you know that?

9    A.   Through the associated DEA exhibit number, which was N-66,

10   comparing that to the DEA 6, the report of investigation.

11           MS. GREENBERG:  The government offers Government

12   Exhibit 705.

13           MR. FREEMAN:  No objection.

14           THE COURT:  Received.

15           (Government's Exhibit 705 received in evidence)

16   BY MS. GREENBERG:

17   Q.   Now, if you could please look at the questionnaires and

18   shipping labels.  Who is listed as the prescribing doctor?

19   A.   Dr. John M. Burling.

20   Q.   Where is Dr. Burling located according to these documents?

21   A.   Bluffton, South Carolina.

22   Q.   Looking at the questionnaires that you have there,

23   according to the billing address, in what states are the

24   patients listing their billing addresses?

25   A.   Michigan, New York, California, Colorado, Wisconsin,

1   Maryland, Pennsylvania.

2           MS. GREENBERG:  Your Honor, may I publish these

3   exhibits to the jury?

4           THE COURT:  Yes.

5           MS. GREENBERG:  I have no further questions for this

6   witness at this time.

7           MR. FREEMAN:  Good afternoon.

8           THE WITNESS:  Good afternoon.

9           MR. FREEMAN:  Your Honor, I have a few questions.  Can

10  I proceed while the jury is looking?

11          THE COURT:  Just give them a couple minutes.

12          MR. FREEMAN:  Sure.

13          (Pause)

14          THE COURT:  Perhaps we can proceed with some

15  questioning.

16  CROSS-EXAMINATION

17  BY MR. FREEMAN:

18  Q.  So you observed a car with an Ohio registration with two

19  males go inside the pharmacy, at least one of them did, and

20  came out with a bag?

21  A.  That's correct.

22  Q.  There was a similar incident, except there were six people

23  in the van, and people went to lunch at the Hellertown Diner,

24  and five went into the pharmacy, five came out holding white

25  bags?

1    A.  No.  I saw six go into the pharmacy, six of them exited,

2    five of them had white bags.

3    Q.  Thanks.  You saw Peter Riccio and Lena Lasher together,

4    correct?

5    A.  Yes.

6    Q.  The car that Ms. Lasher was driving was a Toyota

7    Highlander?

8    A.  Yes.

9    Q.  Do you remember the year?

10   A.  No, I do not.

11   Q.  Was it a late model or was it an older vehicle?

12   A.  Recent at the time.

13   Q.  2007.  It's in your report, right, 2007?

14   A.  The vehicle year?

15   Q.  Yes.

16   A.  I don't recall if I wrote that in my report.

17   Q.  What year was this?  This was 2012 when you were doing your

18   surveillance?

19   A.  Yes.

20   Q.  Would you consider a vehicle that is five years old a late

21   model at the time?

22   A.  No, I would not.

23   Q.  I would like to hand you what would be marked as

24   Defendant's A for identification and ask you if that is one of

25   the reports that you either reviewed or helped create?

1    A.   Yes.

2    Q.   Would you look at it and read it to yourself and see if

3    that refreshes your recollection as to the year of the Toyota

4    Highlander that Ms. Lasher was driving.

5         And it was registered to and to whom it was registered?

6    A.   It says a 2007 Toyota Land Cruiser, silver in color.

7              MS. GREENBERG:  Your Honor, can you instruct the

8    witness not to read from the exhibit because it is not in

9    evidence?

10             THE COURT:  The question is does it refresh your

11   recollection.  If it does, just tell us what we now know.

12             THE WITNESS:  Yes.

13   BY MR. FREEMAN:

14   Q.   Does it refresh your recollection?

15   A.   Yes.

16   Q.   Was it a 2007 vehicle?

17   A.   Yes.

18   Q.   Silver?

19   A.   Silver.

20   Q.   Do you know what Ms. Lasher's maiden name is?

21   A.   Yes, I do.

22   Q.   Was it Contang?

23   A.   Yes.

24             MR. FREEMAN:  I have nothing further.

25             THE COURT:  Anything further from the government for

F57sLAS5                      Murphy - cross

1    this witness?

2              MS. GREENBERG:  No, your Honor.

3              THE COURT:  Thank you very much.

4              THE WITNESS:  Thank you.

5              (Witness excused)

6              THE COURT:  The government can call its next witness.

7              MR. RICHENTHAL:  The government calls John M. Burling.

8              MR. RICHENTHAL:  May I proceed, your Honor.

9              THE COURT:  Yes, you may.

10    JOHN M. BURLING,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MR. RICHENTHAL:

15    Q.  Good afternoon, Mr. Burling.

16    A.  Hello.

17    Q.  I am going to bring you what has been marked as Government

18    Exhibit 705 in evidence.  It is a plastic bag.  I would like

19    you to open it.  Take a look at the first full page.

