F58elas1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                       12 Cr. 868 (NRB)

LENA LASHER,

          Defendant.

------------------------------x

                             New York, N.Y.
                             May 8, 2015
                             9:00 a.m.

Before:

               HON. NAOMI REICE BUCHWALD,

                            District Judge

                    APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
DANIEL RICHENTHAL
KRISTY GREENBERG
    Assistant United States Attorney

FREEMAN, NOOTER & GINSBERG
    Attorneys for Defendant Lena Lasher
BY:  LOUIS M. FREEMAN
    NADJIA LIMANI

ALSO PRESENT:  Annie Chen, Paralegal

F58elas1

1              (In open court; jury not present)

2              THE COURT:  Counsel, if we could go on the record.

3              I have Ms. Greenberg's e-mail -- oh, dear, of

4      12:00 a.m. today.

5              Which I assume that you've received, Mr. Freeman?

6              MR. FREEMAN:  I have.

7              THE COURT:  Just briefly for the record, it concerns a

8      health issue that has arisen with a government witness,

9      Dr. Julio Paredes-Mitchel, and the government's possible

10     request that he be permitted to testify via video

11     teleconference, if he is not authorized by or cleared by his

12     doctors to travel.

13             MR. RICHENTHAL:  That's correct, your Honor.  I'm the

14     one who spoke with Mr. Paredes-Mitchel's counsel last night, so

15     I'm happy to give the Court more information.  But I understand

16     that Mr. Freeman, which we very much appreciate, has expressed

17     at least a potential amenability to a video conference

18     testimony, or even potentially testimonial stipulation, in

19     light of Mr. Paredes-Mitchel's age and medical condition.  But

20     I wasn't party to that conversation, so I'll let Mr. Freeman

21     convey it himself.

22             As I said, I could give the Court more information

23     about what I was told.  I was told by his counsel -- I don't

24     have medical records, so I can't be that specific, but I can

25     answer to that, if the Court would like.

F58elas1

1            MR. FREEMAN:  What Mr. Richenthal said was essentially

2    accurate.  I certainly am amenable to discussing video

3    testimony.  And given the nature of the testimony that

4    Dr. Paredes would be giving, as well as his condition, I don't

5    think that I would be objecting.

6            And as far as a testimonial stipulation is concerned,

7    I did mention that and, of course, it would have to be hammered

8    out.  And we don't always agree, but there have been a lot of

9    stipulations, and we've been able to work them out.  Even the

10   ones that didn't appear to be workable at the beginning did get

11   worked out.  So the operative word is amenable.

12           THE COURT:  Well, I think that we could proceed on the

13   sort of assumption/plan that if you don't work it out, a

14   stipulation, that he can testify by video conference.  The

15   Court certainly has no objection.

16           MR. RICHENTHAL:  Yes.  So yesterday when I spoke with

17   his counsel, his counsel certainly was open to that.  It's my

18   understanding -- I'm going to check at the end of the trial day

19   today -- that he may be released from the hospital in the next

20   day or so.

21           The issue is going to be one of sort of whether it's

22   medically appropriate for him to fly several hours.  Assuming

23   he's released from the hospital in the next day or two, there's

24   no reason to my knowledge he couldn't indeed join us by video

25   conference at whatever time on Monday worked out.  I think

F58elas1

1    that's appropriate.

2           I will say we don't anticipate his testimony to be

3    terribly long, irrespective of this medical event.  This is not

4    a witness of great length.  But I think that that's the

5    appropriate plan.  I'm going to check this afternoon with his

6    counsel.  In the event there's a material change -- for

7    example, he will literally still be in the hospital on

8    Monday -- I'll certainly alert Mr. Freeman.  And the parties

9    will talk and we'll figure out what, if anything, can be done.

10          THE COURT:  Well, I guess our transformation to a

11   technologically advanced courtroom could not have come at a

12   better time.

13          MR. RICHENTHAL:  I agree.  The only wrinkle, but it's

14   not an insurmountable one, but just to alert the Court, is

15   Mr. Paredes-Mitchel, his native language is Spanish.  So he

16   would be testifying through an interpreter.  But we can

17   certainly do that by video conference, just as we could do it

18   in English.  But I did want to alert the Court, it will be a

19   witness in Spanish.

20          MR. FREEMAN:  Judge, just for what it's worth -- I'll

21   be very quick -- I've had a number of instances where we've

22   used video conference testimony, more before the modern times.

23   But I find there's a lot of logistics involved in setting it

24   up.

25          THE COURT:  Well, I'm sure the US Attorney's Office

F58elas1

1     will be not only in touch with their own people, but the

2     Court's staff, to -- note that that doesn't mean my staff.

3              MR. FREEMAN:  I know what you meant.

4              THE COURT:  -- to run through it and make sure that

5     this is all working.

6              MR. FREEMAN:  And we've had a lot of people from the

7     DEA here, and so we could put at least one of them to work.

8              MR. RICHENTHAL:  Yes.

9              MR. FREEMAN:  It's my tax dollars, too, so I'm

10    pleased.

11             MR. RICHENTHAL:  We previously spoke with

12    Mr. Paredes-Mitchel by video conference from our office.  He

13    went to the US Attorney's Office in San Juan.  It worked

14    perfectly fine.  We would do something similar.  We'll be in

15    touch with Mr. Toranno from our office, who I think is the

16    point person on this, and the district court staffer.  And if

17    we need to make it happen, we will.  And we'll test it in

18    advance, so the jury is not sitting around trying to make it

19    work.

20             THE COURT:  Which they are now, so let's get them.

21             While John is getting them, John and I were here not

22    as late as the AUSAs, but we were here late last night working

23    on the charge.  We will have it to you certainly before the end

24    of the day.  There's just one other section that we didn't get

25    to.

F58elas1

1          MR. RICHENTHAL:  I don't see an agent in the room, so

2     I'm going to step out myself and get Mr. Burling.

3     Ms. Greenberg is going to.

4          THE COURT:  Okay.  You can bring the jury.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F58elas1

```
 1              (In open court; jury present)

 2              THE COURT:  Good morning, everyone.  Thanks to

 3    everyone for being on time.  Counsel and I just had something

 4    we needed to talk about, so sorry to keep you waiting for a few

 5    minutes.

 6              But we're ready to go.

 7     JOHN BURLING, resumed.

 8    DIRECT EXAMINATION

 9    BY MR. RICHENTHAL:

10    Q.  Good morning, Mr. Burling.

11    A.  Good morning.

12    Q.  When we left off yesterday, you had testified about what

13    you called the first group?

14    A.  Yes.

15    Q.  And then the second group.  The first group was a website

16    you'd log into?

17    A.  That's correct.

18    Q.  Let me just step back to that for a second.

19              I think that you said that you had approved 500 or

20    more prescriptions through the website every week?

21    A.  Probably more than that per week.  But it varied, yes.

22    Q.  And what percentage approximately did you deny of those

23    prescriptions that is over the website?

24    A.  I would estimate 1 to 2 percent.

25    Q.  And I think you said this yesterday.  Typically the
```

1    questionnaires were, quote/unquote, incomplete?

2    A.   They would either have stated they had no diagnosis or they

3    had no physician that was aware of the questionnaire.

4    Q.   Now, if they were complete, meaning those questions and the

5    others were answered, would you issue the prescription?

6    A.   Yes.

7    Q.   Did you have any ability whatsoever to determine if the

8    completed answers were truthful?

9    A.   No, I did not.

10   Q.   Is that true for every question on the questionnaire?

11   A.   I would say so.  There would be no way to be sure.

12   Q.   Putting aside -- I'm sorry.  Go ahead.

13   A.   That's okay.  Go ahead.

14   Q.   Now, putting aside the questions themselves, yesterday when

15   you looked at Government Exhibit 705, there was also a customer

16   name on it.  Do you recall that?

17   A.   Yes.

18   Q.   Did you have any way to check whether that was, in fact,

19   the person's true name?

20   A.   No.

21   Q.   There was a date of birth on it.  Did you have any way to

22   check whether that was, in fact, the person's true date of

23   birth?

24   A.   No.

25   Q.   Did you have any way to check whether, in fact, the person

1    was an adult?

2    A.  No.

3    Q.  There was an address on it as well.  Do you recall that?

4    A.  Yes.

5    Q.  Did you have any way to check whether the address was the

6    person's true address?

7    A.  No.

8    Q.  Did you have any way to check whether the person had

9    previously ordered drugs at that address?

10   A.  No.

11   Q.  Did you have any way to check whether the person who

12   previously ordered the drugs to a different address?

13   A.  No.

14   Q.  Now, you had mentioned a particular Internet site that you

15   would use to review these questionnaires?

16   A.  Mm-mm.

17   Q.  Did you have any way to check whether the customers had

18   ordered drugs from a different website?

19   A.  Oh, no.

20   Q.  Did you have any way to check how recently, if at all, the

21   person had drugs?

22   A.  No.

23   Q.  Did you have any way to check whether or not the name was

24   real, whether the person had previously used that name to order

25   drugs?

1    A.  No.

2    Q.  That date of birth to order drugs?

3    A.  No.

4    Q.  That address to order drugs?

5    A.  No.

6    Q.  That height to order drugs?

7    A.  No.

8    Q.  That weight?

9    A.  No.

10   Q.  Anything on the questionnaire?

11   A.  No.

12   Q.  Now, you mentioned, then, the second group.  I think you

13   started to say what that was, but let's just back up.

14          Tell us what the second group was, how you got

15   involved with what you call the second group.

16   A.  Okay.  I got another call -- I think it was a phone call

17   from Dr. Tumpatir Rao saying there was a second opportunity

18   involving a different group, and was asking me if I was

19   interested, and I said I was.

20          So he put me in contact with an individual, who was

21   named Martin Monahan, who then put me through and showed me

22   some sample questionnaires.  And then I started working for

23   that group at one of -- at a pharmacy.

24   Q.  Just pause for one second.  You used the name Martin

25   Monahan?

1   A.  Yes.

2   Q.  Do you know whether that was his real name?

3   A.  No, I don't.

4   Q.  Approximately when did you get involved with the second

5   group?

6   A.  Around August 23rd of 2011.

7   Q.  Did you stop working with the first group or just start

8   working with the second group as well?

9   A.  I was working for both of them at the same time.

10  Q.  So you continued to issue the prescriptions over the

11  website you testified about yesterday?

12  A.  Yes.

13  Q.  Let's talk about the second group, what you started doing

14  as well.  How did it work with the second group?  And by "it,"

15  I mean the process of issuing prescriptions.

16  A.  The process was I would receive one or two e-mail

17  attachments per day from Martin.  And in the attachment were a

18  series of questionnaires that were similar in nature to the

19  first group's questionnaires.  And then I would review that

20  document, and then if I -- if I approved it, I would then

21  reattach it and send it back to Martin.

22  Q.  Let me just pause for a moment.  You're saying Martin.

23  Again, do you know if that was the person's real name?

24  A.  No.

25  Q.  Where were you located when you received these e-mails?

1    A.   In South Carolina.

2    Q.   Approximately how many of the questionnaires were attached

3    to a given e-mail typically?

4    A.   Well, there were two batches.  There was batch one and

5    batch two.  And the first batch was a larger batch, and I would

6    say typically one to 200; and the second batch was smaller,

7    maybe 50 to 100, something in that range.

8    Q.   These questionnaires, they were attached to the e-mail in a

9    file?

10   A.   In a zip file.

11   Q.   You say "a zip file."  For anyone who may not be familiar,

12   what's a zip file?

13   A.   You take a document, and there are programs that will

14   compress it to a smaller size to make it easier to send.

15   Q.   Were these questionnaires attached one by one or as a

16   group?

17   A.   They were a group.

18   Q.   Were they noted in some way as if you'd already approved

19   them, or did you have to literally approve one by one?

20   A.   Well, they were all preapproved, you might say.  My

21   signature block was completed.  If I wanted to not approve one,

22   I would make a note on the return e-mail that so-and-so was not

23   approved.

24   Q.   Did these e-mails include medical records?

25   A.   No.

1   Q.  Did they include any kind of backup documentation?

2   A.  No.

3   Q.  Did they include identification; for example, a driver's

    license?

5   A.  No, nothing.

6   Q.  Did they include anything besides the questionnaires

7   themselves?

8   A.  No, that's all.

9   Q.  Where were the customers located for the second group?

10  A.  They were all over the country, I believe.

11  Q.  Was that also true for the first group?

12  A.  Yes.

13  Q.  How long did you take to review each questionnaire in the

14  second group; that is, these e-mail questionnaires?

15  A.  About the same, maybe ten seconds or so.

16  Q.  Did you have any ability to tell whether the questions in

17  the e-mailed questionnaires were truthful?

18  A.  No, I did not.

19  Q.  I asked you a series of questions a moment ago about age,

20  etc.  I'm not going to go through them again, but are the

21  answers the same for the second group?

22  A.  It's the same.

23  Q.  Approximately how many prescriptions per day did you issue

24  in this second group?

25  A.  I guess it could be 300, 200, and somewhere in that range,

1    depending on the day.

2    Q.  How many days a week?

3    A.  Five.

4    Q.  And you're also doing this for the website, the first

5    group?

6    A.  Correct.

7    Q.  So in an average day, how many prescriptions would you

8    issue?

9    A.  I tried to figure that out, and I would say, based on what

10   I was getting paid, probably four or 500 a day perhaps.

11   Q.  How were you paid for the second group; check, wire or some

12   other method?

13   A.  Wire.

14   Q.  Into what?

15   A.  Into my bank account.

16   Q.  Where was that located?

17   A.  In South Carolina.

18   Q.  What were you paid?  That is, literally, what was the sum?

19   A.  The total per week?

20   Q.  How was the total determined?

21   A.  Well, it was determined by the number that I reviewed, 250

22   apiece.

23   Q.  You said "reviewed."  Was it reviewed or approved?

24   A.  I'd assumed it was reviewed.  I've never, like I said

25   before, I never checked it, that particular detail.

1    Q.  Did it make a difference to you?

2    A.  No.

3    Q.  Why not?

4    A.  There was very few that I did not approve of, so it really

5    didn't matter.

6    Q.  You say "very few."  Approximately what percentage?

7    A.  I don't -- well, almost on the second group, almost zero.

8    I'd say it was probably six or eight or something total that I

9    did not approve.

10   Q.  Let me just pause.  You say six or eight total, is that per

11   day?

12   A.  No, for the whole time.

13   Q.  The entire time?

14   A.  Yeah.

15   Q.  When did you start with the second group?

16   A.  August of 2011.

17   Q.  How long did you continue with the second group?

18   A.  Until November of 2012.

19   Q.  In that entire period, you declined approximately six?

20   A.  Yes.

21   Q.  Did you speak with customers at all in connection with what

22   we're calling the second group?

23   A.  I did not.

24   Q.  Did you communicate with them in any way?  I said speak.

25   Let's be more precise.

F58elas1                         Burling - direct

```
 1              Did you e-mail with them?
 2   A.   No.
 3   Q.   Did you --
 4   A.   No methods.
 5   Q.   Did you use an interactive website of any kind?
 6   A.   No.
 7   Q.   How about Skype?
 8   A.   No.
 9   Q.   Any interaction of any kind?
10   A.   None.
11   Q.   Was that your choice, or did you not have such an
12   opportunity?
13   A.   It was my choice.
14   Q.   Let me be more precise.  Were you given any Skype link to
15   speak with these customers?
16   A.   No, but I believe there might have been a phone number on
17   the form, so I had the potential of calling them, but I did
18   not.
19   Q.   Other than the phone number, were you given any methods of
20   communication for the customers?
21   A.   No.
22   Q.   If you chose not to call them, did you know if the phone
23   number was real?
24   A.   No.
25   Q.   Did you have any way to check whether that phone number had
```

1   been listed by a customer ordering drugs at a different time?

2   A.  No.

3   Q.  Did you have any way to check whether that phone number had

4   been listed by a different customer?

5   A.  No.

6   Q.  For what drugs did you issue prescriptions in this second

7   group?

8   A.  Mostly it was tramadol, Fioricet, Soma.

9   Q.  What percentage would you estimate was those three drugs?

10  A.  It was 99-plus percent.

11  Q.  Did you have a doctor-patient relationship with the

12  customers in the first group?

13  A.  I did not.

14  Q.  Did you have a doctor-patient relationship with the

15  customers in the second group?

16  A.  I did not.

17  Q.  Why not?

18  A.  It did not follow the procedure that I mentioned yesterday

19  in terms of seeing a patient face to face, taking a history,

20  exam, diagnosis, etc.

21  Q.  And again, who selected the drug these customers received,

22  you or the customer?

23  A.  The customer.

24  Q.  Who selected the quantity of the drug these customers would

25  receive, you or the customer?

F58elas1                          Burling - direct

1   A.  I assume the customer.

2   Q.  Well --

3   A.  And I say "assume" because I don't know what the process

4   was where that quantity originated, but I'm assuming the

5   customer.

6   Q.  Let me be more precise.  Was the quantity already on the

7   order?

8   A.  Yes.

9   Q.  When you received it?

10  A.  Yes.

11  Q.  You didn't discern what the quantity was?

12  A.  No.

13  Q.  Did you have an understanding of what the purpose of these

14  questionnaires was?

15  A.  I think it gave it a kind of a veneer of legitimacy.  It

16  was -- that's all it was.

17  Q.  What do you mean, "veneer," by "veneer of legitimacy"?

18  A.  It's more the kind of thing you might get when you walked

19  into a doctor's office and they give you something there to

20  fill out when you're in the waiting room, but it's not the same

21  as going in and seeing the nurse at the doctor and getting an

22  actual history, physical done.

23  Q.  Now, you testified you were located in South Carolina when

24  you were doing the first group and the second group, is that

25  right?

F58elas1                           Burling - direct

1    A.  That's correct.

2    Q.  Did you have an understanding of where the customers were?

3    A.  The customers were all over, based on the addresses that

4    were on the forms.

5    Q.  Did you have an understanding of where the pharmacies were?

6    A.  In the first group I have no idea.  In the second group I

7    do know where two of the pharmacies are.

8    Q.  Where were they?

9    A.  Well, one of them was Towne Pharmacy, and that was in

10   Dunellen, New Jersey.  And the other one, which was CPS, only

11   found out about six months ago, it's in Mobile, Alabama.

12   Q.  Did you have any understanding as to whether there may be

13   additional pharmacies that were dispensing drugs pursuant to

14   your prescriptions?

15   A.  I do now.  I did not then.

16   Q.  At the time you didn't?

17   A.  No, I did not.

18   Q.  Did you have any communications with anyone in any pharmacy

19   in connection with your work?

20   A.  I had one initial communication with a pharmacist at the

21   Towne Pharmacy in Dunellen within the first few days of

22   starting the process.

23   Q.  What did you talk about in that communication?

24   A.  Basically to make sure I understood the procedure of

25   reviewing the questionnaires and the prescriptions and sending

F58elas1                              Burling - direct

 1   them.  But that was about it.

 2   Q.  Did they ask you anything else in that conversation?

 3   A.  Not that I recall.

 4   Q.  Did you say in that conversation or any other conversation

 5   with a pharmacy that you were seeing patients in person?

 6   A.  No.

 7   Q.  How about that you were seeing patients via Skype?

 8   A.  No.

 9   Q.  Video conference?

10   A.  No.

11   Q.  Some other interactive program?

12   A.  No.

13   Q.  Did you ever tell anyone in that conversation or in any

14   other conversation that you were reviewing medical records --

15   A.  No.

16   Q.  -- in addition to the forms?

17   A.  No.

18   Q.  That you were reviewing backup documentation in addition to

19   the forms?

20   A.  No.

21   Q.  That you could see an image of the patient?

22   A.  No.

23   Q.  Did you ever tell anyone what I just called patient was, in

24   fact, your patient?

25   A.  I don't quite understand.

F58elas1                         Burling - direct

1   Q.  Did you ever tell anyone --

2             MR. FREEMAN:  Object.

3   Q.  -- the customers, in fact, were patients?

4   A.  No.

5   Q.  Did you ever tell anyone that you communicated with other

6   doctors about the customer?

7   A.  No.

8   Q.  Do you have any ability -- did you at the time have any

9   ability to know whether these customers had spoken with any

10  other doctor?

11  A.  No.

12  Q.  Did you have any ability to know whether these customers

13  had asked for this drug from a doctor and been declined?

14  A.  No.

15            MR. RICHENTHAL:  Ms. Chen, could you put 1002B in

16  evidence on the screen.

17  Q.  Do you recognize this, Mr. Burling?

18  A.  This is a typical record from the first Internet group.

19  Q.  When you say the first group, again, you mean the one where

20  you'd log into the website?

21  A.  Yes.

22  Q.  Roughly what information on your screen now would you see

23  when you logged in?

24  A.  Well, I would certainly see the bottom two-thirds, where

25  the height, weight and some questions were asked.  And I would

```
 1   see, I believe, the -- see, what I'm not clear at this point,

 2   this was -- the formatting on the online was exactly like this,

 3   but I would see that basically information.

 4   Q.  Let me pause for one second.  You said earlier that if the

 5   questionnaire was incomplete, you might deny it?

 6   A.  Yes.

 7   Q.  Can you tell us which questions, if left blank, would cause

 8   you to deny a prescription?

 9   A.  Well, if there was the one there in the middle that says --

10   oh, that's better.  Tension headaches.  If they had no medical

11   condition listed, or if they -- if it says is your personal

12   healthcare practitioner aware that you are requesting a

13   medicine, and they put no.

14   Q.  Let me --

15   A.  Those two.

16   Q.  Let me take those one at a time.

17          On the first one, it says please state the medical

18   condition requiring you to use this medication.  Is that the

19   question you're talking about?

20   A.  That's the one, the second one you've highlighted.

21   Q.  If that was blank, you might deny the prescription?

22   A.  Yes.

23   Q.  If something was written there, would you issue the

24   prescription?

25   A.  Yes.
```

F58elas1                          Burling - direct

1   Q.  Did you have any way to determine whether what was written

2   there was true?

3   A.  No.

4   Q.  Now, here it says tension headaches.  Does it say anything

5   beyond that?

6   A.  That's all it says.

7   Q.  Does this appear to be a prescription you issued?

8   A.  Yes.

9   Q.  Can you go up to where it says personal healthcare

10  practitioner?  That's the first question.

11  A.  Yes.

12  Q.  It says, is your personal healthcare practitioner aware you

13  are requesting this medication?  It says yes.

14          Now, if that was left blank, that might cause you to

15  deny the prescription?

16  A.  Yes.

17  Q.  Did you have any way to tell whether yes was a truthful

18  answer?

19  A.  No.

20  Q.  Were you actually given contact information for this

21  person's alleged personal healthcare practitioner?

22  A.  No.

23  Q.  And again, approximately what percentage of these

24  questionnaires did you deny in the first group?

25  A.  I'd say 1 to 2 percent of this group would have that

F58elas1                    Burling – direct

1    missing.

2    Q.  And that would cause you to deny it?

3    A.  Right.

4    Q.  Let's look at the top.  Do you see where it says date of

5    birth?

6    A.  Yes.

7    Q.  How old did this customer say he or she was?

8    A.  Sixty-four.

9              MR. RICHENTHAL:  Now, Ms. Chen, can you go down a

10   little lower, please, to where it says Dr. Burling.

11   Q.  Mr. Burling, do you see the line that says, are you

12   currently taking any prescription or nonprescription medicines?

13   A.  Yes.

14             MR. RICHENTHAL:  Ms. Chen, can you highlight that,

15   about four or five questions up.

16   Q.  Is that now highlighted on your screen?

17   A.  It's highlighted.

18   Q.  What did this customer say in response to, are you

19   currently taking any prescription or nonprescription medicines?

20   A.  None.

21   Q.  In your experience was it typical for a 64-year-old not to

22   take a single prescription or nonprescription medication?

23   A.  It would be atypical.

24   Q.  Go up to the top now, please.

25             What was this prescription for?  What drug?

F58elas1                           Burling - direct

1    A.  This is for Fioricet.

2    Q.  Brand or generic?

3    A.  Brand.

4              MR. RICHENTHAL:  Could you go to the next

5    prescription, please, Ms. Chen.

6    Q.  Does this also appear to be a prescription you issued?

7    A.  Yes.

8    Q.  For what drug?

9    A.  Fioricet, brand.

10             MR. RICHENTHAL:  Ms. Chen, could you go down to the

11   question that asks for medical condition again.

12   Q.  What did this customer write in response to, please state

13   the medical condition?

14   A.  Occasional headaches.

15   Q.  In your experience, was Fioricet necessary for an

16   occasional headache?

17   A.  Not necessarily, no.

18   Q.  Might aspirin do?

19   A.  It might.

20   Q.  Might Tylenol do?

21   A.  Mm-mm.

22   Q.  You have to say yes or no.

23   A.  Yes.  Sorry.

24   Q.  Now, those two were Fioricet brand.  Did you also fill

25   prescriptions for Fioricet generic?

F58elas1                        Burling - direct

```
 1    A.  I believe so.

 2            MR. RICHENTHAL:  Ms. Chen, can you put the last

 3    prescription in this exhibit on the screen.

 4    Q.  Does this, again, appear to be a prescription issued by

 5    you?

 6    A.  Yes.

 7    Q.  Now, how old did this customer say he or she was?

 8    A.  Fifty-four.

 9            MR. RICHENTHAL:  Ms. Chen, could you go down to the

10    question, asked about prescription/nonprescription medications.

11    Q.  As to the question, are you currently taking any

12    prescription or nonprescription medications, what did this

13    person write?

14    A.  None.

15    Q.  In your experience was that common for a 54-year-old?

16            THE COURT:  If you keep doing this, I'm going to feel

17    very old.

18    A.  Fifty-four-year-old, that could be the case, but as you get

19    older, of course, that's less likely.

20    Q.  Let me pause for a second.  Nonprescription medication,

21    does that include anything over the counter at the pharmacy?

22    A.  Yes.

23    Q.  For example, aspirin?

24    A.  Yes.

25    Q.  Tylenol?
```

1    A.  Yes.

2    Q.  Cold medication?

3    A.  Yes.

4    Q.  Now let's go to the top.  Do you see where it says -- I'm

5    looking at the right now -- take one tablet -- excuse me.  Take

6    one to two tablets every four hours as needed for headache.  Do

7    you see that?

8    A.  Yes.

9    Q.  And then there's a parentheses, and it says, maximum four

10   tablet in 24 hours, closed parentheses.  Do you see that?

11   A.  Yes.

12   Q.  Are these the instructions with respect to the pills?

13   A.  Yes, it is.

14   Q.  Are these the instructions about how often to take them or

15   not to take too many, in so many words?

16   A.  Yes.

17   Q.  Now, after you authorized a prescription, did you ever

18   authorize anyone to change these instructions?

19   A.  I did not.

20   Q.  Ever?

21   A.  No.

22           MR. RICHENTHAL:  Ms. Chen, can you turn to the next

23   page.  Actually, let's go back one second.  I'm sorry.

24   Q.  What's the alleged name of the customer here?

25   A.  Deborah Brighthill.

F58elas1                          Burling - direct

1     MR. RICHENTHAL:  Could we go to the next page now,

2     Ms. Chen.

3     Q.  Does this appear to match?  And by "this" I mean --

4     A.  It's the same name.

5     Q.  Is this also Fioricet generic?

6     A.  Trying to find it on here.

7           MR. RICHENTHAL:  Ms. Chen, can you --

8     A.  Yes.

9           MR. RICHENTHAL:  Ms. Chen, can you put on the screen

10    the top part of the prior page and then this page.

11    Q.  How does the information about the maximum number of

12    tablets compare on these two pages?

13    A.  There's -- in one case it said four, and this one it says

14    six.

15    Q.  Now, the one on the right, those are the instructions you

16    authorized?

17    A.  Yes.

18    Q.  The one on the left does not match?

19    A.  It does not.

20    Q.  And again, did you ever authorize anyone to alter these

21    instructions?

22    A.  No, I did not.

23    Q.  Ever?

24    A.  No, never.

25    Q.  Was that true the entire time you issued prescriptions on

F58elas1                          Burling - direct

1    the Internet?

2    A.  That's correct.

3    Q.  Was it true the entire time you issued prescriptions over

4    e-mail?

5    A.  Yes.

6    Q.  Now, before I switch gears, let me pause for a second.  How

7    many tablets did you authorize for this customer?

8    A.  This one had -- I believe it was 90.

9    Q.  Now, where are you looking on the right?

10   A.  I'm looking at the bottom line on the right, where it says

11   90 tabs, quantity one.

12           MR. RICHENTHAL:  Ms. Chen, can you highlight that.

13   Thank you.

14   Q.  On the left is there also a quantity indication?

15   A.  Ninety.

16   Q.  Does it match?

17   A.  Quantity matches.

18   Q.  Did you ever authorize anyone at the pharmacies to issue a

19   greater quantity than that in the prescription?

20   A.  I did not.

21   Q.  Ever?

22   A.  No.

23   Q.  Did you ever authorize anyone in the pharmacies -- excuse

24   me.

25           Did you ever authorize anyone in the websites to issue

F58elas1                          Burling - direct

1    a greater quantity?

2    A.  No.

3    Q.  At any point ever did you ever authorize someone to issue a

4    greater quantity than that in the prescription?

5    A.  I did not.

6    Q.  Was that true the entire time you did what we've been

7    talking about?

8    A.  Yes.

9    Q.  I want to bring you now to Government Exhibit 2011, what's

10   been marked for identification as 2011.  I'd like you to leaf

11   through that.  Take as much time as you need.  Let me know if

12   you recognize what's in it.

13   A.  These are the typical e-mail attached forms that I received

14   from the second group.  This particular one was from Palmer

15   pharmacy.

16   Q.  Do these appear to be prescriptions you issued as part of

17   that second group?

18   A.  Yes.

19           MR. RICHENTHAL:  The government offers 2011, subject

20   to connection.

21           MR. FREEMAN:  No objection, subject to connection.

22           THE COURT:  Received.

23           (Government's Exhibit 2011 received in evidence)

24           MR. RICHENTHAL:  Ms. Chen, could we put 2011 on the

25   screen.

1    BY MR. RICHENTHAL:

2    Q.  Now, is this format a little different from the format in

3    1002B?

4    A.  Is that what you were showing me before, 1002B?

5    Q.  Yes.

6           MR. RICHENTHAL:  Ms. Chen, could you just quickly put

7    up the first page of 1002B.

8    A.  Yes.  It's a different format.

9    Q.  1002B is an example of what you call the first group?

10   A.  Yes.

11   Q.  And 2011, what's on your screen now, is an example of what

12   you call the second group?

13   A.  Yes.

14   Q.  Putting aside formatting, were these similar?

15   A.  Very similar.

16   Q.  Is this what you would see when you'd open your e-mail?

17   A.  It would be.

18   Q.  Now look at the lower right.  Do you see where it says

19   Palmer Pharmacy & Much More?

20   A.  That was not on the forms that I saw.

21   Q.  What's your understanding of what that is in the lower

22   right?

23   A.  It looks like a receipt.

24   Q.  A receipt for what?

25   A.  For the prescription.

F58elas1                          Burling - direct

1    Q.  The prescription matching the questionnaire?

2    A.  This one looks like it matches, 90 tramadol at the bottom

3    on the stamp and 90 at the top.

4    Q.  You said that this prescription was for tramadol?

5    A.  Yes.

6    Q.  Was that one of the two drugs -- excuse me, one of the

7    three drugs that was 99 percent?

8    A.  Yes.

9    Q.  Now, in this second group, again, what percentage, if any,

10   prescriptions did you deny?

11   A.  I don't think it would really make sense using percentage.

12   It was probably half a dozen.

13   Q.  In your entire time?

14   A.  Yes.

15   Q.  For the second group did the questionnaires come with

16   instructions, again, about how often to use the medication?

