# GALLET DREYER & BERKEY, LLP
ATTORNEYS AT LAW

October 27, 2015

**VIA ECF AND HAND DELIVERY**
Hon. Naomi Reice Buchwald
United States District Court
Daniel P. Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

      Re:    United States v. Lena Lasher
               Docket No. 12 Cr. 868 (NRB)

Dear Judge Buchwald:

      This firm represents defendant Lena Lasher on her appeal to the United States Court of Appeals for the Second Circuit. By order, dated October 21, 2015, the Second Circuit stayed Ms. Lasher's surrender to enable her to make this motion for bail pending appeal. Please accept this correspondence as a motion for bail pending appeal pursuant to 18 U.S.C. §3142.

**Procedural History**:

      At trial, Ms. Lasher was convicted of conspiracy to commit misbranding (18 U.S.C. §371), misbranding (21 U.S.C. §331), conspiracy to commit mail and wire fraud (18 U.S.C. §1349), mail fraud (18 U.S.C. §1341) and wire fraud (18 U.S.C. §1343). Following her conviction, Ms. Lasher's bail conditions were continued, without objection from the Government. (Tr. 1983-1984).[1]

      On September 2, 2015, Ms. Lasher was sentenced by this Court. Her base offense level was determined pursuant to the fraud sentencing guidelines whereby the Court determined the loss caused by Ms. Lasher's fraud by multiplying the number of victims by the average loss to each victim. (S. 26).[2] This Court determined that Ms. Lasher issued approximately 500 prescriptions per week at $64.00 per prescription for a loss amount of $1,664,000. (S. 26-28).

      Ultimately, this Court sentenced Lena Lasher to three years' imprisonment, to be followed by two years' supervised release and a forfeiture of $2.5 Million. At that time the Court ordered Ms. Lasher to surrender voluntarily to a designated Bureau of Prisons Facility by October 21, 2015, at 2:00 p.m. (S. 40). Again, the Government did not object to Ms. Lasher's voluntary surrender and her remaining at liberty for an additional seven week period (S. 40-41).

---

[1] References to "Tr." refer to pages of the trial transcript.
[2] References to "S." refer to pages of the sentencing transcript.

GALLET DREYER & BERKEY, LLP

Hon. Naomi Reice Buchwald
United States v. Lasher, 12 CR. 868(NRB)
October 27, 2015
Page 2

Ms. Lasher's trial counsel, Louis Freeman, Esq., did not move this Court for bail pending appeal at the time of sentence. Mr. Freeman filed a Notice of Appeal on September 11, 2015, shortly after which members of Ms. Lasher's family retained this firm to represent her on appeal to the Second Circuit.

On October 2, 2015 Ms. Lasher, by new counsel, promptly brought a motion for bail pending appeal to the Second Circuit, pursuant to F.R.A.P. Rules 8 and 9. Immediately following oral argument of the motion on October 20, 2015, the Circuit stayed Ms. Lasher's surrender order for the purpose of allowing counsel to move first in this Court for bail pending appeal. A copy of the Second Circuit's order is attached hereto as Exhibit "A".

Notably, in its opposition to Ms. Lasher's motion for bail pending appeal, and again at oral argument, the Government, which had previously consented to Ms. Lasher remaining on bail and voluntarily surrendering, now, for the very first time, referred to her as a "danger". (A. 6)[3]. This argument was implicitly rejected by the Second Circuit when it stayed Ms. Lasher's surrender order and allowed her to remain at liberty while she made an application to this Court for bail pending appeal.

**Statement of Facts**

Peter J. Riccio was a licensed pharmacist who owned and operated several pharmacies, including Hellertown Pharmacy in Hellertown, Pennsylvania and Palmer Pharmacy & Much More in Easton, Pennsylvania (the "Pharmacies"). According to the Government's witnesses, he hired the defendant, Lena Lasher, a licensed pharmacist, who served as Pharmacist-In-Charge of the Hellertown Pharmacy and also supervised at Palmer Pharmacy & Much More. (Tr. 1311). The Pharmacies were linked to Prescription Websites where a customer would choose which Prescription Drugs to order and complete an online medical questionnaire which asked a series of "yes" or "no" questions regarding medical history. (Tr. 92-111). The answers to these questionnaires were prepopulated and pre-approved, resulting in large numbers of these applications being approved by physicians who could scan and approve them in a matter of seconds without ever examining or speaking to the patient. (Tr. 685-700).

An undercover DEA investigator, Thomas Popowich, testified that he was able to order pain medications, including Tramadol, Fioricet, and "Soma" on at least four separate occasions. To do so, he used a prepopulated online questionnaire promulgated by the Pharmacies which did not require the submission of medical records or the discussion of his symptoms with a

---

[3] References to "A" refer to the Transcript of Oral Argument held before the United States Court of Appeals for the Second Circuit on October 20, 2015. Because arguments before the Second Circuit are audio recorded, and not transcribed, we had the recording transcribed as a courtesy to the Court. This transcript is attached hereto as Exhibit "B".