20    A.  Yes.

21    Q.  Do you see the top of it, sir?

22    A.  I am looking at the very top.

23    Q.  Do you see a name?

24    A.  Yes.

25    Q.  Is it your name?

1    A.  Yes.

2    Q.  Do you see an address?

3    A.  Yes.

4    Q.  Was it your address at the time?

5    A.  Yes, it was.

6    Q.  Does this appear to be a prescription?

7    A.  It's an authorization for a prescription.

8    Q.  Does it appear to be an authorization that you issued?

9    A.  Yes.

10   Q.  Let's back up.  Where are you from?

11   A.  I live in Bluffton, South Carolina.

12   Q.  Is that what is on Government Exhibit 705?

13   A.  Yes.

14   Q.  Where do you live now?

15   A.  I still live in Bluffton, South Carolina.

16   Q.  What is your educational background?

17   A.  I got a bachelors in science degree in 1973 from

18   St. Lawrence University, M.D. degree from Rutgers Medical

19   School in 1977.  I trained in internal medicine from 1977 to

20   1980, and I took my boards in internal medicine in 1980, and

21   emergency medicine and occupational medicine in 1990, and got a

22   master's in public health in about 1991 or '2 from Medical

23   College of Wisconsin.

24   Q.  Did you practice medicine?

25   A.  Yes, I did.

1    Q.   What kind of medicine did you practice?

2    A.   I practiced internal medicine, emergency medicine, and some

3    occupational medicine, and urgent care.

4    Q.   Did you write prescription in that practice or any of those

5    practices?

6    A.   Yes, I did.

7    Q.   How would you typically determine whether a prescription

8    was appropriate for a patient?

9    A.   I would see a patient, they would come in with a chief

10   complaint, and I would take a history of that present illness

11   and I would review their past medical history, what's called

12   the review of systems that might be pertinent to the complaint.

13   That would be -- let's say if it was chest pain, cardiac

14   systems or lung systems or that kind of thing.  Then there

15   would be a physical exam of some sort followed, perhaps, by

16   some laboratory or X-ray or other diagnostic test.  Then a

17   diagnosis would be rendered and a prescription may or may not

18   be written, plus whatever else would be appropriate.

19   Q.   Typically how long would the process take from the first

20   thing you just talked about where the patient --

21        MR. FREEMAN:  Excuse me, your Honor.  I will object to

22   this line of questioning.  We need a side bar, please.

23        (Continued on next page)

24

25

1          (At the side bar)

2          MR. FREEMAN:  Judge, I object to having this witness

3    testify in this way.  I understood that he was going to testify

4    in light of his involvement in the conspiracy and that he is

5    going to talk about what he did within the conspiracy and to

6    assist the conspiracy and lend his name as a doctor so that

7    there would be prescriptions from an M.D., but I fear that the

8    government is trying to use him as an expert and that wouldn't

9    be proper.

10          First of all, among other things, he has now lost his

11   medical license.  Based on his involvement in this case, I

12   think his expertise is questionable.

13          MR. RICHENTHAL:  He has actually not lost his medical

14   license, it's suspended, but that's irrelevant.

15          MR. FREEMAN:  You called him mister.  I was confused.

16          MR. RICHENTHAL:  I'm doing that with all witnesses.  I

17   don't direct witnesses with doctor.  I don't think it is

18   appropriate in the court.  I asked him what he did.  I think it

19   is appropriate for the jury to know who he is.

20          More importantly, the jury is going to have to make a

21   determination as to validity.  It is exceedingly relevant,

22   indeed, among the most probative evidence, that the individual

23   issuing a number of these prescriptions had a practice and he

24   was doing his job legitimately, and that he chose for financial

25   renumeration to alter that practice and do prescriptions

1   differently.

2          A comparison between what he originally did and what

3   he chose to do on the Internet is probative of validity.  And

4   what he thought about when he was doing it, what he thought the

5   purposes of the prescriptions were.  I expect that he will

6   testify, in sum, that his original practice involved, in sum

7   and substance, what he just said.  There came a time when he

8   chose to alter it in return for money.  He chose to issue

9   prescriptions over the internet in a different way.  That is

10  the story of his involvement.