17   A.  Yes.

18   Q.  Can you direct us to where those were found on this form.

19   A.  At the bottom, where it says instructions.

20          MR. RICHENTHAL:  Ms. Chen, can you highlight that,

21   please.

22   Q.  Did you ever authorize someone to revise those

23   instructions?

24   A.  They were preprinted on the forms.

25   Q.  And after you issued the form, did you ever authorize

F58elas1                          Burling - direct

1   anyone to give the customer different instructions?

2   A.  No, I did not.

3   Q.  Ever?

4   A.  No.

5   Q.  Now the quantity, again, if you look at the top, what's the

6   quantity here?

7   A.  Quantity was 90.

8   Q.  That's 90 pills or 90 tablets?

9   A.  Ninety tablets.

10  Q.  Now, after you authorized a prescription, did you ever

11  authorize anyone to dispense a greater quantity?

12  A.  I did not.

13  Q.  Ever?

14  A.  No.

15  Q.  Did there come a time when you were arrested for what you'd

16  been doing?

17  A.  Yes.

18  Q.  Approximately when were you arrested?

19  A.  November 29, 2012.

20  Q.  By the time you were arrested, approximately how much money

21  had you made issuing prescriptions to people you never met or

22  spoke with?

23  A.  About 300,000.

24  Q.  Approximately how many prescriptions in total did you issue

25  this way?

1   A.  I'm estimating about 125,000.

2   Q.  Did there come a time when you decided to cooperate with

3   law enforcement?

4   A.  Yes.

5   Q.  Why did you do so?

6   A.  Well, I felt it was the right thing to do, and also to

7   improve my chances for leniency.

8   Q.  What do you mean by improve your chances for leniency?

9   A.  To have a lesser sentence.

10  Q.  Did you later plead guilty to criminal charges?

11  A.  I did.

12  Q.  What kinds of charges?

13  A.  Charges that arose from issuing fraudulent prescriptions

14  and being paid for it.

15  Q.  Did you plead guilty under any kind of agreement?

16  A.  Yes.  I signed a cooperating agreement.

17  Q.  What's your understanding of what that agreement is?

18  A.  The agreement outlines the charges that I pleaded guilty

19  for, and obligates me to give factual testimony to any

20  prosecution of -- related to this or other cases related to

21  this; not to provide false or misleading testimony; and not to

22  commit any additional crimes since the original agreement.

23  Q.  Did you also have to give up any money?

24  A.  Yes.

25  Q.  What money?

F58elas1                           Burling - direct

1    A.  All of it.

2    Q.  All of what?

3    A.  All of the 300,000.

4    Q.  That's the money you made from what you did?

5    A.  Yes.

6    Q.  Now, that's what you agreed to do?

7    A.  Yes.

8    Q.  What, if anything, did the government agree in return?

9    A.  That at the conclusion of all of my testimonies in

10   different places that I've given it, that they would issue a K1

11   letter to the Court.

12   Q.  Let me pause for a moment.  You said a K1 letter?

13   A.  I believe that's what it's called.  A K5 letter maybe, K --

14   one of those, K something.

15   Q.  Regardless of the term, what's your understanding of what

16   that letter is?

17   A.  The letter outlines what I did leading up to the arrest and

18   what I have done in cooperation since the arrest.

19   Q.  Let me pause for a second.  You mentioned two different

20   things, what led up to your arrest and what you've done since?

21   A.  Right.

22   Q.  By "what led up," do you mean the criminal activity you

23   talked about?

24   A.  Yes.

25   Q.  And what you've done since, what do you mean?

1   A.  I have provided testimony in several -- in several --

2   what's the good word? -- investigations, including this one, in

3   cooperation with different prosecutors; one in Kentucky, one in

4   Alabama, and of course here.

5   Q.  To whom will this letter be sent?

6   A.  To the judge here.

7   Q.  Who will decide your sentence?

8   A.  The judge.

9   Q.  Does the government decide your sentence?

10  A.  It does not.

11  Q.  Does the agreement protect you if you lie in court?

12  A.  It does not.

13  Q.  What's your understanding of what will happen if you lie?

14  A.  Then I would be subject to all the original penalties that

15  I was charged with, without any consideration.

16  Q.  Would you still get your letter?

17  A.  No.

18  Q.  Does the agreement protect you if you provide misleading

19  testimony?

20  A.  It does not.

21  Q.  Would you still get your letter?

22  A.  No.

23  Q.  Is it your understanding this letter only says good things

24  about you?

25  A.  It is what I said before.  It says the bad things that I

1     did, and hopefully the good things that I have done in

2     cooperation.

3     Q.  Is the agreement specific to the investigation that led to

4     this trial?

5     A.  No, it's not.

6     Q.  Is the agreement specific to Lena Lasher personally?

7     A.  No, it's not.

8     Q.  Does your sentence depend on whether she's convicted?

9     A.  No.

10    Q.  Does your sentence depend whether anyone is convicted?

11    A.  No.

12    Q.  Before you were arrested, to your knowledge had you ever

13    met anyone named Lena Lasher?

14    A.  No, I had not.

15    Q.  I'd like you to look to your right.  Do you recognize

16    anyone sitting at the second table?

17    A.  Your paralegal.  That's all.

18    Q.  I'm calling the one Ms. Chen's at the first table.  Do you

19    recognize anyone at the second table?

20    A.  No, I do not.

21    Q.  Do you know who else, if anyone, is testifying in this

22    trial?

23    A.  I do not.

24    Q.  Do you know how many witnesses have testified so far?

25    A.  No.

1   Q.  Do you know whether any witnesses at all are testifying

2   after you?

3   A.  Yes.

4   Q.  How do you know that?

5   A.  Well, when I was sitting outside in the lobby yesterday,

6   there was a gentleman that was at the other end of the hall.

7   He was called in ahead of me, and then you guys pulled a

8   switch.  So I'm assuming he's testifying next.

9   Q.  Do you know who he is?

10  A.  No.

11  Q.  Do you know what he's going to say?

12  A.  I have no idea who he is.  He's just out in the lobby.

13  Q.  Do you have any idea what anyone said in this trial so far?

14  A.  No.

15  Q.  Other than what I've shown you, Government Exhibit 705,

16  Government Exhibit 1002B and Government Exhibit 2011, do you

17  have any idea what evidence, if any, is being introduced in

18  this trial?

19  A.  No, I don't.

20  Q.  Do you have any idea whether it supports or doesn't support

21  what you've testified to so far?

22  A.  I do not.

23  Q.  Now, again, with Government Exhibit 705, 1002B and 2011,

24  those are the different questionnaires.  Do you know where that

25  evidence is from?

F58elas1                    Burling - direct

1   A.  I do not.

2           MR. RICHENTHAL:  Could I have a moment, your Honor.

3           THE COURT:  Sure.  (Pause)

4           MR. RICHENTHAL:  No further questions.

5   CROSS EXAMINATION

6   BY MR. FREEMAN:

7   Q.  Good morning.

8   A.  Good morning.

9   Q.  My name is Louis Freeman.  I'm an attorney and I represent

10  the person that you've never seen, Lena Lasher, who's on the

11  far end of the table where I sit.

12          While you were working for group one and group two,

13  you never heard the name Lena Lasher?

14  A.  I did not.

15  Q.  Was it worth it?

16          MR. RICHENTHAL:  Objection.

17  Q.  The 300,000.

18  A.  Of course not.

19  Q.  But you weren't thinking that way at the time?

20  A.  No.

21  Q.  And you recounted for us yesterday your educational

22  background.

23  A.  Yes.

24  Q.  It was quite impressive.

25          You're suspended as a physician, correct?

F58elas1                         Burling - cross

1   A.  Correct.

2   Q.  And do you have a hope or an expectation that you might be

3   able to get your license back?

4   A.  I hope so.

5   Q.  Did the government agree to assist you in that regard?

6   A.  They did say they would write a letter in support to the

7   board and -- when this is all said and done.

8   Q.  You've not been sentenced yet, am I correct?

9   A.  That's correct.

10  Q.  And it's your hope to get a sentence that does not include

11  jail time, correct?

12  A.  Of course.

13  Q.  But you're facing a substantial amount of jail time,

14  correct?

15  A.  Yes.

16  Q.  And the letter that you described, 5K letter, 5K1 to be

17  precise, is a letter that who writes?  Does the government

18  write it?

19  A.  The government writes it.

20  Q.  Right.  And as you said, if the government writes a

21  favorable letter -- this is according to your understanding --

22  the chances of your sentence being lower are greater, correct?

23  A.  Yes.

24  Q.  And the less favorable letter, your chances of going to

25  jail increase, correct?

F58elas1                        Burling - cross

1   A.  Correct.

2   Q.  And this isn't just whether you lied or whether you don't

3   lie; this is up to the government to write the letter and write

4   it as strong as possible, correct?

5   A.  My understanding is they will simply outline what I have

6   done in support of the government in terms of my testimony.

7   Q.  So to put that another way, you're helping the government?

8   A.  Yes.

9   Q.  Now, speaking of helping the government, I understand that

10  you're testifying in other investigations, including Kentucky,

11  including -- what was the other state you mentioned?

12  A.  Alabama.

13  Q.  Alabama.  And did you have something to do with an

14  investigation in Rhode Island?

15  A.  No.

16  Q.  But let's just talk about this case, this particular trial.

17          So you live in South Carolina, correct?

18  A.  Yes.

19  Q.  And you've had to come up to New York to prepare for your

20  testimony here, correct?

21  A.  Correct.

22  Q.  How many times did you come up?

23  A.  Three times.

24  Q.  And did you speak to the government by Skype or video

25  conference or anything else in addition to that?

F58elas1                          Burling – cross

1   A.  No, just face to face.

2   Q.  And face to face three times.  How many hours did you

3   spend meeting with the government in preparation for your

4   testimony --

5   A.  I'd say --

6   Q.  -- each time?

7   A.  Probably the first time was the longest, maybe a couple

8   hours, hour and a half, something like that.  The second time

9   was shorter.  And the third time was just a quick review, so it

10  was probably 45 minutes.

11  Q.  Would it be fair to say, then, an hour and a half, plus an

12  hour, plus 45?

13  A.  Something like that.

14  Q.  Could have been more, could have been less?

15  A.  Yeah.

16  Q.  So that would be about three hours, using the numbers that

17  I put in front of you?

18  A.  Yes.

19  Q.  Now, you've met with other government agents and

20  prosecutors in other cases, correct?

21  A.  That's correct.

22  Q.  I'm not counting that.  That's, I'm sure, an extended

23  period of time, correct?

24  A.  Yes.

25  Q.  You testified about instructions with respect to how many

F58elas1                    Burling - cross

1    pills are taken at one time and what's the max that you could

2    take during the day, correct?  Do you remember that testimony?

3    A.  Yes.

4    Q.  The government asked you, did you authorize anybody to

5    change those instructions, and you said no?

6    A.  That's correct.

7    Q.  Who put the instructions on the invoice in the first

8    instance?  Was that you or was it already there?

9    A.  It was there on those first documents that I showed on the

10   screen.

11   Q.  Yes.

12   A.  It was preprinted on there.

13   Q.  All right.  So it really isn't accurate to say that you

14   didn't authorize anybody to change it; you didn't have anything

15   to do with it in the first place, am I correct?

16   A.  I don't know that I would agree with that statement.  I had

17   something to do with the fact that I checked okay, and then

18   sent it back to them for filling the prescription.  So

19   obviously I had something to do with it.

20   Q.  But you had something to do with it in the sense that you

21   took ten seconds to review the questionnaire, which included

22   the instructions for the pills, and you said, okay, that's all

23   right.  Let's move on, right?

24   A.  Right.

25   Q.  So you had a total of ten seconds' involvement, is that

1    fair to say?

2    A.  That's fair to say.

3    Q.  Did you take time to even look at what the numbers were?

4    A.  Yes.  I did scan the forms.  I was pretty good at quickly

5    reviewing them, and the instructions were all, and quantities

6    were all quite similar so ...

7    Q.  In other words, what you seem to be saying -- correct me if

8    I'm wrong -- is that when you looked at the form, and the

9    prescription for that form was 90 Fioricet at 40 milligrams,

10   let's say, that you got to know what the indications were for

11   taking it orally; for example, one tablet every four hours, not

12   to exceed four times in one day, correct?

13   A.  Correct.

14   Q.  When you saw 90 Fioricet, 40 milligrams, isn't it fair to

15   say you assumed the instructions were going to be the same, and

16   you just flipped and went to the next one?

17   A.  The instructions were the same.

18   Q.  I know, but if there was a mistake, either purposeful or

19   not, I'm suggesting to you that you wouldn't have noticed

20   because you would have assumed the instructions were the same?

21           MR. RICHENTHAL:  Objection.  That's not a question.

22   Q.  Isn't that a fair statement?

23   A.  No.

24   Q.  Okay.  You're testifying here today under oath that you

25   believed that you would have caught, if it said take three, no

F58elas1                        Burling - cross

1    more than six in one day?

2    A.  I don't know that if I saw take three, no more than six in

3    one day, I would have disapproved it.  But I don't recall ever

4    seeing that instruction, for instance.  There was always the

5    other instruction every time I looked at it.  So if you're

6    asking me whether one in 100,000 might have been a different

7    instruction that I didn't notice, that's certainly possible.

8    But I don't believe there was any variations.

9    Q.  So let's be clear:  You're saying that you -- if it was

10   three, six in one day, or even eight in one day, you might not

11   have disapproved it, correct?

12   A.  Correct.

13   Q.  But you're also saying that you think you would have caught

14   it if it was different, am I correct?

15   A.  If it was different in the sense that it was not right, I

16   think I would have caught it.

17   Q.  All right.  Where did you do this work?  I understand

18   you've been open and candid about where you live, but was it in

19   a kitchen?  Was it at a desk?  Where did you actually do the

20   approving?

21   A.  I did it on my computer, wherever I was.

22   Q.  So you weren't reviewing sheets of paper, hard copy?

23   A.  No.  No.  It was all on online screens.

24   Q.  And so when you reviewed one and it was time to move on,

25   you would click or do some --

1   A.  Scroll down.

2   Q.  Scroll down and look at the next one.

3           And were you ever on the phone while you were doing

4   this?

5   A.  I might have been.  I've gotten a phone call while I was

6   doing it possibly.

7   Q.  And if I remember your testimony correctly, you think you

8   may have done this, did you say, 100,000 times?

9   A.  I said 125,000.

10  Q.  And with respect to the purpose of these forms, do you

11  recall saying that you didn't think that they had a purpose;

12  that it was rather a veneer?

13  A.  Yes, I did say that.

14  Q.  And was that a word that you used when you were talking to

15  the government --

16  A.  Yes.

17  Q.  -- during the three hours of preparation?

18  A.  Mm-mm.

19  Q.  And you indicated that you rejected only a handful, is that

20  correct?

21  A.  That's correct.

22  Q.  And you rejected the handful because certain aspect of the

23  form was not filled in, correct?

24  A.  That's correct.

25  Q.  Was there ever a time when there was a medication that was

F58elas1                          Burling - cross

1    listed on the form that you felt or believed did not interact

2    well with another medication, the one you were prescribing?

3    A.  No.

4    Q.  That never happened?

5    A.  No.

6    Q.  Is that because the medication it was filled in was not

7    contraindicated, or was that because nobody filled in the

8    medication?

9    A.  Nobody filled in medications.

10   Q.  Is it your testimony that in 125,000 applications, nobody

11   ever filled in a medication?

12   A.  I don't recall seeing any.

13   Q.  Did you believe when you first got involved, that the

14   operation was legitimate?

15   A.  Initially I did, based on the fact I got this e-mail from

16   this doctor and that kind of thing.

17   Q.  And did you do any due diligence to look up this doctor or

18   speak to him or interview him?  That's Dr. Rao, R-A-O, correct?

19   A.  I spoke to him, yes.

20   Q.  And did he give you comfort?  I mean, did you think after

21   speaking to him that your due diligence was satisfied?

22   A.  He outlined what the process was, and I was comfortable

23   doing it, so I went ahead with it.  Obviously that wasn't

24   adequate due diligence.

25   Q.  When was it that your -- withdrawn.

1          You were arrested as you testified on November 29,

2     2012?

3     A.   Correct.

4     Q.   When was the -- remind me from yesterday -- when did you

5     first receive an e-mail, or when did you first get involved?  I

6     know it was fairly quick.

7     A.   I got the first e-mail in July of 2011.

8     Q.   So you were involved about 14 months, give or take?

9     A.   Sixteen or fifteen, something like that.

10    Q.   You said at the beginning, after speaking to Dr. Rao, you

11    felt and concluded for yourself that this appeared to be --

12    what you were doing appeared to be legitimate, correct?

13    A.   Initially.

14    Q.   At some point did your suspicions rise?  In other words,

15    did you feel that this operation might not be legitimate?

16    A.   Yes.

17    Q.   And before I ask my next set of questions, you didn't stop

18    doing it, correct?

19    A.   No, I kept going.

20    Q.   And for timeline purposes, when was that during the 16

21    months?

22    A.   Within the first few months.

23    Q.   What was it, if you can recall -- and I can pinpoint --

24    what was it that caused you to say to yourself, wait a minute,

25    maybe I should do more due diligence; maybe I should quit; what

1  was it?

2  A.  Well, I think the questionnaires were too perfect.  There

3  was not enough -- as has been talked about, there was never any

4  variation in all of them.  And I didn't get a 1099, and that

5  was a little surprising to me.  Foreign bank wires.  So there

6  was a few things that made me think this might be suspicious.

7  Q.  So the foreign bank wires, if I remember correctly, were

8  for, you know, Europe or some other exotic place?  One was from

9  Israel, I think one was from?

10  A.  China.

11          MR. RICHENTHAL:  Objection to Mr. Freeman saying "I

12  think."

13          MR. FREEMAN:  I'll rephrase the question.

14  Q.  Where were the wires from?  I think you just said one was

15  from China.  I asked you if one was from Israel.  I think you

16  said yes.

17          Were there any other places that the wires were from

18  that caused you to be suspicious?

19  A.  I think they came from those two countries.  I don't know

20  if there was any from another country.

21  Q.  So, again, timeline wise, you're three months in, is that

22  fair to say?

23  A.  Okay.

24  Q.  So you have another 13 months to go?

25  A.  Yes.

F58elas1                          Burling - cross

1    Q.  Did your suspicions increase any further from month 3 to

2    month 16?

3    A.  I think there was always that level of suspicion, but

4    nothing happened to increase it.

5    Q.  Now, would it be fair to say that the only thing that

6    stopped you was your arrest?

7    A.  Yes.

8    Q.  Did you get involved in this what you thought to be

9    legitimate and turned out not to be, did you get involved

10   because of money?

11   A.  Yes.

12   Q.  Would it be fair to say greed?

13   A.  Yes.

14   Q.  And I think you already testified that it wasn't worth it?

15   A.  No.

16              MR. FREEMAN:  Nothing further.

17              MR. RICHENTHAL:  May I have one brief moment, your

18   Honor.  (Pause)

19   REDIRECT EXAMINATION

20   BY MR. RICHENTHAL:

21   Q.  In addition to the factors that you just mentioned, did you

22   find the volume suspicious?

23   A.  The volume was high at times.  And again, suspicious

24   depends on -- I don't know that I would call that suspicious.

25   I mean, if they were advertising this or if they were somehow

1    soliciting customers, it simply meant that they were doing a

2    pretty good job of that, as opposed to being suspicious.

3    Q.  How about the fact that 98 to 100 percent of the drugs were

4    three drugs?

5    A.  That's suspicious.

6    Q.  That was suspicious?

7    A.  Yeah.

8    Q.  How about the fact that it was 500-plus prescriptions a

9    day, 98 to 100 percent of the drugs were pain medications, the

10   forms always looked the same, no one said there were any --

11   they were taking any prescription medications, never came with

12   medical records?  Are those combination of factors suspicious?

13   A.  Yes, of course.

14   Q.  Was that apparent from the face of what you were looking

15   at?

16   A.  Yes.

17   Q.  Now, you mentioned a letter to the state medical board.

18   It's your understanding that letter will only contain good

19   things?

20   A.  I have not discussed that with the government as to what is

21   in that letter.  I'm hoping it will be good things.

22   Q.  Is it your understanding the government intends to hide

23   from the state medical board what you've done?

24   A.  No, I don't think they would.

25        MR. FREEMAN:  Objection.

F58elas1                     Burling - redirect

1   Q.   Is it your understanding the government intends not to tell

2   the state medical board the crimes you pled guilty to?

3   A.   No.

4   Q.   Is it your understanding the government intends not to tell

5   the state board what you did that was criminal?

6   A.   No.

7   Q.   Is it your understanding the government doesn't intend to

8   tell the state board the scope of what you did, the length, the

9   amount of money, etc.?

10  A.   No.

11  Q.   Does the government control what the state board does with

12  accurate information?

13  A.   No, of course not.

14  Q.   Is it your understanding the government intends to give the

15  state board inaccurate information?

16  A.   No.

17  Q.   Finally, what do you hope your sentence is going to be?

18  A.   No sentence.

19  Q.   What do you mean by "no sentence"?

20  A.   I'm hoping I don't go to jail.

21  Q.   Are you willing to lie?

22  A.   No.

23  Q.   Why not?

24  A.   That could put me in jail.

25  Q.   Are you willing to provide misleading testimony?

1  A.  No.

2  Q.  Why not?

3  A.  Same reason.

4  Q.  Is this the only case in which you've been interviewed or

5  provided information?

6  A.  No, it's not.

7  Q.  Is this the only case you think you may be asked to?

8  A.  No.  I may be asked on the other ones, I think, as well.

9  Q.  Is that your decision or the decision of the various

10 prosecutors?

11 A.  Prosecutors.

12 Q.  Now, in the few hours you met with the government, were you

13 ever told to do anything other than tell the truth to them?

14 A.  No.

15 Q.  Were you ever told, tell this story, that's what will help?

16 A.  No.

17 Q.  Were you ever told, only say good things about yourself?

18 A.  No.

19 Q.  What were you told?

20        MR. FREEMAN:  Objection.  Asked and answered several

21 times.

22 Q.  What were you told?

23 A.  Told to say the truth.

24 Q.  Were you told that once or more than once?

25 A.  More than once.

F58elas1                      Burling - redirect

1   Q.  Is that what you've done here today?

2   A.  It is.

3            MR. RICHENTHAL:  No further questions.

4            MR. FREEMAN:  No.  Thank you, Judge.

5            THE COURT:  Thank you.  You're excused.

6            (Witness excused)

7            MR. RICHENTHAL:  May we call our next witness, please.

8            THE COURT:  Please.

9            MR. RICHENTHAL:  The government calls Steven Goloff.

10   STEVEN GOLOFF,

11       called as a witness by the Government,

12       having been duly sworn, testified as follows:

13   DIRECT EXAMINATION

14   BY MR. RICHENTHAL:

15   Q.  Good morning, Mr. Goloff.

16   A.  Good morning.  Can you hear me okay?

17   Q.  I can.

18   A.  Okay.  Trying to move this seat to get comfortable.  Okay.

19   Q.  Where are you from?

20   A.  Philadelphia, PA.

21   Q.  Where do you work?

22   A.  Currently Caribbean Pharmacy in Philadelphia.

23   Q.  What do you work as --

24   A.  Pharmacist/manager.

25   Q.  Wait for me to finish the question, sir.

F58elas1                        Goloff - direct

```
 1   A.  I'm sorry, sir.

 2   Q.  Start again.  What do you work as at Caribbean Pharmacy?

 3   A.  A pharmacist.

 4   Q.  Do you have a license of some kind?

 5   A.  Yes, I do.

 6   Q.  What kind of license?

 7   A.  Pharmacist, Pennsylvania.

 8   Q.  Did there come a time when you worked at a pharmacy called

 9   Hellertown Pharmacy?

10   A.  Correct, sir.

11   Q.  Approximately when did you start to do so?

12   A.  March 2011.

13   Q.  Did you interview with anyone --

14   A.  Yes, I did.

15   Q.  -- in order to get the job?

16   A.  Say that again?

17   Q.  In order to get the job.

18   A.  Yes.  I had an interview.  Yes.

19   Q.  With whom did you interview?

20   A.  Mrs. Lena Lasher.

21   Q.  Do you recognize that person in the courtroom?

22   A.  Yes, I do.

23   Q.  Could you describe what she's wearing, please.

24   A.  Like a black blazer, blazer and a green top.

25            MR. RICHENTHAL:  May the record reflect that
```

F58elas1                        Goloff - direct

 1   Mr. Goloff has identified Ms. Lasher.

 2              THE COURT:  Yes.

 3   Q.  Were you hired immediately after your interview permanently

 4   or were you given a trial?

 5   A.  It was a trial basis.

 6   Q.  How long was your trial?

 7   A.  Two weeks' probation period.

 8   Q.  Two weeks' probation period?

 9   A.  Well, to complement the training, two-week training

10   provision.

11   Q.  Who supervised you during that two weeks?

12   A.  Ms. Lasher.

13   Q.  Were you then hired permanently?

14   A.  Yes, after two weeks.  Yes.

15   Q.  By Ms. Lasher?

16   A.  Yes, sir.

17   Q.  Did you have an immediate supervisor after you were hired?

18   A.  Yes.

19   Q.  Who?

20   A.  Ms. Lasher.

21   Q.  After you were hired, did you continue to communicate with

22   her in any way?

23   A.  Yes.

24   Q.  In person?

25   A.  Sometimes.

F58elas1                          Goloff – direct

1    Q.  By phone?

2    A.  Yes.

3    Q.  What subjects would you talk about in person or over the

4    phone?

5    A.  The work flow, contact with the technicians, a daily basis

6    of the pharmacy routine.

7    Q.  You just used the phrase "work flow."

8    A.  Correct.

9    Q.  What's work flow?

10   A.  That means the speed of production of prescriptions being

11   processed.

12   Q.  Did Ms. Lasher want it slower or faster?

13   A.  Faster.

14   Q.  Always faster?

15   A.  Yes.

16   Q.  What was her most common complaint, if she had one, about

17   the work going on in the pharmacy?

18   A.  Conduct of the technicians, and make sure they work faster.

19   Q.  You said "conduct."  What do you mean?

20   A.  Not talking to each other.  Different hygiene of the

21   technicians.

22   Q.  And what areas of the business were you the sole

23   decisionmaker?

24   A.  None.

25   Q.  Were you free to hire employees on your own?

1    A.  No.

2    Q.  Were you free to fire employees on your own?

3    A.  No.

4    Q.  Were you free to discipline employees on your own?

5    A.  No.

6    Q.  Were you free to set policies for employees on your own?

7    A.  No, sir.

8    Q.  Who set all of those policies?

9    A.  Ms. Lasher.

10   Q.  Now, how often, if at all, did Ms. Lasher ensure that what

11   she wanted to happen at the pharmacy actually happened?

12   A.  Repeat that again, please.

13   Q.  How, if at all, did Ms. Lasher ensure that what she wanted

14   to happen at Hellertown, in fact, happened?

15   A.  Well, the order of her procedures to go back?  I'm not sure

16   of the question again.

17   Q.  Let me ask a different one.

18   A.  Okay.

19   Q.  Were there things Ms. Lasher wanted to happen at Hellertown

20   Pharmacy?

21   A.  Yes.

22   Q.  For example, you mentioned working faster?

23   A.  That's correct.

24   Q.  Did she do anything to get people to work faster?

25   A.  Okay.  She would write out memos, tell them verbally, tell

F58elas1                        Goloff - direct

1    me or employees themselves in a conference call.

2    Q.  Now, did she ever tell anyone in your presence what would

3    happen if they didn't work fast enough?

4    A.  They would lose their hours of working.

5    Q.  Were those employees paid by the hour?

6    A.  Yes, sir.

7    Q.  Were you paid by the hour?

8    A.  Yes, sir.

9    Q.  Did Ms. Lasher ever threaten to cut your hours?

10   A.  Yes, sir.

11   Q.  Once or more than once?

12   A.  More than once.

13   Q.  Now, did Ms. Lasher ever physically work in the pharmacy,

14   like literally at the same time as you did?

15   A.  Sometimes.

16   Q.  How often in an average week?

17   A.  Once or twice a week.

18   Q.  And you'd both be working there at the same time?

19   A.  Alternate, overlapping hours.

20   Q.  Now, when she wasn't there and you were there, how, if at

21   all, was she able to supervise the technicians and you?

22   A.  She would have used the security camera to look at us,

23   observe our work.

24   Q.  How do you know that?

25   A.  She would -- she was -- I was told that she was looking at

1   us and also by another technician.

2         MR. FREEMAN:  Objection to what he was told.

3   Q.  Did Ms. Lasher ever call you when you were at the pharmacy

4   and she was not?

5   A.  Yes.

6   Q.  Did she ever refer to what she saw on cameras?

7   A.  Yes, sir.

8   Q.  Were you free to turn the cameras off?

9   A.  Not at all.

10  Q.  Other than the bathroom were the cameras everywhere?

11  A.  Yes, they were, everywhere.

12  Q.  What was the main source of business at Hellertown

13  Pharmacy?

14  A.  Internet prescriptions.

15  Q.  How soon after you started did you learn that?

16  A.  About two days.

17  Q.  How did you learn it?

18  A.  Just by observation of what was going through.  We didn't

19  do too many walk-ins.  Most of the orders were taken off the

20  computers in the back room and sort of got mailed out.

21  Q.  Was that business already in place when you started?

22  A.  Yes, sir.

23  Q.  Could you tell where the doctors were from?

24  A.  Various states in the United States.

25  Q.  Could you tell where the customers were from?

F58elas1                    Goloff - direct

1   A.  Same.

2   Q.  "Same" meaning various states?

3   A.  Various states.

4   Q.  Did you ever speak with the doctors whose names were on the

5   prescriptions?

6   A.  Only one time.

7   Q.  What happened that one time?

8   A.  I was told by Lena to obtain his current up to date DEA

9   license.

10  Q.  Did she ask you to obtain anything else from him?

11  A.  Not at all.

12  Q.  Did she tell you to ask any other questions?

13  A.  Not at all, sir.

14  Q.  After learning how the business worked, did you think the

15  prescriptions were legitimate?

16  A.  No.

17  Q.  Why not?

18  A.  Because it's no -- to me, there was no knowledge of a

19  doctor and patient relationship.

20  Q.  What do you mean by that?

21  A.  I don't know how they could communicate either -- I wasn't

22  clear how they communicated with the patients, the doctors.

23  Q.  What was the volume of prescriptions being filled by this

24  pharmacy over the Internet?

25  A.  Approximately 600 a week, give or take a few.

F58elas1                         Goloff - direct

1  Q.  Were you given instructions by anyone as to things to say

2  or not say about the Internet business?

3  A.  We were told that we weren't an Internet pharmacy, we were

4  a fulfillment pharmacy.  That's the term we used.  And also,

5  that the people who asked us when they walked into the store,

6  or our regular walk-in customers, that we do not do mail order

7  prescriptions.

8  Q.  Let's pause for a second.  Who told you not to use the

9  phrase --

10  A.  Ms. Lasher.

11  Q.  You've got to let me finish.

12  A.  I'm sorry, sir.

13  Q.  Who told you not to use the phrase Internet pharmacy?

14  A.  Ms. Lasher.

15  Q.  Who told you not to tell walk-in customers what was going

16  on?

17  A.  Ms. Lasher.

18  Q.  Now, let's talk about a piece of how the business worked

19  for a second.  How were pills counted to get into individual

20  vials and out to customers?

21  A.  We would have different volumes of different -- let's say

22  drug -- give you an example of the pill Fioricet.  It was

23  stocked in like a 500-count bottle stock size from the

24  manufacturer, and we would obtain the 90 count.  So we'd do a

25  little math, take out the ten or make it even, count one vial,

F58elas1                         Goloff - direct

1   hand-counted it, and then pour the other remaining amount to

2   equal like 900 pills, until leveled off by eyeball count after

3   the first one was counted back earlier.