GALLET DREYER & BERKEY, LLP

Hon. Naomi Reice Buchwald
United States v. Lasher, 12 CR. 868(NRB)
October 27, 2015
Page 3

physician. (Tr. 94; 111). He testified that he employed fake names and mismatched credit card information. (Tr. 110).

Testimony from Dr. John Burling, a doctor who approved the internet prescriptions, indicated that the customer, and not the doctor, selected the type and quantity of the medication he or she would receive. (Tr. 705). Dr. Burling testified that he received $2.00 per prescription, and he approved nearly all of the prescriptions that came to him. (Tr. 684-685). Dr. Burling did not meet the patients for whom he authorized prescriptions, and could not verify the accuracy of the information they provided on the questionnaires. (Tr. 680; 696).

Once approved by a physician, the prescriptions were largely filled by pharmacy technicians at the Pharmacies, who were trained and supervised by Ms. Lasher (Tr. 216-217). The pharmacy technicians testified that they filled up to 500 prescriptions a day (Tr. 461). As much as 95% of the Pharmacies' business came from the internet across eight different web sites. (Tr. 457-458). Internet customers were paying exorbitantly high prices for medications. (Tr. 472). The pharmacy technicians testified that employees of the Pharmacies had no accurate way of determining whether these customers had placed orders across multiple websites. (Tr. 468; 556).

Pharmacy technicians also testified that Ms. Lasher instructed them to use code words when discussing internet pharmacy orders in order to conceal the nature of the business. (Tr. 346-348; 426). They further testified that they were told to avoid discussing the internet business over the phone or revealing to anyone which pharmacist was on duty. (Tr. 630).

According to the pharmacy technicians, they were instructed by Ms. Lasher to fill the bottles by weight, rather than counting pills, and either to change the labels on how to take the medication or misidentify the prescribing doctor. (Tr. 272-273; 486; 559; 580; 801; 881). Dr. Ian Yang and Dr. Julio Paredes testified that the Pharmacies filled prescriptions bearing their respective names, but which they neither authorized nor signed. (Tr. 904; 1279-1282).

The Government's witnesses testified that medications returned by customers, or otherwise marked "undeliverable" by the post office, were sometimes re-dispensed with different labels. (Tr. 325-327; 490). These medications were supposed to be destroyed or returned to the wholesaler, but instead, according to the technicians, employees would, at Lasher's direction, place the pills in new vials, and dispense them to other customers. (Tr. 331).

Medications were also stored improperly in "totes" where they were mixed with medications of varying lot numbers and expiration dates and supplied from different wholesalers. (Tr. 488-489). Inspectors from the Pennsylvania Department of State testified that Ms. Lasher lied to them about these practices during a surprise inspection and subsequent meeting. (Tr. 949).

GALLET DREYER & BERKEY, LLP

Hon. Naomi Reice Buchwald
United States v. Lasher, 12 CR. 868(NRB)
October 27, 2015
Page 4

      According to the Government witnesses, the Pharmacies served repeat customers from out-of-state bearing prescriptions for pain medication from doctors who were also out-of-state. (Tr. 357-358). Some of these customers came from as far away as Kansas or Ohio, with prescriptions from Florida, raising the specter that they were facially improper. (Tr. 610-613). Some of these customers were notably dirty with "faces sunken in.") (Tr. 612). Pharmacy employees testified that Ms. Lasher dismissed their concerns regarding these issues. (Tr. 613). Law enforcement surveillance witnesses confirmed customer traffic with license plates from all over the country, and a search of the Pharmacies' trash indicated shipments to various states. (Tr. 665-667). Moreover, the Pharmacies would repeatedly send multiple orders bearing different names to the same apartment. (Tr. 575). Pharmacy technicians testified that Lasher again disregarded their concerns regarding these issues. (Tr. 575).

      The Government called Carmen Catizone, Director of the National Association of Board of Pharmacy, as an expert witness. Ms. Catizone testified that a pharmacist has the legal responsibility to determine that the drug is safe for a patient, and that the prescription is valid pursuant to a legitimate "prescriber-patient relationship." (Tr. 986-987). Ms. Catizone further testified that a questionnaire which does not contain medical records, such as those promulgated by the Pharmacies through the internet, cannot be the basis of a valid "prescriber-patient relationship". (Tr. 992). Pharmacies should not, and cannot, fill prescriptions where there is no bona fide relationship between the prescriber and the patient. (Tr. 1003). Ms. Catizone averred that no state has rules and regulations permitting pharmacists to fill prescriptions based solely on such a questionnaire. (Tr. 1004-1005).