11         It would be odd, at best, for example, in a cocaine

12  case, to ask someone -- excuse me -- not to ask someone how

13  they got involved in the offense.  How he got involved in the

14  offense is he went from what I am talking about now to doing

15  the offense.  And a comparison between those two types of

16  practice, his own personal practice, his own personal practice,

17  not his knowledge of practice of others, is relevant for

18  validity.

19         How is the jury supposed to determine if prescriptions

20  issued by him, when he issued them over the Internet, are valid

21  if he himself is not allowed to talk about what he did and what

22  he didn't do?

23         MR. FREEMAN:  Therein lies the problem.  The

24  government should be calling an expert, not using this witness

25  as an expert to testify about validity.  If he wants to talk

1    about how he got involved -- I read his 3500, he did it for

2    money, etc. etc. -- I can't object to that.

3         But for him to be talking about what constitutes a

4    doctor-patient relationship, that is improper for this witness.

5         MR. RICHENTHAL:  Your Honor, he pled guilty to

6    multiple felonies arising, from his personal view, that he did

7    not have a doctor-patient relationship.  We are surely allowed

8    to ask him why that is his view, indeed if that is his view,

9    which it is.  He pled guilty under oath in this very courtroom.

10        I am not going to use the word "valid," to be very

11   clear, that's for the jury to determine.  I do intend to ask

12   him whether he had a doctor-patient relationship.  He pled

13   guilty to crimes arising out of a lack of one.  I don't know

14   how we could possibly ask him questions and not ask did he have

15   a valid relationship when he pled guilty to crimes without a

16   valid relationship.

17        MR. FREEMAN:  I wouldn't object if the question was

18   asked:  Did you have a valid relationship with any of these

19   people, the thousands of people?  Of course he didn't have a

20   doctor relationship.  He was in one state, they were in another

21   state.  That is a different issue.

22        The way he is doing it, it's having the witness

23   testify as an expert.

24        MR. RICHENTHAL:  It's his own practice.  There is no

25   expertise involved.  I want to make a point here, surely I am

1    entitled to ask him why he didn't have a doctor-patient

2    relationship.  And you know what he will say?  What he is

3    saying now.  I am just going at it a little earlier.  If

4    Mr. Freeman would like me to indicate, I can ask him then,

5    meaning ten questions from now.

6              THE COURT:  Okay.

7              (Pause)

8              The bottom line, to me, is that the government could

9    ask him these questions in one of two orders.  One, you could

10   start with:  What did you do here and how did that differ from

11   your practice?  Or you do what you're doing, ask him what his

12   regular practice was and then ask him how his activity related

13   to this case differently.  I think it is literally six of one,

14   half a dozen of the other.

15             MR. RICHENTHAL:  That's our view.

16             THE COURT:  It's your choice.

17             MR. RICHENTHAL:  I have chosen the latter.  I don't

18   think the rules of evidence have anything to say on the latter

19   or the former.  On that basis, we would like to proceed.

20             MR. FREEMAN:  To the extent he strays into opinion --

21   this is a fact witness -- then it's objectionable.

22             MR. RICHENTHAL:  Your Honor, he literally pled guilty

23   in this courtroom.

24             THE COURT:  It's not a matter of opinion, it's a

25   matter of what he did in fact.

1          MR. RICHENTHAL:  I just want to add, his opinion, as

2     it were, does matter.  He pled guilty.  He believes himself to

3     have issued prescriptions without a doctor-patient

4     relationship.  I am entitled to ask him why he has that belief.

5     It's a highly probative issue for the jury and not prejudicial.

6     I don't expect he is going to testify he ever met Ms. Lasher.

7     It goes to validity.

8          MR. FREEMAN:  I'll object, but I understand your

9     ruling.

10          THE COURT:  Okay.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2     BY MR. RICHENTHAL:

3     Q.   Let's pick up where we left off.

4     A.   Okay.

5     Q.   You described a process that resulted or could result in

6     the issuance of a prescription?

7     A.   Correct.

8     Q.   In your personal experience, typically how long did that

9     process take?

10    A.   If it was a new patient, it might be 30 minutes to an hour

11    perhaps, depending on the complexity.  For a brief visit on an

12    established patient, it might be 15 minutes.

13    Q.   Now, if a patient asked for a particular drug, would you

14    always prescribe that particular drug?

15    A.   No, not necessarily.

16    Q.   Why not?

17    A.   Well, it would have to be appropriate for the condition

18    that they are being treated for.  They may not be asking for

19    the right drug.

20    Q.   If a patient asked for a prescription drug generally,

21    didn't name it, said I want a prescription drug, would you

22    always prescribe a prescription drug?