4   Q.  Who, if anyone, instructed you that that's how pills were

5   to be counted?

6   A.  One was the technician who worked there, and Lena, too.  It

7   was herself.

8   Q.  Did you ever use that method yourself?

9   A.  Yes, sir.

10  Q.  Did you ever see other people use that method?

11  A.  Yes, sir.

12  Q.  Was that method used when Ms. Lasher was in the pharmacy?

13  A.  Yes, sir.

14  Q.  Did she ever tell anyone to stop?

15  A.  No.

16  Q.  Did she ever tell anyone to work faster?

17  A.  Yes.

18  Q.  Was that method accurate?

19  A.  No.

20  Q.  Did customers ever complain they weren't getting the right

21  number of pills?

22  A.  Yes, sir.

23  Q.  How do you know that?

24  A.  We would get calls on a daily basis that we were a couple

25  short.  Nobody complained they were over, but they were always

F58elas1                          Goloff - direct

1   short.

2   Q.  Did you ever talk with Ms. Lasher about those complaints?

3   A.  Yes, occasionally.

4   Q.  What, if anything, did she say?

5   A.  Just we resend the remainder to the customer.

6   Q.  What did you mean by send the remainder?

7   A.  Well, the ones that say they're short.  Or bring back the

8   bottles, ship us the bottle back and we'll recount it for them.

9   But that happened very rarely.

10  Q.  Now, when you say send the remainder --

11  A.  Well, if the bottle was miscounted, sometimes we wanted the

12  bottle back so we can see if it was really true, because

13  sometimes they could be lying, the customer.

14  Q.  Did you ever get any other kinds of complaints from

15  customers?

16  A.  Yes, I did, sir.

17  Q.  From customers' families?

18  A.  It was a -- one minute.  One minute.  I want to take a sip

19  here.  Give me a minute, please.

20  Q.  Take your time, Mr. Goloff.

21  A.  A customer called me, complaining his spouse was abusing

22  the drug, and how he's obtaining -- his spouse was, pertaining

23  to see this doctor.  He was very concerned, wanted to put a

24  stop to it.

25  Q.  Did you talk with Ms. Lasher about that?

F58elas1                    Goloff - direct

1    A.  Yes, I did, sir.

2    Q.  Did she seem concerned?

3    A.  Not really.

4    Q.  What, if anything, did she say?

5    A.  That I asked her, how do these people see the doctor?  She

6    said, some customers got Skype; is computer device that you can

7    video, on a video camera.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F58sLAS2                    Goloff - direct

BY MR. RICHENTHAL:

Q.  She told you customers were using Skype?

A.  Sometimes, yes.

Q.  Did you see anything in the pharmacy that indicated

customers were using Skype?

A.  No.

Q.  Did you see anything on the forms you saw that indicated

customers were using Skype?

A.  Not at all.

Q.  I think you said that at least 600 prescriptions went out a

week?

A.  Correct, sir.

Q.  Did any of the drugs come back?

A.  Yes, sir.

Q.  By who?

A.  The couriers, FedEx, post office.

Q.  Were you given any kind of instructions on what to do with

the drugs that came back?

A.  Well, the technicians that handled it first, they would put

the order numbers and the various websites they came through,

write down the information and the reason why they were

returned.  And I would take -- they would put the bottles

aside, and I would put them back in the remaining totes to be

shipped out, reshipped out.

Q.  Let me pause for a second, Mr. Goloff.  You just described

F58sLAS2                    Goloff - direct

1    a few steps and a process.

2    A.  I'm sorry.

3    Q.  That's fine, but I just want to ask you a question about

4    that.  That process you described of pills coming back to going

5    back in the totes, who, if anyone, told you that was the

6    process?

7    A.  Lena.

8    Q.  By Lena, do you mean Ms. Lasher?

9    A.  Right.

10   Q.  You said put back in the totes.  Showing you Government

11   Exhibit 1035-1.  You mean totes like this?

12   A.  Yes, sir.  Correct.

13   Q.  Where did they go after they were put back?

14   A.  Where did the totes go back?

15   Q.  Where were the pills returned at?

16   A.  In that tote.

17   Q.  Where did they go after that?

18   A.  They were reshipped out.

19   Q.  To customers?

20   A.  Yes, sir.

21   Q.  Were customers told they might be getting pills a different

22   customer had gotten first?

23   A.  Not at all.

24   Q.  Did Ms. Lasher ever tell you to tell customers they might

25   be getting pills --

F58sLAS2                          Goloff - direct

1    A.  No.

2    Q.  -- a different customer got first?

3    A.  No, no.

4    Q.  Did Ms. Lasher ever tell anyone else in your presence to

5    tell customers they might be getting pills someone else had

6    gotten first?

7    A.  No.

8    Q.  When pills came back and then were put into totes, was any

9    effort made to only match pills by lot number or expiration

10   date?

11   A.  We couldn't track that down because we sent out the

12   medicine originally, the lot numbers on the label, we couldn't

13   match the exact lot numbers.

14   Q.  Was it possible?

15   A.  No, it wasn't possible.

16   Q.  Now, changing subjects, did there come a time when you were

17   told by anyone to change instructions on prescriptions?

18   A.  At the time that we were -- there was hard copies that we

19   kept, they were changing the directions of Fioricet.

20   Q.  Let me pause for a second, Mr. Goloff.  Who, if anyone,

21   told you to do that?

22   A.  Mrs. Lasher.

23   Q.  Did you see anyone else do the same thing?

24   A.  Yes.

25   Q.  Who?

1   A.  Numerous technicians were doing the same thing.

2   Q.  We have been talking about Hellertown Pharmacy?

3   A.  Both stores, sir.

4   Q.  I just want to pause far a second.  We were talking about

5   Hellertown Pharmacy, correct?

6   A.  Correct.

7   Q.  You just said both stores?

8   A.  Yeah.

9   Q.  Did there come a time you started working at a second

10  pharmacy?

11  A.  Yes, sir.

12  Q.  What pharmacy?

13  A.  Palmer Pharmacy & Much More.

14  Q.  Approximately when did you start working at Palmer

15  Pharmacy?

16  A.  The end of the summer, I believe.  I don't know an exact

17  date.

18  Q.  That's after you were already working at --

19  A.  Hellertown for a few months, yes.

20  Q.  Had you stopped working at Hellertown?

21  A.  No.

22  Q.  You started working at both?

23  A.  Correct.

24  Q.  Who, if anyone, asked you to start working at Palmer

25  Pharmacy?

1   A.  Mrs. Lasher.

2   Q.  Did there come a time when you took on a title at Palmer

3   Pharmacy?

4   A.  Yes, sir.

5   Q.  What title?

6   A.  Pharmacy in charge, manager.

7   Q.  How long after you started working there, approximately?

8   A.  Four to six months after that.  I don't know an exact time.

9   The date is documented on the pharmacy.

10  Q.  Who, if anyone, gave you that title?

11  A.  Mrs.~Lasher.

12  Q.  What was your understanding of why she gave you that title?

13  A.  The only reason, explanation, was because we can't have

14  two -- one individual cannot be pharmacy in charge at two

15  stores in Pennsylvania.  She was the pharmacy on paper in

16  Hellertown, pharmacy manager, and she wanted to appoint

17  somebody at Palmer Pharmacy, so she nominated me.

18  Q.  What, if anything, did she say about why she selected you?

19  A.  They didn't give me an answer.  I asked why not the other

20  pharmacist, he was there most of the time, this other

21  gentleman.  And she goes, he's not smart enough.  That's what

22  her answer was, sir.

23  Q.  That was her answer to you?

24  A.  Yes, sir.

25  Q.  You said the title was pharmacy in charge?

F58sLAS2                     Goloff - direct

1   A.  According to the state board, the document would be

2   pharmacy manager, and it has a relationship -- you look on the

3   website, a business relationship.  That is what it says on the

4   title.  It's the pharmacy manager, they call it.

5   Q.  Were you, in fact, in charge?

6   A.  No, sir.

7   Q.  Were you, in fact, the manager?

8   A.  No.

9   Q.  What makes you say that?

10  A.  Because I was -- I wasn't making up policies for this store

11  or procedures or firing people, supervising them, I was just

12  carrying out Ms. Lasher's direct procedures and orders.

13  Q.  You talked a few minutes ago about speaking with Ms. Lasher

14  while you were working at Hellertown Pharmacy.  Do you recall

15  talking about that?  Did you continue to speak with her when

16  you worked at Palmer pharmacy?

17  A.  Yes, on the phone.

18  Q.  Similar subjects?

19  A.  Similar subjects, yes.

20  Q.  Were you free to hire employees on your own for Palmer

21  Pharmacy?

22  A.  No, sir.

23  Q.  Fire employees?

24  A.  No, sir.

25  Q.  Discipline employees?

1    A.  Not at all.

2    Q.  Determine policy for employees?

3    A.  No.

4    Q.  Change policy for employees?

5    A.  No.

6    Q.  Who set those policies?

7    A.  Mrs.~Lasher.

8    Q.  Generally, were there differences between the policies or

9    procedures of Hellertown and Palmer?

10   A.  No.  They were uniform.

11   Q.  With respect to sick leave?

12   A.  Correct.

13   Q.  Employee discipline?

14   A.  Yes.

15   Q.  Storage of pills?

16   A.  Correct, sir.

17   Q.  Labeling of pills?

18   A.  Yes.

19   Q.  Whether pills were counted or not counted?

20   A.  Yes.

21   Q.  What to do with returned pills?

22   A.  Correct.

23   Q.  How were pills counted or not counted at Palmer?

24   A.  Similar to the same procedure at Hellertown Pharmacy.

25   Q.  Was that already occurring when you started at Palmer?

F58sLAS2                    Goloff - direct

1   A.  Yes, sir.

2   Q.  What was the main source of business at Palmer?

3   A.  Same as Hellertown, Internet sales.

4   Q.  Was that already occurring when you started working at

5   Palmer?

6   A.  Yes, sir.

7   Q.  You said earlier that you continued to work at Hellertown

8   after you worked at Palmer?

9   A.  Correct.

10  Q.  What was the rough breakdown in a given week?

11  A.  All right.  An example, I'll give you, an example was like

12  Monday to Tuesday, I would be working at Palmer, alternate with

13  another pharmacist, would split the day.  And then in the

14  remaining of the week, I would work full hours at Hellertown.

15  Q.  Who, if anyone, determined where you worked, meaning which

16  of the two stores?

17  A.  Mrs.~Lasher determined all that, sir.

18  Q.  Who, if anyone, determined the times you started work on a

19  given day?

20  A.  Mrs.~Lasher.

21  Q.  The times you sended work an a given day?

22  A.  Same, Mrs.~Lasher.

23  Q.  The number of hours you worked on a given day?

24  A.  Mrs.~Lasher.

25  Q.  The number of hours you worked in a given week?

F58sLAS2                         Goloff - direct

1    A.  Mrs.~Lasher.

2    Q.  How about who you worked with?

3    A.  Mrs.~Lasher.

4    Q.  Now, was Ms. Lasher ever present at Palmer Pharmacy when

5    you were at Palmer Pharmacy, physically?

6    A.  Very rarely.

7    Q.  How, if at all, did she supervise what occurred at Palmer

8    when she wasn't there?

9    A.  She would supervise on a daily basis by phone and by the

10   Internet -- by the security cameras.

11   Q.  You say the security cameras.  Are you referring to the

12   same kind of cameras that were at Hellertown?

13   A.  Correct.

14   Q.  Other than the bathroom, were those looking at all the

15   rooms?

16   A.  Yes, sir.

17   Q.  Did Ms. Lasher ever call you when you were working at

18   Palmer?

19   A.  Yes, sir.

20   Q.  Did she ever refer to what she saw on the camera?

21   A.  Yes, sir.

22   Q.  Did she ever tell you to tell people to work faster?

23   A.  Yes, sir.

24   Q.  Now, I think you said earlier that there were not many

25   walk-in customers at Hellertown?

F58sLAS2                       Goloff - direct

1    A.  That is correct.

2    Q.  Is that also true at Palmer?

3    A.  Correct, sir.

4    Q.  Did there come a time at either pharmacy when there were

5    multiple customers at once coming into the store?

6    A.  Yes, sir.

7    Q.  Approximately when did that start happening?

8    A.  February 2012.

9    Q.  How often did that start to happen; that is, how often did

10   the groups come?

11   A.  They come in in groups twice a week, maybe.  It started

12   with one patient, and then the whole group came in from the

13   same area of the country.

14   Q.  What drug or drugs was the most common drug these customers

15   wanted?

16   A.  The main drug was pain reliever, oxycodone, plus supplement

17   medications for antiinflammatory, anxieties, and constipation

18   medication.

19   Q.  You just said that -- I don't want to put words in your

20   mouth.  Tell me if I'm wrong.

21   A.  Sure.

22   Q.  I think you just said the customers were from the same

23   area?

24   A.  Correct, sir.

25   Q.  How did you know that?

1  A.  It was on the prescriptions itself.  It had the addresses

2  on there, wherever they were from.

3  Q.  Where were they from?

4  A.  Cincinnati, Kentucky area.

5  Q.  What state were these pharmacies in again that you worked

6  at?

7  A.  My state?

8  Q.  Yes, sir.

9  A.  Pennsylvania.

10 Q.  You said you saw the prescriptions yourselves?

11 A.  Yes, sir.

12 Q.  Where were the prescriptions from, generally?

13 A.  Fort Lauderdale, Florida, Bauer Pain Medication Clinic.

14 Q.  They were all from --

15 A.  Pain medication clinic in Fort Lauderdale, Florida.

16 Q.  Just to be clear, Mr. Goloff, are you saying that they were

17 generally all from the exact same clinic?

18 A.  Yes, sir.

19 Q.  So the prescriptions were from the same clinic in Florida?

20 A.  Correct.

21 Q.  Customers were generally from where?

22 A.  In the area, Cincinnati, Kentucky area.

23 Q.  And you're where?

24 A.  In Pennsylvania.

25 Q.  Did either pharmacy receive notice that these customers

1    were coming?

2    A.  Yes.  Personally, at Hellertown, we would get a fax, on the

3    way, they're driving up, they would stop at a FedEx fax center.

4    They would fax in the hard copies to us and we would prepare

5    the medication in advance to get them out of the store faster.

6    Then they would replace it with the copies that the doctor gave

7    them and destroy the second copies.

8    Q.  Did any customer ask for Ms. Lasher specifically?

9    A.  Sometimes.

10   Q.  Did you fill these prescriptions, Mr. Goloff?

11   A.  Yes, sir.

12   Q.  Did you have any concerns about doing that?

13   A.  Yes, sir.

14   Q.  What were your concerns?

15   A.  The abuse of the drug, where they were from, the nature,

16   and the people that would come, the characters of the patients.

17   Q.  What do you mean by the characters of the patients?

18   A.  They looked a little rough.  Looked like they weren't a

19   pain person and very suspicious looking.

20   Q.  Did you talk with Ms. Lasher about that?

21   A.  Yes, I did.

22   Q.  What, if anything, did she say?

23   A.  She said these people -- she gave me the reasons.  They

24   were snow birds with family members in the area, the medication

25   and where they live is too expensive and they can't see the

F58sLAS2                         Goloff - direct

 1   doctor frequently.  They said they had to seek medication

 2   elsewhere in the United States.

 3   Q.  These were the series of reasons she gave you?

 4   A.  Yes, sir.

 5   Q.  Did you see anything to indicate any of those reasons were

 6   true?

 7   A.  No.

 8   Q.  Did she seem concerned about these groups?

 9   A.  Not at all.

10   Q.  Did she instruct you to fill the prescriptions?

11   A.  Yes, sir.

12   Q.  Did you?

13   A.  Yes, I did.

14   Q.  How did these customers pay?

15   A.  Cash only.

16   Q.  Cash only?

17   A.  Um-hmm.  Correct, sir.

18   Q.  Did you talk with Ms. Lasher about that?

19   A.  No, not at all.

20   Q.  How did you know what to charge them?

21   A.  She had a price schedule for them.

22   Q.  Price schedule for what?

23   A.  For a pill of the oxycodone, and I would call her for the

24   places for the other medications.  She had standard set prices

25   for the oxycodone.  They were two different strengths.  There

F58sLAS2                    Goloff - direct

1    were 15s and 30s.  I don't remember the exact prices, you know.

2    Q.  A group of customers came in for oxycodone and perhaps some

3    other drugs.  How much cash would they hand over, like one

4    group?  How much cash is that?

5    A.  Well, let's see.  About over $1,000, at least.  A group of

6    ten, you might say.  I'm not sure what the question is.

7    Q.  How big was an average group, Mr. Goloff?

8    A.  About ten.

9    Q.  In an average group, how much cash?

10   A.  It cost $1,000, maybe more, maybe less.

11   Q.  You said the principal drug was oxycodone?

12   A.  That's correct, sir.

13   Q.  Did there come a time when either or both pharmacies sought

14   to increase the amount of oxycodone they had on hand?

15   A.  That's correct.

16   Q.  Approximately when was that?

17   A.  In the end of the summer, in August sometime, July.  I

18   forget the exact date.

19   Q.  Is this the same year, Mr. Goloff?

20   A.  Yes, sir.

21   Q.  So they start around February?

22   A.  Correct.

23   Q.  And several months later the pharmacies seek to increase?

24   A.  Our threshold ordering the set by the DEA and the

25   wholesaler was, there is a formula they use.  If you were to

1    increase the sales per month, you try to pertain the medication

2    per month.  They would stop you from ordering it, then you had

3    to apply for a threshold increase.

4    Q.  Did you talk about that with Ms. Lasher?

5    A.  Yes, of course.

6    Q.  What, if anything, did she say?

7    A.  Well, she inquired to McKesson wholesaler, the procedure,

8    how to go about to increase our threshold.

9    Q.  What help, if any, did she ask you to give in that process?

10   A.  Call the computer company, the software vendor on how to do

11   a printout and send it to the wholesaler, provide the patients'

12   name and doctors and quantities they were getting.  I did it on

13   my own.  I knew how to do printouts.  I didn't have to call

14   AMS.

15   Q.  You said AMS?

16   A.  That what the software company, AMS, Applied Micro Systems

17   its called.

18   Q.  Did there come a time after this when Ms. Lasher asked you

19   to get any other kind of records in connection with these

20   customers?

21   A.  Yes, sir.

22   Q.  What kind of records?

23   A.  Their MRIs, medical reports, particular, you know,

24   corresponding to their pain, therapy, and what kind of pain

25   they were in.

1   Q.  Mr. Goloff, was this before a single oxycodone prescription

2   had been dispensed or later?

3   A.  I don't understand what you're saying now.

4   Q.  The customers starting coming in in February, is that

5   right?

6   A.  Right.

7   Q.  How long after that did Ms. Lasher instruct you to get

8   records to document their alleged medical conditions?

9   A.  Towards the end of the year, about maybe September

10  sometime, October.  September or August, in that area.

11  Q.  At any time prior to that, did she instruct you to get

12  documentation?

13  A.  No.

14  Q.  To support their alleged medical conditions?

15  A.  No, not at all, no.

16  Q.  Now, changing subjects for a moment, did you ever fill a

17  prescription for an individual for opium tincture?

18  A.  Yes, sir.

19  Q.  Do you recall the individual's name?

20  A.  It was a physician named Hayt-  -- I can't pronounce it.

21  Begins with "Hayt" or something like that.  I don't recall his

22  first name.  It was a doctor that she was -- she knew the

23  doctor.  He had prescribed medication for himself.  It was for

24  severe abdominal problems he had.

25  Q.  Let me pause for a second.

1    A.  Sure.

2    Q.  We call him Haytmanek.

3    A.  Haytmanek.

4    Q.  Haytmanek.

5    A.  I don't know to pronounce his name.

6    Q.  We will call him Dr. Haytmanek?

7    A.  Okay.

8    Q.  Who prescribed these prescriptions?

9    A.  Himself, sir.

10   Q.  How do you know that?

11   A.  He would write it right on the spot at the store.

12   Q.  When you said he had a stomach condition --

13   A.  Some kind of intestinal disorder.  I don't know exactly.

14   Q.  Do you know that, Mr. Goloff, or someone told you that?

15   A.  Somebody told me that.

16   Q.  Who told you?

17   A.  Ms. Lasher.

18   Q.  Did you fill these prescriptions?

19   A.  Yes, sir.

20   Q.  Did you fill one or more than one?

21   A.  More than one.

22   Q.  Mr. Goloff, for ease of questions, I'll call him Dr. H.  Is

23   that all right?

24   A.  That's okay with me.  Okay.

25   Q.  Did you fill one prescription from Dr. H or more than one?

F58sLAS2                          Goloff - direct

1    A.  More than one.

2    Q.  Did there come a time when you became concerned about

3    filling these prescriptions?

4    A.  Yes, a little.  One time, yeah.

5    Q.  What caused you to become concerned?

6    A.  I asked him why he is getting this medication, and she

7    explained that he can't get to his primary doctor and he can't

8    afford an operation for his condition and he wants to control

9    the pain.  At first -- I'm sorry.

10   Q.  Go ahead.  Answer one question at a time, Mr. Goloff.

11   A.  I'm sorry, I'm getting a little fatigued.

12   Q.  Take some water.  Do you want to take some water?

13   A.  Yes.  I'm sorry.  Okay.

14   Q.  Let's sort of break this into pieces.

15   A.  Sure.

16   Q.  You said "she" --

17   A.  Correct.

18   Q.  Talking about something you were told.  Who is the "she,"

19   Mr. Goloff?

20   A.  Mrs.~Lasher told me about his medical condition and why he

21   is getting it filled, writing it for himself.

22   Q.  I think you said something about her telling you he

23   couldn't visit his own doctor?

24   A.  That's correct.

25   Q.  Can you explain?

F58sLAS2                    Goloff - direct

1   A.  Well, he has a primary doctor, and he didn't have time to

2   go to see his primary doctor.

3   Q.  Ms. Lasher told you that?

4   A.  Yes, that is what she told me, yes.

5   Q.  Did she instruct you to keep filling the prescriptions?

6   A.  Yes.

7   Q.  Did you?

8   A.  Yes.

9   Q.  Did any other pharmacist?

10  A.  Yes, sir.

11  Q.  I would like to show you Government Exhibits 1046 and 1047.

12  When I say 1046 and 1047, Mr. Goloff, I'm talking about what is

13  in two different folders.

14  A.  Okay.

15  Q.  Let's look at them one at a time.  These have been marked

16  for identification.  I don't want you to describe them.  Just

17  look at them in detail.  I just want you to tell me if you

18  recognize what each is.

19  A.  All right.  This is GX 1046.  That's a prescription that

20  Dr. H wrote.

21  Q.  GX 1047, Mr. Goloff, the other folder?

22  A.  Same thing.

23  Q.  I'm going to come up to you, sir.  I think there is a copy

24  in there of each that I am going to take back.

25  A.  All right.

1   Q.  I'm going to leave you the ones that are marked with the

2   yellow sticker.

3        Do you see that, Mr. Goloff?

4   A.  Yes, sir.

5   Q.  You said these were prescriptions by Dr. H?

6   A.  I'll verify it again.

7   Q.  Take your time.

8   A.  Yes, sir.

9   Q.  Do you recognize each of them, Mr. Goloff?

10  A.  Yes, sir.

11            MR. RICHENTHAL:  Government offers 1046 and 1047.

12            MR. FREEMAN:  No objection.

13            THE COURT:  Received.

14            (Government's Exhibits 1046 and 1047 received in

15  evidence)

16            MR. RICHENTHAL:  Ms. Chen, can you put on the screen

17  1046 and 1047.

18  BY MR. RICHENTHAL:

19  Q.  Mr. Goloff, do you now see both of these on your screen?

20  A.  Correct.

21  Q.  You said prescriptions by him.  Do you mean that he is the

22  person who wrote them, meaning he's the prescriber, Mr. Goloff?

23  A.  Yes.

24  Q.  Who is the patient?

25  A.  Him, Mr. Craig H.

1    Q.  For what drug?

2    A.  Opium tincture, 10 milligrams ML, eight ounces, 240 in

3    total.

4    Q.  You said eight ounces.  Was this a liquid?

5    A.  Yes, it is.

6    Q.  Mr. Goloff, do you see the right prescription?

7    A.  Yes.

8    Q.  For the record, the right is 1047?

9    A.  Correct.

10   Q.  Do you see some words to the right below like a slash?

11   A.  Correct.

12   Q.  It appears to say O.K. per M.D.?

13   A.  Correct.  That's the procedure that one of the pharmacists

14   used to write on there.

15   Q.  O.K. for M.D. means what, prescription has been checked?

16   A.  By the medical doctor.

17   Q.  Here, is the medical doctor and the patient the same

18   person?

19   A.  Yes, sir.

20   Q.  Are these two prescriptions examples of the prescriptions

21   Ms. Lasher told you to fill?

22   A.  Yes.

23   Q.  I would like to show you Government Exhibit 1048.  Again,

24   Mr. Goloff, I'm just going to bring you a folder.  This time, I

25   am actually going to take out a document marked for

1   identification as 1048.

2   A.  Do you want this first?

3   Q.  Take your time.  Look at 1048.  Without describing it in

4   detail --

5   A.  Okay.  I see it.

6   Q.  -- do you recognize that, Mr. Goloff?

7   A.  Yes, I do.

8   Q.  What is that, Mr. Goloff?

9   A.  That is a stimulant for people who have night shift

10  disorder.  What do you call it.  It's a stimulant.

11  Q.  What is the piece of paper, Mr. Goloff?

12  A.  It's a prescription.

13  Q.  Do you recognize the prescription?

14  A.  Yes, I do.

15  Q.  From your work at one of the pharmacies?

16  A.  Yes.

17  Q.  Which pharmacy?

18  A.  Hellertown.

19          MR. RICHENTHAL:  The government offers 1048.

20          MR. FREEMAN:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibit 1048 received in evidence)

23          MR. RICHENTHAL:  Put that on the screen.

24  BY MR. RICHENTHAL:

25  Q.  Mr. Goloff, who is the prescriber here?

F58sLAS2                        Goloff - direct

1    A.  Dr. Haytmanek.

2    Q.  Dr. H?

3    A.  Dr. H, whatever you want to call him.

4    Q.  Who is the patient?

5    A.  Same.

6    Q.  What's the name of the drug?

7    A.  Provigil, 200 milligrams.

8    Q.  Now, Mr. Goloff, the opium tincture --

9    A.  Correct.

10   Q.  -- and the Provigil, was there a process in Hellertown

11   Pharmacy, after prescriptions were filled, as to where they

12   should be put physically?

13   A.  Well, on the one list of the prescriptions were put in a

14   little side on Lena's desk that she would, you know, check,

15   recheck my work.

16   Q.  Let me just be precise, Mr. Goloff.  You would fill a

17   prescription and you give the customer the drugs, here a liquid

18   for opium, and you take the prescription and put it on

19   Ms. Lasher's desk?

20   A.  Correct.

21   Q.  In a pile?

22   A.  Sometimes in a pile, but it depends on how many CTs we do

23   or narcotics we do.

24          THE COURT:  What are CTs?

25          THE WITNESS:  Controlled substance, number two

1    classification.

2    BY MR. RICHENTHAL:

3    Q.  Does that include opium tincture?

4    A.  Yes, that is C2.

5    Q.  Was that the process the entire time at Hellertown, most

6    prescriptions go on the desk?

7    A.  Yes, most of the time.

8    Q.  Most the time, sir, or all of the time?

9    A.  All the time, yeah.

10   Q.  Is that true regardless of whether the prescription was

11   physically filled by her or physically filled by someone else?

12   A.  I only filled -- the ones I did, I had to put it on her

13   desk.  I don't know about the ones she did or other

14   pharmacists.  I did the same thing, too.  We had -- actually,

15   we had a little bin.

16   Q.  I asked a question in a bad way.

17   A.  I'm sorry.

18   Q.  If someone else filled the prescription --

19   A.  Correct.

20   Q.  -- for example, you, were the prescriptions then put on her

21   desk?

22   A.  Yes.

23   Q.  Is that true for what you call C2s?

24   A.  C2s, mostly, yes.

25   Q.  Like opium tincture?

1    A.  Correct, sir.

2    Q.  Is that true for oxycodone?

3    A.  Yes.  That is the same class, classification.

4         MR. RICHENTHAL:  You can take that off the screen,

5    Ms. Chen.

6    BY MR. RICHENTHAL:

7    Q.  Did there come a time when one of the other pharmacies was

8    inspected by the commonwealth of Pennsylvania?

9    A.  Yes.

10   Q.  Which pharmacy?

11   A.  Hellertown.

12   Q.  Were you there --

13   A.  Yes, sir.

14   Q.  -- when the inspectors arrived?

15   A.  Yes, sir.

16   Q.  Did you speak with anyone about the inspection as it was

17   happening?

18   A.  Yes, sir.

19   Q.  Who?

20   A.  Lena Lasher.

21   Q.  Once or more than once?

22   A.  More than once on the telephone.

23   Q.  I'm sorry, sir.  Did you say the telephone?

24   A.  Yes.

25   Q.  Did she give you any instructions about who should speak or

F58sLAS2                          Goloff - direct

1    not speak with the inspectors?

2    A.  Don't have the technicians talk to the inspector and make

3    sure they do their work and not interfere with the inspection.

4    Q.  Don't have the technicians talk to the inspector?

5    A.  Correct.

6    Q.  Make sure the technicians keep doing their work?

7    A.  Correct.

8    Q.  And the inspection doesn't interfere with their work?

9    A.  Right.

10   Q.  Did you pass on that instruction?

11   A.  Yes, sir.

12   Q.  To the technicians?

13   A.  Yes, sir.

14   Q.  From what you could tell, did they listen?

15   A.  Sometimes.  Not really.

16   Q.  Well, let me be more precise.

17   A.  They would say --

18   Q.  Mr. Goloff, just wait.

19   A.  I'm sorry.

20   Q.  Let me be very precise.

21            THE COURT:  Slow down.

22   Q.  Take a breath.  Have some more water.

23   A.  Repeat the question again.

24   Q.  Have some water.

25   A.  All right.

F58sLAS2                         Goloff - direct

1    Q.  Are you ready?

2    A.  Yeah.

3    Q.  You passed on the instruction that the technicians

4    shouldn't speak with the inspectors.  From what you could tell,

5    did they listen to that specific instruction not to speak with

6    the inspectors?

7    A.  No.

8    Q.  What do you mean by that?

9    A.  They kept talking to them, because the inspectors were

10   asking them questions.

11   Q.  Did you also personally speak with the inspectors?

12   A.  Yes.

13   Q.  Did you speak with them on multiple subjects?

14   A.  Yes, sir.

15   Q.  Did Hellertown Pharmacy pass or fail the inspection?

16   A.  They failed.

17   Q.  Did you receive notice of that failure, Mr. Goloff?

18   A.  Yes, I did.

19   Q.  After that happened, did you receive anything from

20   Ms. Lasher?

21   A.  Yes.  The next day, there was a memo placed on where my

22   work area was.