      Ms. Catizone also testified that the "black list" kept by the Pharmacies of patients who have indicators of drug abuse, lacked critical information needed to make it effective. (Tr. 1022-1023). A pharmacy has an obligation not to fill a prescription for addictive medication written to someone who had indications of drug abuse. (Tr. 1021).

      Ms. Catizone also noted that Pharmacies had improperly changed labels on medications without permission from the prescribing physician (Tr. 1045-1047) and reused medications that had been returned to the pharmacy by a patient. (Tr. 1048-1049). Both of these practices ran afoul of federal and state law. According to Ms. Catizone, the Pharmacies, under Lasher's supervision and direction, were acting improperly and illegally.

      The Government also called as a witness an internet customer of the Pharmacies who was apparently addicted to Tramadol. Amanda Walker testified that she received Tramadol from the Pharmacies through the internet. She stated that she falsified the online questionnaire and paid for the prescriptions herself with check or credit card. (Tr. 1130-1132). She nevertheless testified that she would not have ordered Tramadol from the Pharmacies had she known the medication had been previously dispensed and returned. (Tr. 1123-1138). Ms. Walker also

GALLET DREYER & BERKEY, LLP

Hon. Naomi Reice Buchwald
United States v. Lasher, 12 CR. 868(NRB)
October 27, 2015
Page 5

testified that she attended drug rehabilitation, and even after, she would continue to receive calls from the Pharmacies asking for repeat business. (Tr. 1133).

Ms. Lasher testified in her own defense. Ms. Lasher made a number of statements which contradicted the testimony of other witnesses including that she always instructed the pharmacy technicians to hand-count pills, and that all "totes" contained medications with matching lot numbers and expiration dates. (Tr. 1344; 1349-1350). Ms. Lasher also testified that she always destroyed returned drugs using any one of a number of methods. (Tr. 1372-1384). She further testified that she also contacted the doctors and various Government agencies when she had a suspicion about a prescription. (Tr. 1437-1441).[4]

## ARGUMENT

## THIS COURT SHOULD GRANT BAIL PENDING APPEAL

A.  The Legal Standard

Bail pending appeal is appropriate if: (i) the defendant can show by clear and convincing evidence that she is not likely to flee or pose a danger to others, and (ii) the appeal raises a substantial question that is likely to result in a reversal. 18 U.S.C. §3143(b). Here, there is zero likelihood of flight or danger, and the appeal will raise substantial questions likely to result in a reversal.

B.  Lena Lasher Poses No Danger to the Community

First, there is little question that Ms. Lasher is neither a danger to others nor is she likely to flee. Ms. Lasher was compliant with all of her pre-trial conditions, and attended trial and sentencing without issue. Indeed, she was even present in the Court of Appeals for the oral argument of her motion for bail pending appeal on October 20th, the day before her scheduled surrender. Of greater salience, prior to the motion for bail pending appeal, the Government consented to Ms. Lasher remaining at liberty, and voluntarily surrendering to a Bureau of Prisons facility. (Tr. 1983-1984; S. 40-41).

It was only after Ms. Lasher moved for bail pending appeal that the Government changed its tune and labeled her as a "danger." (A. 6). This argument was summarily dismissed by the Circuit, which stayed this Court's order requiring Ms. Lasher to surrender herself to a Bureau of

---

[4] At sentencing, Ms. Lasher's testimony was found to be false and perjurious. She was given a two point sentencing enhancement for obstruction of justice. (S. 29-32).

GALLET DREYER & BERKEY, LLP

Hon. Naomi Reice Buchwald
United States v. Lasher, 12 CR. 868(NRB)
October 27, 2015
Page 6

Prisons Facility on October 21, 2015. (Exhibit "A"). In fact, Judge Newman was openly skeptical of the Government's position, when he asked the Government at oral argument, "What's the danger, that she's going to go around lying some more?" (A. 6).

Ms. Lasher is a middle-aged woman with a family, and no prior criminal involvement. The Government's revised position with regard to her status as a "danger" must be rejected by this Court, as it was by the Second Circuit.

C.  The Evidence is Insufficient to Support the Fraud Convictions

The foregoing facts, as elicited by the Government at trial, present a straightforward case of misbranding pursuant to 21 U.S.C. §331. The Government focused the bulk of its case proving that Ms. Lasher improperly stored medications, redistributed pills that had been returned, improperly counted pills, distributed medications based on invalid prescriptions, and changed labels on medications. In fact, the Government treated the mail and wire fraud counts as an afterthought, introducing scant evidence at trial of any scheme to defraud customers of the Pharmacies.