23    A.   No.

24    Q.   Why not?

25    A.   It may not be necessary.

1    Q.  If you were going to prescribe a prescription drug and a

2    patient demanded a particular quantity of that drug, would you

3    always prescribe that precise quality?

4    A.  No.

5    Q.  Why not?

6    A.  It may not be necessary.  It may not be appropriate.

7    Q.  Did there come a time when you started to act differently?

8    A.  Yes.

9    Q.  Did you start issuing prescriptions over the Internet?

10   A.  Yes.

11   Q.  How did that come about?

12   A.  I received an e-mail from a Dr. Prab Tumpatir Rao offering

13   an opportunity to do telemedicine for either an internist or a

14   family practice type doc working part-time.  I responded to

15   that e-mail and had a conversation with him, which was followed

16   up by contact with some individuals that were running an

17   Internet prescription program.

18   Q.  Approximately when did you get these contacts?

19   A.  I believe it was around July 11 of 2011 when I received the

20   first e-mail.  Probably over the next two or three days, we had

21   e-mail and verbal discussions.  Then I was put into contact

22   with two other individuals named Richard and Aaron, who gave me

23   some training on that website, with a log-in ID and password

24   about August 23 of 2011.  Then I started a couple days later, I

25   believe.

1    Q.  Now, where were you when you started this work?

2    A.  I was working in Bluffton.

3    Q.  You referenced a website.  Would you literally log into a

4    website?

5    A.  Yes.

6    Q.  What would you see when you logged in?

7    A.  There would be a screen of customers with -- I am not

8    precisely sure what was on the initial screen.  They had their

9    names and other information, in the left column, there was

10   check boxes for approve or disapprove.

11   Q.  What kinds of questions were these?  What kind of

12   information was this?

13   A.  Well, when you click another tab to bring up a detail page,

14   you would see a group of questions that are like the ones that

15   you presented to me here.

16   Q.  Let's be precise.  When you say like the ones that I

17   presented to you, are you referring to document in Government

18   Exhibit 705?

19   A.  This one right in front of me here.

20   Q.  Can you hold up the document you are talking about?

21   A.  It would look similar to this.

22   Q.  Just for the record, you are holding about an eight by 10

23   or 11 piece of paper with a bunch of lines on it?

24   A.  Yes.

25   Q.  Can you look in the upper right, please.  Do you see a

1   signature?

2   A.   Yes.

3   Q.   Is that your signature?

4   A.   Yes.

5   Q.   Is that literally your signature or an electronic

6   signature?

7   A.   It's an electronic signature.

8   Q.   Going back to the website, would you see the same kinds of

9   questions you are seeing on that piece of paper?

10  A.   Yes.

11  Q.   Did you have any way to determine whether the customer had

12  answered the questions honestly?

13  A.   No, I did not.

14  Q.   Did the piece of paper, or in this case the website, did it

15  come with any medical records?

16  A.   No, it did not.

17  Q.   Did it come with any backup documentation as to the

18  information in the questions?

19  A.   No.

20  Q.   Just the questions?

21  A.   Just the questions.

22  Q.   How long did it take you to review each questionnaire?

23  A.   You could look at these and scan through them in about ten

24  seconds or so.

25  Q.   Did you speak with any customers?

1    A.   I did speak with a few.

2    Q.   How much is a few?

3    A.   Probably half a dozen or less.

4    Q.   What would lead you to speak with a customer?

5    A.   Well, they might have answered the questions and left out

6    if they had a doctor or might be some extenuating circumstance,

7    and I would reach out to them and find out what the situation

8    was.  So they would respond to an initial rejection, and then I

9    would call and find out what was going on.

10   Q.   Let's just be clear.  These conversations are after you

11   rejected the prescription?

12   A.   They were, yes.  That would be the typical situation.

13   Q.   You said you talked to customers approximately six times?

14   A.   I would say so.

15   Q.   Approximately how many prescriptions did you issue on an

16   average day through this website?

17   A.   Through this website in 2011, it wasn't that many.

18   Probably 50 to 100.  I think there were more in 2012, 100 to

19   200 a day or something like that.

20   Q.   How many days a week?

21   A.   Five.

22   Q.   So that is at least 500 a week?

23   A.   Yes.

24   Q.   It could be a thousand a week?

25   A.   I don't think it would ever reach the level of a thousand a

1    week, but it could have been more than 500 at times.

2    Q.   From what drugs?

3    A.   Mostly they were for Fioricet, Soma, tramadol, and

4    occasional others.