23   Q.  I am going to bring to you Government Exhibit 3004.  This

24   one is in a bag.  When I say 3004, I'm looking at the sticker

25   on the back.  Do you recognize that, Mr. Goloff?

```
 1    A.  Yes, of course.

 2    Q.  What is it?

 3    A.  It says Stephen --

 4    Q.  Mr. Goloff, I am not going to ask you to read it yet.  It

 5    is not in evidence yet.

 6         What is that piece of paper?

 7    A.  It's a memo.

 8    Q.  From who?

 9    A.  Mrs.~Lasher.

10    Q.  Is that the one you received on your desk?

11    A.  Yes, sir.

12              MR. RICHENTHAL:  The government offers 3004?

13              MR. FREEMAN:  No objection.

14              THE COURT:  Received.

15              (Government's Exhibit 3004 received in evidence)

16              MR. RICHENTHAL:  Ms. Chen, can you put this on the

17    screen?

18    A.  Do you put this down?

19    Q.  Now we can talk about it.

20    A.  Okay.

21    Q.  You can look --

22    A.  I'll look at the screen.

23    Q.  It's up to you.

24    A.  All right.

25    Q.  You said this was on your work area?
```

1    A.   That is correct.

2    Q.   How did you know it was from Ms. Lasher?

3    A.   It's her handwriting, and I'm pretty sure -- yeah, it

4    wasn't her signature on there, it was her handwriting.

5    Q.   Can you read the note, Mr. Goloff?

6    A.   Read it now?

7    Q.   Yes, sir?

8    A.   You complained to the inspector about me.  You need to

9    write a letter to him.  120 mistakes was on your shift because

10   they were -- because they weren't focusing on their work.  I

11   never failed an inspection before.  Get your facts straight.

12   Q.   Let me pause there for a moment.  This says they weren't

13   focusing on their work.  Who did you understand that to be

14   referring to?

15   A.   The technicians.

16   Q.   These are the technicians who were answering the

17   inspectors' questions?

18   A.   Possibility.  I don't know.

19   Q.   What did you understand at the time about the note,

20   Mr. Goloff?

21   A.   When I saw that note?

22   Q.   Yes, sir.

23   A.   That she was blaming everything on me, the failure of the

24   pharmacy inspection.

25   Q.   I just want to ask specifically about that line for a

1    moment.

2    A.  All right.

3    Q.  The reference to they weren't focusing on their work.

4    A.  Oh, okay.

5    Q.  You understand that to refer to the technicians?

6    A.  Correct.

7    Q.  The ones who were asked questions from the inspectors?

8    A.  Correct.

9    Q.  Now, more generally, you just said something like I thought

10   she was blaming me?

11   A.  That's what I got the impression, yeah.

12   Q.  Now, there is a reference here, it's in the middle,

13   Mr. Goloff --

14   A.  I see that.

15   Q.  -- you need to write a letter to him.  Who did you

16   understand the "him" to be?

17   A.  The state board -- there was two people involved with the

18   inspections.  One was a State Board of Pharmacy and the

19   complaint -- the complaint from the Bureau of -- I forget the

20   term they used -- Professional Affairs of Pennsylvania.  There

21   were two agencies involved here.

22   Q.  Now, at the bottom, it says get your facts straight,

23   exclamation point.  Do you see that?

24   A.  Yes, sir.

25   Q.  Had you been asked about facts by the inspectors,

1   Mr. Goloff?

2   A.   Yes.

3   Q.   Were you honest with them?

4   A.   Yes.

5   Q.   Did there come a time after you got this note when you

6   spoke with Ms. Lasher?

7   A.   Yes.

8   Q.   What, if anything, did she ask you to do when you spoke

9   with her?

10  A.   Write letters to the inspectors explaining everything that

11  was told to them, that we really -- reverse everything, that we

12  failed, that's what we really do.

13          MR. RICHENTHAL:   You can take it off the screen,

14  Ms. Chen.

15  BY MR. RICHENTHAL:

16  Q.   Now, Mr. Goloff, you just said the word "reverse?"

17  A.   Well, we reverse -- well, what we failed on this particular

18  thing and she wanted me to write a letter in the context that

19  we really do this particular task.

20  Q.   Let's just pause.   You told the inspector certain things?

21  A.   Right.

22  Q.   She wanted you to tell the inspectors certain things on the

23  same subjects?

24  A.   Correct.

25  Q.   Was her version true or false?

 1    A.   False.

 2    Q.   Did you agree to write the letter?

 3    A.   Unfortunately, yes.

 4    Q.   Why did you agree?

 5    A.   Because I wouldn't have my hours and jeopardize my

 6    position.

 7    Q.   After you wrote the letter -- let me back up.

 8         Did Ms. Lasher ask you to give this letter to someone?

 9    A.   Just to her.

10    Q.   To her?

11    A.   Yes, sir.

12    Q.   Not directly to the inspectors?

13    A.   Not at all.  She told me not to mail it off, she wants to

14    look at it.  She'll mail it on her own.

15    Q.   Did you draft the letter?

16    A.   I drafted it on my home computer.

17    Q.   Did you give her a copy?

18    A.   I sent her, by e-mail to her and to the Hellertown store

19    e-mail, and I kept a copy -- I put the copy on her desk the

20    next morning.

21    Q.   So I want to now bring up to you what's been marked for

22    identification as Government Exhibit 3001.  It's two pages.

23    Mr. Goloff, can you just look at it?  Don't describe it in

24    detail just yet.  Do you recognize what that is?

25    A.   Yes, the letter --

F58sLAS2                          Goloff - direct

1   Q.  That's the second page you're holding, Mr. Goloff?

2   A.  Yes.

3   Q.  What is the first page?

4   A.  The first page is the address, the e-mail from my home

5   computer to Ms. Lasher's e-mail.

6   Q.  What's the date on that e-mail, Mr. Goloff?

7   A.  Sunday, September 23, 2012.

8   Q.  Is that a few days after the inspection?

9   A.  That is correct, sir.

10          MR. RICHENTHAL:  Government offers 3001.

11          MR. FREEMAN:  No objection.

12          THE COURT:  Received.

13          (Government's Exhibit 3001 received in evidence)

14          MR. RICHENTHAL:  Can you put that up, Ms. Chen.

15   BY MR. RICHENTHAL:

16   Q.  Mr. Goloff, this is the first page, right?

17   A.  Correct.

18   Q.  Where you said from your home computer to Ms. Lasher?

19   A.  Correct.

20   Q.  Are you talking about the from line and the to line?

21   A.  Yes, sir.

22   Q.  Could you read the sentence above your name, Mr. Goloff?

23   A.  Above my name?  Where is that?

24   Q.  Beginning good afternoon.

25   A.  Good afternoon, Lena.  Attached is my letter.  Steve

F58sLAS2                          Goloff - direct

 1    Goloff.
 2              MR. RICHENTHAL:  Ms. Chen, can you turn to the second
 3    page.
 4    Q.  Mr. Goloff, is this the attachment to your e-mail, that is,
 5    what you sent Ms. Lasher?
 6    A.  Yes.
 7    Q.  What happened next with the letter you drafted?  Did anyone
 8    edit it?
 9    A.  Yes, she did.
10    Q.  Who is she?
11    A.  Mrs.~Lasher.
12              MR. RICHENTHAL:  You can take that off the screen for
13    just a moment, Ms. Chen.
14    Q.  Did there come a time when someone asked you to sign a copy
15    of this letter?
16    A.  Yes.
17    Q.  Who?
18    A.  Mrs.~Lasher.
19    Q.  Did you do so?
20    A.  Yes, I did.
21    Q.  I am going to walk up to you what has been marked for
22    identification as Government Exhibit 3002.  Do you recognize
23    that?
24    A.  Yes, I do.
25    Q.  What is that?

F58sLAS2                     Goloff - direct

1    A.  That's the letter to the State Board of Pharmacy with my

2    signature on it.

3    Q.  Is this the one Ms. Lasher asked you to sign?

4    A.  Yes, sir.

5    Q.  Or one of the ones Ms. Lasher asked you to sign?

6    A.  Yes.

7              MR. RICHENTHAL:  Government offers 3002.

8              MR. FREEMAN:  No objection.

9              THE COURT:  It's received.

10             (Government's Exhibit 3002 received in evidence)

11             MR. RICHENTHAL:  Ms. Chen, can you put that up,

12   please.

13   BY MR. RICHENTHAL:

14   Q.  Mr. Goloff, did you see at the top it says, Dear Thomas

15   Bat?

16   A.  Correct.

17   Q.  Do you recall who Mr. Batt was?

18   A.  Batt was the state board inspector.

19   Q.  You said there were two gentlemen?

20   A.  Right.  It was a Fitzpatrick, I believe, and a Mr. Bat,

21   Thomas.  Bat was the State Board of Pharmacy inspector,

22   Fitzpatrick was the complaint department inspector for

23   professional affairs.

24   Q.  Could you read the first sentence?

25   A.  Yeah.  I leave good would like to clear up some

1    misconceptions and interpretations of policies and rules.

2    Q.  Let me pause there, Mr. Goloff.  When you wrote this letter

3    and then signed this letter, did you want to clear up some

4    misconceptions, is that why you wrote it?

5    A.  I was told to write that.

6    Q.  Let's look at the next sentence.  You see where it says, We

7    allow all inspectors to look at all areas, including the back

8    rooms where the techs work.  The door was to be kept shut for

9    the purpose to work quietly and focus on the orders.  Do you

10   see that, sir?

11   A.  Yes, sir.

12   Q.  Is there any reference in here to Ms. Lasher's instruction

13   to you that the technicians should not speak with the

14   inspectors?

15   A.  Not in this sentence, no.  It was only verbally to me at

16   the time the inspection was going on.

17   Q.  She didn't want that included in the letter?

18   A.  Not at all.  I don't think so.

19   Q.  Did she ask you to include that in the letter?

20   A.  No, no.

21   Q.  Did you see the next line, there were numerous errors that

22   day because I did not follow my supervisor's orders.  Do you

23   see, Mr. Goloff?

24   A.  Yes, sir.

25   Q.  Who do you understand your supervisor to refer to?

```
 1   A.  To me, it could have been -- that's a good question.

 2   Q.  Who was your supervisor, Mr. Goloff?

 3   A.  Mrs.~Lasher.

 4   Q.  Do you see the next line?

 5   A.  Sure.

 6   Q.  We do allow you to speak to our staff about pharmacy

 7   matters.  Do you see that, Mr. Goloff?

 8   A.  Right.

 9   Q.  The techs were to concentrate on the work and not disturb

10   the inspection?

11   A.  Right.

12   Q.  Does that say that she instructed you to tell the techs not

13   to speak with the inspectors?

14   A.  Yes.

15   Q.  Yes, it says that?

16   A.  No, it doesn't say that.

17   Q.  Did she ask you to include that in your letter?

18   A.  No.

19   Q.  Now, there is a reference here to the sick day policy in

20   the next paragraph.  Do you see that?

21   A.  Yes, sir.

22   Q.  Have you described the sick day policy accurately to the

23   inspectors?

24   A.  Well, it was -- we -- I referred to a sign posted, a memo

25   posted to us.
```

F58sLAS2                    Goloff - direct

1    Q.  Let me just be precise.  When you were asked about the

2    policy by the inspectors, did you tell them the truth?

3    A.  Yes.

4    Q.  Did Ms. Lasher want you to tell the truth about the policy?

5    Strike that.

6        Did Ms. Lasher ask you to tell the truth about the policy

7    in this letter or to say something else?

8    A.  She asked me about the policy --

9    Q.  Let me backtrack.

10            THE COURT:  Why don't you try that question again.

11            MR. RICHENTHAL:  Let me do it a different way.

12   A.  That -- yeah, that's confusing.

13   Q.  You said you answered the inspectors questions honestly --

14   A.  Correct.

15   Q.  -- on the sick day policy?

16   A.  Right.

17   Q.  I want to read you to the first sentence in the next

18   paragraph.

19   A.  Sure.

20   Q.  As far as our sick day policy, you were told incorrectly by

21   me.  Was that right, Mr. Goloff?

22   A.  Yes.

23   Q.  Had you told the policy incorrectly to the inspectors?

24   A.  No.  I told them what was initially said, that we should

25   come to work sick and they would determine if we were sick and

1    go home and find a doctor.

2    Q.  That's what you told the inspectors?

3    A.  That is what we were following.

4    Q.  That was true?

5    A.  True, yes.

6    Q.  Let's look at the next sentence.  Mr. Goloff, do you see

7    where it says, when orders are returned from mail, this is my

8    supervisor's department, we do not return to active stock?

9    A.  Right.

10   Q.  Now earlier, sir, you testified that when orders were

11   returned, they were put back in the totes?

12   A.  That is correct.  This statement is false.

13   Q.  Let's look at the next line.  We also hand count

14   medications on all orders using a vial to measure accuracy.

15   Mr. Goloff, were all orders counted pill by pill?

16   A.  No.

17   Q.  Were they all hand counted or were they poured?

18   A.  They were poured.  They weren't hand counted.  Nothing was

19   hand counted, only specific -- only certain drugs that were in

20   the common list.

21   Q.  You said the common list?

22   A.  If there were three drugs involved, mainly they were

23   counted by a pouring method.  If it was a brand name or an odd

24   drug, we would count it by hand.

25   Q.  Let's just pause there for a second.  You said that three

1    drugs --

2    A.  The soma, Fioricet, and tramadol pills.

3    Q.  Did Ms. Lasher ask you to tell the inspectors, returns

4    don't go back out?  This sentence, Mr. Goloff, is this

5    something Ms. Lasher wanted you to include in your letter?

6    A.  Yes.

7    Q.  Now, I want to direct your attention to the last sentence.

8    Do you see, once again, I regret telling you bad information

9    and I will be more cooperative in the near future with your

10   department?  Do you see that?

11   A.  Yes, sir.

12   Q.  Then it says, Thank you, Stephen Goloff, RPH.  Do you see

13   that?

14   A.  Yes, sir.

15   Q.  Why did you sign this letter, Mr. Goloff?

16   A.  Because I was under distress and I want didn't want to lose

17   my position there.  It was hard to find another job at the

18   time.

19          THE COURT:  How long after the actual inspection did

20   you send this letter?

21          THE WITNESS:  The inspection date, I think, was the

22   21st.  I'm not recalling.  It was like three days afterwards.

23   I didn't send it.  I sent it to Lena.  It was on a Sunday I

24   drafted this.

25          THE COURT:  Okay.  Hold on.

1          THE WITNESS:  All right.

2          THE COURT:  There is a sequence.  An actual

3     inspection?

4          THE WITNESS:  Correct.

5          THE COURT:  A report from the state of Pennsylvania?

6          THE WITNESS:  That was already sent immediately.

7          THE COURT:  That was the same day as the inspection,

8     the report, or the day after?

9          THE WITNESS:  Almost the same day.  The next day.  I

10    had an e-mailed copy.  He sent me an e-mail copy of the report.

11         THE COURT:  This is the letter that you signed how

12    many days after?

13         THE WITNESS:  It would be two, three days afterwards,

14    yeah.  The date is the 23rd.  I think the inspection, I'm not

15    sure, was the 21st.  I'm not sure of the exact date of the

16    inspection.  You have the records.

17         THE COURT:  I don't.

18         THE WITNESS:  You don't have it, the attorneys have

19    it.  I have it, too.  I don't know where it is.

20    BY MR. RICHENTHAL:

21    Q.  I'm going to ask another question.

22    A.  Sure.  Go ahead.

23    Q.  Other than this letter --

24         MR. RICHENTHAL:  Ms. Chen, you can take it off the

25    screen.

```
 1    Q.  -- did Ms. Lasher ask you to send anything else after the

 2    inspection?

 3    A.  Yes, I recall that.

 4    Q.  Mr. Goloff, I'm going to show you what's been marked for

 5    identification as government exhibit -- actually, we are going

 6    to put it on your screen -- 1031 in evidence.

 7        Mr. Goloff, do you see that?

 8    A.  Yes, sir.

 9    Q.  This was also after the inspection?

10    A.  Yes.

11    Q.  It's dated September 19, 2012?

12    A.  Right.

13    Q.  Entitled inspections?

14    A.  Correct.

15    Q.  Do you see the line that says, The moment the state

16    pharmacy board inspector arrives at the pharmacy, call Lena

17    immediately, exclamation point, exclamation point, exclamation

18    point.  Do you see that, sir?

19    A.  Yes, sir.

20    Q.  Had you done that?

21    A.  Yes, I did.

22    Q.  Let's look at B.  When an inspector asks questions the

23    pharmacist does not know the answers to, call Lena immediately,

24    exclamation point, exclamation point, exclamation point.  Had

25    you done that?
```

1   A.  Yes, I did.

2   Q.  Let's look at C.  Before the inspector leaves the pharmacy,

3   call Lena right away, exclamation point, exclamation point,

4   exclamation point.  Had you done that?

5   A.  Yes, I did.

6   Q.  Had you, in fact, spoken with her multiple times during the

7   inspection?

8   A.  Yes, I did.

9   Q.  Did someone ask you to sign this, Mr. Goloff?

10  A.  Yes.

11  Q.  Who?

12  A.  Lena.

13  Q.  That's Ms. Lasher?

14  A.  Yes, sir.

15  Q.  I would like you now to look at Government Exhibit 1032,

16  the next exhibit also in evidence.  Mr. Goloff, this is, again,

17  going on your screen.

18  A.  Sure.

19  Q.  Do you see that?

20  A.  Yes, sir.

21  Q.  Do you see the date?

22  A.  Yes, sir.

23  Q.  Also after the inspection?

24  A.  Correct.

25  Q.  Now, it says at the top Palmer Pharmacy & Much More and

1    Hellertown Pharmacy?

2    A.  Correct.

3    Q.  Were those the two pharmacies with which you worked?

4    A.  Yes, sir.

5    Q.  It says prescription counting policy?

6    A.  Yes, sir.

7    Q.  Do you see number one, Mr. Goloff?

8    A.  Yes, sir.

9    Q.  All prescriptions must be counted by hand or by machine.

10   Do you see that?

11   A.  Yes, I do.

12   Q.  Before I ask you about that, did someone ask you to sign

13   this?

14   A.  Yes.

15   Q.  Who?

16   A.  Mrs. Lasher.

17   Q.  Can you point to where your signature is?

18   A.  On the top, top line.

19   Q.  That's the first line, Mr. Goloff?

20   A.  Correct.

21   Q.  Is that the same day the policy is dated, from what you can

22   tell?

23   A.  Yes, it was.  I believe so.  I can't see that.

24            MR. RICHENTHAL:  Ms. Chen, can you maybe blow up the

25   first signature.

1   A.  I don't know if that's the two -- that's the 21st.

2   Q.  Can you now see it better, Mr. Goloff?

3   A.  Yes.  It's the 21st, yes.

4   Q.  Is that the same day as the policy?

5   A.  Yes, sir.  It wasn't the same day.  Yes, it is the same

6   day.  Yes.

7   Q.  Now, you said Ms. Lasher asked you to sign this?

8   A.  Yes, sir.

9   Q.  Now, at the time that you signed this, did she ask you to

10  ensure that pills were to be counted by hand pill by pill, all

11  pills?

12  A.  We were told.  No, not count by hand, no.

13  Q.  You weren't told that by Ms. Lasher --

14  A.  No.

15  Q.  -- at the time you were asked to sign?

16  A.  Right.

17  Q.  After the time you were asked to sign, did she tell anyone

18  else, We are going to start counting by hand pill by pill?

19  A.  No.  The only thing she started, she got a scale method.

20  Q.  I will ask you about that.  Let's be precise.

21      At the time she asked you to sign this, did she tell you or

22  anyone else, We are going to start counting -- pills?

23  A.  No, no.

24  Q.  -- by hand pill by pill?

25  A.  Not at all.

F58sLAS2                              Goloff - direct

1    Q.  You made reference to a scale?

2    A.  We had a balance.

3    Q.  I'm going to ask you about that in a second.

4    A.  Okay.

5    Q.  Let me ask you something else first.

6    A.  Sure.

7    Q.  There's a reference here to a machine.  Do you see that,

8    Mr. Goloff?

9    A.  Yes.

10   Q.  Do you know what a pill-counting machine is?

11   A.  Yes, I do.

12   Q.  Have you seen one?

13   A.  Of course.  I've use one myself.  Not at this store, but

14   other stores.

15   Q.  You said not at this store.  Was one used at Hellertown?

16   A.  No.

17   Q.  Was one used at Palmer?

18   A.  No.

19   Q.  What other kind of machine was there?

20   A.  I think you said it.  There was a balance.

21   Q.  A balance, you mean a scale?

22   A.  A scale.

23   Q.  Was that another method to count or approximately count

24   pills?

25   A.  Want me to explain the theory behind it?

1    Q.   Explain what you did.

2    A.   Okay.  What they did with the balance, an accurate count,

3    let's say 90 pills.  You put it in a vial, weigh that, weigh it

4    on a scale.  Take the number of that, let's say 15 grams, okay,

5    and then the next vial, we would pour in the pills in the vial.

6    And then when the weight comes up to 15 grams, that's what we

7    use.

8    Q.   Let me pause, Mr. Goloff.  You described a certain

9    method --

10   A.   With the balance.

11   Q.   -- involving a balance?

12   A.   Right.

13   Q.   Earlier you described a method involving pouring into an

14   eye level?

15   A.   That's correct.

16   Q.   Were those the two methods used at Hellertown and Palmer

17   Pharmacy?

18   A.   Yes, at one time.

19   Q.   Let me be precise.  Were those the two methods used

20   throughout the time --

21   A.   No, just the pouring.

22   Q.   Then at some point someone also used the scale method?

23   A.   Yes.

24   Q.   Was that accurate?

25   A.   Not really, no, no.

1    Q.  At any point at Hellertown or Palmer Pharmacies, in your

2    presence, did anyone hand count pill by pill Fioricet,

3    tramadol, or Soma?

4    A.  Only if it was an odd quantity.

5    Q.  An odd quantity meaning like not 90, 120 --

6    A.  That is correct, sir.

7    Q.  -- or 180?

8        When Ms. Lasher asked you to sign this, did she say we were

9    going to stop doing the pours and not going to use the scale,

10   we are going to counter pills by hand?

11   A.  She didn't say that.

12   Q.  Did she say we are going to start using a pill-counting

13   machine?

14   A.  No.

15   Q.  Did the pharmacy even have a pill-counting machine?

16   A.  Not to my knowledge.

17   Q.  The counting you're talking about, whether it is the scale

18   or the pouring, did that occur on camera?

19   A.  Oh, yes.

20   Q.  Did it occur in front of Ms. Lasher?

21   A.  While she's in the store you mean?

22   Q.  Yes, sir.

23   A.  Oh, yes.

24   Q.  Did she continue to come in the stores after the

25   inspection?

F58sLAS2                    Goloff - direct

1   A.  Yes.

2   Q.  Did she continue to be present when people used the pouring

3   or the scale?

4   A.  Yes.

5   Q.  Did she tell anyone to stop?

6   A.  No.

7           MR. RICHENTHAL:  Mr. Goloff, I want to show you

8   something else on a different subject.  Ms. Chen, you can take

9   that off the screen.

10  BY MR. RICHENTHAL:

11  Q.  I'm going to show you 3003 in evidence.  Ms. Chen is going

12  to put it on the screen.  I'm also going to bring you a hard

13  copy because it's a bunch of pages.  All right?

14  A.  Sure.

15  Q.  Do you recognize that, Mr. Goloff?

16  A.  Yes, sir.

17  Q.  This is just one page, right?  Let me be more precise.

18  A.  It's more than one page.

19  Q.  That's why it wasn't a good question.  Let's try it again.

20  A.  Just cross that out.

21  Q.  What is on your screen is one wage?

22  A.  Say that again?

23  Q.  What is on your screen is one page?

24  A.  Yes.

25  Q.  You're holding a bunch more?

F58sLAS2                    Goloff - direct

1    A.  Correct.

2    Q.  Do you recognize generally what the bunch is, what these

3    papers are?

4    A.  This is my report of class two narcotics.

5    Q.  You say "my report."  Did you actually print this out?

6    A.  I print the report out.  It came from the computer, the

7    walk-in pharmacy computer system.

8    Q.  At what pharmacy?

9    A.  At Hellertown Pharmacy, sir.

10           MR. RICHENTHAL:  Ms. Chen, could you turn to the page

11   in 3003 that is marked in the lower right-hand corner 8528.

12   That's the lower right page number.

13   A.  Do you want me to get to that page myself?

14   Q.  You could.  If the screen is easier, use the screen.

15   A.  I think I would rather read the hard copy here.  It's kind

16   of weird.  8528, sir?

17   Q.  Yes.

18   A.  Yes, I have it.

19   Q.  Okay.  Mr. Goloff, do you see the second line?

20   A.  Yes, I do.

21   Q.  Let's start with the left.

22   A.  Oh, I'm sorry.  Let me look at the screen.  I think we're

23   on the wrong page.  I'm on -- yes, I see the second line.

24   Q.  Do you see the second line?

25   A.  Correct.

F58sLAS2                    Goloff - direct

1    Q.  On the page marked 8528?

2    A.  Page 15 was it, on the top?  Page 15?

3    Q.  Yes, Mr. Goloff, it does.

4    A.  I got that.

5    Q.  We're on the same page?

6    A.  Yes, I'm on the same page.

7    Q.  Do you see the second line in this report?

8    A.  Yes, sir.

9    Q.  There is a date.  Do you see that, sir?

10   A.  Yes, sir.

11   Q.  Do you then see the name of a patient?

12   A.  Yes, sir.

13   Q.  Was that Dr. H?

14   A.  That's correct.

15   Q.  Do you then see the name of a prescriber?

16   A.  Yes, I do.

17   Q.  Is that Dr. H?

18   A.  No.

19   Q.  Do you know why this doesn't say Dr. H, if he was the one

20   writing the prescriptions?  Actually, pause for one second.

21       What is this for?  What is this prescription for, looking

22   to the right?

23   A.  Opium tincture.

24   Q.  He was writing those for himself, is that right?

25   A.  At the time, yes.

1    Q.   Now let me ask my question again.  Do you know why this

2    says prescriber and it lists someone other than Dr. H?

3    A.   Yes, I do.  I remember what happened.

4    Q.   What happened, Mr. Goloff?

5    A.   Dr. H came in with Dr. C's prescription pack, wrote the

6    prescriptions under his, Dr. C's, name, and he was doing

7    Mr. H's prescriptions.

8    Q.   Let's take it piece by piece.

9    A.   Sure.

10   Q.   When did this happen, after the inspection?

11   A.   Yes, sir.

12   Q.   Dr. H shows up at the pharmacy?

13   A.   Correct, sir.

14   Q.   Does he ask for anyone?

15   A.   Lena.

16   Q.   That's Ms. Lasher?

17   A.   Yes, she was present at the time.

18   Q.   Did Ms. Lasher then ask you to print anything out for her?

19   A.   Print out the printout of his profile, of his particular

20   profile.  This is for the opium prescription.

21   Q.   Let me pause, Mr. Goloff.  When you say his particular

22   profile --

23   A.   His profile, yeah.

24   Q.   -- that is Dr. H's profile?

25   A.   Correct.

F58sLAS2                    Goloff - direct

1   Q.  You say "profile."  You mean within the Hellertown computer

2   system?

3   A.  Yes.

4   Q.  Did that indicate that he was his own prescriber?

5   A.  Correct.

6   Q.  Who did you give that report to at that time?

7   A.  I gave it to Lena and Lena gave it to the doctor.  I'm

8   sorry, I gave it to Lena.  Sorry.

9   Q.  Let's take -- nothing to apologize for.  I want to take it

10  step by step.

11  A.  Baby steps.  I'm sorry.  I understand.

12  Q.  Don't apologize.

13  A.  All right.

14  Q.  You print it up.  Who do you hand it to?

15  A.  Lena.

16  Q.  That's Ms. Lasher?

17  A.  Correct.

18  Q.  Was Dr. H physically there, too?

19  A.  Yes, sir.

20  Q.  He did say anything to her at the time?

21  A.  No?

22          MR. FREEMAN:  Objection to what he said.

23  BY MR. RICHENTHAL:

24  Q.  Did he say anything to Ms. Lasher at the time?

25          MR. FREEMAN:  Objection.

1      THE COURT:  It would still be a yes or no.

2   Q.  Did he say anything to Ms. Lasher?

3   A.  Yes.

4   Q.  Did he ask her anything?

5   A.  No.

6   Q.  Did he express concerns about anything?

7   A.  Yes, sir.

8   Q.  What concerns did he express to her?

9      MR. FREEMAN:  Objection.

10      THE WITNESS:  He said --

11      MR. RICHENTHAL:  I'm going to ask Mr. Goloff how she

12   responded, your Honor.  It's not offered for truth.

13      MR. FREEMAN:  It is offered for the truth.

14      MR. RICHENTHAL:  It's a statement in furtherance.  In

15   any event, it's not offered for truth.  Her hearsay is not

16   hearsay.  To understand the response, the jury needs to know

17   what she was responding to.

18      THE COURT:  I'll allow it.

19   BY MR. RICHENTHAL:

20   Q.  Mr. Goloff, what did Dr. H express to Ms. Lasher?

21   A.  If he is going to get in trouble by doing this.

22   Q.  What did she say back?

23   A.  No, don't worry about it.

24   Q.  Now, you have given Ms. Lasher the patient profile at this

25   point?

1    A.  Yes, with the dates and the prescription numbers that were

2    dispensed under his name, written under his name and dispensed

3    under his name.

4    Q.  Where, if anywhere, did Dr. H and Ms.~Lasher go after you

5    handed Ms. Lasher this printout?

6    A.  They went to the back room.

7    Q.  You say the back room, you mean the back room of the

8    pharmacy?

9    A.  Correct.

10   Q.  Could you hear what they spoke about at that point?

11   A.  No, I couldn't.  I wasn't involved, no.

12   Q.  They walked away from you?

13   A.  Oh, yeah.  I wasn't -- I was present in the front store.  I

14   didn't go with them.

15            MR. RICHENTHAL:  Now let me pause for a second.

16   Ms. Chen, you can satisfy this off the screen.

17   BY MR. RICHENTHAL:

18   Q.  Mr. Goloff, I'm going to show you on your screen 3006.  Do

19   you recognize that?

20   A.  Yes, sir.

21   Q.  What is that, Mr. Goloff?

22   A.  That is like a shot of the computer -- the computer's

23   program on the screen.  We would -- the pharmacist would look

24   at the patient profile on the screen itself.

25   Q.  Is this a piece of what you gave Ms. Lasher?

F58sLAS2                          Goloff - direct

1    A.  No.

2    Q.  What's missing on this screen, Mr. Goloff, compared to what

3    you gave Ms. Lasher?

4    A.  There is more than one -- there is only a certain -- it

5    wasn't all a complete profile.

6           THE COURT:  He asked you, sir, if it was a piece of

7    what you gave to Mrs.~Lasher.  Was it a piece of what you gave?

8           THE WITNESS:  Yes, it was a piece of it.

9    BY MR. RICHENTHAL:

10   Q.  What you gave her had more information on it?

11   A.  Yes, sir.

12   Q.  Was it also from the patient profile?

13   A.  Yes, sir.

14   Q.  Now, you said that Ms. Lasher and Dr. H walked into the

15   back, correct?

16   A.  Yes.

17   Q.  Did there come a time when they left the back?

18   A.  Yes.

19   Q.  Did they return to where you were?

20   A.  Yes.

21   Q.  Were they together?

22   A.  Yes.

23   Q.  Just physically near each other?

24   A.  Yes.  I don't know a particular period of time they were

25   together, but they were there.

F58sLAS2                        Goloff - direct

1    Q.  Just did they walk out together?

2    A.  No.

3    Q.  Did they walk out of the back room together?

4    A.  Yes.

5    Q.  Did they walk over to you together?

6    A.  Yes.

7    Q.  When they walked out and walked over to you, did Dr. H have

8    anything with him?

9    A.  He had the set of prescriptions that --

10   Q.  He had a set of prescriptions with him?

11   A.  Yes, sir.

12   Q.  Did either Dr. H or Ms.~Lasher give them to someone?

13   A.  Well, they put it on my desk.

14   Q.  What prescriptions were these, Mr. Goloff?

15   A.  They were the prescriptions that were written under

16   Dr. Cochran's name.

17   Q.  Let's pause for a second.  You just said prescriptions

18   written in Dr. Cochran's name?