The facts alleged, and proven at trial, do not support mail and wire fraud or a conspiracy to commit mail and wire fraud. Evidence regarding fraud was directed at the misbranding counts. The "fraud" was on the regulators, not on the customers who received what they had ordered over the internet. This conduct is appropriately dealt with in the enhanced penalties for misbranding with intent to defraud set forth in 21 U.S.C. §333. As shown below, the misrepresentations here do not go to the essence of the transaction between Ms. Lasher and the customers.[5]

The elements of a mail or wire fraud are: (1) a scheme to defraud; (2) money or property as the object of the scheme; and (3) the use of the mails or wires to further the scheme. See Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004), cert. denied, 544 U.S. 1017 (2005); United States v. Mittelstaedt, 31 F.3d 1208, 1216 (2d Cir. 1994); United States v. Wallach, 935 F.2d 445, 461 (2d Cir. 1991). To allege a sufficient mail or wire fraud, it is not required that the victim actually be harmed, only that the defendant contemplated actual harm or injury to the victim. See United States v. Wallach, supra; United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987).

---

[5] While this issue was not raised before this Court either before or after trial, it is cognizable in the Second Circuit under the plain error doctrine. See United States v. Glick, 142 F.3d 520, 523 (2d Cir. 1998) (failure to allege or prove the charged crimes of Mail Fraud, Wire Fraud, and Mail and Wire Fraud Conspiracy, is subject to "plain error" review)

GALLET DREYER & BERKEY, LLP

Hon. Naomi Reice Buchwald
United States v. Lasher, 12 CR. 868(NRB)
October 27, 2015
Page 7

As a matter of law the "scheme to defraud" must involve a misrepresentation that goes to the essence of the bargain. As the Second Circuit wrote in United States v. Starr, 816 F.2d 94 (2d Cir. 1987):

> "Misrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself."

Id. at 98-99. As Judge Newman noted in his concurrence: "regret at doing business with a company that defrauds the Government does not transform fraud upon the Government into a fraud upon the customer." Id. at 101.

The Second Circuit continued this reasoning in United States v. Shellef, 507 F.3d 82 (2d Cir. 2007) when it ruled that a fraud count cannot be predicated on a "no-sale" theory ("I would not have purchased if I knew"). In Shellef, the defendants induced Allied Signal to sell certain chemical solvents to their company by misrepresenting that the chemical solvents were for export only. It was important to Allied Signal that the chemical solvents were only to be sold outside the United States for excise tax purposes. This Circuit reversed the mail and wire fraud convictions, making clear that statements which are not an "essential element of the bargain," cannot constitute a scheme to defraud the under the fraud statutes:

> Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid – which do not violate the mail or wire fraud statutes – and schemes that depend for their completion on a misrepresentation of an essential element of the bargain – which do not violate the mail and wire fraud statutes....

Id. at 108.

Like Allied Signal in Shellef, the "victim" customers here received the product they paid for, and issues regarding labeling, lot numbers, and physician interactions were not "essential elements of the bargain." The elements of the bargain here are the receipt of prescription medication in exchange for money. The invalidity of the prescriptions due to a lack of a patient-physician relationship, which was a primary aspect of the misbranding emphasized by the Government at trial, was obvious to the patients who ordered their medications over the internet without ever being examined by a doctor. The fact the pills were not properly stored, or even that they were redistributed after being returned, and various other regulatory violations did not go to the essence of the bargain between the parties. Accordingly, the record is entirely devoid

GALLET DREYER & BERKEY, LLP

Hon. Naomi Reice Buchwald
United States v. Lasher, 12 CR. 868(NRB)
October 27, 2015
Page 8

of overt false statements by Ms. Lasher which induced the customers to purchase the prescription medications.

Rather, it appears that the Government's case rests on *implicit* assurances that the prescription medications ordered over the internet conformed to all regulatory requirements. Such *implicit* assurances are insufficient to form the basis for Mail and Wire Fraud charges or convictions. At best, they constitute misrepresentations or deceit of the *regulators*, not a fraud on the *customers* who received what they paid for. The problem here is that the Government sought to fit the square peg of a misbranding case which defrauded the regulators, into the round hole of a mail and wire fraud case, which did not defraud the customers.

Even the miscounting of the number of pills does not rise to the level of fraud on the customers. The Government argued that the customer victims received fewer pills than they purchased which was evidence of the mail and wire fraud. (Tr. 1826). The applicable testimony, however, was in reference to the misbranding, and the pills not being counted in the requisite manner, and, as such, was evidence of misbranding. Moreover, this improper method resulted in some customers receiving more than ordered, and some receiving less. Indeed, Thomas Popowich, an undercover DEA investigator, testified that he received more pills than he ordered. (T.104). The significance of this is that a "scheme to defraud" by selling fewer pills than a customer paid for was never proven. Accordingly, this claim falls short of the mark for mail or wire fraud. See United States v. Novak, 443 F.3d 150, 156) (2d. Cir. 2006) quoting United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987) ("While this language does not require the government to prove that the victims of the fraud were *actually* injured, the government 'must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims.'")