5    Q.   What percentage were those three; Fioricet, tramadol and

6    Soma?

7    A.   Probably at least 98 percent or more.

8    Q.   How were you paid for what you agreed to do; check, wire,

9    some other method?

10   A.   Wire, bank wire.

11   Q.   A bank wire into what?

12   A.   To my bank account.

13   Q.   Where was that located?

14   A.   My bank account?  In South Carolina.

15   Q.   Now, what you were paid?  What was the sum?

16   A.   Well, it was about $2 per prescription.

17   Q.   Is that prescriptions approved or prescriptions reviewed?

18   A.   I was under the impression it was prescriptions reviewed.

19   I never went to check to see if there was any difference

20   between the two.

21   Q.   Did it matter to you?

22   A.   Not really.

23   Q.   Why not?

24   A.   There were so few that I wound up rejecting, it wasn't

25   something I tracked.

1    Q.  You said there were so few you wound up rejecting.  In an

2    average day out of 500, how many would you reject?

3    A.  I would estimate one to two percent of the first group

4    would have missing diagnosis or missing -- they would answer

5    the question and didn't their private physician would be no or

6    something like that.

7    Q.  You mentioned missing.  If information was missing, is that

8    what would cause you to reject them?

9    A.  Yes.

10   Q.  If information was not missing, would you approve them?

11   A.  Yes.

12   Q.  You also mentioned a second group?

13   A.  Yes.

14   Q.  What do you mean by that?

15   A.  I was contacted again by Dr. Rao about a month after the

16   first group started that there was a second opportunity of a

17   similar nature and was I interested in participating in that.

18   I said I was, so he put me in touch with the second group.

19   Q.  Approximately when was that?

20   A.  About a month after the first.  Roughly August 23rd or so.

21   Q.  Of 2011?

22   A.  Yes.

23   Q.  Did you start to issue prescriptions for the second group?

24   A.  Yes.

25   Q.  How did that work?

1    A.  Well, it worked a little differently.  I got daily e-mails

2    with attached customer questionnaires, and I would -- they were

3    essentially the same kind of information as the first group.  I

4    would scan through those e-mail attachments and then return

5    that to the person that sent it to me.

6            MR. RICHENTHAL:  Your Honor, I think it may be 2:15.

7    Would you like me to stop for the day?

8            THE COURT:  My phone says it's 2:15 and so does my

9    computer.  It's 2:15.

10            We will respect the jurors' request today.  I wish you

11    a wonderful evening.  Remember the rules, don't talk about the

12    case and keep an open mind.

13            (Jury excused)

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2              THE COURT:  Anything we need to talk about?

3              MR. FREEMAN:  Unless that leads to something.

4              MR. RICHENTHAL:  Nothing for us, your Honor.

5              THE COURT:  John and I are going to work on the

6     charge.  We will probably e-mail it to you later tonight.  I

7     think, just the way things are going, we probably appreciate

8     your comments in writing over the weekend.  That doesn't mean

9     that I intend to firm it up totally, but I thought that it's

10    better to get it out there.

11             MR. FREEMAN:  Thank you.

12             THE COURT:  We welcome both substantive and spelling

13    errors and anything else that you have to make of it.

14             Thank you.

15             (Adjourned to May 8, 2015, at 9:00 a.m.)

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                              Page

3   DANIEL GEIGER

4   Direct By Ms. Greenberg . . . . . . . . . . 519

5   Cross By Mr. Freeman . . . . . . . . . . . . 531

6   Redirect By Ms. Greenberg . . . . . . . . . 552

7   ALBERT BUCK

8   Direct By Ms. Greenberg . . . . . . . . . . 557

9   Cross By Mr. Freeman . . . . . . . . . . . . 633

10  Redirect By Ms. Greenberg . . . . . . . . . 647

11  MATTHEW MURPHY

12  Direct By Ms. Greenberg . . . . . . . . . . 648

13  Cross By Mr. Freeman . . . . . . . . . . . . 668

14  JOHN M. BURLING

15  Direct By Mr. Richenthal . . . . . . . . . . 671

16                   GOVERNMENT EXHIBITS

17  Exhibit No.                              Received

18   3010   . . . . . . . . . . . . . . . . . . 526

19   701    . . . . . . . . . . . . . . . . . . 661

20   702    . . . . . . . . . . . . . . . . . . 663

21   703    . . . . . . . . . . . . . . . . . . 664

22   704    . . . . . . . . . . . . . . . . . . 666

23   705    . . . . . . . . . . . . . . . . . . 667

24

25