19   A.  Yes.

20   Q.  Prescriptions for what?

21   A.  For the opium.

22   Q.  Were they dated the day they gave them to you or a

23   different day?

24   A.  The date that he -- the date that it was inspected, written

25   on the date Dr. H wrote the script.

F58sLAS2                              Goloff - direct

1    Q.  In other words, they matched the prior dates?

2    A.  Prior dates, right, not the dates that -- that physical

3    date that day, no.

4    Q.  Let me back up.  Did anyone ask you to do anything with

5    these prescriptions?

6    A.  Yes.

7    Q.  Would asked you to do anything?

8    A.  Lena.

9    Q.  That's Ms.~Lasher?

10   A.  Right.

11   Q.  What did she ask you to do?

12   A.  Go back to the prescription number on the computer, edit

13   the doctor's name, and put Dr. Cochran's name in there, and

14   then reprint the label to put on the prescriptions, our copy.

15   Q.  Let's sort of break that down.  She tells you to go into

16   the computer system --

17   A.  Right.

18   Q.  -- and change the doctor's name?

19   A.  No.  Under the patient's name, Dr. H is the patient.  Go in

20   there and put the specific prescription number and then edit

21   the doctor and reprint the label for that date, but with the

22   new doctor's name on it.  Just edit the doctor.  We didn't edit

23   anything else.

24   Q.  You say "edit the doctor?"

25   A.  That means change the doctor's name.

1   Q.  Do you mean the prescriber?

2   A.  Yes, the prescriber, yes.

3   Q.  Were you asked to have it match the prescriptions you had

4   been given?

5   A.  Yes.

6   Q.  Were these for one date or multiple dates?

7   A.  Multiple dates, sir.

8   Q.  Let's go back to 3006 for a moment.  Mr. Goloff, when you

9   say edit the prescriber or doctor --

10  A.  Um-hmm.

11  Q.  -- what do you mean by that?

12  A.  Well, from here, we would go -- where it says on the bottom

13  of the screen change one, so we hit C1, and now we bring up to

14  another screen.  We don't have a copy of that.  Then go into

15  the line where it says physician's name, and there is another

16  thing you hit change, I think CM, to change medication

17  prescriber, and then change the name and then redo the label

18  again.

19  Q.  Were you asked to change anything other than the

20  prescriber?

21  A.  No.

22  Q.  Were you asked to match what you did to the physical

23  prescriptions you were handed?

24  A.  Yes.

25  Q.  Where was Ms. Lasher when you were doing this work?

1    A.  Right next to me, helping me do it.

2    Q.  You said helping you do it.  What was she doing?

3    A.  Taking the stuff on the printer and putting it on, the

4    labels itself.

5    Q.  You were also physically printing out a label?

6    A.  Yeah, we were putting it on the back of the -- well, one

7    part of the label goes on the bottle.  We weren't redoing the

8    prescription over, just taking the second part of the label

9    that is attached to the back of the label of the prescription

10   that has the prescription number and all the information.

11   Q.  You are doing this after the inspection, is that right?

12   A.  Yes, sir.

13   Q.  That is sometime after mid to late September 2012?

14   A.  In and around that time, yes.

15   Q.  The prescriptions were dated before, is that right?

16   A.  Correct.

17   Q.  The printed-out label, did they have the date in September

18   '12 or it had earlier dates?

19   A.  They had the date that it was originally signed with the

20   first doctor.  It was the same dates, but the doctor is

21   changed.  Everything was the same but the doctor is changed,

22   that's all.

23   Q.  When you printed the label out, Mr. Goloff, where did that

24   label go?

25   A.  The label to the bottle, on the bottle?

1   Q.   Yes.

2   A.   That goes in the trash again.

3   Q.   The new labels, Mr. Goloff?

4   A.   The new labels.

5   Q.   Where did they go?

6   A.   We used the second part of the label.

7   Q.   What did you do with the second part of the label?

8   A.   Put it on the back of the script.

9   Q.   Where was Ms. Lasher when you were doing that?

10  A.   Right next to me.

11  Q.   Was she helping with that, too?

12  A.   Yes, sir.

13          MR. RICHENTHAL:  Your Honor, it is just after 11:15.

14  I think this is a good time to break.

15          THE COURT:  A good time to break.  Everybody, let's

16  take our break, and remember the rules.

17          THE WITNESS:  Thank you.

18          THE COURT:  Keep an open mind, don't talk about the

19  case.

20          I have another matter I'm squeezing in at 11:30.  I

21  hope to be done by 11:45, but if you're kept waiting, it's

22  because I'm doing something else in the courtroom.

23          (Jury excused)

24          (Jury not present)

25          MR. FREEMAN:  Your Honor, I have something to put on

1      the record.

2                  THE COURT:  Yes.

3                  MR. FREEMAN:  Your Honor, reluctantly, I am asking for

4      the court to declare a mistrial with respect to the hearsay

5      objection.  This witness testified about what Dr. H --

6      H-a-y-t-m-a-n-e-k -- said to him, that he, Dr. H, thinks he is

7      going to get into trouble.  That is a hearsay statement.  It is

8      offered for the truth.  I know that the prosecutor will sum up

9      on it and it will be offered for the truth and argued that way.

10                 In addition, it is not in furtherance.  There is no

11     conspiracy between Lena Lasher and Dr. H.  It is a significant

12     piece of evidence that will not allow a fair explanation.  I am

13     asking for a mistrial.

14                 THE COURT:  First of all -- go ahead.

15                 MR. RICHENTHAL:  First, I am not going to sum up on

16     it.  First, there was a conspiracy between Dr. H and Lena

17     Lasher.  Based on a preponderance, based on the witness's

18     testimony alone, especially in conjunction with the documentary

19     tax evidence.  Third, it is not offered for truth, it was

20     offered so the jury can understand Ms. Lasher's response.

21     Categorically, it's not hearsay as matter of law.  Her response

22     literally makes no response unless the jury first hears what

23     she heard.  Finally, this is not that big of a deal.  This

24     small piece of evidence is not the problem.  The problem, as is

25     apparent from the timing of Mr. Freeman's objection, is what

F58sLAS2                         Goloff - direct

1      Ms. Lasher asked this witness to do, not what Dr. H said to

2      Ms. Lasher.  It is not appropriate for a mistrial because it is

3      legally permissible.  In any event, its *de minimus*.

4                 THE COURT:  Right.

5                 (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           THE COURT:  Counsel, we got a note from a juror, I

3    think, which I'm getting copies made for you.  It's a series of

4    kind of substantive questions about proper practice:  Is it a

5    general rule for pharmacists, Internet -- I'm going to give

6    it -- we'll mark it as a court exhibit.  I will give you

7    copies.

8           My proposed response -- I think it's accurate -- is

9    that most, if not all, of the questions that the juror has

10   will, to my knowledge, be the subject of testimony.  I think it

11   gets very much to the expert questions.  I don't propose to

12   otherwise respond.  It will, I guess, give you, shall we say, a

13   heads up on what's on their minds, for you to do with

14   whatever -- you know, do what you do.

15           MS. GREENBERG:  Thank you.

16           MR. RICHENTHAL:  That makes sense to us.

17           Mr. Freeman?

18           MR. FREEMAN:  Yes.

19           THE COURT:  So we're just getting the copies made.

20   (Pause)

21           Counsel, I know you haven't had a lot of time to look

22   at the note, but given the time you've had, any objections to

23   my proposal?

24           MR. FREEMAN:  No.

25           THE COURT:  Okay.  Fine.

F58elas3

1          MR. RICHENTHAL:  No, your Honor.

2          THE COURT:  So bring the jury back in.  Perhaps one of

3    the agents could get the witness.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F58elas3

```
 1              (In open court; jury present)
 2              THE COURT:  Ladies and gentlemen, thank you for your
 3    patience as I handled the other matter.
 4              I have a note from one juror.  I have no idea who it
 5    is.  I don't want to know.  Let me just say that the subjects
 6    raised by the questions I believe will be the -- some of them
 7    will be the subject of testimony as the case goes on.
 8              You may continue.
 9    BY MR. RICHENTHAL:
10    Q.  Good afternoon, Mr. Goloff.
11    A.  Good afternoon.
12    Q.  When we took the break, you had just testified about
13    prescriptions you were handed, and I believe you talked about
14    printing out a sticker?  Do you recall that, Mr. Goloff, or --
15    A.  Well, it was -- only altered the doctor's name.  And the
16    printout of another label, there was two parts to it.  One gets
17    on the bottle.  Second part goes on back of the prescription or
18    in the bottom part of the two-part label.  And the other's a
19    big printout for the patients, information of the medication.
20    And that sticker would go on to the new prescription with the
21    same -- everything's the same -- the date, the name of the
22    patient -- but the doctor's name has been changed.
23    Q.  Let me pause there for a second.  There are two labels?
24    A.  There was -- it's two -- it's one big sheet.  It's two
25    parts.  One label goes -- there's a little label goes on the
```

1    prescription bottle.  That's the main label.  There's a

2    secondary label, like a little tag underneath, that gets put on

3    the hard copy itself.

4    Q.  Now, in this case, with respect to the new prescriptions,

5    was there a bottle?

6    A.  No.

7    Q.  What did you do with the label that would typically go on

8    the bottle?

9    A.  Destroy it.

10   Q.  What did you do with the other label?

11   A.  That little tiny label?

12   Q.  Yes.

13   A.  Put it on the new prescription.

14   Q.  Now, was that the typical practice at the time the original

15   prescription --

16   A.  Yes.  Yes, nothing was changed then.

17   Q.  Was it placed on the new prescription in the manner it

18   would have been placed on back when the original prescriptions

19   were issued?

20   A.  Yes.

21   Q.  What was the purpose of doing that, Mr. Goloff?

22   A.  Which part, putting the second label on or --

23   Q.  What was the purpose for these new prescriptions, of

24   putting that label on the prescription?

25   A.  To make it look like -- had to match what the doctor seen

F58elas3                          Goloff - direct.

1   and the patient's name, matching on that little auxiliary

2   label.

3   Q.  To make it look like a real prescription?

4   A.  Well, yes.  Correct.

5   Q.  Now, you have a bunch of new prescriptions when you're done

6   with this process, is that right?

7   A.  Say that again?

8   Q.  You have the new prescriptions --

9   A.  Right.

10  Q.  Correct?

11  A.  Correct.

12  Q.  Where, if anywhere, did you put those?

13  A.  Back in the file, away file.

14  Q.  When you say the "file" --

15  A.  It's the Class II narcotic files.

16  Q.  What was in those files typically at Hellertown Pharmacy?

17  A.  Yes.  They were in a drawer with all the files with the

18  C2 -- all the narcotic prescriptions on them.

19  Q.  Now, where specifically did you put the new prescriptions?

20  A.  In the C2 file.

21  Q.  Anywhere in the file?

22  A.  No.  When the order was -- when the order was filled, that

23  date, that number.  It wasn't placed -- on that date that we

24  altered it, we placed it on the original date that was filled.

25  Q.  Let's back up for a second.  How was the file kept?  Is it

F58elas3                          Goloff - direct.

1    chronological --

2    A.  Chronological, numerical by date.

3    Q.  So in order, oldest to newest?

4    A.  Say that again?

5    Q.  Oldest to newest, chronological order?

6    A.  Yes.

7    Q.  So you have the new prescriptions?

8    A.  Right.

9    Q.  They have multiple dates on them, is that right?

10   A.  On the new prescriptions?

11   Q.  Yes, sir.

12   A.  No.  It has the old -- on the new prescription, it has the

13   date that it was changed from the original one.

14   Q.  They have multiple prior dates, is that --

15   A.  Right.

16   Q.  When you went to the new -- when you went to the C2 file,

17   Mr. Goloff, where did you put the new prescriptions?

18   A.  Back in -- replace where the old one was.  Replaced the old

19   one with the new script, with the same prescription number, the

20   same date, but the doctors changed.  That's the only thing that

21   was changed.

22   Q.  In that file, when you do that, did you see the old

23   prescription?

24   A.  No.  We don't have -- didn't put the old one in there.

25   Q.  I'm not asking that, Mr. Goloff.  One second at a time.

F58elas3                          Goloff - direct.

1    A.  All right.

2    Q.  You go into the file?

3    A.  Uh-huh.

4    Q.  You look for the right date?

5    A.  Right.

6    Q.  You find the old prescription?

7    A.  Right.

8    Q.  Now you've got an old prescription, which is the real one;

9    you got a new prescription?  Yes?

10   A.  Yes.

11   Q.  Put the new one in the same place where the old one was?

12   A.  Right.

13   Q.  What did you do with the old one?

14   A.  Old one, we took it out, and I don't know what happened

15   afterwards.

16   Q.  Did you give it to anyone?

17           THE COURT:  What did you do with it?

18   A.  I did.  I put it on the desk.

19   Q.  Put it on which desk?

20   A.  My desk.

21   Q.  Was Ms. Lasher present when you did it?

22   A.  Yes, sir.

23   Q.  Mr. Goloff, I'm going to walk up to you.

24   A.  Sure.

25   Q.  I'll show you what's been marked for identification

F58elas3                          Goloff - direct.

1    Government Exhibit 1049.  Before opening it, just do you

2    recognize that form generally?

3    A.  Yes.

4    Q.  What is that, Mr. Goloff?

5    A.  That is the narcotic file.

6    Q.  Well, the entire file or a piece of it?

7    A.  What, one sticking out?

8    Q.  No, sir.  What you're holding in your hand, is that the --

9    A.  No.  That's not the whole file.  No.

10   Q.  That's a piece of the file?

11   A.  Right.  This has the numerical dates.  It's filed by

12   hundreds, hundred scripts in here.

13   Q.  Hundred scripts at a time?

14   A.  In each binder, yes.

15   Q.  By date?

16   A.  Right.

17   Q.  Would you recognize that from your time at Hellertown

18   Pharmacy?

19   A.  Yes.

20            MR. RICHENTHAL:  The government offers 1049.

21            MR. FREEMAN:  No objection.

22            THE COURT:  Received.

23            (Government's Exhibit 1049 received in evidence)

24   BY MR. RICHENTHAL:

25   Q.  Now, Mr. Goloff, there are some papers poking out the top.

F58elas3                          Goloff - direct.

1  Just to make this easier, can you pull those papers out?

2  A.  Well -- messier file.  Is it in -- all right.

3  Q.  It's all right if you mess it up.

4  A.  Okay, cool.

5  Q.  Had you pulled those papers out?

6  A.  Yes, I did.

7  Q.  You can look through them one at a time.  Take as much time

8  as you want.  Look up when you're done.

9  A.  Okay.

10  Q.  Have you looked at those, Mr. Goloff?

11  A.  Yes.

12  Q.  What are those?

13  A.  They're the prescriptions for tincture opium from -- for a

14  patient, Craig Hancheck (sic), signed off Eric Cochran, is the

15  doctor on some of them.  And the other one was one the

16  Dr. Craig H. wrote for himself.

17  Q.  I'd like you to separate those into two piles.

18  A.  All right.

19  Q.  Can you put in one pile the prescriptions you recognize you

20  were handed when you were asked to change the information.

21  Just put those to the side, all in one pile.

22        Have you done that?

23  A.  Yeah.

24  Q.  How many are in that pile?

25  A.  I got four that were changed.

F58elas3                          Goloff - direct.

1          MR. RICHENTHAL:  May I publish, your Honor.

2          THE COURT:  Yes.

3    A.   These are the ones you're talking about?

4          THE COURT:  There's no question.  If there's no

5    question, don't say anything.

6          THE WITNESS:  All right.

7    Q.   Mr. Goloff, I'm just going to give the jury some time.

8    A.   No problem.  (Pause)

9    Q.   Mr. Goloff, while the jury is continuing to look at those,

10   the subset that you just identified -- you don't have it.  The

11   jury has it.

12         The subset you just identified, were those all the

13   forged prescriptions you were given or just a smaller subset?

14         MR. FREEMAN:  Objection.

15   Q.   Were those all the prescriptions you were given?

16   A.   That went to the jury as now?

17   Q.   Yes.

18   A.   No.

19   Q.   You were given more than that?

20   A.   Yes, sir.

21   Q.   That's a subset?

22   A.   Mm-mm.

23         MR. FREEMAN:  Object to what he guesses.

24         THE COURT:  I'm not -- I think you may have misheard

25   him.

1           MR. FREEMAN:  He said I guess so.

2      A.   I didn't say I guess.  There's more.

3      Q.   Let's be clear, Mr. Goloff:  Were you given more than that

4      number?

5      A.   Yes.  That number the jury -- yes, I was.

6      Q.   You were given more than that?

7      A.   Yes.

8      Q.   When you went into the C2 file, what process are you using

9      to match the new prescriptions and the old prescriptions?

10     A.   Prescription number.

11     Q.   So let's use an example.  Just hypothetically, let's say

12     one of the new ones said 123456.  What are you looking for in

13     the file?

14     A.   Same number.

15     Q.   And you did that for every prescription you were handed?

16     A.   That's correct.

17     Q.   Now, those numbers, were those generated when the

18     prescriptions were issued in the past?

19     A.   Yes.

20     Q.   Not when you were handed them, the new ones?

21     A.   No, they couldn't be.  The new -- if I was handed the new

22     ones, the numbers weren't produced yet.

23     Q.   Now, let me just -- I'm going to wait another moment for

24     the jury to finish.

25           MR. FREEMAN:  Your Honor, could the court reporter

F58elas3                          Goloff - direct.

1    read back the last word?  The numbers weren't -- maybe your

2    Honor could read it.  I don't have the term.

3          THE COURT:  No, they couldn't be.  The new -- if I was

4    handed the new ones, the numbers weren't produced yet.

5          MR. FREEMAN:  Oh, produced.

6    Q.  What do you mean by that?

7    A.  If I could clarify myself, let me explain to the jury --

8    the Court?

9    Q.  Sure.

10   A.  The original prescription -- let's give you an example,

11   this one.

12   Q.  Just for the record --

13   A.  Just for clarification.

14   Q.  You're holding a prescription from Government Exhibit 1049?

15   A.  Right.  Let's say this prescription was 986.  We were given

16   a new prescription without any entry yet of under Dr. Cochran's

17   name, and the date this was on here, all right?  You following

18   me?  The date -- let's say this prescription was dated 5/3/11

19   and with this prescription number.  The number -- the new

20   prescription the ---that Cochran's name was under, would be --

21   I wouldn't say this particular prescription's file, one that's

22   under this.  Just change the doctor's name, and I'll say on the

23   new tag, it will say 96 -- 986 for this thing.  And the date

24   that was filled that could have been -- on the date that was

25   filled on this paper, put it on the new one.  That's the only

F58elas3                              Goloff - direct.

1    thing that was changed.

2              THE COURT:  I'm now getting more confused.

3              THE WITNESS:  It's not confusing.  It's hard to

4    understand.

5    Q.  Let me see if I can talk us through it.

6              THE COURT:  When you -- you went into the computer

7    system.

8              THE WITNESS:  Right.

9              THE COURT:  You generated a prescription -- well, in a

10   sense, it's a record of the prescription.

11             THE WITNESS:  Right.

12             THE COURT:  The prescription is really the handwritten

13   piece of paper.

14             THE WITNESS:  Right.

15             THE COURT:  So that you then take the new handwritten

16   piece of paper and enter information within the computer

17   system.

18             THE WITNESS:  Correct.

19             THE COURT:  You use the same date --

20             THE WITNESS:  Correct.

21             THE COURT:  -- as the original prescription.

22             THE WITNESS:  Correct.

23             THE COURT:  You change the doctor?

24             THE WITNESS:  Correct.

25             THE COURT:  You don't change anything else?

F58elas3                              Goloff - direct.

 1                THE WITNESS:  No.

 2                THE COURT:  Okay.  And now we're just -- the last

 3      questions were about what number is given to that.

 4                THE WITNESS:  The same number that was on the

 5      original.

 6                THE COURT:  Because you don't change that?

 7                THE WITNESS:  Right.  That's correct.

 8                THE COURT:  So then you take this new one and put it

 9      into the --

10                THE WITNESS:  The old file, the sequence --

11                THE COURT:  Called the C2 file?

12                THE WITNESS:  The sequence that it was.

13                THE COURT:  And substitute it for the one?

14                THE WITNESS:  That is correct.  You got it right on

15      the nail.

16                I'll make her a technician.

17                THE COURT:  In my next life.

18                THE WITNESS:  Okay.  You can have my job.  I've had

19      enough of this.

20                MR. RICHENTHAL:  Your Honor, may I take the

21      prescriptions back?

22                THE COURT:  Please.

23      BY MR. RICHENTHAL:

24      Q.  Mr. Goloff, I'm going to bring back to you the set that you

25      took, okay?

F58elas3                          Goloff - direct.

1    A.  Yes, sir.

2    Q.  Now, you just used as an example a prescription marked 986.

3    That's an example you just used, okay?

4    A.  Yeah.  It's right here.

5    Q.  Let's just go with your example.  You're holding in your

6    hand a prescription that's 986 --

7    A.  Yes, sir.

8    Q.  -- in your right hand?

9    A.  Yes.

10   Q.  Is that the original prescription, Mr. Goloff, or a new

11   one?

12   A.  This is the original that the doctor H wrote for himself.

13   Q.  How do you know that?

14   A.  That's my memory.  I'm looking at it.  Has his name.  The

15   prescription pad says, Craig Hancheck, and the patient says

16   Craig Hancheck.

17   Q.  I'm going to bring you the set back.  On the top, can you

18   compare the prescription number to the top prescription in the

19   set?

20   A.  Yes, correct.

21   Q.  How do they match, Mr. Goloff, if they do?

22   A.  Yes, they do.

23   Q.  They're the same number?

24   A.  Yes, sir.

25   Q.  Which one is the real one?

F58elas3                          Goloff - direct.

1    A.  The real one?

2            MR. FREEMAN:  Objection to the form of the question.

3            THE COURT:  Which is the first one?

4    Q.  Which is the real one?

5    A.  This is the first one.

6    Q.  In your right hand?

7    A.  Yes.

8    Q.  Who wrote -- we'll start over.

9            Mr. Goloff, you have two sets of prescriptions.  They

10   both are marked 986, correct?

11   A.  Correct.

12   Q.  Which one was the original?

13   A.  One in my right hand.

14   Q.  In your right hand, sir, who wrote that prescription?

15   A.  Dr. H.

16   Q.  In your left hand do you have another prescription with the

17   same number?

18   A.  Yes.

19   Q.  According to that piece of paper, who wrote that

20   prescription?

21   A.  According to the paper, Dr. Cochran.

22   Q.  Was that true?

23   A.  No.

24           MR. FREEMAN:  Objection.

25           MR. RICHENTHAL:  He has personal knowledge.

F58elas3                          Goloff - direct.

1   Q.  What's the date, Mr. Goloff, of the original prescription?

2   A.  5/3/11.

3   Q.  That's May 2011?

4   A.  Right.

5   Q.  The prescription in your left hand with the same number,

6   were you handed that in 2011 or 2012?

7   A.  No.

8   Q.  Mr. Goloff, the one in your left hand that says

9   Dr. Cochran --

10  A.  Right.

11  Q.  -- were you handed that in 2011 or in 2012?

12  A.  2011.

13  Q.  Mr. Goloff, let's break it down.

14  A.  It has -- all right.

15  Q.  I'm not asking you what it says.  I want to know when you

16  were handed the piece of paper in your left hand.

17  A.  Oh, that piece of paper, was it on that date?  No.

18  Q.  Right.

19  A.  It wasn't on May 16th of 2011.

20  Q.  Was it in 2011 at all?

21  A.  Yes, it was.

22  Q.  Was it after the inspection in 2012?

23  A.  It was after the inspection.

24  Q.  So let's go piece by piece.

25  A.  Oh.  I know what you're talking about now.  Yeah.

1    Q.  I want to be --

2    A.  This prescription --

3    Q.  Mr. Goloff, hold on.  We're going to take small steps.

4    A.  I understand.  Okay.

5    Q.  All right?  Let's start again.

6        You have a prescription in your right hand?

7    A.  Right.

8    Q.  You testified it's from May 2011?

9    A.  Mm-mm.

10   Q.  Yes?

11   A.  That has May 3, 2011.

12   Q.  So May 2011?

13   A.  Right.

14   Q.  In your left hand you have a prescription with the same

15   prescription number, is that correct?

16   A.  Correct.

17   Q.  I'm not asking you what it says on there.  I just want to

18   know, the one in your left hand, were you handed that in

19   May 2011?

20   A.  No.

21   Q.  You were handed that in 2012?

22   A.  Correct.

23   Q.  After the inspection?

24   A.  Correct.  There you go.

25   Q.  Do the prescription numbers match --

F58elas3                          Goloff - direct.

1   A.  Yes, sir.

2   Q.  -- on the prescriptions?

3   A.  Yes, sir.

4   Q.  Now, I want to show you -- you can put those down,

5   Mr. Goloff.

6           I want to walk up to you Government Exhibit 1045.

7   These are just photocopies?

8   A.  Sure.

9   Q.  Just leaf through it.  Tell me if you recognize the

10  photocopies.  I don't want you to tell me everything that's on

11  them.  I just want to know, do you recognize what they are?

12  A.  Yes, they are -- I do.

13  Q.  What are they, Mr. Goloff?

14  A.  They're prescriptions.

15  Q.  Well, let's be a little more precise.  Which prescriptions,

16  Mr. --

17  A.  From opium -- tincture of opium from Dr. Cochran.

18  Q.  Are these photocopies of prescriptions you were handed?

19  A.  No.  These are copies that we made.

20  Q.  Let me be more precise.

21  A.  I'm the one who made the copies.

22  Q.  Are these photocopies of prescriptions you were handed in

23  2012 after the inspection?

24  A.  Yes.

25           MR. RICHENTHAL:  The government offers 1045.

F58elas3                              Goloff - direct.

1                   THE COURT:  Mr. Freeman, there's --

2                   MR. FREEMAN:  One second.  No objection.

3                   THE COURT:  Received.

4                   (Government's Exhibit 1045 received in evidence)

5                   MR. RICHENTHAL:  Ms. Chen, could you put 1045 up,

6       please.  Could you turn to the prescription for May 2011, I

7       guess the fourth -- number 986 specifically.

8       BY MR. RICHENTHAL:

9       Q.  Mr. Goloff, a few moments ago I asked you some questions

10      about prescription 986.  Do you recall that?

11      A.  Yes, I do.

12      Q.  Is this a copy, just a scan, of the same prescription you

13      were holding in one of your hands?

14      A.  This is a copy of this one, yes.

15                  MR. RICHENTHAL:  Ms. Chen, can you put up 1046.

16      Q.  Mr. Goloff, on your screen now do you see two

17      prescriptions?

18      A.  Yes, I do.

19      Q.  Are they both number 986?

20      A.  They are both 986, but there was two different prescription

21      pads.

22      Q.  That's what I want to ask you, Mr. Goloff.  You were

23      answering some questions about prescription 986.

24      A.  Correct.

25      Q.  You're referring to one in your left hand and one in your

1   right hand.  Are these the two that you were referring to, just
2   copies, are these copies of the two you were referring to?
3   A.  Yes, they're copies.  They're the copies of the original --
4   the prescriptions that are in hard copies.  Because it has the
5   weight, and you see the legal, that's --
6   Q.  Now, the one on your left, Mr. Goloff --
7   A.  Yes.
8   Q.  -- that has the prescriber as Eric Cochran?
9   A.  Right.
10  Q.  Is that the one that you got in 2012?
11  A.  That's -- yes.
12  Q.  Can you direct the jury to where to find number 986.
13  A.  On the left-hand corner on the bottom, right there.  That's
14  the number 986.
15  Q.  Is that a sticker, Mr. Goloff?
16  A.  That's the sticker I was referring to that we put on each
17  prescription, nonnarcotic and narcotic.
18  Q.  Now, the one on the right?
19  A.  Right.
20  Q.  Do you have that original with you, Mr. Goloff?
21  A.  Yes, I do.  That's the one we were talking about earlier.
22  Q.  Where, if anywhere, is the label or sticker on the
23  original?
24  A.  It's on the back.
25          MR. RICHENTHAL:  Ms. Chen, could you go to the next

F58elas3                          Goloff - direct.

1    page, the one on the right.

2    Q.  Is that now on your screen, Mr. Goloff?

3    A.  Yes, sir.

4    Q.  Is that the back of what you're holding?

5    A.  Yes, sir.

6    Q.  Where is the 986 there?

7    A.  There's two of them.  There's one on the top, one on the

8    bottom.  These two right here.

9    Q.  Are they the ones that are highlighted now?

10   A.  Yes, sir.  Well, that's -- on the top one is a receipt

11   label that we have highlighted.  The second two labels were the

12   auxiliary label that we put on the scripts that were filled.

13   Q.  Mr. Goloff, you said the "receipt label."  Is that because

14   the customer was, in fact, given the prescription?

15   A.  At that time, no, they probably -- we put it on hold until

16   we came in to pay for it.

17   Q.  I just was pausing you.

18   A.  All right.

19   Q.  The one on the right had a receipt?

20   A.  Yeah.  The receipt's on the top.  Yeah.  That's the receipt

21   label, usually goes on the back.

22   Q.  Is that because the one on the right is the one that was,

23   in fact, dispensed in May 2012?

24   A.  Right.

25   Q.  That's correct?

F58elas3                          Goloff - direct.

1  A.  Yes.

2          MR. RICHENTHAL:  Could I have a moment, your Honor.

3  Q.  Mr. Goloff, are you familiar with the term fill date?

4  A.  Yes.

5  Q.  What is the fill date?

6  A.  That's the exact date that we -- the date we dispensed the

7  medication.

8  Q.  That's the date it's literally filled?

9  A.  Right.

10  Q.  Sticking with the prescription on the right, do you still

11  have that on your screen, Mr. Goloff?

12  A.  Yeah.  I'm looking at it on the screen.

13  Q.  What's the fill date of the original prescription?

14  A.  5/16/11.

15  Q.  May 16, 2011?

16  A.  Correct.

17  Q.  Now, could you look at the prescription on the left.

18  A.  Right.

19  Q.  The new one.  What's the date?

20  A.  The written date or the date filled?

21  Q.  Either.

22  A.  The date filled was 5/16, but the written date is different

23  than the original one.

24  Q.  One at a time.  What's the date, 5/16?

25  A.  5/16 that was filled -- you're asking me the fill date, not

F58elas3                          Goloff - direct.

1   the written date, correct?

2   Q.  Asking for the fill date.

3   A.  5/16.

4   Q.  Do they match?

5   A.  Yes.

6          MR. RICHENTHAL:  Ms. Chen, can you highlight the fill

7   date, please.

8   A.  It's highlighted now.

9   Q.  Is it now highlighted, Mr. Goloff?

10  A.  Yes.  That is correct, sir.

11  Q.  Just for clarity, on the left there's now two things

12  highlighted.  The prescription number, yes?

13  A.  Yes, sir.

14  Q.  And the fill date?

15  A.  Correct.

16  Q.  How do those two things compare to the prescription on the

17  right?

18  A.  Well, if you turn it the other way around, that's the same

19  thing.  On the fill date, the fill date and the number is the

20  same thing.

21  Q.  They match?

22  A.  Yes, sir.

23  Q.  Now, Mr. Goloff, do you see to the right of the number two

24  letters, SG?

25  A.  Yes, I do.

1   Q.  Do you know what those mean?

2   A.  That's my initials, the pharmacist that filled it.

3   Q.  The pharmacist who filled it?

4   A.  Correct.

5   Q.  Now, you testified earlier that you were not the only

6   pharmacist who filled opium tincture for Dr. H.  Do you recall

7   that?

8   A.  Yes, I do.

9   Q.  What, if anything, was done to ensure that the new

10  prescriptions matched the pharmacist that had filled the old

11  prescriptions?