This brings us to the testimony of Amanda Walker, the only customer "victim" to testify at trial. Ms. Walker testified that she would not have purchased misbranded pharmaceuticals. (Tr. 1138). Accepting Ms. Walker's testimony as true, it is still insufficient to support a fraud conviction in that it amounts to nothing more than the "no-sale" theory of fraud rejected in Shellef, supra. Ms. Walker merely stated that she would not have bought the prescriptions had she known of the misbranding. These statements cannot support a fraud charge as a matter of law.

At trial, the Government attempted to mutate a simple misbranding case into a complex fraud on customers which was never alleged or proven. It could not succeed. The allegations and the evidence were insufficient to establish the crimes of conspiracy to commit mail and wire fraud or substantive mail and wire fraud. The issue is subject to plain error review in the Second Circuit, which is likely to reverse on this ground.

## GALLET DREYER & BERKEY, LLP

Hon. Naomi Reice Buchwald
United States v. Lasher, 12 CR. 868(NRB)
October 27, 2015
Page 9

B.   Ms. Lasher's Trial Was Tainted by the Improper Admission of Other Act Evidence

Ms. Lasher's trial was also tainted by the improper introduction of evidence regarding her distribution of OxyContin and Opium Tincture to addicted individuals. This evidence, which permeated the trial, was used for the improper purpose of tainting Ms. Lasher as someone who preyed upon vulnerable drug addicts. The admission of this evidence was improper as it was highly prejudicial, and lacked any probative value.

When it comes to the introduction of "other act" evidence, such as providing pills to addicts, the Second Circuit ordinarily follows an "'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." United States v. Curley, 639 F.3d 50, 56 (2d Cir. 2011) citing United States v. Pascarella, 84 F.3d 61, 69 (2d Cir.1996). In determining whether 404(b) evidence should be admitted, the court must find: (1) the prior crimes evidence was offered for a proper purpose; (2) the evidence was relevant to a disputed issue; (3) the probative value of the evidence was substantially outweighed by its potential for unfair prejudice pursuant to Rule 403. United States v. McCallum, 584 F.3d 471, 475 (2d Cir.2009) citing Huddleston v. United States, 485 U.S. 681, 691–92, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

Evidence that Ms. Lasher sold OxyContin and Opium Tincture to individuals coming from out-of-state, with physical indicia of drug addition, bears no relation to the elements of fraud or misbranding. Nor does it show opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. F.R.Evid. 404(b)(2). The introduction of such evidence served only to taint Ms. Lasher as a narcotics distributor, and prejudice the jury against her.

That such evidence is entirely irrelevant is especially true in an internet pharmacy case, where Ms. Lasher met few of the individuals who she sold pills to. In truth, Ms. Lasher's misbranding and her misrepresentations occurred independently of who actually received the prescriptions. As the Government proved at trial, Ms. Lasher filled over 95% of these prescriptions through the mail. (Tr. 457-458).

An error in the admission of evidence may be deemed harmless only if it is highly probable that the error did not contribute to the verdict. United States v. Jean–Baptiste, 166 F.3d 102, 108 (2d Cir.1999). Here, narcotics sales to out-of-state addicts permeated the trial. Such repeated references cannot be said to have had no impact on the jury. Accordingly, Ms. Lasher is likely to prevail on this issue in the Second Circuit.

## GALLET DREYER & BERKEY, LLP

Hon. Naomi Reice Buchwald
United States v. Lasher, 12 CR. 868(NRB)
October 27, 2015
Page 10

### Conclusion

Ms. Lasher comes before this Court now, after sentencing, seeking bail pending appeal at the direction of the Second Circuit. She presents no danger to the community or flight risk. She clearly has meritorious issues which are likely to result in a reversal. Accordingly, it is respectfully requested that this Court order that she remain at liberty as she purses her meritorious appellate issues.

Respectfully submitted,

Adam M. Felsenstein

cc:

**VIA ECF**
United States Attorney's Office
for the Southern District of New York
Attn: AUSA Daniel C. Richenthal

# EXHIBIT "A"

S.D.N.Y.
12-cr-868-2
Buchwald, J.

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 20th day of October, two thousand fifteen.

PRESENT:
    Jon O. Newman,
    Ralph K. Winter,
    José A. Cabranes,
             *Circuit Judges.*

---

United States of America,

             *Appellee,*           **ORDER**

v.                               15-2915-cr

Lena Lasher,

           *Defendant-Appellant.*

---

On October 2, 2015, defendant-appellant Lena Lasher moved for bail pending appeal. The Government opposed Lasher's motion.