12  A.  You would have to change the initials of the pharmacist on

13  the computer.

14  Q.  From SG to the initials of the person who, in fact, filled

15  it?

16  A.  That is correct, sir.

17  Q.  Was Dan Geiger a pharmacist who filled at least one of the

18  prescriptions?

19  A.  Yes, he was, sir.

20  Q.  For Dr. H?

21  A.  That's correct.

22  Q.  So his initials would be DG?

23  A.  That is correct.

24  Q.  Now, would you and Ms. Lasher work to create these labels?

25  A.  The ones you're producing now on the screen?

1    Q.  Yes, sir.

2    A.  I was the one who sort of worked.  She was helping me out,

3    putting the stickers on.

4    Q.  She was helping you out?

5    A.  Yes.

6    Q.  You were helping her?

7    A.  Correct.

8    Q.  Was an effort made to say DG, not SG?

9    A.  Yes, we did.

10   Q.  Why?

11   A.  Because I wasn't the one filling the prescription at that

12   date, the original date, yes.

13   Q.  So it had to match the original?

14   A.  That is correct, sir.

15            MR. RICHENTHAL:  You can take those off the screen.

16   Q.  Did there come a time after what we've been talking about

17   when Ms. Lasher was arrested?

18   A.  Yes.

19   Q.  Soon after that did she instruct you to do anything?

20   A.  She asked me and other employees to write a letter in good

21   faith expressing her pharmacy ethics and liability as a good

22   employer, good faith amendment -- good faith letter about her.

23   Q.  What, if anything, did she say your agreeing to write this

24   letter would demonstrate?

25   A.  Who's on her side and who's with her.

F58elas3                              Goloff - direct.

```
 1    Q.  Did you agree to write the letter?

 2    A.  Yes, I did.

 3    Q.  Why?

 4    A.  Because I thought I'd be losing a position.

 5    Q.  Did she tell you to send the letter directly to anyone

 6    other than herself?

 7    A.  No.

 8    Q.  She told you to give it to her?

 9    A.  Correct.

10    Q.  I want to show you what's been marked for identification as

11    Government Exhibit 3003.  Do you recognize that, Mr. Goloff?

12    A.  Yes, I do.

13    Q.  What is that?

14    A.  It's a letter I sent out that she wanted me to propose what

15    I was just talking about.

16    Q.  Was this the draft of the letter she asked you to write?

17    A.  This is my own words.  She didn't express to me how to

18    write it.  Just expressed to me about the content.

19    Q.  Let me break those into two pieces.

20    A.  Sure.

21    Q.  She said express to you about the content.  You mean she

22    told you the facts, content?

23    A.  No.  She just told me what ideas I should write.

24    Q.  What ideas you should write?

25    A.  Yeah.
```

F58elas3                           Goloff - direct.

1    Q.  She wanted it in your own words?

2    A.  Of course, which I did.

3    Q.  Did you put her ideas in your words?  Excuse me.  Did you

4    put her ideas in your words?

5    A.  I just put -- no.

6    Q.  Let me back up.

7    A.  I'm sorry.

8    Q.  She wanted you to express certain things, is that right?

9    A.  Correct.

10   Q.  But in your own words?

11   A.  Right.

12   Q.  Did you do that in the piece of paper you're holding?  Did

13   you do what you were told?

14   A.  Yes.  I did what I was told.

15           MR. RICHENTHAL:  The government offers 3003.

16           MR. FREEMAN:  No objection.

17           THE COURT:  Received.

18           (Government's Exhibit 3003 received in evidence)

19   BY MR. RICHENTHAL:

20   Q.  Approximately when did this happen, Mr. Goloff?

21   A.  About two days after the arrest maybe.  I'm not sure exact

22   date, approximately.

23   Q.  Mr. Goloff, I'm going to show you something.  I don't want

24   you to read it aloud.

25   A.  Sure.

F58elas3                          Goloff - direct.

1    Q.  I just want you to look at it, and then look up when you're

2    done.  Let me know if that refreshes your memory as the

3    approximate date Ms. Lasher instructed to you write this

4    letter.

5    A.  (Pause)

6    Q.  I'm going to ask you to look at the bottom, but, again,

7    just look silently.  Look up when you're done.

8    A.  All right.

9    Q.  Does that refresh your memory as to the approximate date

10   Ms. Lasher asked you to write this letter?

11   A.  Yes.

12   Q.  What date, Mr. Goloff?

13   A.  Well, here it says December.

14   Q.  Mr. Goloff, I'm not asking you what it says.  I want to

15   know, does this refresh your memory?  Does this help you

16   remember when it happened?

17   A.  Yes.

18   Q.  When did it happen?

19   A.  The day she told me to write the letter.

20   Q.  When was that, Mr. Goloff?

21   A.  December 3rd.

22   Q.  Of 2012?

23   A.  Right.

24   Q.  I'm going to take that back from you.

25            Now, I believe that -- let me back up for a second.

F58elas3                          Goloff – direct.

1    Can we go to 3003.  Actually, may we publish 3003, your Honor.

2    I don't think I asked that.

3              THE COURT:  I don't think you did.

4              MR. RICHENTHAL:  May we do so?

5              THE COURT:  Sure.

6    BY MR. RICHENTHAL:

7    Q.  This is your letter, Mr. Goloff?

8    A.  Yes, it is.

9    Q.  This is unsigned.  Did you also sign a copy?

10   A.  Yes, I did.

11   Q.  Where did you put the signed copy?

12   A.  On her desk.

13   Q.  Whose desk?

14   A.  Lena Lasher's desk.

15   Q.  Now, Mr. Goloff, I want to direct you to the sentence that

16   says, she's always been very kind, understanding and caring.

17             At the time you wrote this, Mr. Goloff, did you feel

18   those things?

19   A.  No.

20   Q.  Now, the next line, as a pharmacist, she's a very

21   professional person.

22             At the time you wrote this, Mr. Goloff, did you agree

23   with that?

24   A.  No.

25   Q.  Next line, Lena has followed all state and federal laws I

F58elas3                          Goloff - direct.

1   know of to an accurate degree.

2          At the time you wrote that, Mr. Goloff, did you

3   believe that?

4   A.  No.

5   Q.  Why did you sign this letter, Mr. Goloff?

6   A.  To protect my position there so I could have a position at

7   the moment.  I wouldn't get reprimanded or repercussions would

8   occur.

9          MR. RICHENTHAL:  You can take it off the screen,

10  Ms. Chen.

11  Q.  Mr. Goloff, do you know an individual named Amber Hibbler?

12  A.  Yes.

13  Q.  Or Amber Sosa?

14  A.  Yes.

15  Q.  Is that the same person?

16  A.  Yes.  I think she got married.

17  Q.  Was she present when Ms. Lasher told you to write this

18  letter?

19  A.  Yes, she was.  I remember that.

20  Q.  Did Ms. Lasher give her any instruction at that time?

21  A.  The same.

22          MR. FREEMAN:  Objection.

23  Q.  Mr. Goloff, were you present for this?

24  A.  Yes.

25  Q.  Did you hear Ms. Lasher give Ms. Hibbler an instruction?

F58elas3                              Goloff - direct.

1    A.  Yes.

2    Q.  What was the instruction?

3    A.  To write a letter like I did.  We were in the same room at

4    the same time.

5    Q.  How did Ms. Hibbler react?

6    A.  Very upset about it afterwards.

7    Q.  After you wrote the letter, did there come a time when you

8    began to meet with the United States Attorney's Office?

9    A.  Yes, sir.

10   Q.  Did you also provide materials to the Drug Enforcement

11   Administration?

12   A.  Yes, sir.

13   Q.  DEA?

14   A.  Yes, sir.

15   Q.  Did there come a time after that when you learned a

16   complaint had been filed against you with the Commonwealth of

17   Pennsylvania?

18   A.  Six months later.

19   Q.  How did you learn a complaint had been filed against you?

20   A.  An inspector came to my door and presented me with --

21           MR. FREEMAN:  Objection to what the --

22           THE COURT:  Inspector -- physical description.

23   Q.  Mr. Goloff, what did you see?  What happened?

24   A.  I saw the complaints in writing about myself.

25   Q.  At your door?

F58elas3                          Goloff - direct.

1    A.  In my home.

2    Q.  Who showed that to you?

3    A.  The inspector.

4    Q.  From where?

5    A.  Pennsylvania State of Professional Affairs, Complaint

6    Division.

7    Q.  I'm not going to ask you the details, but did you see the

8    allegations in the complaint?

9    A.  Yes, sir.

10   Q.  Were the allegations connected to your time at Hellertown

11   or Hellertown Pharmacies?

12   A.  Yes, sir.

13   Q.  Who did you understand to have filed the complaint?

14   A.  Lena Lasher.

15   Q.  What effect did that have on you?

16   A.  Very upset, disgruntled.

17   Q.  What's your understanding of what happened in the

18   complaint?

19   A.  About a month -- or a year later, the charge, one of the

20   charges was dropped and the whole thing was dropped.  Just a

21   warning.  Nothing was reprimanded against my license.  No

22   punishment, no criminal action or anything like that.

23   Q.  To your understanding was that complaint done with?

24   A.  Hopefully, yes.  As far as I know, it's done, yes.

25   Q.  Now, Mr. Goloff, I want to talk about one allegation.

F58elas3                              Goloff - direct.

1    A.  Sure.

2    Q.  Did one of the allegations in the complaint involve you

3    providing a tablet of Fioricet to someone?

4    A.  That is correct, sir.

5    Q.  What was the allegation, Mr. Goloff?

6    A.  That I presented the -- I gave the patient -- technician a

7    prescription drug without a prescription, one pill, because she

8    had a severe headache and she told me she was on it.

9    Q.  You said the allegation was that you gave a technician one

10   pill of Fioricet?

11   A.  Correct.

12   Q.  And the technician didn't have a prescription?

13   A.  That is correct.

14   Q.  In response to a request that the technician wanted it for

15   a headache?

16   A.  Correct.

17   Q.  Was that allegation true, Mr. Goloff?

18   A.  Yes, it is true.

19   Q.  You did that?

20   A.  I did it physically.  Did it, honest, to be honest.

21   Q.  Why did you do that?

22   A.  Because she was nagging me to death, and I can't say no to

23   this certain person.

24   Q.  Had you ever done that before; that is, given any

25   technician --

F58elas3                              Goloff - direct.

1    A.  No.

2    Q.  -- a drug without prescription?

3    A.  No.

4    Q.  Did you tell anyone you'd done it afterwards?

5    A.  Yes, I did.

6    Q.  Who did you tell?

7    A.  Ms. Lasher.

8    Q.  Have you done anything else over your time as a pharmacist

9    that wasn't proper?

10   A.  Yes.

11   Q.  What did you do, Mr. Goloff?

12   A.  I had to take medication for my wife, who was suffering

13   pain, endometriosis.  In between her regular physician's

14   visits, she did not get to the doctor.  So I had to take some

15   pills from my position and help her ease her pain.  She was in

16   chronic pain condition and severe pain.

17   Q.  When did you do that, Mr. Goloff?

18   A.  Sixteen --

19   Q.  Approximately.

20   A.  Sixteen years ago.

21   Q.  Did you pay for those pills, Mr. Goloff?

22   A.  No.

23   Q.  Why not?

24   A.  I forgot.  I didn't -- at the time it was trying to get the

25   pills to her, and I had -- it was a rush to get them to her.

F58elas3                          Goloff - direct.

1   Q.  Did you pay the pharmacy back for them?

2   A.  Yes, I did, direct.  Paid back the fine and the pill -- the

3   cost of the medication.

4   Q.  Have you ever not paid for other pills?

5   A.  One for myself.  I was rushed out -- they wanted to close

6   the store.  I didn't have time to pay for it.  My wife was in

7   critical condition.  She almost died.  She had a blood

8   transfusion.  And I had to get my own medication out, and they

9   just caught me without paying for it.  And then all this other

10  accusations came back about her medicines.  I had to confess to

11  that.

12  Q.  Let's just be clear.  When you were caught, did you tell

13  them what you'd done?

14  A.  Yes.

15  Q.  Did you pay them back?

16  A.  Yes, sir.

17  Q.  Have you ever not paid for anything else?

18  A.  There was a time of my -- my pets had severe lice -- not

19  lice, flea problem.  And I took medicine for that from two

20  different chain stores.  I wrote a note I was going to pay it

21  back.  The note disappeared.  The loss prevention people got

22  wind of it, and I said I would pay back.  And they didn't want

23  me to do that.  I paid them back.  They didn't want me to

24  continue working there.

25  Q.  What did you take, Mr. Goloff?

F58elas3                        Goloff - direct.

1    A.  It was for Frontline.  It was for fleas.

2    Q.  Why did you pay for that?

3    A.  I didn't have the money at that time, and I was desperate.

4    I was in desperate need to fix these animals.  They were really

5    sentimental to me because my wife left -- died that year, and I

6    wanted to keep them going -- alive.

7    Q.  Did you pay the pharmacy back after that?

8    A.  Yes, I did.

9    Q.  Now, Mr. Goloff, did you volunteer to testify today or were

10   you subpoenaed?

11   A.  I was subpoenaed.

12   Q.  Are you testifying under any kind of agreement?

13   A.  Yes.  It was an agreement of -- nonprosecution agreement

14   from the attorney -- from the US government.

15   Q.  What's your understanding of what that agreement is?

16   A.  It would -- I wouldn't be -- anything I say won't be

17   charged against me, according to activities at Hellertown

18   Pharmacy and the medication I dispensed to the technician, and

19   the cover me with the letter I sent to the state board.

20   Q.  Let's just be precise, Mr. Goloff.  There's three subjects

21   what you did at the pharmacies.

22   A.  Correct.

23   Q.  The letter to Pennsylvania --

24   A.  Right.

25   Q.  -- you testified about.  And the tablet of Fioricet?

F58elas3                        Goloff - direct.

1    A.  That is correct.  That's what's in the agreement, my copy.

2    Q.  Anything else?

3    A.  No.

4    Q.  What did you agree to do in return, if anything?

5    A.  Give the government actual facts, exact dates and stuff and

6    cooperate with them with the investigation.

7    Q.  Does the agreement require you to be honest?

8    A.  Yes.

9    Q.  About Ms. Lasher?

10   A.  Yes.

11   Q.  About yourself?

12   A.  Yes.

13   Q.  About anything you've been asked today?

14   A.  Yes.

15   Q.  About anything Mr. Freeman asks you?

16   A.  Yes.

17   Q.  About anything I may ask you, if I choose to ask you more

18   questions?

19   A.  Sure.

20   Q.  Does the agreement protect you if you lie in response to

21   any question?

22   A.  No.

23   Q.  Does it protect you if you provide misleading testimony --

24   A.  No.

25   Q.  -- in response to any question?

F58elas3                        Goloff - direct.

1    A.  Not at all.

2    Q.  Does it protect you only if Ms. Lasher is convicted?

3    A.  No.

4    Q.  Mr. Goloff, I've shown you a bunch of different things

5    before the break and after the break.  Other than what I've

6    shown you, do you know what evidence is being introduced in

7    this trial?

8    A.  Yes.

9    Q.  How do you know that, Mr. Goloff?

10   A.  You showed me before some of the evidence.  I was going

11   over it with you.

12   Q.  Let's be precise.

13   A.  I'm not sure what you're asking me.

14   Q.  I'll do better.  I'll ask you a better question.

15           Before you testified today were you shown some

16   materials?

17   A.  Yes, sir.

18   Q.  Were those the materials you're talking about?

19   A.  Yes, sir.

20   Q.  Then in court today were you shown some materials?

21   A.  Yes.

22   Q.  So there was two sets of materials?

23   A.  Right.

24   Q.  Other than those materials, do you know what evidence the

25   government has, if any?

 1  A.  No.

 2  Q.  Beyond that?

 3  A.  Not to my knowledge.  The only ones you showed me and the

 4  ones in court.

 5  Q.  Now, other than what I've shown you in court, do you know

 6  what evidence has been shown to this jury?

 7  A.  Just today.  Those prescriptions.

 8  Q.  Just what I've shown you?

 9  A.  Yes, correct.

10          MR. RICHENTHAL:  Could we have a moment, your Honor.

11          THE COURT:  Yes.  (Pause)

12          MR. RICHENTHAL:  Thank you, Mr. Goloff.  No further

13  questions.

14          THE WITNESS:  You're welcome.

15          THE COURT:  Stay.  Mr. Freeman gets to ask.

16          THE WITNESS:  I know, I know.  I've seen this on TV.

17          THE COURT:  This is the fun part.

18          THE WITNESS:  I know, unfortunately.  I plead the

19  Fifth.  That's a joke.

20  CROSS EXAMINATION

21  BY MR. FREEMAN:

22  Q.  Just tell me when you're ready.

23  A.  I'm ready, any time.

24  Q.  Okay.  Me, too.  Mr. Goloff?

25  A.  Yes.

1    Q.  You testified that Lena Lasher asked you to write a letter,

2    correct?

3    A.  Correct.  To who?  I wrote several letters.

4            THE COURT:  You know what, it would be so much better

5    if you just listen to Mr. Freeman's questions and only answer

6    what he asks you.  Don't speak, if there's no question pending.

7            THE WITNESS:  All right, fine.

8            MR. FREEMAN:  Thank you, Judge.  Let's see how we do.

9            THE COURT:  All right.

10   BY MR. FREEMAN:

11   Q.  Ms. Lasher asked you to write a letter endorsing her good

12   faith?

13   A.  Correct.

14   Q.  And she asked you to write the letter?

15   A.  Yes.

16   Q.  And you testified here today that you wrote it because you

17   were afraid of losing hours?

18   A.  Correct.

19   Q.  Did Ms. Lasher ever cut your hours?

20   A.  Yes.

21   Q.  When?

22   A.  A few months ago.  Couple months ago.

23   Q.  You don't mean to --

24   A.  I don't know exact date.

25   Q.  And how many hours did she cut?

1    A.  Ten.

2    Q.  What was it for?

3    A.  Not listening to her.  Other things I don't remember.

4    Q.  And when you wrote the letter endorsing her good faith,

5    she'd already been arrested, correct?

6    A.  Yes.  When that -- when I wrote the good faith letter, she

7    was arrested and she was on bail.

8    Q.  And you thought that she had the ability to cut your hours?

9    A.  Yes.

10   Q.  Do you know who Peter Riccio is?

11   A.  Yes, I do.

12   Q.  He's the owner, right?

13   A.  Correct.

14   Q.  He's the real boss, right?

15   A.  To my knowledge, no.  She said she's the boss of the

16   pharmacy.

17   Q.  She said she's the boss of the pharmacy?

18   A.  Right.

19   Q.  In fact, she said to you on one occasion that she was an

20   owner, right?

21   A.  That is correct.

22   Q.  And then she changed it and told you she's just a

23   supervisor, right?

24   A.  That's correct.

25   Q.  How long have you been a pharmacist?

1   A.  Since '75.

2   Q.  And you've worked a lot of places?

3   A.  Yeah.  That's correct, sir.

4   Q.  Were you afraid of Lena Lasher?

5   A.  When?

6   Q.  At any time.

7   A.  Yes.

8   Q.  Because she was going to cut your hours?

9   A.  Correct.

10  Q.  You were a pharmacist who was also in charge of the

11  pharmacy when you worked there, correct?

12  A.  No, I wasn't in charge.

13  Q.  What about when Lena Lasher wasn't there?

14  A.  I was -- I was present as the pharmacist in charge, but I

15  wasn't as a supervisor, as it was following out policies of

16  Lena Lasher.

17  Q.  What about when you were there and she wasn't there and

18  there were techs there?  Who was giving the instructions then?

19  A.  I was, through her instructions.  I was following her

20  orders through me.

21  Q.  On the day-to-day basis, when she's not in the pharmacy and

22  you're there, you're in the pharmacy and there are people under

23  you as pharmacy techs, who's telling them what to do?

24  A.  Lena is, through me.

25  Q.  So you're just a puppet?

F58elas3                        Goloff - cross

1   A.   That's correct, sir.

2   Q.   You saw the people in the back of the pharmacy, Hellertown

3   Pharmacy, putting together envelopes to send to people around

4   the country?

5   A.   That is correct.

6   Q.   And did that bother you?

7   A.   It bothered me because why are they getting this certain

8   type of medicine after customers?

9   Q.   So what did you do about it?

10  A.   Nothing really.  It's part of the job.  I just went through

11  it.

12  Q.   When you started working at Hellertown Pharmacy, you

13  testified that Lena Lasher interviewed you?

14  A.   Yes.

15  Q.   Isn't it also true that you interviewed with Riccio?

16  A.   That is correct.

17  Q.   You didn't mention that on direct examination, did you?

18  A.   You're right.  It was a --

19  Q.   And didn't Riccio --

20       MR. RICHENTHAL:  Your Honor, Mr. Goloff should be

21  permitted to finish his answer.  He was literally in the middle

22  of a sentence.

23       THE COURT:  Just finish.

24       THE WITNESS:  When I was interviewed by Mrs. Lasher,

25  she sat me down in a chair and through a video -- through an

1    Internet -- through the camera, Mr. Riccio got on the phone and

2    just looked at me and asked me a couple questions.  It wasn't

3    really an interview -- you know, how old am I?  Can I do this?

4    That was it.

5    Q.  Do you know who made the final decision?

6    A.  No, I don't.

7    Q.  Have you ever met Riccio in person?

8    A.  Yes, sir.

9    Q.  And didn't you describe him as somebody who yelled a lot?

10   A.  He was very verbal.

11   Q.  But did he raise his voice?

12   A.  Yes.

13   Q.  Who did he raise his voice at?

14   A.  To technicians and me.

15   Q.  And also Lena Lasher, correct?

16   A.  Yeah, that is correct.  I heard a friend.  Conversation by

17   my end, not her end.

18           MR. RICHENTHAL:  Your Honor, I think Mr. Goloff is

19   saying he only heard one side of the conversation.

20           THE WITNESS:  That is correct.

21           MR. RICHENTHAL:  And he may be assuming what happened

22   on the other side.

23   Q.  But you heard Riccio raise his voice talking to Lasher?

24   A.  Yes, I did.

25   Q.  And to techs and to pharmacists?

F58elas3                    Goloff - cross

```
 1   A.  Yes, sir.

 2   Q.  Do you know Carl Riccio?

 3   A.  Yes, I do.

 4   Q.  Did you meet him?

 5   A.  Yes.  He came to the store several times.

 6   Q.  And wasn't he the manager of the stores?

 7   A.  No.

 8   Q.  What was his role?

 9   A.  As far as I knew, he was just a lawyer for the corporation.

10   Q.  Riccio's corporation?

11   A.  Yeah, Riccio's corporation.

12   Q.  And who was Sandra Arnao?

13   A.  She was a technician from Towne Pharmacy.

14   Q.  Was she in charge of anything?

15   A.  Not to my knowledge, it --

16   Q.  Wasn't she --

17           MR. RICHENTHAL:  Your Honor, Mr. Goloff was, again, in

18   the middle of a sentence.

19           THE COURT:  The question was:  Was she in charge of

20   anything?  And you said no?

21           THE WITNESS:  No, not at all.

22   Q.  Was there anything else you wanted to add?

23   A.  Well, Mrs. Sandra used to give out -- come to our store

24   from Towne and give orders that technicians have to work the

25   system better, faster.  And she was like, I don't know, what
```

1    you call henchman or something like that, in terms like that.

2    Q.  A henchman?

3    A.  You know, like a sergeant in arms, you know, to carry out

4    orders.  I don't know how to --

5    Q.  So she was pushing people to work faster?

6    A.  Correct, sir.  And what orders to get out.  She would come

7    in like in a period of time, she would come in once a day with

8    a group of people from Towne Pharmacy.

9    Q.  And did you understand that she was getting her

10   instructions from Riccio?

11   A.  I -- I don't want to assume, but I don't -- I don't know

12   exactly.

13           THE COURT:  We don't do assuming.

14           THE WITNESS:  Okay.  That's correct.  I don't know.

15   Q.  But she was from which pharmacy?

16   A.  Towne Pharmacy.

17   Q.  And did you work in Towne Pharmacy?

18   A.  Not at all.

19   Q.  Did Riccio work in Towne Pharmacy?

20   A.  Not to my knowledge.

21   Q.  Did he work in any of the pharmacies?

22   A.  Not to my knowledge.

23   Q.  You worked at Hellertown for approximately a year and a

24   half?

25   A.  That is correct, sir.

1   Q.  And we were just talking about how you were hired?

2   A.  Correct.

3   Q.  And you were hired as a full-time pharmacist?

4   A.  That is correct, sir.

5   Q.  And regardless of what you called it when you were at

6   Hellertown Pharmacy and Lena Lasher wasn't there, you were the

7   pharmacist?

8   A.  Yeah.  At the day, yes.

9   Q.  Correct?

10   A.  Yes.

11   Q.  And if something happened at the pharmacy, you would have

12   to make a decision as to what to do?

13   A.  Correct.

14   Q.  And there were people packing envelopes of three kinds of

15   medication in particular at Hellertown, correct?

16   A.  Yes.

17   Q.  And you knew about it?

18   A.  Yes.

19   Q.  And when you first started at Hellertown, did you feel

20   comfortable being a pharmacist working there?

21   A.  In the -- yeah, in the beginning I was.  A little bit,

22   for -- I got a position.  You know, I was happy working at the

23   store in general.

24   Q.  Fair enough.  You were happy working.  But you were part of

25   an Internet pharmacy or fulfillment center, correct?

F58elas3                         Goloff - cross

1   A.  Yes, correct.

2   Q.  And when you were working there, at the beginning, you did

3   not feel uncomfortable, correct?

4   A.  I was a little uncomfortable with the type of medications

5   that were being sent out, sir.

6   Q.  At the very beginning?

7   A.  Yes, sir.

8   Q.  And who did you tell, if anyone?

9   A.  I really didn't tell anybody.

10  Q.  So is this a fair statement, that you didn't feel so

11  uncomfortable that you had to tell anybody?

12  A.  No.

13  Q.  You didn't quit?

14  A.  No.

15  Q.  You didn't tell anybody.  How long into the 18 months that

16  you worked at Hellertown, how long did you feel

17  uncomfortable -- well, withdrawn.  Let me rephrase the

18  question.

19          In the 18 months -- let's use it as a timeline -- how

20  long before you started to feel slightly uncomfortable?

21  A.  About three or four months in.

22  Q.  Did your discomfort grow as time went on?

23  A.  Yes, it had.

24  Q.  So would it be fair to say nine months, you felt more

25  uncomfortable than at three or four months?

F58elas3                        Goloff - cross

1    A.  Yes, fair to say.

2    Q.  Did you quit?

3    A.  No.  I looked for other positions, but they fell through.

4    Q.  Did you complain to anyone?

5    A.  In particular pertaining to what?

6    Q.  Well, about your discomfort.

7    A.  Yeah.  I talked to the technicians about it, and everybody

8    was complaining.  Wasn't just me.  What you going to do?

9    Q.  You weren't the only one that felt uncomfortable?

10   A.  That is correct.

11   Q.  Now, at this point are you feeling uncomfortable because of

12   Lena Lasher's management style; was that fair to say?

13   A.  No -- I was uncomfortable with her management style, yes.

14   Q.  And were you also feeling uncomfortable because of the

15   medication issue?

16   A.  Yes.

17   Q.  And when did you start looking for other work?

18   A.  Constantly.  I don't remember a date.

19   Q.  Was your commute a substantial one to get to Hellertown?

20   A.  It sure was.

21   Q.  It was, wasn't it?

22   A.  I would say so.

23   Q.  And wasn't that a reason that you were looking for other

24   work?

25   A.  That is one of the reasons, yes.

1   Q.  You testified that you were in the -- withdrawn.

2            Were you working mostly in the front with walk-ins or

3   were you working mostly in the back with the online pharmacy?

4   A.  Doing both, really.  I mean, can't give you a percentage,

5   but most of the time -- most of the -- part of the work, it's

6   like 80, 90 percent, was Internet and walk-ins.  I only did

7   like ten or twelve a day.  So when they came in, I did what I

8   had, stopped checking orders from the back and came up and

9   filled the people that walked in, the prescriptions.  So that's

10  a good majority of the time was in the back most of the time.

11  Q.  These items here -- I'm holding one in my hand -- it's

12  1035-1 -- is that called a tote?

13  A.  That is correct, sir.

14  Q.  Is that standard in the pharmacy industry to use a tote?

15  A.  No.

16  Q.  But --

17  A.  Those totes came from the wholesaler that were -- purchased

18  medication from the wholesaler shipped to us.

19  Q.  So at the other pharmacies where you worked, they didn't

20  have totes?

21  A.  No.  We never used a tote.  We never are to do that.  They

22  weren't a tool to dispense medication.

23  Q.  All right.  So -- but you are familiar with a tote?

24  A.  Yes, that -- that tote, the tote, yeah.  But not for

25  purpose, yes.

1  Q.  It came from which wholesaler distributor?

2  A.  McKesson pharmaceuticals.

3  Q.  And was that -- McKesson is such a distributor?

4  A.  That is what -- they're the biggest one in the country.

5  Q.  And the instructions you were given were to fill these

6  totes with medication?

7  A.  That is correct.

8  Q.  And the instructions you were given were to fill the

9  medication so that when it was sent out, it was ready to go?

10  A.  That is correct.

11  Q.  Did you have occasion to inspect these totes or look into

12  them?

13  A.  Yes.

14  Q.  And you did that?

15  A.  Yes.

16  Q.  To your knowledge, were empty manufacturers' bottles in

17  each of the totes?

18  A.  Yes, sir.

19  Q.  And the reason the manufacturers' bottle was in the tote

20  was so that you and other people in the pharmacy could know

21  what kind of medication was in there?

22  A.  That is correct.

23  Q.  Including the expiration date, including the lot number --

24  you don't have to look here.  You can look at me.

25  A.  I'm looking at you.

F58elas3                          Goloff - cross

1   Q.  Good.  So, do you understand that the empty manufacturers'

2   bottle had on it the expiration date, the lot number, the kind

3   of medication, how much medication was in the original bottle,

4   which was now empty?

5   A.  Yeah.  That bottle -- doesn't pertain to all those pills.

6   It could mix/match.  In other words, to fill one tote, we could

7   use multiple empty bottles.  Multiple empty bottles might have

8   different expiration dates on them.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F58sLAS4                      Goloff - cross

```
1    BY MR. FREEMAN:
2    Q.  It might?
3    A.  Yes.
4    Q.  But it also might be the case that all the medication in
5    this particular tote has the same lot number and the same
6    expiration date?
7    A.  Not all of it, no.
8    Q.  It's impossible?
9    A.  That technically is impossible.
10   Q.  Technically?
11   A.  Yes, because if you took -- to fill up that tote, let's say
12   we need five bottles.  Now five bottles, we might have the
13   same, depends on how we --
14   Q.  That's just what I said.  I asked you --
15   A.  Yeah.
16   Q.  -- if is it possible, if you need five manufacturer's
17   bottles --
18   A.  Right.
19   Q.  -- and they have all the same lot numbers, all the same
20   expiration dates, all the same medication, if you use the same
21   five, then all the medication in the tote is going to be the
22   same?
23   A.  That's correct.
24   Q.  At any time while you were working at Hellertown, was there
25   also a piece of paper --
```

```
 1    A.  Yes, there was.

 2              THE COURT:  Let him finish the question.

 3              THE WITNESS:  I thought he was done.

 4              THE COURT:  Put a piece of paper in the sky?

 5              THE WITNESS:  No.

 6    BY MR. FREEMAN:

 7    Q.  Was there a piece of paper in the tote?

 8    A.  Yes, sir.

 9    Q.  And do you recall as you sit here what was on the piece of

10    paper?

11    A.  Yes, sir.

12    Q.  Tell me.

13    A.  The technician's initials, pharmacist's initials,

14    expiration date, the date of the bottle, and sometimes, down

15    the road, a lot number, and the date that the tote was

16    prepared.

17    Q.  You just said sometimes the lot numbers.  How was it

18    determined whether the lot number was on that piece of paper or

19    not?

20    A.  We started not doing it, then we determined it would be

21    more accurate to put lot number on there.

22    Q.  Who is "we?"

23    A.  The technicians and everybody else.

24    Q.  Including you?

25    A.  Yes, including me.
```

F58sLAS4                        Goloff - cross

1    Q.  You said that you had been a pharmacist since 1970
2    something?
3    A.  Right.
4    Q.  Before we determined -- I am quoting you now -- we
5    determined it would be more accurate to put the information on
6    the piece of paper, did you instruct the techs to do that, to
7    use the same medication for the entire tote?
8    A.  No.
9    Q.  You did not?
10   A.  Say that again?  I'm not too clear what you're saying.
11   Q.  You just testified a moment ago that we -- you said we --
12   we determined that it would be more accurate if the paper that
13   was in the tote contained more information?
14   A.  That is correct, right.
15   Q.  I am asking you, did you instruct the technicians to do
16   that at any time while you worked at Hellertown?
17   A.  Yes, I did.
18   Q.  Did they listen to you?
19   A.  Not all the time.
20   Q.  Was it something that you thought was important to do?
21   A.  Yes, sir.
22   Q.  Did you write your initials on the totes that you
23   inspected?
24   A.  We never put initials on the totes, on the outside, no.
25   Q.  How about on the piece of paper?