The motion is DENIED. Because Lasher did not move in the District Court for an order continuing her release pending appeal, the present motion is improperly brought in this Court. We therefore "deny the motion, without prejudice to [her] seeking such relief in the district court" within seven days of entry of this order. *See United States v. Hochevar*, 214 F.3d 342, 342 (2d Cir. 2000). The surrender order is hereby STAYED pending further order of the District Court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

CERTIFIED COPY ISSUED ON OCTOBER 20, 2015

# EXHIBIT "B"

United States v. Lena Lasher, Docket No. 15-2915-cr

Motion for Bail Pending Appeal

Present:      John O. Newman
              Ralph K. Winter
              Jose A. Cabranes,
                     Circuit Judges.

Counsel:
              Daniel Richenthal
              Assistant United States Attorney
              for the Southern District of New York
                     For the Government.

              Gallet Dreyer & Berkey, LLP
              By: Roger L. Stavis
                     Attorneys for the Defendant, Lena Lasher.

**TRANSCRIPT OF ORAL ARGUMENT HELD ON OCTOBER 20, 2015**

1  JUDGE CABRANES: (Inaud.)...in which the clerk reports that everyone is ready, or should be ready, we'll
2  hear counsel in USA versus Lena Lasher.

3  MR. STAVIS: Good afternoon your Honors, may it please the Court, my name is Roger Stavis and I
4  represent Lena Lasher who is the moving party behind this application for bail pending appeal. I was
5  recently retained to represent Ms. Lasher after trial and after the filing of the Notice of Appeal, and I
6  make this application pursuant to §3143(b). With regard to the danger to the community and the risk of
7  flight, I can only quote what Mr. Richenthal, who is here before the court, has said on page 1984 of the
8  record, which is "we have no objection to Ms. Lasher continuing on bail." Of course now it's a different
9  story, Ms. Lasher has to report at Danbury tomorrow at 2 PM, and this application is brought for that
10 reason. When I first came into the case, your Honors, I noticed, and it was glaring at me, that mail fraud
11 was kind of an afterthought, kind of a throw-in, mail and wire fraud and mail and wire fraud conspiracy.
12 The case was a misbranding case, a misbranding with a fraud component, which is a felony, but I had to
13 go until the judge's instructions to learn who the victims were. The victims were, the judge said to the
14 jury in her instructions on page 1914, the customers. Your Honors, the customers received exactly what
15 they bargained for; they received their fioricet or their tramadol or whatever it was. As a regulatory
16 point of view, and that's the misbranding, the items might have the wrong labels on them, they might
17 not have the lot numbers on them, they might have been returned, but those are regulatory issues. And
18 I cited from your Honor Judge Newman's concurrence in the *Starr* case, where no fraud was found, and
19 your Honor said "it might be a fraud on the regulators, that's the misbranding, but it was not a fraud on
20 the customers, on the people who received." There was one witness whose name was Amanda Walker,
21 who testified on page 1138 of the transcript. She was asked a question "if you had known that the lot
22 numbers weren't on these prescription medications, if you had known that the instructions weren't
23 correct, and might have been returned, would you have nevertheless ordered these prescription
24 medications through the Internet?" and she testified "of course not."

25 JUDGE NEWMAN: As you frame the issue, is it that you think the indictment didn't state a crime, or the
26 evidence didn't show guilt?

27 MR. STAVIS: Both. Both, Your Honor. Absolutely.

28 JUDGE NEWMAN: Then, so now the question, the first question is going to be why wasn't this presented
29 in the District Court, on at least a bail motion?

30 MR. STAVIS: Well, Your Honor, first of all, the primary issue, and it's not the only issue, but the
31 application was brought on in some haste, the primary issue is this mail fraud issue, which is a plain
32 error review, which is to be reviewed by this court on plain error review. There was no objection, it was
33 missing completely; everyone just kind of assumed that maybe if you have a misbranding you also have
34 a...

35 JUDGE NEWMAN: That's why the error, if anything, is plain error review, but why does the bail motion
36 not go to the District Court first?

1  MR. STAVIS: Because, Your Honor, I came in after the Notice of Appeal, and under Rule 4(b) of the
2  Federal Rules of Appellate Procedure, there was no jurisdiction even at that point, because this court
3  had already accepted jurisdiction. So I come to this court with a novel issue, and an issue…

4  JUDGE NEWMAN: You're saying after a Notice of Appeal a bail motion cannot be made in the District
5  Court?

6  MR. STAVIS: Without the permission of the Court. Without the permission of this Court, which has
7  jurisdiction.

8  JUDGE NEWMAN: We said that?

9  MR. STAVIS: No, it's in…

10  JUDGE NEWMAN: It's in the Rules?

11  MR. STAVIS: Rule of Appellate Procedure §4(b)(5) which gives specific, actually one specific way that
12  there exists jurisdiction in the District Court, and that is for "an application under Rule 35(a)." Rule 4(b)
13  subdivision 5 jurisdiction, I'll read what it says. "The filing of a Notice of Appeal under this Rule 4(b)
14  does not divest the District Court, does NOT divest the District Court of jurisdiction to correct a
15  sentence." Therefore it divests the District Court of all other matters. The jurisdiction is now with this
16  court. And since the Notice of Appeal has been filed, that's why…and because it was not an issue

17  JUDGE NEWMAN: No, it says it doesn't divest them of jurisdiction for one thing, so you're inferring it
18  does divest it for everything else?