F58sLAS4                    Goloff - cross

1    A.  On the piece of paper, I did, yes.

2    Q.  Why did you do that?

3    A.  Because it could be accountable.  We wanted accountability.

4    Q.  Did you tell the techs to put their initials?

5    A.  Whoever prepared that tote, yes.

6    Q.  Was the pharmacist supposed to inspect the tote?

7    A.  Yes.  That's correct.

8    Q.  Did you inspect the totes?

9    A.  Yes, I did.

10   Q.  Did you take bottles out?  Did you take individual vials

11   out and look at them?

12   A.  Sometimes.

13   Q.  What was the purpose of that?

14   A.  Just to see if they looked like they were counted right,

15   quote-unquote.

16   Q.  Did you count any of the vials?

17   A.  No.  The pills in the vials or the vials itself?

18   Q.  Yes, the pills.

19   A.  No.

20   Q.  Do you know how to count pills?

21   A.  Yes.  Yes, I do.

22   Q.  Well, you're a pharmacist, right?  Did you ever use a

23   counting machine?

24   A.  Yes, I did.

25   Q.  In fact, you testified earlier today that you have one

F58sLAS4                        Goloff - cross

1   where you work now?

2   A.  I don't have one where I work now.  In previous positions,

3   we had a counting machine.  It was a previous -- it was a

4   couple of chains I worked for.  They had a robot and they had

5   an electronic counter.

6   Q.  Did you make a suggestion that Hellertown should get a

7   counting machine, a count machine?

8   A.  Yes, I have.

9   Q.  Who did you tell that to?

10  A.  Ms. Lasher.

11  Q.  And what did she say?

12  A.  She said it was too expensive.

13  Q.  Do you know of your own knowledge whether she passed that

14  on to Mr. Riccio?

15  A.  Not that I know, sir.

16  Q.  Pardon?

17  A.  No, sir.

18  Q.  You don't know that?

19  A.  I don't know.

20  Q.  You mentioned earlier today that you used a scale from time

21  to time, a weight scale?

22  A.  That's correct.  That was not my idea.

23  Q.  Whose idea was that?

24  A.  Ms. Lasher's.

25  Q.  To your knowledge, is a weight scale accurate?

1   A.  No.

2   Q.  How inaccurate is it?

3   A.  Well --

4   Q.  Plus or minus?

5   A.  Yeah, could be plus or minus.

6   Q.  Have you ever used a weight scale at your other pharmacies?

7   A.  Not for counting pills, only for measuring medications in

8   the compound.

9   Q.  Is this weight scale a small scale or a large scale.

10  A.  Depends on the size.  It could be.

11  Q.  Excuse me.  How many scales were there at Hellertown?

12  A.  You had -- each pharmacy had to have a regular balance.

13  This scale we were talking about she bought for each store

14  after the inspection occurred, so there was two, one for each

15  store.

16  Q.  Do you know if you take a vial of 90 Fioricet --

17  A.  Um-hmm.

18  Q.  -- and you count it out, and you know that there is exactly

19  90 in there, do you know the difference in weight if you put

20  one less pill in?

21  A.  Maybe.  It could.

22  Q.  Pardon?

23  A.  If I put one less pill, the weight would change.

24  Q.  Right?

25  A.  Yes.

F58sLAS4                          Goloff - cross

1    Q.   Would it be enough to notice?

2    A.   Sure.

3    Q.   If you add one, would it be enough to notice?

4    A.   Yeah, the numbers will change.  But you have to consider

5    the weight of the vial.  The weight of the vial is not

6    universal.

7    Q.   No, but if you do a standard --

8    A.   Right.

9    Q.   -- you can weigh pills this way?

10   A.   Yeah, but it is not totally accurate.

11   Q.   And pill counting is better?

12   A.   That's correct.

13   Q.   And you had pill-counting machines at places like CVS or

14   Rite Aid?

15   A.   Yes.  Yes, correct.  Yes.

16   Q.   You testified on direct examination that you tried to reach

17   Ms. Lasher while the inspection was going on?

18   A.   That is correct.

19        MR. RICHENTHAL:  That mischaracterizes the testimony.

20   BY MR. FREEMAN:

21   Q.   You reached her?  Did you call out to her?

22   A.   I called on the phone, yeah.

23   Q.   Several times, right?

24   A.   I'm not sure how -- that might have been inaccurate.

25   Q.   But you did try to reach her?

F58sLAS4                          Goloff - cross

1    A.  Yes.

2            MR. RICHENTHAL:  Objection.  He reached her.  He is

3    mischaracterizing the testimony.

4            MR. FREEMAN:  I'll do that next.

5    BY MR. FREEMAN:

6    Q.  You tried to reach her, right?

7    A.  Yes.

8    Q.  And then you reached her?

9    A.  Yes.

10   Q.  Okay.  Now, who called you back?

11   A.  She did.

12   Q.  Did somebody else call you?

13   A.  Peter Riccio, too.

14   Q.  Did you call Peter Riccio?

15   A.  No.

16   Q.  But he called you?

17   A.  Yes, sir.

18   Q.  He gave you instructions?

19   A.  He just asked me questions, what they're looking for and

20   why are they still there, and that's about it.  He was kind of

21   upset they were there the first time.

22   Q.  Did Lena Lasher tell you that filling prescriptions on the

23   Internet was legit?  Do you remember her saying that?

24           MR. RICHENTHAL:  Objection.

25   BY MR. FREEMAN:

1    Q.  You don't remember that?

2    A.  No.

3    Q.  I would like to show you Goloff 3506-6, page eight.

4            MR. RICHENTHAL:  I think Mr. Goloff testified that

5    didn't happen, not that he doesn't remember.

6    A.  I don't know what it looked like.  I didn't see.

7            MR. RICHENTHAL:  Hold on.  There are rules.

8            Your Honor, I don't think Mr. Goloff has testified he

9    forgot something.  I think Mr. Goloff has testified that didn't

10   occur.

11           Mr. Goloff, you have to answer orally in court.

12           THE WITNESS:  That didn't occur about the legality --

13           MR. FREEMAN:  No, I didn't say that.

14           MR. RICHENTHAL:  Your Honor, on that basis, we object

15   on him being shown that document.

16           MR. FREEMAN:  Let me reask the question.

17   BY MR. FREEMAN:

18   Q.  Did Lena Lasher tell you that filling Internet drug orders

19   at Hellertown Pharmacy was legit, l-e-g-i-t?

20   A.  I don't recall.

21           MR. RICHENTHAL:  Objection.

22           MR. FREEMAN:  He said he didn't recall.

23           MR. RICHENTHAL:  Second objection, hearsay.

24           MR. FREEMAN:  It's not hearsay.

25           MR. RICHENTHAL:  Your Honor, he also said he doesn't

 1   recall it happening, which is not the same thing.  In any

 2   event, we have a hearsay objection.

 3              THE COURT:  You have given two answers.

 4              THE WITNESS:  Um-hmm.

 5              THE COURT:  One that this didn't happen, and two, that

 6   you don't recall.  Which is it?

 7              THE WITNESS:  I don't recall.

 8              THE COURT:  Okay.

 9   BY MR. FREEMAN:

10   Q.  Mr. Goloff, I'm going to hand you 6506 and ask you to look

11   the just this paragraph, number 32.  Read it to yourself.

12   Don't read it out loud.

13       Now, I would like to ask you if reading that paragraph

14   refreshes your recollection that you said --

15              THE COURT:  No.

16   BY MR. FREEMAN:

17   Q.  -- Hellertown Pharmacy --

18              MR. RICHENTHAL:  No, your Honor.  That is completely

19   improper.

20              THE COURT:  No.  That is not the proper question.

21              MR. RICHENTHAL:  Correct.

22   BY MR. FREEMAN:

23   Q.  Does it refresh your recollection?

24              MR. RICHENTHAL:  That's not the problem with the

25   question.

| | |
|---|---|
| 1 | THE COURT:  That's not the proper question either. |
| 2 | BY MR. FREEMAN: |
| 3 | Q.  Sir, do you recall making that statement? |
| 4 | A.  No. |
| 5 | Q.  You met with the government and agents on several |
| 6 | occasions, right? |
| 7 | A.  That is correct. |
| 8 | Q.  In fact, you met with agents shortly after the date that |
| 9 | Lena Lasher was arrested? |
| 10 | A.  That is correct. |
| 11 | Q.  Approximately how many times have you met with agents and |
| 12 | prosecutors? |
| 13 | A.  Six times, approximately. |
| 14 | Q.  During those times that you met, were people taking notes? |
| 15 | A.  Yes. |
| 16 | Q.  Did it appear to you that they were attempting to take |
| 17 | notes accurately of what you were saying? |
| 18 | MR. RICHENTHAL:  Objection. |
| 19 | THE COURT:  How do you tell someone is taking notes |
| 20 | accurately? |
| 21 | BY MR. FREEMAN: |
| 22 | Q.  Were they taking notes contemporaneous with your talk? |
| 23 | A.  They were taking notes when I was talking.  I remember |
| 24 | seeing that visually.  I don't know what they wrote. |
| 25 | Q.  I didn't ask you that. |

1    A.  I know that.

2    Q.  Over the six times that you have met with agents,

3    approximately how long did you spend with government

4    representatives each time?

5    A.  Approximately four hours.

6    Q.  So that would be 24 hours, correct?

7    A.  That's correct.

8    Q.  You went over what you were going to say, correct?

9    A.  We went over what I know and what was accurate, not what I

10   was going to say.

11   Q.  And what you were going to say?

12            MR. RICHENTHAL:  Objection.  He already answered "no"

13   to that.

14            THE COURT:  That's a no.

15            THE WITNESS:  Yeah.

16   BY MR. FREEMAN:

17   Q.  Mr. Goloff, did you know about a procedure at Hellertown

18   where certain drugs were sent to certain states and certain

19   drugs were not sent to certain states?

20   A.  I'm aware of the procedure.  I wasn't involved in doing

21   that.

22   Q.  You weren't?

23   A.  No.  The technicians were more responsible to check the

24   states.

25   Q.  Was that called a no-ship list?

F58sLAS4                          Goloff - cross

```
 1   A.  That is correct, sir.

 2   Q.  Did you research any state laws?

 3   A.  Pertaining to what?

 4   Q.  To which states could be shipped to and which states could

 5   not?

 6   A.  Yes, I have.  Under --

 7           THE COURT:  In connection with your work at

 8   Hellertown?

 9           THE WITNESS:  Yes.  Yes, of course.  Yes, that is

10   accurate.

11   BY MR. FREEMAN:

12   Q.  Did you find that certain states prohibited shipments,

13   online shipments, to those states?

14   A.  Yes.

15   Q.  And you found that some states permitted it?

16           MR. RICHENTHAL:  Objection, hearsay.

17           MR. FREEMAN:  I'll rephrase it.

18   Q.  Did you do the research?

19   A.  I did some of the research.  I wasn't the only one doing

20   the research.

21   Q.  Other people did the research?

22   A.  Yeah.  She had other technicians do it, too.

23   Q.  And other pharmacists?

24   A.  Correct.

25   Q.  Was Michael Della-Ventura involved in that process?
```

F58sLAS4                          Goloff - cross

1    A.  I have no clue.

2    Q.  But you were?

3    A.  I was at the Hellertown level.

4    Q.  Did you help put together a booklet?  Where did you keep

5    your results?

6    A.  I just left the information printed out on the Internet,

7    left it on Lena's desk.  After that, I don't know what happened

8    to it.

9    Q.  Did there come a time when you noticed a list on the wall

10   of ship and no-ship states?

11   A.  Correct.

12   Q.  Did you yourself use that as a guide?

13   A.  Yes, sir.

14   Q.  To what extent were you involved in shipping?  Other than

15   being the pharmacist on duty, what did you do?  Did you pack

16   any of the envelopes?

17   A.  I did pack some of them, of course, because we were getting

18   behind and I put together some of the envelopes.

19   Q.  Did a pharmacist have to check the medication before it

20   went into an envelope?

21   A.  No.

22   Q.  That didn't --

23   A.  Only certain drugs, certain times that happened.

24   Q.  Was it a directive that a pharmacist would have to check

25   the tote before the tote went -- the individual vials in the

1    totes went to --

2    A.  Well, if I have time.  Can I clarify my procedure of doing

3    the Internet checking?

4    Q.  Yes.  Let me ask that in a second.

5    A.  Okay.

6    Q.  To your knowledge, it was not a pharmacist's responsibility

7    to check the medication?

8           MR. RICHENTHAL:  Objection, vague.  Does he mean at

9    Hellertown?

10          THE COURT:  Yes.

11   BY MR. FREEMAN:

12   Q.  At Hellertown --

13   A.  I would check --

14          THE COURT:  The issue isn't which state.

15          MR. FREEMAN:  Exactly.  I will clarify.

16   A.  You're confusing yourself, I think.

17   Q.  You can help me.  I wasn't there.

18   A.  You're asking me about the state or about any state?  See,

19   that's the difference.

20   Q.  No, I'm asking about --

21          THE COURT:  Just let him just ask the questions, okay?

22          THE WITNESS:  Okay.

23   BY MR. FREEMAN:

24   Q.  I'm asking about, you indicated a little while ago that you

25   checked the tote?

1    A.  Right.

2    Q.  Is it the pharmacist's responsibility to check the tote?

3          MR. RICHENTHAL:  Objection.

4    Q.  At Hellertown?

5          MR. RICHENTHAL:  When?

6    Q.  Before the medication leaves Hellertown Pharmacy?

7          MR. RICHENTHAL:  At any time before?  It's just vague.

8    Q.  At any time before it leaves, it gets packed up.  Does the

9    pharmacist have to check the medication to make sure it's

10   secure, to make sure it's the right medication?

11         MR. RICHENTHAL:  In which vial?  At what point in the

12   process?

13         THE WITNESS:  That's right.

14         MR. RICHENTHAL:  That question should not be answered.

15         THE COURT:  No.

16   BY MR. FREEMAN:

17   Q.  At any time before it leaves?

18         MR. RICHENTHAL:  Objection.

19         MR. FREEMAN:  Let me do it this way.

20   Q.  You said that the tote is filled?

21   A.  Correct.

22   Q.  Who fills it?

23   A.  The technicians.

24   Q.  At some point the medication leaves the pharmacy?

25   A.  Right.

1   Q.  Via some shipping company or postal service?

2   A.  Correct, sir.

3   Q.  Okay.  Between the time the tote is filled and the

4   medication leaves the pharmacy, does the pharmacist have to

5   inspect the medication?

6           MR. RICHENTHAL:  Objection.  In what vial and in what

7   form?  When?

8           THE COURT:  Sustained.

9           THE WITNESS:  Don't --

10          THE COURT:  Sir.

11          THE WITNESS:  I'm not going to say --

12          THE COURT:  When I say "sustained," you don't speak.

13  It's just the rules.

14  BY MR. FREEMAN:

15  Q.  Fioricet, 90s, tote is filled.  The techs have completely

16  filled a tote.  The tote is ready for shipment?

17          THE COURT:  The tote doesn't get shipped.

18          MR. FREEMAN:  I know that.

19  Q.  The tote is ready for shipment.  At some point, the

20  medication has to leave the tote and be put in an envelope with

21  other paperwork, am I correct?

22  A.  That is correct.

23  Q.  Okay.  Let me break it down even further.  Who takes the

24  individual vials from the tote and puts it into the envelope?

25  A.  The technicians.

F58sLAS4                         Goloff - cross

1   Q.  You testified earlier that the pharmacist checks to make

2   sure the medicine that's supposed to be in the vials is, in

3   fact, in the vials?

4   A.  That's right.

5   Q.  The pharmacist has to do that?

6   A.  Has to check what's being prepared in the vials?

7   Q.  Right.

8   A.  Not in the envelope.

9   Q.  I didn't say that.

10  A.  Okay.  Yeah.

11  Q.  And they do that, the pharmacist does that --

12          MR. RICHENTHAL:  Objection.

13  Q.  -- before --

14          MR. RICHENTHAL:  He can testify to what he did.

15  Q.  -- before it leaves the tote, before it goes to the

16  envelope?

17          MR. RICHENTHAL:  Objection.

18  A.  Can you say that again?

19  Q.  Did you ever do that?

20  A.  I don't know.

21          MR. RICHENTHAL:  Your Honor, there is an objection.

22          THE WITNESS:  There's too many people --

23          THE COURT:  Hold on.

24          MR. FREEMAN:  Judge, the interruptions are not

25  helping.

F58sLAS4                        Goloff - cross

1          THE COURT:  No, they're not.  Nothing is helping.

2          MR. FREEMAN:  I'll continue and I will --

3          THE COURT:  After a tech filled a tote to the top with

4    a certain drug, did you have any role in ensuring that the drug

5    in the tote was the same as the label on the outside of the

6    tote?

7          THE WITNESS:  Yes.  Yes, ma'am.

8          THE COURT:  There you go.

9    BY MR. FREEMAN:

10   Q.  What was that role?

11   A.  It was to check.

12   Q.  Okay.  When did you check?

13   A.  After the tote was completely filled, before the package

14   was sent out -- this is a preliminary thing before a package

15   was sent out.

16   Q.  Using the judge's question, you needed to make sure that

17   the medication that was in the tote -- we're using Fioricet 90s

18   as an example -- matched what was going into the envelope?

19   A.  Yes.  No, no, no, no.

20         MR. RICHENTHAL:  Objection, mischaracterizes the

21   testimony.

22         THE COURT:  Absolutely.  Sustained.

23   BY MR. FREEMAN:

24   Q.  Did you need to make sure that the prescription Fioricet 90

25   was going into the right tote?

1             MR. RICHENTHAL:  Objection to that question.

2             MR. FREEMAN:  Do you understand?

3    A.  If you let me explain my procedure and how it went, I think

4    you have got it all reversed.  It would clear everything up.

5             MR. FREEMAN:  Let me ask the questions.

6             THE COURT:  He still has to ask the questions.

7             THE WITNESS:  All right.

8    BY MR. FREEMAN:

9    Q.  You check to make sure that the medication in this tote,

10   Fioricet 90s, was going into an envelope that was properly

11   marked?

12            MR. RICHENTHAL:  Objection.

13            THE COURT:  Sustained.

14   BY MR. FREEMAN:

15   Q.  So your answer is no?

16            MR. RICHENTHAL:  Your Honor, Mr. Freeman is

17   characterizing an answer that wasn't even given to a question,

18   the objection to which was sustained.  His statement should be

19   stricken from the record.

20   BY MR. FREEMAN:

21   Q.  What was wrong with my question?

22   A.  The question is --

23            THE COURT:  No.  Sustained.

24            MR. RICHENTHAL:  Objection.

25            THE WITNESS:  I answered it.

1          THE COURT:  No.

2    BY MR. FREEMAN:

3    Q.  Sir, how about let's do it this way.  What was the

4    procedure after the pharmacist, you, checked the tote?

5    A.  It was to put the lid on top of it.

6    Q.  Did the tote get moved?

7    A.  No.  It stayed -- it was in -- it was in an area of all the

8    90 count Fioricets.  We had an area, it had different shelves

9    with different types of the medication and the quantity of the

10   pills that were in there.

11   Q.  How did the techs know that the tote had been inspected?

12          MR. RICHENTHAL:  Objection to what other people may

13   have known or may not have known.

14          THE COURT:  Was there a way?

15   BY MR. FREEMAN:

16   Q.  Was there a way?

17   A.  That piece of paper that was in it.

18   Q.  So that was sort of the stamp of approval?

19   A.  That is correct, sir.

20   Q.  Now, did the pharmacist, you in particular, look at the

21   tote or the medication again?

22   A.  Yes.

23   Q.  When?

24   A.  After the technicians prepared the whole tote.

25          THE COURT:  That's going back in time.  After you had

1    have done that already and you put the lid on it --

2                THE WITNESS:  Yeah.

3                THE COURT:  -- did you then inspect the tote again?

4                THE WITNESS:  No.

5    BY MR. FREEMAN:

6    Q.  Did you learn that medication, occasionally the wrong

7    medication, was in an envelope?

8    A.  Yes.

9    Q.  Did you testify earlier that you learned that by people

10   calling?

11   A.  Correct.

12   Q.  When you were working at Hellertown, was that your

13   responsibility, to make sure the right medication went into the

14   right envelope as a supervisor?  I'm over here, okay?  Did that

15   happen?

16               MR. RICHENTHAL:  Your Honor, I'm not sure why

17   Mr. Freeman made that comment.  He should just ask questions.

18   That's what I did.

19               THE COURT:  You are both next to each other.  That's

20   your problem.

21               MR. FREEMAN:  I'm not going to --

22               MR. RICHENTHAL:  If Mr. Freeman would like me to move,

23   I would be happy to move.

24               THE COURT:  We're almost finished.  Let's finish it.

25   BY MR. FREEMAN:

F58sLAS4                    Goloff - cross

1    Q.  Do you understand my question?

2    A.  No.  Can you repeat that, please?

3    Q.  Okay.  The way that you learned that the wrong medication

4    was in a particular envelope was calls that you received at the

5    pharmacy?

6    A.  That is correct.

7    Q.  Was it your responsibility, when you were the pharmacist at

8    Hellertown and you were there and you were the only pharmacist,

9    was it your responsibility to make sure that the medication

10   went into the right envelope?

11   A.  Yes.

12   Q.  What did you do to ensure that that happened, that the

13   right medication went into the right envelope?

14   A.  Say that again?

15   Q.  What did you do to ensure that Fioricet went into an

16   envelope marked Fioricet?

17   A.  The way the procedure went, we couldn't really make the

18   final decision because the techs put the pills in the tote.

19   Q.  That's not the question.

20         THE COURT:  Before.

21   Q.  The question is, what did you do to ensure that the

22   medication --

23   A.  Nothing, right.

24   Q.  Now, you testified on direct examination that Lena Lasher

25   watched through a camera, correct?

1   A.  That's correct.

2   Q.  Did Riccio look at the camera?

3   A.  Yes.

4   Q.  And did he call in with instructions?

5   A.  Yes.  Not to me itself, but through other people, as I was

6   told.

7   Q.  To other employees?

8   A.  Say that again?  I'm sorry.

9   Q.  You mean to others --

10  A.  Yes.

11  Q.  -- working at Hellertown?

12  A.  That is correct.

13  Q.  And Riccio, Carl Riccio, would be sent to the pharmacies,

14  correct?

15  A.  Yes.

16          MR. RICHENTHAL:  Objection.  How could he possibly

17  know Carl Riccio was sent to the pharmacies?

18          THE WITNESS:  That's right.

19          MR. FREEMAN:  I'm just using his words.

20          MR. RICHENTHAL:  Objection.

21  BY MR. FREEMAN:

22  Q.  Did you see Carl Riccio at the pharmacies?

23  A.  Yes.  That's the correct answer, sir.

24  Q.  You testified that you spoke to Lena Lasher after she was

25  arrested?

F58sLAS4                          Goloff - cross

1    A.  Yes, I have.

2    Q.  Did she express to you that she was sad about what

3    happened?

4              MR. RICHENTHAL:  Objection, hearsay and relevance.

5              THE COURT:  Sustained.

6    Q.  Did she express remorse to you?

7              MR. RICHENTHAL:  Objection, hearsay, relevance, and

8    Rule 403.

9              THE COURT:  Sustained.

10   BY MR. FREEMAN:

11   Q.  Now, certain people came to Hellertown to get oxycodone?

12   A.  Yes.

13   Q.  You saw these people?

14   A.  Yes, I have.

15   Q.  You said that there was ten of them in one car?

16   A.  That is correct.

17   Q.  That must have been a pretty big car?

18   A.  I didn't look at the cars outside in the parking lot.

19   Q.  Is this something that bothered you?

20   A.  Yes.

21   Q.  Did you express your concern?

22   A.  Yes, I have.

23   Q.  Did you express it to Lena Lasher?

24   A.  Yes, I have.

25   Q.  Did you express it to Peter Riccio, the owner?

F58sLAS4                          Goloff - cross

1   A.  He didn't know about it, no.

2   Q.  How could you know that?

3   A.  Because I didn't tell him.

4   Q.  That's a little bit different.

5   A.  I never spoke to Peter about it.

6   Q.  Now, you understood that Peter Riccio was the owner?

7   A.  Yes, I have.

8   Q.  You understood that Lena was the pharmacist in charge?

9   A.  Correct.

10  Q.  You didn't feel strongly enough to call Peter Riccio?

11  A.  No.

12  Q.  Did you ever call any of the patients that were on the

13  questionnaires?

14  A.  No.

15  Q.  Did you ever call any of the doctors that were on the

16  questionnaires?

17  A.  Just that one time I spoke earlier about the license,

18  that's it.

19  Q.  Who told you to do that?

20  A.  Well, Lena, Mrs. Lasher.

21  Q.  Did you understand that there was a black list at

22  Hellertown?

23  A.  Yes.

24  Q.  How was that created?

25  A.  I wasn't involved creating that at all.

F58sLAS4                          Goloff - cross

1    Q.  Do you understand what it was?

2    A.  Yes, sir.

3    Q.  What is it?

4    A.  It was -- it was that people were getting the Internet

5    scripts too frequently, ordering too frequently.  They were

6    receiving them, they would be ordering too frequently.

7    Q.  How long was that list?

8    A.  I mean, long like how many people were on it?

9    Q.  Yes.

10   A.  Maybe 20, 25.  I'm not sure an exact number.  It varied.

11   Some of them was longer and some were taken off.

12   Q.  Did you check it?

13   A.  When I was -- well, we had a couple checks to check.  The

14   technicians will check it when they were processing the labels.

15   Q.  I'm asking -- I'm sorry.

16   A.  I did check the list when I was checking the scripts that

17   was done.

18   Q.  Did you use it?

19   A.  Yes, I did.

20   Q.  And did you find people on that list that caused you to not

21   fill the prescriptions?

22   A.  Yes.

23   Q.  So it worked?

24   A.  Yes, it had worked.

25   Q.  You testified that you have a nonprosecution agreement?

F58sLAS4                    Goloff - cross

1   A.  That is correct, sir.

2   Q.  Do you have a lawyer?

3   A.  Yes, I do.

4   Q.  Did that lawyer help you negotiate the nonprosecution

5   agreement?

6   A.  Yes.

7   Q.  Is his name Bennett Epstein?

8   A.  That's correct.

9   Q.  You said that if you tell the truth, you remain

10  nonprosecuted, correct?

11  A.  That's right.

12  Q.  Who determines if you tell the truth?

13  A.  I don't know.

14  Q.  You don't know?

15  A.  No.  The government does, but I don't know who from the

16  government does.  That's for the government to decide.

17  Q.  Have you been in touch with Dan Geiger?

18  A.  Yes.

19          THE COURT:  In what time frame, please?

20          THE WITNESS:  A week or two ago.

21  BY MR. FREEMAN:

22  Q.  Did Dan Geiger write a complaint, to your knowledge, about

23  what was --

24  A.  Yes.

25  Q.  -- about the pharmacy?

F58sLAS4                          Goloff - cross

```
 1   A.  Yes, sir.

 2   Q.  Did he enlist you to help him?

 3          MR. RICHENTHAL:  Objection to "enlist."

 4   Q.  Did he ask you to be a witness?

 5   A.  Yes.

 6   Q.  With respect to the tincture, the opium tincture

 7   medication, do you know who the first person was to fill that

 8   prescription?

 9   A.  To my knowledge, myself.

10   Q.  Right.  Did you --

11          MR. RICHENTHAL:  Objection to Mr. Freeman's commentary

12   that that answer was, quote, right.

13          THE COURT:  Guys, please.

14   BY MR. FREEMAN:

15   Q.  Did you fill 14 prescriptions?

16   A.  I don't know the exact count, sir.

17   Q.  Do you want to estimate?

18   A.  Most likely.  I filled most of them, yes, except for that

19   one Dan filled.  And she might have filled one, I'm not sure.

20   Because I know I did most of it.

21   Q.  Pardon me?

22   A.  Most of it was under my name.  We can see by the records.

23   Q.  Did you fill oxycodone prescriptions?

24   A.  Yes, sir.

25   Q.  What's the difference between oxycodone and OxyContin?
```

F58sLAS4                    Goloff - cross

1   A.  OxyContin you said?

2   Q.  I think it is c-o-n-t-i-n.

3   A.  T-i-n is a long-acting of the oxycodone.  Oxycodone, that's

4   the brand name.  It's -- oxycodone ER is a generic, which is a

5   long-acting.  The ones that we were dispensing were

6   intermediary acting, like a short-term, like every four to six

7   hours.  In between dose is a long-acting.

8   Q.  So you know your oxycodone?

9   A.  Yes, I do, unfortunately.

10  Q.  So we just established that you did fill prescriptions?

11  A.  That is correct.

12  Q.  Would it be fair to say that you filled hundreds of

13  prescriptions?

14  A.  Yes.

15  Q.  A thousand?

16  A.  No.

17  Q.  Is that one of the things that you did for which you are

18  receiving nonprosecution treatment?

19  A.  Correct.

20          MR. FREEMAN:  I have nothing further.

21          MR. RICHENTHAL:  I'll be brief.

22  REDIRECT EXAMINATION

23  BY MR. RICHENTHAL:

24  Q.  Mr. Goloff.

25  A.  Yes.

F58sLAS4                      Goloff - redirect

1   Q.   You testified that the government determines the truth.

2   Mr. Freeman asked you that question, do you recall that

3   question?

4   A.   The government says -- yeah, it determines the truth.  Yes.

5   Q.   Do you have any idea what the process is for that?

6   A.   No, not at all, sir.

7   Q.   Do you have any idea who makes that decision?

8   A.   No, I have not been informed.

9   Q.   Do you have any idea what checks that are in that decision?

10  A.   No idea, sir.

11  Q.   Do you have any idea what is looked at when that decision

12  is made?

13  A.   No.

14  Q.   Did you tell the truth today, sir?

15  A.   Yes, I did.

16  Q.   Mr. Freeman asked you some questions about what he called

17  research on the law?