19  MR. STAVIS: That's correct, Your Honor.

20  JUDGE NEWMAN: Oh we have cases where there's a Notice of Appeal, and they go in for an injunction.

21  MR. STAVIS: That would be in a civil case.

22  JUDGE NEWMAN: Yeah.

23  MR. STAVIS: I'm unaware of that in…

24  JUDGE NEWMAN: It's not a carve-out. I'm just a little surprised that you're saying that because one
25  thing is specifically reserved, nothing else is.

26  MR. STAVIS: Yes, well explaining, in answer to…

27  JUDGE NEWMAN: Did you try? Did you go to the District Court and then get thrown out for lack of
28  jurisdiction?

29  MR. STAVIS: No, Your Honor. I did not.

30  JUDGE NEWMAN: Why?

1   MR. STAVIS: Because of this Rule, and the haste, and the fact that...it was a combination of things.
2   Because of this Rule, §4(b)(5), because of the haste on which I was bringing it, because of the fact that it
3   was not an issue that the judge had any familiarity with, it was totally not objected to in the record. It
4   was not an issue that the judge could weigh in or, under Rule 9, the Judge, the District Court Judge is
5   ordinarily in a better position. This Court's in a better position.

6   JUDGE NEWMAN: When did you file your motion here?

7   MR. STAVIS: Excuse me, your Honor?

8   JUDGE NEWMAN: When did you file your motion here?

9   MR. STAVIS: October 2nd.

10  JUDGE NEWMAN: October 2nd?

11  MR. STAVIS: Yes.

12  JUDGE NEWMAN: That's what, about three weeks ago?

13  MR. STAVIS: Yes. Yes.

14  JUDGE NEWMAN: So, on that day or the next day you could have just gone to the District Court and said
15  "Judge, how about bail pending appeal?" and if the judge says "don't bother me, there's no jurisdiction,"
16  that issue's taken care of.

17  MR. STAVIS: I didn't believe that the District Court had jurisdiction.

18  JUDGE NEWMAN: Well I understand you don't, but it would have been nice to have that cleared out, so
19  that we don't even have that as an issue here.

20  MR. STAVIS: It would have been nice, but I didn't believe the Court had jurisdiction, your Honor.

21  JUDGE CABRANES: Let's hear from the government.

22  MR. RICHENTHAL: May it please the Court, I'm Assistant United States Attorney Daniel Richenthal, I'm
23  one of the Assistant US Attorneys representing the government at trial. I represent the government
24  with respect to this motion, and anticipated appeal. First, the District Court did and, indeed, still does
25  have jurisdiction to entertain this motion. As this Court is no doubt aware, it is common and frequent
26  for defendants to file Notices of Appeal and move for bail pending appeal. We would be happy to file a
27  letter about the District Court's jurisdiction if this Court were inclined to hear further argument on this
28  issue. But in any event, this motion is devoid of any merit whatsoever. As framed by my adversary, it
29  might be meritorious, but that's entirely inconsistent with the evidence at trial. Customers did not get
30  what they bargained for. Customers got fewer pills than were written on a label. Customers got fewer
31  pills than they paid for. Customers got pills with instructions from an alleged doctor, that were not the
32  doctor's instructions, because Ms. Lasher had told her employees to alter them. No customer knew
33  that. The label looked like every label we all get at CVS. That is fraud. Customers also got pills that had

1   been returned by other customers; no indication of that on the label, which looked like an everyday
2   label.

3   JUDGE CABRANES: Before we continue on the merits, I want to go back to the concern stated by Judge
4   Newman. What would the government have us do in this case? Would you have us return...leave this
5   matter for the District Court?

6   MR. RICHENTHAL: As your Honor knows from my affirmation our view is, as a procedural matter, this
7   should have been filed in the District Court. And it's not the case that Judge Buchwald had no familiarity
8   with this case. She had had it four years, she had sentenced other defendants, she saw a two week
9   trial. She has intricate familiarity with this case. It should have been filed before Judge Buchwald, it was
10  not. However...

11  JUDGE CABRANES: What would you have us do?

12  MR. RICHENTHAL: In our judgment, the sole argument here, which is that the defendant's conviction on
13  a subset of the counts is insufficient, is so plainly without merit, that this court should rule on the
14  merits. As a procedural matter, it should have been filed before Judge Buchwald first, and we stand by
15  that position. She didn't just have jurisdiction, she's in a better position, respectfully, than this Court is.