18  A.   Right.

19  Q.   Are you a lawyer?

20  A.   No.

21  Q.   Did you research the law or print stuff out?

22  A.   Just printing stuff out.

23  Q.   Who asked you to print something out?

24  A.   Ms. Lasher.

25  Q.   Who did you give it to?

1   A.  Lena Lasher.

2   Q.  Did you provide her advice?

3   A.  No.  I'm sorry, there was a cough there.

4   Q.  Did you provide her advice about state law?

5   A.  Did I give her advice?  No.

6   Q.  Did you ever give her advice?

7   A.  No, no.

8   Q.  Did you tell her how to run her pharmacy?

9   A.  No.

10  Q.  In response to one of Mr. Freeman's questions about the

11  totes --

12  A.  Right.

13  Q.  -- you talked about a piece of paper inside.  You said we

14  had that because she wanted accountability.  Do you remember

15  seeing that?

16  A.  I remember saying something similar, yeah.  We wanted

17  liability, who was responsible for the counting.

18  Q.  Who was the "she," Mr. Goloff?

19  A.  Ms. Lasher.

20  Q.  Every policy I showed you, who told you about that policy,

21  Mr. Goloff?

22  A.  Ms. Lasher.

23  Q.  Every policy I showed you, who enforced that policy?

24  A.  Ms. Lasher.

25  Q.  When your hours were cut, who cut them, Mr. Goloff?

1    A.  Ms. Lasher.

2    Q.  When you did what Ms. Lasher told you to do, who did you

3    fear would cut your hours?

4    A.  Ms. Lasher.

5    Q.  How long after you started at Hellertown Pharmacy did you

6    start looking for another job?

7    A.  Four months in.

8    Q.  Did you keep looking for another job?

9    A.  Yes, sir.

10   Q.  Was it difficult to find a job?

11   A.  Yes, it was at that time.

12   Q.  Do you now have another job?

13   A.  Yes, I do.  Thank God.

14          MR. RICHENTHAL:  No further questions.

15          THE WITNESS:  Okay.

16   RECROSS EXAMINATION

17   BY MR. FREEMAN:

18   Q.  You indicated earlier that you were a puppet; do you

19   remember that?

20   A.  That's correct.

21   Q.  Lena Lasher was a puppet, too?

22          MR. RICHENTHAL:  Objection.

23          THE COURT:  Sustained.  Strike that.

24   BY MR. FREEMAN:

25   Q.  You don't know what Riccio said to Lasher, correct?

1              MR. RICHENTHAL:  Objection, beyond the scope.

2              THE COURT:  Sustained.

3              MR. FREEMAN:  Nothing further.

4              MR. RICHENTHAL:  Nothing further from the government,

5    your Honor.

6              THE WITNESS:  Thank you.

7              (Witness excused)

8              THE COURT:  The government can call its next witness.

9              MS. GREENBERG:  Your Honor, the government calls

10   Dr. Yang.

11    IAN YANG,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MS. GREENBERG:

16   Q.  Good afternoon, Dr. Yang.

17   A.  Hi.

18   Q.  Dr. Yang, where do you currently work?

19   A.  Actually, I'm doing private practice for the pain

20   management in a private office.

21   Q.  Have you ever prescribed oxycodone?

22   A.  A long, long time ago, yes, I did, but not for, I think,

23   the past five years.  I don't think I prescribed it.

24   Q.  Directing your attention to roughly 2011, 2012, did you

25   receive a copy of an oxycodone prescription that bore your

 1   name?

 2   A.  Yes, I did.  Actually, more than one copy.  Whoever, you

 3   know, had the question for that, then they would call me and I

 4   would ask them for a copy.

 5   Q.  How did you receive the copy of the oxycodone prescription?

 6   A.  From fax.

 7   Q.  I would like to show you what's been marked as Government

 8   Exhibit 3025.  Dr. Yang, if you could put away the papers that

 9   you have in your hand and just look at the exhibit, please.

10   A.  Sure.

11   Q.  Thank you.

12   A.  Sorry, I need my glasses.  Yeah, this is a copy I received

13   in the past.

14   Q.  Just looking at this exhibit, without reading it, did you

15   issue this prescription?

16   A.  No, I did not.

17   Q.  Does this prescription bear your name?

18   A.  Printed out, it bears my name.

19   Q.  Is that your signature on this prescription?

20   A.  No, it was not.

21         MS. GREENBERG:  The government offers this exhibit

22   into evidence.

23         MR. FREEMAN:  Judge, we object.

24         MS. GREENBERG:  Your Honor, I can offer this subject

25   to connection.

1           MR. FREEMAN:  I'm still objecting.  Improper

2    foundation.

3           THE COURT:  I think he can testify to this.  It's

4    received.

5           (Government's Exhibit 3025 received in evidence)

6           MS. GREENBERG:  Ms. Chen, can you please publish the

7    exhibit.  It's not scanned.

8    BY MS. GREENBERG:

9    Q.  Dr. Yang, do you see the prescription up on your screen?

10   A.  Yes, I do.

11   Q.  Do you see the area where the signature is?  Is that your

12   signature?

13   A.  It is not.

14   Q.  Looking over here where it says LIC on the top, what does

15   LIC stand for?

16   A.  That's the license, abbreviation for the license.

17   Q.  Is that your license number?

18   A.  It is.

19   Q.  Looking at the next number underneath it, where it says

20   NPI, what does NPI stand for?

21   A.  That's the National Physician Identification number.

22   Q.  Looking at that number, is that your number?

23   A.  Yes, it is.

24   Q.  Looking underneath it -- it is difficult to see on the

25   screen, I think if you look at the hard copy in front of you --

1    do you recognize the practitioner's DEA number?

2    A.  Yes.

3    Q.  Is that yours?

4    A.  Yes, it is.

5    Q.  Looking on the top, do you see the 718 phone number?

6    A.  Right.

7    Q.  Do you recognize that phone number?

8    A.  No, I do not.

9    Q.  Dr. Yang, did you ever verify to a pharmacist a

10   prescription that you had written for oxycodone?

11   A.  No.

12   Q.  Lastly, do you recognize the phone number (347) 673-3926 as

13   a previous cell phone of yours?

14   A.  That's correct.

15           MS. GREENBERG:  Government has no further questions.

16           MR. FREEMAN:  Nothing.

17           THE COURT:  Thank you very much.  You win the prize of

18   the shortest witness.  That's a valuable prize.

19           THE WITNESS:  Thank you.

20           (Witness excused)

21           MS. GREENBERG:  The government calls as its next

22   witness Sergeant Richard Pizzuti.

23    RICHARD PIZZUTI,

24       called as a witness by the Government,

25       having been duly sworn, testified as follows:

F58sLAS4                           Yang – direct

1   DIRECT EXAMINATION

2   BY MS. GREENBERG:

3   Q.  Good afternoon.

4   A.  Good afternoon.

5   Q.  Where do you work?

6   A.  I'm employed by Lyndhurst Police Department in New Jersey.

7   Q.  What is your position?

8   A.  I'm a sergeant with Lyndhurst.

9   Q.  How long have you been a sergeant with the Lyndhurst, New

10  Jersey police department?

11  A.  I was promoted in October of this past year.

12  Q.  What are your duties and responsibilities as a sergeant

13  with the Lyndhurst, New Jersey police department?

14  A.  I'm assigned to the DEA task force in Newark, New Jersey.

15  Q.  Have you held any other positions with the Lyndhurst, New

16  Jersey police department?

17  A.  I was just a patrol officer prior to that.

18  Q.  How long were you with the New Jersey police department in

19  Lyndhurst?

20  A.  15 years, August of 1999.

21  Q.  During what period were you a task force officer with the

22  DEA?

23  A.  I was assigned to the DEA in March of 2010.

24  Q.  Before becoming a sergeant, did you participate in any

25  training?

F58sLAS4                          Pizzuti - direct

1    A.  I have, yes.

2    Q.  Did you receive any training in conducting searches and

3    seizures?

4    A.  Yes, I have.

5    Q.  Have you received any training in conducting narcotics

6    investigations?

7    A.  Yes.

8    Q.  Now, I want to direct your attention to November 29, 2012,

9    at approximately 6:25 a.m.  Were you working that day?

10   A.  I was.

11   Q.  What was your assignment?

12   A.  I was assigned to assist the diversion group at 16 Patton

13   Street in High Bridge with the execution of a search warrant

14   and an arrest warrant.

15   Q.  Who was the arrest warrant for?

16   A.  It was for Lena Lasher.

17   Q.  Now, you said 16 Patton Street, I believe?

18   A.  Yes.

19   Q.  Do you know whose residence that was?

20   A.  Yes.  It was Lena Lasher's residence.  I believe she lived

21   there with her husband and children.

22   Q.  Upon arriving at Ms. Lasher's house, did you and other law

23   enforcement officers enter the house?

24   A.  We did.

25   Q.  Did you participate in the search of her house?

1   A.  I did.

2   Q.  Did you search anything else that day?

3   A.  I searched her vehicle.

4   Q.  Can you describe her car?

5   A.  It was a silver Toyota Highlander.

6   Q.  Where was her car parked?

7   A.  It was in her driveway.

8   Q.  Can you describe what you observed inside Ms. Lasher's car?

9   A.  The vehicle itself was unkept, there was paperwork strewn

10  all over the compartment, the passenger compartment.

11  Q.  I am going to be handing up to you a number of exhibits,

12  starting with Government Exhibit 901, then 902, 903, and 904.

13  I would like you to start with what's been marked for

14  identification as Government Exhibit 901.

15      What does this exhibit contain?

16  A.  901 is U.S. Postal Service C.O.D.s.

17  Q.  What is a C.O.D.?

18  A.  Cash on delivery.  It indicates that there was product that

19  was sent out.

20  Q.  Where did you obtain these C.O.D. receipts?

21  A.  These were located in the Toyota Highlander.

22  Q.  Now, can you please read the date and the exhibit number on

23  the evidence tag of this sealed exhibit?

24  A.  The date is November 29, 2012, and that's Exhibit N-248.

25  Q.  Is your name on this evidence tag?

1    A.  It is.

2    Q.  Did you initial next to your name?

3    A.  I did.

4    Q.  What, if anything, does that indicate to you about where

5    you obtained these C.O.D. receipts?

6    A.  I was assigned to the vehicle and this evidence was removed

7    from the vehicle.

8    Q.  Did you compare the exhibit number on that evidence tag

9    against reports from the DEA that indicated that that exhibit

10   number came from the car?

11   A.  Yes, I have.

12           MS. GREENBERG:  The government offers Government

13   Exhibit 901.

14           MR. FREEMAN:  No objection.

15           THE COURT:  Received.

16           (Government's Exhibit 901 received in evidence)

17           MS. GREENBERG:  Your Honor, if I may, I would like to

18   read a part of a stipulation.  It's Government Exhibit 6004.

19   This is stipulated to by the government and Ms. Lasher through

20   her attorney.

21           If called to testify, representatives from the Drug

22   Enforcement Administration, DEA, and the United States

23   Attorney's office would testify it that Government Exhibits 902

24   through 904 are subsets of material originally marked as DEA

25   Exhibit Number N-249.

1   BY MS. GREENBERG:

2   Q.  I would like to start with what's been marked for

3   identification as Government Exhibit 902.

4   A.  Okay.

5   Q.  Now, looking at this exhibit, what does it contain?

6   A.  902 contains what appears to be scheduling miscellaneous

7   paperwork.

8   Q.  Again, where did you obtain the schedules?

9   A.  This was obtained from the Toyota Highlander.

10  Q.  How do you know that?

11  A.  Because after reviewing the report, Exhibit N-249 was

12  listed on a DEA report as being taken from the Toyota

13  Highlander.

14          MS. GREENBERG:  The government offers Government

15  Exhibit 902.

16          MR. FREEMAN:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 902 received in evidence)

19  BY MS. GREENBERG:

20  Q.  I would like to show you what's been marked for

21  identification as Government Exhibit 903.  What does this

22  exhibit contain?

23  A.  Exhibit 903 is listed as payroll.  It looks like some names

24  on it, Stephen James, some names of that sort.

25  Q.  Where did you obtain these payroll schedules?

1    A.   This was also taken from the Toyota Highlander.

2    Q.   How do you know that?

3    A.   Because this is an exhibit out of Exhibit N-249, which

4    after the review of the report, I know this was taken out of

5    the Highlander.

6            MS. GREENBERG:   The government offers Government

7    Exhibit 903.

8            MR. FREEMAN:   No objection.

9            THE COURT:   Received.

10           (Government's Exhibit 903 received in evidence)

11   BY MS. GREENBERG:

12   Q.   Lastly, I would like to show you what has been marked for

13   identification as Government Exhibit 904.   What does this

14   exhibit contain?

15   A.   This exhibit -- this exhibit appears to be legal

16   information from West Virginia.

17   Q.   Can you take it out?   Where did you obtain these written

18   materials?

19   A.   Again, this was removed from the Toyota Highlander, which

20   is referenced in the DEA report 6.

21           MS. GREENBERG:   The government offers Government

22   Exhibit 904.

23           MR. FREEMAN:   No objection.

24           THE COURT:   Received.

25           (Government's Exhibit 904 received in evidence)

F58sLAS4                        Pizzuti – direct

1   BY MS. GREENBERG:

2   Q.  Now, if you could turn to the second to last page of this

3   exhibit.  What is the title of this document?

4   A.  This is from the West Virginia Board of Pharmacy.

5   Q.  Can you turn to the last page of the document.  Do you see

6   where it says Internet pharmacies legitimate practitioner

7   patient relationship required.  Do you see that?

8   A.  I see that, yes.

9   Q.  Is there anything in handwriting next to that?

10  A.  Above that is a star.

11  Q.  If you could look to the bottom of that section underneath

12  West Virginia Board of Pharmacy.  Do you see the name Carmen A.

13  Catizone listed?

14  A.  I do, Carmen A. Catizone.

15          MS. GREENBERG:  The government has no further

16  questions.

17          May we publish these exhibits to the jury, as they are

18  not scanned?

19          THE COURT:  Sure.

20          MR. FREEMAN:  If you're waiting for me, I thought you

21  were leaving time for the jury.  I have no questions.

22          THE COURT:  You can excuse the witness then.  Thank

23  you very much.

24          THE WITNESS:  Thank you.

25          (Witness excused)

1          MR. RICHENTHAL:  Your Honor, would you like us to call

2     our next witness?  The government calls Thomas Bat.

3          THE COURT:  Go ahead.

4      THOMAS BAT,

5          called as a witness by the Government,

6          having been duly sworn, testified as follows:

7     DIRECT EXAMINATION

8     BY MR. RICHENTHAL:

9     Q.  Good afternoon.

10    A.  Good afternoon.

11    Q.  Where are you from?

12    A.  Wilkes-Barre, Pennsylvania.

13    Q.  What is your educational background?

14    A.  I have a BA degree in criminal justice from Kings College.

15    Q.  Where did you work after getting your degree?

16    A.  First, I worked as a correctional officer at CSI Dallas in

17    Pennsylvania, and then I transferred to another job, another

18    state job.

19    Q.  What was the state job in which you transferred to?

20    A.  An investigator for the Department of State.

21    Q.  What, in short, is the Department of State?

22    A.  The Department of State is a conduct-level agency in

23    Pennsylvania.  And what we do is license professionals,

24    27 professional licensing boards.

25    Q.  For how long did you work for the Department of State?

1    A.   27 years.

2    Q.   Did you have a title or titles while you were there?

3    A.   Professional conduct investigator.

4    Q.   Did you have a title for a period of time prior to that?

5    A.   Yes.  When I first joined, I was an inspector called a

6    regulatory inspector, which was for about a year.

7    Q.   What kinds of businesses did you either investigate or

8    inspect?

9    A.   We had 27 licensing boards which include doctors, dentists,

10   veterinarians, pharmacies, engineers, architects, nurses, quite

11   a range of professions.

12   Q.   Did you receive any kind of training in connection with

13   either serving as an inspector or investigator?

14   A.   Most of the training was on the job.  We did have some

15   specialized training to clear in confidence.

16   Q.   Are you still an investigator?

17   A.   No, sir.  I retired in May 2014.

18   Q.   During the course of your career, approximately how many

19   pharmacies did you either inspect or investigate?

20   A.   It's hard to gauge because it wasn't on a regular basis.

21   You might do two pharmacies one month, and then maybe not do

22   any pharmacies for six months in a row.

23            MR. RICHENTHAL:  Can I have just one moment, your

24   Honor?

25            THE COURT:  Yes.

F58sLAS4                          Bat - direct

| | |
|---|---|
| 1 | MR. RICHENTHAL:  May I proceed, your Honor? |
| 2 | THE COURT:  Yes. |
| 3 | BY MR. RICHENTHAL: |
| 4 | Q.  Directing your attention to 2012, did there come a time |
| 5 | when a complaint was filed with respect to Hellertown Pharmacy |
| 6 | and Palmer Pharmacy & Much More? |
| 7 | A.  That is correct. |
| 8 | Q.  Approximately when was it filed? |
| 9 | A.  February of 2012. |
| 10 | Q.  By whom was it filed? |
| 11 | A.  A former employee named Dan Geiger. |
| 12 | Q.  Without getting into details, what was the nature of the |
| 13 | allegations in the complaint?  What was the subject matter? |
| 14 | A.  He made several complaints, some being just facility |
| 15 | requirements of the pharmacy, and some were very serious |
| 16 | charges against what the pharmacist -- |
| 17 | MR. FREEMAN:  Objection.  Objection to "serious." |
| 18 | BY MR. RICHENTHAL: |
| 19 | Q.  No need to characterize serious or not, what were the |
| 20 | subject matters?  What types of things? |
| 21 | A.  One of the complaints was they were restocking medication. |
| 22 | Q.  Was an investigation commenced? |
| 23 | A.  Yes. |
| 24 | Q.  Were you assigned to lead that investigation? |
| 25 | A.  Yes, I was. |

1   Q.   What were some of the initial steps taken in the

2   investigation?

3   A.   The first thing we do is to check prior licensure, see what

4   the licensees were like, the pharmacy and the pharmacist, do a

5   little background check.  The second stage would be to go talk

6   to the complainant.

7   Q.   Did you do that?

8   A.   Yes, I did.

9   Q.   Did you also speak with others?

10  A.   Yes.  The complainant supplied witnesses' names.

11  Q.   Did there come a time when you visited one or both

12  pharmacies?

13  A.   Yes.

14  Q.   Approximately when was that?

15  A.   September 18.

16  Q.   Of what year?

17  A.   2012.

18  Q.   Were these surprise inspections or informed in advance?

19  A.   Surprise investigations.

20  Q.   Who, if anyone, accompanied you to the inspection?

21  A.   I brought with me a pharmacy inspector, Michael

22  Fitzpatrick.

23  Q.   Which of the two pharmacies did you visit first?

24  A.   First was Hellertown.

25  Q.   Approximately what time of day did you visit?

F58sLAS4                          Bat - direct

1    A.  It would be late morning.

2    Q.  Was a pharmacist present?

3    A.  Yes.

4    Q.  Who?

5    A.  Stephen Goloff.

6    Q.  Did you speak with him?

7    A.  Yes.

8    Q.  Did he answer your questions?

9    A.  Yes.

10   Q.  What was his demeanor?

11   A.  Very cooperative.

12   Q.  Do you recall approximately how large the public area of

13   the pharmacy was?

14   A.  It was a very small pharmacy, what we call in the trade a

15   mom-and-pop, compared to the larger pharmacies such as CVS and

16   Walgreens.

17   Q.  Did the pharmacy also contain back rooms, that is,

18   nonpublic rooms?

19   A.  Yes.

20   Q.  Did you inspect those rooms?

21   A.  Yes, that was part of the inspection.

22   Q.  Were photographs taken of certain areas of the pharmacy?

23   A.  Yes.

24   Q.  Were you present when they were taken?

25   A.  Yes, and some I directed to be taken.

F58sLAS4                          Bat - direct

1    Q.  If you could look at what is marked for identification --

2    I'll walk up to you Government Exhibits 301 through 313.  Take

3    a moment and leaf through those.  Let me know if you recognize

4    them.

5    A.  Yes, I do recognize them.

6    Q.  What are those, Mr. Bat, without describing them?  One by

7    one, what's the set?

8    A.  Excuse me, what?

9    Q.  Without describing them one by one, what is the set of

10   things just handed you?  What are those?

11   A.  Photographs.

12   Q.  Photographs of what?

13   A.  Of the pharmacy, different parts of this pharmacy that we

14   were taking.

15   Q.  Taken during the inspection?

16   A.  Correct.

17          MR. RICHENTHAL:  Government offers 301 through 313.

18          MR. FREEMAN:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibits 301 through 313 received in

21   evidence)

22          MR. RICHENTHAL:  Ms. Chen, can you put 304 on the

23   screen.

24   BY MR. RICHENTHAL:

25   Q.  Mr. Bat, turn to 304, or as your screen warms up, you

1    should see it in a moment.

2    A.   304?

3    Q.   304.  It should also now be on the screen to your right.

4    A.   Yes.

5    Q.   Do you recognize these?

6    A.   Yes.  These are bins that we found in the back room.

7    Q.   Do you recall what was in these bins?

8    A.   Yes.  Each one contained bottles of medication.

9    Q.   Were the bottles individually labeled?

10   A.   No.

11        MR. RICHENTHAL:  Ms. Chen, can you now put up 310.

12   Q.   Is that an example of the inside of one of the bins?

13   A.   Yes.  That's an interior photo.

14        MR. RICHENTHAL:  Ms. Chen, can you put up 302.

15   Q.   Mr. Bat, do you recognize these?

16   A.   Yes.  These were vials that we found in the dispensing area

17   of the pharmacy.

18   Q.   You say "the dispensing area."  What was near these vials?

19   A.   The medication, the vials, vials to be filled, the

20   prescriptions, the drugs would be taken to be counted and

21   measured.

22        MR. RICHENTHAL:  May I have a moment, your Honor?

23        THE COURT:  Yes.

24   BY MR. RICHENTHAL:

25   Q.   Mr. Bat, I'm going to bring to you Government Exhibit 1001

F58sLAS4                        Bat - direct

1   in evidence.  Do those appear similar?

2   A.  Yes, they are.

3   Q.  To the bottles that you saw?

4   A.  That is correct.

5          MR. RICHENTHAL:  Now, could we go back, Ms. Chen, to

6   Government Exhibit 304.

7   Q.  Mr. Bat, do you recall approximately how many bins like

8   this were in Hellertown Pharmacy?

9   A.  Over 100, I think 117 to be exact.

10  Q.  At the end of the inspection, did Hellertown Pharmacy pass

11  or fail the inspection?

12  A.  It failed.

13  Q.  Was that conveyed to anyone?

14  A.  Oh, yes.  The supervising pharmacist that day.

15  Q.  Was the failure also thereafter transmitted to anyone

16  electronically, for example, by e-mail?

17  A.  Yes.  The pharmacy inspectors, Mike would have sent it by

18  e-mail.

19  Q.  To whom?

20  A.  To the supervising pharmacist.

21  Q.  In that case, in this case, in this pharmacy who was that,

22  do you recall?

23  A.  Stephen Goloff.

24  Q.  Would it also have been provided to the pharmacist in

25  charge, that is the official licensee?

F58sLAS4                        Bat - direct

1    A.  Not necessarily.  It would be up to Mike if he wants to

2    send to both.  Normally, the procedure is to give it to the

3    supervising pharmacist.

4    Q.  When you say "give," you mean physically?

5    A.  No, sent electronically.

6    Q.  I'm going to show you what has been marked for

7    identification as Government Exhibit 4004.  First, do you

8    recognize the sender?

9        Let me back up.  Is this an e-mail?

10   A.  Yes.

11   Q.  Do you recognize the sender?

12   A.  Yes.

13   Q.  Who is the sender?

14   A.  Michael Fitzpatrick.

15   Q.  Is that the individual that accompanied you?

16   A.  Yes.  This is the pharmacy inspector.

17   Q.  Do you recognize the recipient?

18   A.  Yes.  It's to Lena Lasher.

19   Q.  At a particular --

20   A.  Yes, I'm sorry, at yahoo.com.

21   Q.  Now, can you turn to the second page.  Without reading what

22   is on there, is that the indication that the pharmacy had

23   failed?

24   A.  Yes.

25   Q.  What's the date of that e-mail?

1    A.  9/18/2012.

2    Q.  Is that the same day as the inspection?

3    A.  That is correct.

4    Q.  After you inspected Hellertown Pharmacy, where did you go?

5    A.  We went to the Palmer Pharmacy.

6    Q.  That's the other pharmacy that was the subject of the

7    complaint?

8    A.  That is correct.

9    Q.  Did you perform an inspection there as well?

10   A.  Yes, we did.

11   Q.  Who, if anyone, accompanied you?

12   A.  Michael Fitzpatrick.

13   Q.  The same individual as the first pharmacy?

14   A.  That's correct.

15   Q.  Approximately what time of day did you arrive to the second

16   pharmacy?

17   A.  Early afternoon.

18   Q.  Now, that second pharmacy, how did its public area, front

19   area, compare to the first pharmacy?

20   A.  It was a larger pharmacy.

21   Q.  Did it also have back areas, that is, nonpublic areas?

22   A.  That is correct.

23   Q.  Did your inspection include those areas?

24   A.  Yes.

25   Q.  Were photographs taken of at least some of those areas?

F58sLAS4                    Bat - direct

1    A.  Yes.

2    Q.  I'm going to walk up to you what's been marked in

3    identification as Government Exhibits 401 through 407.  Just

4    take a moment and leaf through those, and let me know if you

5    recognize them.

6    A.  Yes, I recognize them.

7    Q.  What are those, Mr. Bat?

8    A.  These were photos that were taken at that time of the

9    inspection.

10             MR. RICHENTHAL:  Government offers 401 through 407.

11             MR. FREEMAN:  No objection.

12             THE COURT:  Received.

13             (Government's Exhibits 401 through 407 received in

14   evidence)

15             MR. RICHENTHAL:  Ms. Chen, can you put 402 and 403 on

16   the screen.

17   BY MR. RICHENTHAL:

18   Q.  Do you recognize these, Mr. Bat?

19   A.  Yes.

20   Q.  Do you recall what was in these, if you knew?

21   A.  Yes.  They were very similar to the one we found at

22   Hellertown.  They were bottles of medication.

23   Q.  Were the bottles or vials individually labeled?

24   A.  No.

25   Q.  Approximately how many bins like this were in Palmer

1   Pharmacy?

2   A.  I believe the number was 28.

3   Q.  The other one was more than 100?

4   A.  117.

5          MR. RICHENTHAL:  Can you now turn to 401, Ms. Chen.

6   Q.  Do you recall finding this, Mr. Bat?

7   A.  Yes.  That was in the Palmer Pharmacy, in the dispensing

8   area.  In fact, the photo actually shows it in the dispensing

9   area.

10  Q.  When you say the photo shows it, are you referring to the

11  amber vials behind that is for measuring?

12  A.  That is correct.

13  Q.  The ones on the left are filled?

14  A.  Yes.

15  Q.  The ones on the right in the back are empty?

16  A.  That is correct.

17  Q.  At the end of the inspection, did Palmer Pharmacy pass or

18  fail the inspection?

19  A.  It failed.

20  Q.  Was that conveyed to anyone?

21  A.  Yes.

22  Q.  How?

23  A.  It would have been sent by Mike.  He, first of all, had the

24  pharmacist sign the inspection form and then sent as an e-mail.

25  Q.  When you say the pharmacist signed, you mean the person on

F58sLAS4                      Bat - direct

1    duty?

2    A.   That's correct.

3    Q.   This was a different pharmacist from the pharmacist at

4    Hellertown?

5    A.   Yes.

6              MR. RICHENTHAL:  Your Honor, I think it's 2:15.  I

7    don't have a lot of time left with Mr. Bat, but it is Friday

8    afternoon.  I want to let the court know it's 2:15.

9              THE COURT:  All right.  Have a great weekend.  It's

10   supposed to be nice.  Just remember the rules, don't talk about

11   the case, keep an open mind.  Thank you very much for your

12   attention and enjoy the weekend.  See you bright and early and

13   fresh on Monday morning.

14             (Jury excused)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  On the charge, we would appreciate

3   feedback.  An e-mail to John is fine.

4          MR. RICHENTHAL:  By a particular time over the

5   weekend?  I don't mean to suggest it would be midnight Sunday

6   night if your Honor didn't answer the question.  If Mr. Briggs

7   has a certain time he intends to take a look.

8          THE COURT:  You can send it by noon on Sunday and we

9   can call it a Mother's Day present.

10          MR. RICHENTHAL:  Will do.

11          MR. FREEMAN:  Isn't that nice.  Do you prefer it in

12   Word?

13          THE COURT:  I don't care.

14          MR. RICHENTHAL:  Question of clarification.  Maybe

15   Mr. Freeman and I are anticipating different things.  Does your

16   Honor want us literally track changes?

17          THE COURT:  No, I'm not asking that.

18          MR. RICHENTHAL:  Substantive commentary?  Both

19   wording, so to speak, and substantive commentary, if any?

20          THE COURT:  It would be most helpful, if you have an

21   objection to something, to tell me what the alternative is.  If

22   it is an objection to take out something, I only need to have

23   you express it in a way that I appreciate what you're asking

24   for.

25          MR. RICHENTHAL:  Understood.  By commentary, I meant

F58sLAS4                          Bat - direct

1    exactly that, the objection here is the reason, or something

2    like that.

3              THE COURT:  If it's just grammar, typo, just let us

4    know.  We also have put some questions in you probably would

5    want to respond.

6              MR. RICHENTHAL:  Okay.  Would it be possible for

7    Mr. Briggs to e-mail us a copy in Word?  That way we can,

8    perhaps, copy and paste sentences, if that would assist us in

9    sort of providing objections?

10             THE COURT:  Whatever Mr. Briggs tells you to send.

11             MR. RICHENTHAL:  Thank you.  Nothing further from us,

12   your Honor.  Have a nice weekend to all.

13             (Adjourned to May 11, 2015, at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2     Examination of:                                  Page

3     JOHN BURLING                                      695

4     Direct By Mr. Richenthal . . . . . . . . . . 695

5     Cross By Mr. Freeman . . . . . . . . . . . . 727

6     Redirect By Mr. Richenthal . . . . . . . . . 738

7     STEVEN GOLOFF

8     Direct By Mr. Richenthal . . . . . . . . . . 742

9     Cross By Mr. Freeman . . . . . . . . . . . . 856

10    Redirect By Mr. Richenthal . . . . . . . . . 899

11    Recross By Mr. Freeman . . . . . . . . . . . 902

12    IAN YANG

13    Direct By Ms. Greenberg . . . . . . . . . . 903

14    RICHARD PIZZUTI

15    Direct By Ms. Greenberg . . . . . . . . . . 907

16    THOMAS BAT

17    Direct By Mr. Richenthal . . . . . . . . . . 914

18

19

20

21

22

23

24

25

```
 1                        GOVERNMENT EXHIBITS

 2   Exhibit No.                                   Received

 3   2011      . . . . . . . . . . . . . . . . 718

 4   1046 and 1047   . . . . . . . . . . . . . 773

 5   1048      . . . . . . . . . . . . . . . . 775

 6   3004      . . . . . . . . . . . . . . . . 781

 7   3001      . . . . . . . . . . . . . . . . 786

 8   3002      . . . . . . . . . . . . . . . . 788

 9   1049      . . . . . . . . . . . . . . . . 824

10   1045      . . . . . . . . . . . . . . . . 836

11   3003      . . . . . . . . . . . . . . . . 844

12   3025      . . . . . . . . . . . . . . . . 905

13   901     . . . . . . . . . . . . . . . . . 910

14   902     . . . . . . . . . . . . . . . . . 911

15   903     . . . . . . . . . . . . . . . . . 912

16   904     . . . . . . . . . . . . . . . . . 912

17   301 through 313   . . . . . . . . . . . . 919

18   401 through 407   . . . . . . . . . . . . 924

19

20

21

22

23

24

25
```