16  JUDGE NEWMAN: Are you now saying that failure to do that deprives us of jurisdiction on the motion?

17  MR. RICHENTHAL: No, Your Honor. In the principal case cited in my affirmation, it's reasonably clear this
18  court found it's not a jurisdictional question, it was a discretionary question. And it's more appropriate
19  for it to be brought in the District Court.

20  JUDGE NEWMAN: What's the sentence?

21  MR. RICHENTHAL: The sentence here was three years.

22  JUDGE NEWMAN: What's the age of the Defendant?

23  MR. RICHENTHAL: I believe the defendant is forty-five or forty-six years old.

24  JUDGE CABRANES: The surrender date and time is tomorrow?

25  MR. RICHENTHAL: Is tomorrow.

26  JUDGE CABRANES: What time?

27  MR. RICHENTHAL: 2 PM. And I want to be clear about something, too. Not only is this an insufficiency
28  challenge with respect to a subset of the counts of conviction, it is an insufficiency challenge with
29  respect to that subset, that does not result in a statutory maximum below the sentence the defendant
30  received, does not result in a guideline range below the sentence the defendant received. It essentially
31  is a challenge that would result in nothing. Now, having waited four weeks to file her motion, and done
32  it in the first instance in this Court, the defendant has deprived this Court of Judge Buchwald's analysis
33  of what I'm saying. But the guideline range and the statutory maximum, even if the defendant's

challenge had merit, and it doesn't, but even if it did, those two things would be well above the sentence she received. And that is the only challenge she says she intends to make on appeal.

JUDGE NEWMAN: So if he is not successful here and goes to the District Court, which you think he should've, I take it he's not going to be met with the government argument that there's no jurisdiction?

MR. RICHENTHAL: Absolutely not, Your Honor. My personal experience is this is not a remotely unusual situation, for a defendant to change counsel or decide to try for bail pending appeal, having litigated sentencing motions and received a sentence that she doesn't like. But we do not intend to argue the District Court's without jurisdiction. Let me also note for the record, we did not consent to Ms. Lasher having bail pending appeal. That's just false. We consented her having bail between conviction and sentencing, not bail pending appeal. And the reason we didn't consent to bail pending appeal is she doesn't warrant it, as a matter of law. The only challenge here is plainly without merit. It's a subset of convictions, it's an insufficiency challenge, it's a challenge that ignores entire categories of evidence. People would get a bottle of pills, let's say 90, but there wouldn't be 90 pills in them.

JUDGE NEWMAN: There's no claim of risk of flight, or risk of danger.

MR. RICHENTHAL: We think there's actually a significant concern here about danger, in a very specific way. The defendant perjured herself at trial repeatedly. Judge Buchwald commented that in 35 years on the bench she had never seen this much perjury. The defendant sought to intimidate…

JUDGE NEWMAN: What's the danger, that she's going to go around lying some more?

MR. RICHENTHAL: The concern is obstructive conduct, your Honor. After her arrest…

JUDGE NEWMAN: But what's the danger? Danger to the community, isn't that the test?

MR. RICHENTHAL: We think danger in the community could account for obstructive conduct. Obstruction of justice in the form of witness tampering, in the hope that…

JUDGE NEWMAN: Witness tampering?

MR. RICHENTHAL: Yes, Your Honor. This defendant, after she was…

JUDGE NEWMAN: Do you have some basis to think there's a risk of…

MR. RICHENTHAL: We do, your Honor. After she was arrested, after she knew she'd been indicted, this defendant pressured two employees to sign false letters designed for the government. This came out at trial. This defendant filed a complaint with respect to a state licensing authority, against one of those defendants, after he started cooperating with the government. This defendant, at trial, then committed perjury to such a degree that Judge Buchwald commented, as I said, in more than 3 decades she had never seen it. That set of facts indicates a defendant who may well continue to engage in obstructive conduct. It's a concern we expressed in front of the District Court, it's a concern we might well express at this motion we're remanding. But…

1  JUDGE NEWMAN: It's an interesting theory.

2  MR. RICHENTHAL: Even if this court doesn't accept that theory, as I said, this is an insufficiency challenge
3  with respect to a subset of the convictions. It's an insufficiency challenge that ignores entire categories
4  of evidence. And it's an insufficiency challenge, that even if it were meritorious, would result in
5  nothing, because the sentence would still...the guidelines and the statutory maximum would still be far,
6  far above the sentence the defendant received. For all those reasons, the motion should be denied on
7  the merits, and in the event the Court would like to return it to the District Court, we will not argue the
8  District Court lacks jurisdiction, and we'll make the same arguments we're making today.

9  JUDGE CABRANES: Thanks very much. We'll reserve decision, and for obvious reasons we'll expect to
10 make a decision by mid-afternoon.